IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JANE AND JOHN DOES 1 through 100, individually and on behalf of a class of similarly situated disabled veterans,

Civil Action No. __________

CLASS ACTION

Plaintiffs,

v.

Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Clinton County Bar Association; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Lycoming County Law Association; Jenna Ann Neidig; North Penn Legal Services; Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of

Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network; Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union-Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference;

Defendants.

CLASS ACTION COMPLAINT

# Introduction

1. Plaintiff brings this class action to challenge the exclusion, confusion, retaliation, and denial of equal access that disabled veterans experienced

when Defendants controlled, funded, promoted, administered, endorsed, restricted, or preserved Wills for Heroes, Wills for Veterans, veterans service, legal aid, bar association, court connected, and public service legal structures.

2. Plaintiff seeks declaratory, injunctive, and monetary relief because disabled veterans were promised public service estate planning access, then received shifting eligibility statements, committee exclusion, event suspension, and retaliation against the people who tried to correct the problem.

## Parties

3. Plaintiff Jane/John Doe is a disabled veteran who brings this action individually and on behalf of similarly situated disabled veterans who needed clear, equal, nonretaliatory access to estate planning, veterans service legal programs, Wills for Heroes, Wills for Veterans, and related public service legal assistance.

4. Defendant Administrative Office of Pennsylvania Courts participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

5. Defendant American Bar Association participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.
6. Defendant Bloomsburg Fair Association participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.
7. Defendant Matthew W. Brann participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.
8. Defendant Heath Brosius participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.
9. Defendant Jessica Chapman participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

10. Defendant William R. Christman III participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

11. Defendant Mary Beth Clark participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

12. Defendant Committee on Rules of Practice and Procedure participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

13. Defendant Commonwealth of Pennsylvania participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

14. Defendant Mark J. Conway participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar

association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

15. Defendant Court of Judicial Discipline participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

16. Defendant Robert Cravitz participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

17. Defendant Doe Defendants 1 through 200 participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

18. Defendant Federal Judicial Center participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

19. Defendant Lori R. Hackenberg participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal

service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

20. Defendant International Legal Aid Group participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

21. Defendant Judicial Conduct Board of Pennsylvania participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

22. Defendant Heather Kelly participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

23. Defendant Brian Kerstetter participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

24. Defendant Robert Leadbeter participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

25. Defendant Legal Services Corporation participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

26. Defendant Kathleen Lincoln participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

27. Defendant Gabriele Miller Wagner participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

28. Defendant Lori Molloy participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

29. Defendant Jenna Ann Neidig participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

30. Defendant North Penn Legal Services, Inc. participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

31. Defendant Northumberland County Prothonotary Office participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

32. Defendant Office of Attorney General participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

33. Defendant Office of Disciplinary Counsel participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal

service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

34. Defendant Pennsylvania Bar Association participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

35. Defendant Pennsylvania Board of Law Examiners participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

36. Defendant Pennsylvania Department of Human Services participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

37. Defendant Pennsylvania Department of Military and Veterans Affairs participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public

service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

38. Defendant Pennsylvania General Assembly participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

39. Defendant Pennsylvania Legal Aid Network, Inc. participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

40. Defendant Supreme Court of Pennsylvania participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

41. Defendant Michael F. J. Piecuch participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal

service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

42. Defendant Jeffrey A. Rowe participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

43. Defendant Jamie Saleski participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

44. Defendant Alexandra Sholley participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

45. Defendant Timothy Smith participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

46. Defendant Snyder County participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar

association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

47. Defendant Snyder County STOP Coalition participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

48. Defendant Sarah Stigerwalt Egan participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

49. Defendant K. Michael Sullivan participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

50. Defendant David Andrew Strouse participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

51. Defendant Transitions Legal Center participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

52. Defendant Transitions of PA participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

53. Defendant David K. Trevaskis participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

54. Defendant Brian Ulmer participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

55. Defendant Union County participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

56. Defendant Union Snyder County Bar Association participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

57. Defendant Union County Criminal Justice Advisory Board participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

58. Defendant Union County Mental Health Advisory Committee participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

59. Defendant Union County STOP Coalition participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

60. Defendant United States Bankruptcy Court for the Middle District of Pennsylvania participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

61. Defendant United States Congress participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

62. Defendant United States Court of Appeals for the Third Circuit participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

63. Defendant United States District Court for the Middle District of Pennsylvania participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

64. Defendant United States Department of Health and Human Services participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

65. Defendant United States Judicial Conference participated in, controlled, funded, supported, ratified, failed to correct, benefitted from, or preserved the legal service, bar association, public service, veterans service, court connected, disciplinary, funding, or event access structures challenged in this complaint.

66. Defendant Clinton County Bar Association is a local county bar association in Clinton County, Pennsylvania, whose members participate in Clinton County legal, courthouse, public service, pro bono, and bar association structures affecting access to legal services for Clinton County residents and disabled veterans.

67. Clinton County Bar Association participated in the challenged conduct because Pennsylvania Bar Association Wills for Heroes officials directed SLAAY and Clinton County officials to coordinate with Clinton County Bar Association regarding the 2025 Clinton County Wills for Heroes event, volunteer recruitment, scheduling, and young lawyer participation, and

because Clinton County Bar Association accepted Martineau into its membership and pro bono structure while the broader Wills for Heroes dispute already involved disabled veteran eligibility confusion, bar association coordination, public service legal programming, and nonretaliatory access to estate planning services.

68. Defendant Lycoming Law Association is a nonprofit professional association of Lycoming County attorneys located at 25 West Third Street, Suite 803, Williamsport, Pennsylvania 17701, and it provides member services, legal community resources, continuing legal education, court information, local legal news, public service programming, charitable activity, pro bono involvement, and public-facing legal access structures in Lycoming County and surrounding communities.

69. Lycoming Law Association participated in the challenged conduct because it partnered with the Pennsylvania Bar Association in the 2025 Lycoming County Wills for Heroes program, publicly represented that the program would provide free wills, living wills, health care powers of attorney, and financial powers of attorney to active and retired first responders, military veterans, and spouses or partners, and then became part of the same regional Wills for Heroes access structure in which disabled veterans and their

advocates relied on bar-sponsored estate planning access while facing cancellation, exclusion, retaliation, and loss of timely wills.

## Jurisdiction and Venue

70. This Court has federal question jurisdiction over Plaintiff's federal constitutional, civil rights, disability rights, and federal statutory claims.

71. This Court has original federal question jurisdiction under 28 U.S.C. § 1331, which provides that "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," because this action arises under the United States Constitution, 42 U.S.C. §§ 1983, 1985, and 1986, Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act, and other federal civil rights statutes.

72. This Court has civil rights jurisdiction under 28 U.S.C. § 1343(a)(1), which grants district courts original jurisdiction over civil actions brought "to recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in furtherance of any conspiracy mentioned in section 1985 of Title 42," because Plaintiffs seek relief for conspiratorial deprivation of constitutional and statutory rights.

73. This Court has civil rights jurisdiction under 28 U.S.C. § 1343(a)(3), which grants district courts original jurisdiction over civil actions brought "to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution," because Plaintiffs challenge state-connected customs, practices, programs, public service legal structures, and retaliatory exclusion from access to public-facing legal services for disabled veterans.

74. This Court has jurisdiction over Plaintiffs' claims for declaratory relief under 28 U.S.C. § 2201(a), which provides that, "[i]n a case of actual controversy within its jurisdiction," a federal court may "declare the rights and other legal relations of any interested party seeking such declaration," because Plaintiffs seek declarations concerning ongoing legal obligations, retaliation, disability discrimination, equal access, public service legal programs, and the rights of disabled veterans and their advocates.

75. This Court has authority to grant further relief under 28 U.S.C. § 2202, which provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted," because Plaintiffs seek injunctive relief, corrective notice, damages, fees, costs, and other relief necessary to remedy the violations described in this complaint.

76. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a), which provides that district courts with original jurisdiction "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," because Plaintiffs' Pennsylvania constitutional, statutory, and common law claims arise from the same Wills for Heroes, Wills for Veterans, veterans service, disability access, retaliation, estate planning, bar association, public service legal program, and legal aid access facts as the federal claims.

77. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(1) because multiple Defendants reside in, maintain offices in, operate in, perform official duties in, conduct public service legal programming in, or are subject to personal jurisdiction in this District.

78. Venue is proper in the Middle District of Pennsylvania under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including events and omissions in Union County, Snyder County, Lycoming County, Clinton County, Northumberland County, Columbia County, Montour County, and related Pennsylvania legal service channels affecting disabled veterans in this District.

79. Venue is also proper because the challenged conduct includes planning, promotion, cancellation, restriction, suspension, exclusion, eligibility confusion, and retaliation involving Wills for Heroes, Wills for Veterans, veterans coalition meetings, county bar association programs, legal aid programs, public service legal events, court-connected legal structures, and public-facing estate planning services located in or directed into the Middle District of Pennsylvania.

80. Venue is proper as to the state, county, municipal, bar association, legal aid, nonprofit, and individual Defendants because Plaintiffs' injuries arose from conduct occurring in this District and from decisions that targeted disabled veterans, SLAAY, Martineau, local coalition partners, local bar participation, public service legal access, and estate planning programs in this District.

81. Venue is proper as to federal Defendants under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Plaintiffs seek relief concerning federal actors, federal judicial administration, federally connected legal aid structures, and federal funding or oversight structures that affected disabled veterans and public service legal access in this District.

82. The Middle District of Pennsylvania is the proper forum because the challenged facts center on disabled veterans and their advocates in central and northcentral Pennsylvania, including Wills for Heroes and Wills for Veterans access in Union, Snyder, Lycoming, Clinton, Columbia, Montour, and surrounding counties.

83. The Middle District of Pennsylvania is convenient for the parties and witnesses because the relevant disabled veterans, veterans coalition participants, bar association members, legal aid actors, county officials, court-connected actors, public service event participants, and documentary evidence are concentrated in this District.

84. This Court has personal jurisdiction over Defendants because Defendants reside in Pennsylvania, conduct business in Pennsylvania, perform official duties in Pennsylvania, operate legal aid, bar association, court-connected, veterans service, public service, or estate planning programs in Pennsylvania, directed relevant conduct into Pennsylvania, or participated in conduct causing injury in Pennsylvania.

## Class Allegations

85. Plaintiff brings this action for a class of disabled veterans who were excluded from, misled about, deterred from, or denied equal access to Wills

for Heroes, Wills for Veterans, veterans service legal programs, public service legal events, or related estate planning services because of Defendants' challenged conduct.

86. The class is sufficiently numerous because disabled veterans across the relevant Pennsylvania counties depended on public service legal programs, veterans coalitions, bar sponsored estate planning programs, and legal aid or nonprofit legal service channels to obtain documents they could not otherwise easily afford or access.

87. Common questions include whether Defendants used Wills for Heroes, Wills for Veterans, bar governance, veterans service channels, legal aid systems, court connected systems, public event access, and disciplinary pressure to deny disabled veterans equal access and retaliate against protected advocacy.

88. Plaintiff's claims are typical because Plaintiff suffered the same access barriers, uncertainty, exclusion, and loss of equal estate planning opportunity that affected other disabled veterans who relied on Defendants' public service legal structures.

89. Plaintiff will fairly and adequately protect the class because Plaintiff seeks equal access, corrective notice, nonretaliation, written eligibility standards,

restoration of services, damages, and prospective relief for all similarly situated disabled veterans.

## Statement of Facts

90. Plaintiff is a disabled veteran who needed legal service systems to treat disabled veterans as real people with urgent estate planning needs rather than as public relations props for bar controlled programs.

91. In 2025, the Pennsylvania Bar Association, Union-Snyder County Bar Association, Clinton County Bar Association, and Lycoming Law Association all violated the rights of veterans by cancelling veterans events solely because veterans' advocates were expressing First Amendment rights.

92. Plaintiff incorporates by reference Grohol v. NPLS, MDPA 4:26-1437, for additional facts.

93. The Lycoming Law Association was outrageously selfish, biased, unconstitutional, and harmful to disabled veterans when it illegally and unnecessarily cancelled a Wills for Heroes event because veterans' advocates were exercising constitutional rights to criticize the Wills for Heroes program for regularly excluding disabled veterans and planned to share those criticisms publicly.

94. The Clinton County Bar Association was outrageously selfish, biased, unconstitutional, and harmful to disabled veterans when it illegally cancelled an event because of the exercise of constitutional rights by veterans advocates.

95. The Pennsylvania Association was outrageously selfish, biased, unconstitutional, and harmful to disabled veterans when it illegally cancelled an event because of the exercise of constitutional rights by veterans advocates.

96. The Pennsylvania Department of Military Veterans was outrageously selfish, biased, unconstitutional, and harmful to disabled veterans when it illegally cancelled an event because of the exercise of constitutional rights by veterans advocates.

97. The PA DMVA also violated its own regulations, which prohibit it from participating in PBA Wills for Heroes events unless it participates to the same extent in similar events hosted by other private organizations.

98. Obviously, a bias that violates state or federal law is not in the public interest, so it violates the public interest for the PA DMVA to show favoritism through participating with the PBA, and it was in the public interest for veterans advocates to object to this bias by the PA DMVA in favor of the PBA, especially when the PBA does essentially no meaningful

work for veterans, and instead uses them as publicity pawns in photoshoots to increase the PBA's own popularity.

99. Courts have always held that it is incredibly selfish, biased, unconstitutional, and harmful to the public to cancel an event because of First Amendment activities.

100. Courts have always held that it is even more selfish, biased, unconstitutional and harmful to the public to blame the illegal event cancellation on the citizens who were exercising First Amendment rights.

101. Courts have always held that it is even more selfish, biased, unconstitutional and harmful to the public to cancel the event because of constitutionally protected activities when that event is providing desperately needed services the recipients otherwise cannot obtain.

102. According to what Courts have always said, the Lycoming Law Association was incredibly selfish, biased, unconstitutional and harmful to the public when it cancelled Wills for Heroes, and veterans activists who were advocating for veterans were not to blame, at all.

103. According to what Courts have always said, every time any other public interest entity or state actor has cancelled an event because of First Amendment activism, the Pennsylvania Bar Association was incredibly selfish, biased, unconstitutional and harmful to the public when it cancelled

Wills for Heroes, and veterans activists who were advocating for veterans were not to blame, at all.

104. According to what Courts have always said, every time any other public interest entity or state actor has cancelled an event because of First Amendment activism, the Clinton County Association was incredibly selfish, biased, unconstitutional and harmful to the public when it cancelled Wills for Heroes, and veterans activists who were advocating for veterans were not to blame, at all.

105. According to what Courts have always said, every time any other public interest entity or state actor has cancelled an event because of First Amendment activism, the Union-Snyder County Bar Association incredibly selfish, biased, unconstitutional and harmful to the public when it cancelled Wills for Heroes, and veterans activists who were advocating for veterans were not to blame, at all.

106. Of course, courts do not apply the same rules to Bar Associations, which spend millions of dollars lobbying to increase the power of the judiciary, that they apply to everyone else, so they have allowed and encouraged the bar associations to engage in incredibly selfish, biased, unconstitutional, and harmful decisions, and directly contributed to the harm to the public.

107. It was incredibly selfish, biased, unconstitutional and harmful to the public, especially disabled veterans, for the Clinton County Bar Association, Union-Snyder County Bar Associations, and Lycoming Law Associations, the Pennsylvania Department of Military Veterans, and the PBA to cancel Wills for Heroes, and refuse to provides pro bono wills to first responders and veterans, solely because veterans and veterans advocates were criticizing them for excluding disabled veterans from most Wills for Heroes events.

108. It was incredibly selfish, biased, unconstitutional, and harmful to the public for the Court to endorse and encourage the blatant constitutional violations by the Bar Associations and Department of Military Veterans, and to commit its own constitutional violations by illegally attributing the PA DMVA's illegal cancelling of the event to activists' lawful activities.

109. It was incredibly selfish, biased, unconstitutional and harmful to the public, especially disabled veterans, for the Office of Disciplinary Counsel to encourage behaviors that elevate the needs of lawyers over the needs of disabled veterans.

110. According to the Constitution, the government, not Bar Associations, should be responsible for pro bono legal programs, just like it is responsible for libraries.

111. However, the Bar Association took the power to administer pro bono programs away from the government based on the promise that they would adhere to higher standards than the Constitution requires in regulating the legal industry.

112. Obviously the Constitution would require the Bar Associations to welcome criticism, to welcome nonfrivolous lawsuits, and to refrain from engaging in any behavior that would deter either criticism or nonfrivolous lawsuits.

113. Obviously it is in the public interest to allow free discussion of criticism and litigation, at least according to the last several hundred years of constitutional law.

114. The Founding Fathers intended criticism to be directed more at judges and the judiciary than any other branch of government, especially by lawyers.

115. Bar associations have always promised that they will hold themselves to higher standards than the Constitution would require.

116. For hundreds of years, the Constitution, legislature, and courts have held that the First Amendment is essential to the public interest.

117. Bar Associations have always promised that they will welcome criticism more than other professions.

118. Bar Associations have lied.

119. The only reason veterans in Lycoming County are not getting wills is because the Lycoming Law Association made an outrageously harmful, unconstitutional, selfish, self-interested, and biased decision based on irrational and inappropriate emotion rather than law, rationality, fairness, or justice.

120. The only reason veterans in Clinton County are not getting wills is because the Pennsylvania Department of Military Veterans made an outrageously harmful, unconstitutional, selfish, self-interested, and biased decision based on irrational and inappropriate emotion rather than law, rationality, fairness, or justice.

121. Advocates exercising constitutional rights are not to blame for immature and histrionic overreactions by over-privileged state actors who cannot handle the slightest criticism and apparently lack the coping skills to deal with citizens exercising of First Amendment rights.

122. Doe will also be suing the same 39-member conspiracy identified in Grohol v. NPLS.

123. Congress enacted Constitutional provisions and statutes that provide remedies for both the client and a law firm if a group of people conspire to cause harm to the law firm, like burning a cross in its parking lot, or any

other retaliation, because of civil rights litigation, if that retaliation causes delay to the client's case.

124. If 39 judges and lawyers participated in a cross burning to intimidate an attorney from bringing claims against powerful people, both the attorney and client would have claims against the conspiracy. If 39 judges and lawyers participate in an illegal and obviously unconstitutional disciplinary investigation to intimidate an attorney from being claims against powerful power, both the attorney and the client have claims against the 39 member conspiracy.

125. After litigation began, local bar leadership cancelled or restricted meetings, withheld meeting access, and suspended membership through an unsigned communication without notice, reasons, hearing, or appeal.

126. Defendants' conduct chilled disabled veteran advocacy because it taught Plaintiff and other disabled veterans that asking for equal access could cause the cancellation of services, exclusion from public service programs, and punishment of the people willing to help them.

127. Plaintiff and the class suffered loss of estate planning access, loss of equal participation in veterans service legal programs, confusion, delay, reputational harm, deterrence from seeking help, loss of volunteer support, loss of coalition access, and loss of trust in public service legal systems.

# CAUSES OF ACTION

**Count 1-Failure to Follow Statute, Agency Rules, Nonendorsement Duties, and Public-Service Neutrality Standards for Preferential Treatment of PBA over Similar, Veteran-Run Business, Against Pennsylvania Department of Military and Veterans Affairs**

128. Plaintiff incorporates by reference all preceding paragraphs.

129. The elements of failure to follow statute, agency rule, agency policy, and mandatory public-service standard are a statute, rule, policy, directive, or established agency standard governing agency conduct; agency action subject to that authority; agency departure from that authority; causation; and injury.

130. Pennsylvania Department of Military and Veterans Affairs violated those requirements when it used official Commonwealth veterans-service authority, regional outreach channels, public-facing communications, and PA VETConnect-related coordination to prefer one private legal-service organization's Wills for Heroes or Wills for Veterans planning over other private organizations, bar associations, law firms, legal-aid providers, veterans-service partners, and estate-planning providers without neutral criteria, equal process, public standards, or nonpreferential referral procedures.

**51 Pa.C.S. § 714 PA VETConnect**

131. 51 Pa.C.S. § 714 establishes the PA VETConnect Program within Pennsylvania Department of Military and Veterans Affairs and authorizes participation by federal agencies, state agencies, county directors of veterans' affairs, veterans' service organizations, accredited postsecondary educational and technical institutions, health care providers, businesses, and nonprofit organizations.

132. 51 Pa.C.S. § 714 requires PA VETConnect to improve the health and well-being of veterans and veterans' families through referrals, community engagement, and consistent network communication.

133. 51 Pa.C.S. § 714 requires PA VETConnect to organize participating public and private entities to cooperate with network partners to provide proactive solutions to problems faced by veterans.

134. 51 Pa.C.S. § 714 requires the Department to develop and administer the program, clearly communicate its mission statement to network advocates, partners, and participants, and coordinate with federal agencies, state agencies, county directors of veterans' affairs, veterans' service organizations, educational institutions, health care providers, businesses, and nonprofit organizations that provide programs, initiatives, reintegration outreach, and related services to veterans and veterans' families.

135. The statutory structure does not authorize the Department to turn a public referral network into a preferred-private-provider channel.

136. The statutory structure does not authorize the Department to elevate one private organization's Wills for Heroes or Wills for Veterans event over another private organization's equivalent Wills for Heroes or Wills for Veterans event without neutral criteria and equal referral treatment.

137. The statutory structure instead requires a coordinated network in which multiple public and private participants cooperate to serve veterans, and that structure is violated when an agency uses the network to favor one private participant over another in the same service category.

138. On July 28, 2025, the PA DMVA announced in an email that it would be treating a veteran-run organization with substantially less favorable treatment and endorsement for estate planning events than it provides to the Pennsylvania Bar Association, which is a private corporation with profits of millions of dollars per year.

139. The PBA regularly excludes veterans from their events, and is not run by a veteran, while the organization seeking to serve veterans never excludes veterans from their events, and donates thousands of hours of time per year serving veterans, without funding.

140. The Department therefore failed to administer PA VETConnect as a neutral, consistent, cooperative resource network and instead used the network to prefer one private organization in a disputed legal-service program.

141. This also violates statements in PA VETConnect Implementation Materials. See, attached, Exhibit A; ("The Pennsylvania Department of Military and Veterans Affairs does not endorse the organizations sponsoring events mentioned in this newsletter, and we do not endorse the views they express or the products/ services they offer. The views and opinions expressed in any referenced document do not necessarily state or reflect those of DMVA. The information provided is intended for your general knowledge only, and serves solely as a DMVA community outreach effort"); ( "DMVA does not recommend one agency, organization, service provider, program, resource, or service over another.")

**Executive Order 1980-18 and the Governor's Code of Conduct**

142. Executive Order 1980-18 promulgates the Governor's Code of Conduct for Commonwealth officials and employees and is grounded in the need to preserve public confidence in Commonwealth government.

143. The Code of Conduct prohibits an Executive Branch employee, appointee, or official from engaging directly or indirectly in business transactions or private arrangements for profit that accrue from or are based on official position or authority.

144. The Code of Conduct prohibits an Executive Branch employee, appointee, or official from representing or acting as agent for a private interest in a transaction in which the State has a direct and substantial interest and where that role could reasonably be expected to create a conflict between the private interest and the official State responsibility.

145. The Code of Conduct prohibits use of Commonwealth equipment, supplies, or property for private gain or for purposes other than officially designated purposes.

146. The Code of Conduct requires Executive Branch employees and officials to avoid conduct inconsistent with impartial administration of official duties.

147. The July 28, 2025 email used Commonwealth position, Commonwealth contact channels, Commonwealth outreach authority, and a Commonwealth veterans-service network to direct public and private veterans-service participants to one private legal-service organization's representatives for Wills for Heroes or Wills for Veterans planning.

148. That use of official authority created at least the appearance that one private organization had received Commonwealth-preferred planning status over other private organizations in the same legal-service field.

149. That use of official authority was inconsistent with impartial administration because it placed the Department's communication power behind one private organization's planning channel without a neutral process for other private entities seeking equal participation in veterans estate-planning services.

**65 Pa.C.S. § 1103**

150. 65 Pa.C.S. § 1103 prohibits a public official or public employee from engaging in conduct that constitutes a conflict of interest.

151. 65 Pa.C.S. § 1103 also prohibits seeking to improperly influence the vote, official action, or judgment of a public official or public employee.

152. The conduct described above violated or created a substantial risk of violating the Ethics Act because it used public office authority to confer a private operational advantage in veterans legal-service coordination without neutral criteria, competitive process, or equal treatment of similarly situated private organizations.

**4 Pa. Code § 1.4 Index of Issuances MD 205.40, 205.42**

153. 4 Pa. Code § 1.4 indexes executive orders, management directives, and other Governor's Office issuances that apply to Commonwealth agencies.

154. MD 205.40 applies to agency communications, including public-facing documents and materials such as press releases, marketing materials, web design, brochures, signage, pamphlets, business cards, emails, and digital platforms.

155. MD 205.40 requires agencies to use Commonwealth branding standards as agency communications are developed, disseminated, updated, and maintained.

156. MD 205.40 states that Commonwealth branding is designed to foster consistency and build a strong Commonwealth brand.

157. MD 205.40 warns that Commonwealth logos and branding must not be shared freely, broadly, or casually and may be shared with trusted third parties only with clear limitations on their use.

158. MD 205.40 requires branded communications to be managed and approved through agency press or communications offices and, where required, through the Governor's Office of Digital Strategy.

159. The PA DMVA violates these rules by lending its brand to the PBA events, but refusing to do so for similar events by veteran-led organizations.

160. That communication implicated MD 205.40 because it used a Commonwealth agency communication channel to create the appearance of official Commonwealth recognition, approval, or preference for one private legal-service organization's planning role.

161. The Department violated MD 205.40 by using Commonwealth communication authority in a manner that was not neutral, was not limited, was not criteria-based, and was not consistent with a nonendorsement rule that protects the Commonwealth brand from becoming a private organization's promotional or operational advantage.

162. MD 205.42 Authorized Use of Social Media on Behalf of the Commonwealth establishes policy, responsibilities, and procedures for authorized use of social media on behalf of the Commonwealth.

163. MD 205.42 applies to departments, offices, boards, commissions, and councils under the Governor's jurisdiction.

164. MD 205.42 requires communications on behalf of the Commonwealth through social media to comply with Commonwealth policy, responsibilities, and procedures.

165. MD 205.42 states that social media must never be used in a manner that violates other Commonwealth directives and policies, including

Executive Order 1980-18, the Code of Conduct, personnel rules, and Commonwealth nondiscrimination policies.

166. To the extent DMVA repeated, promoted, posted, republished, or maintained the July 28, 2025 designation through social media, websites, digital platforms, or related Commonwealth digital channels, the Department also violated MD 205.42.

167. The social-media rule matters because the same nonpreferential and nonendorsement principles that govern agency conduct and communications also govern Commonwealth digital communication channels.

168. Taken together, these statutes, rules, directives, and agency standards required Pennsylvania Department of Military and Veterans Affairs to administer veterans referrals, veterans outreach, public communications, event publication, digital communications, and private-provider coordination neutrally, consistently, and without recommending or preferring one agency, organization, service provider, program, resource, or service over another.

169. The Department violated that combined legal duty by using official DMVA regional outreach authority to identify SLAAY representatives as the Wills for Heroes or Wills for Veterans planning contacts, while simultaneously participating more in PBA Wills for Heroes channels than in SLAAY's equivalent Wills for Heroes or Wills for Veterans channels and

failing to provide equal, neutral, written criteria for private organizations offering veterans estate-planning services.

170. The Department's violation harmed disabled veterans because they needed neutral, reliable, and nonretaliatory information about estate-planning services, not agency communications that could be used by competing private organizations to claim endorsement, preference, displacement, or official recognition.

171. The Department's violation harmed Plaintiff and the class because disabled veterans lost the benefit of a neutral PA VETConnect resource network, lost trust in DMVA referral channels, lost clear information about Wills for Heroes and Wills for Veterans access, and became dependent on a disputed private-provider structure rather than a neutral public veterans-service referral system.

172. The Department's violation also harmed the integrity of veterans-service coordination because it placed the Commonwealth's communication authority inside a private dispute among bar associations, legal-service providers, veterans coalitions, and estate-planning program actors.

173. Plaintiff and the class are entitled to declaratory relief stating that Pennsylvania Department of Military and Veterans Affairs violated 51 Pa.C.S. § 714, its PA VETConnect nonrecommendation rule, its event-

publication nonendorsement rule, Executive Order 1980-18, the Governor's Code of Conduct, 65 Pa.C.S. § 1103, MD 205.40, and MD 205.42 by preferring or appearing to prefer one private organization's Wills for Heroes or Wills for Veterans planning over another without neutral written criteria.

174. Plaintiff and the class are entitled to injunctive relief requiring Pennsylvania Department of Military and Veterans Affairs to use written neutral referral standards, equal event-publication standards, nonendorsement language, nonrecommendation language, private-provider neutrality rules, and a uniform process for all private organizations seeking to provide Wills for Heroes, Wills for Veterans, estate-planning, or related legal-service outreach to veterans.

175. Plaintiff and the class are entitled to corrective notice, preservation of records, neutral referral procedures, equal access to DMVA veterans-service outreach channels, damages where available, costs, fees where available, and all other lawful relief.

**Count 2-ADA Title II Discrimination Against Pennsylvania Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; and Does**

176. Plaintiff incorporates by reference all preceding paragraphs.

177. The elements of ADA Title II discrimination are a qualified individual with a disability, exclusion from or denial of the benefits of a public entity service, program, or activity, and exclusion or denial by reason of disability.

178. Plaintiff and the class satisfy the qualified disability requirement because they are disabled veterans who needed estate planning, Wills for Heroes, Wills for Veterans, veterans service programs, public service legal events, and related legal service assistance.

179. Plaintiff and the class satisfy the public service benefit requirement because Defendants controlled, supported, promoted, administered, endorsed, restricted, or preserved state connected veterans service channels, court connected legal service channels, bar connected public service programs, and Wills for Heroes access.

180. Plaintiff and the class satisfy the exclusion requirement because Defendants gave disabled veterans shifting eligibility information, allowed contradictory statements about whether veterans could receive wills, failed to provide written eligibility standards, suspended planning, and blocked the representatives who tried to correct the problem.

181. Plaintiff and the class satisfy the disability causation requirement because Defendants knew disabled veterans were the group harmed by the

eligibility confusion and still refused clear access, effective communication, inclusive planning, reasonable modification, and equal participation.

182. Plaintiff and the class suffered injury because disabled veterans lost reliable estate planning access, lost trust in veterans service legal programs, delayed or avoided seeking help, and lost the benefit of the planning infrastructure built to serve them.

183. Defendants violated ADA Title II because they used public entities, state connected veterans service channels, bar connected public service legal programs, county connected public service access, public facing veterans events, Wills for Heroes, Wills for Veterans, and related estate planning access systems to deny disabled veterans equal and meaningful access to estate planning services, veterans service legal programs, public facing outreach, and related public service legal benefits.

184. Pennsylvania Bar Association satisfies the disability element because Plaintiff and the class are disabled veterans who needed estate planning access, Wills for Heroes access, Wills for Veterans access, veterans service coordination, and public service legal programs.

185. Pennsylvania Bar Association satisfies the qualification element because disabled veterans were within the class of people served by Wills

for Heroes, Wills for Veterans, veterans service legal programs, public facing estate planning services, and related public service legal access.

186. Pennsylvania Bar Association satisfies the public service or state connected program element because it used statewide bar authority, Wills for Heroes program authority, public service legitimacy, statewide professional influence, and veterans service legal programming that functioned with public facing and state connected legal service authority.

187. Pennsylvania Bar Association satisfies the exclusion or denial element because favored Wills for Heroes participants and noncritical bar actors remained able to participate while disabled veteran advocates were restricted, banned, and removed from the program structure after seeking equal access for disabled veterans.

188. Pennsylvania Bar Association satisfies the by reason of disability element because it preserved program control and reputation protection after disabled veterans received contradictory eligibility information, instead of providing clear access, written standards, reasonable modification, effective communication, or nonretaliatory correction for disabled veterans.

189. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban

removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

190. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, lost trust in statewide bar public service programs, and lost the benefit of representatives willing to correct exclusion.

191. Union Snyder County Bar Association satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to estate planning, veterans service legal programs, Wills for Heroes, and Wills for Veterans.

192. Union Snyder County Bar Association satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans coalition referrals, and related public service legal access.

193. Union Snyder County Bar Association satisfies the public service or state connected program element because it used county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

194. Union Snyder County Bar Association satisfies the exclusion or denial element because favored insiders controlled planning while disabled veterans and the representatives raising their concerns received confusion, delay, committee exclusion, service suspension, and retaliation.

195. Union Snyder County Bar Association satisfies the by reason of disability element because it allowed contradictory statements about whether veterans could receive wills, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates instead of providing effective communication, reasonable modification, written standards, and equal access for disabled veterans.

196. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

197. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, lost timely public service opportunities, and were forced to rely on litigation for corrective relief.

198. William R. Christman III satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to Wills for Heroes, Wills for Veterans, and related statewide public service estate planning services.

199. William R. Christman III satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans service legal programs, and public facing estate planning services.

200. William R. Christman III satisfies the public service or state connected program element because he used Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

201. William R. Christman III satisfies the exclusion or denial element because he allowed favored Wills for Heroes participants and volunteers to remain inside the program while barring Plaintiff's representatives after they advocated for disabled veterans, discussed subpoenas, and raised potential litigation.

202. William R. Christman III satisfies the by reason of disability element because he treated disabled veteran access advocacy as a reason to restrict participation instead of treating it as a reason to correct eligibility confusion, provide effective communication, and preserve disabled veteran access.

203. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

204. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

205. Gabriele Miller Wagner satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to Wills for Heroes, Wills for Veterans, statewide training, and estate planning coordination.

206. Gabriele Miller Wagner satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes,

Wills for Veterans, veterans service legal programs, and statewide public service estate planning access.

207. Gabriele Miller Wagner satisfies the public service or state connected program element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

208. Gabriele Miller Wagner satisfies the exclusion or denial element because disabled veteran advocates were subjected to participation restrictions while other Wills for Heroes participants, volunteers, and organizers remained eligible to participate without comparable exclusion.

209. Gabriele Miller Wagner satisfies the by reason of disability element because statewide Wills for Heroes channels did not restore Plaintiff's representatives to full participation after disabled veteran access objections and did not ensure that local exclusion would not deprive disabled veterans of service.

210. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service

channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

211. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, and lost access to the representatives who were trying to preserve estate planning services.

212. David K. Trevaskis satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to Wills for Heroes, Wills for Veterans, statewide guidance, and estate planning services.

213. David K. Trevaskis satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans service legal programs, and public facing estate planning services.

214. David K. Trevaskis satisfies the public service or state connected program element because he used Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

215. David K. Trevaskis satisfies the exclusion or denial element because statewide Wills for Heroes leadership allowed favored organizers to remain in the program while the advocates raising disabled veteran concerns were restricted from participation.

216. David K. Trevaskis satisfies the by reason of disability element because statewide Wills for Heroes leadership did not remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or Plaintiff's representatives.

217. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

218. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, lost timely estate planning opportunities, and lost the practical benefit of statewide intervention.

219. K. Michael Sullivan satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to local Wills for Heroes, Wills for Veterans, and public service estate planning programs.

220. K. Michael Sullivan satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans service legal programs, and related estate planning services.

221. K. Michael Sullivan satisfies the public service or state connected program element because he used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

222. K. Michael Sullivan satisfies the exclusion or denial element because he allowed favored bar planning to be controlled by insiders while disabled veteran advocates were excluded, contradicted, and pressured to drop claims before services would proceed.

223. K. Michael Sullivan satisfies the by reason of disability element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections.

224. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

225. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, and faced delay because the local program was controlled by actors who would not correct the access problem.

226. Sarah Stigerwalt Egan satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to local Wills for Heroes, Wills for Veterans, and public service estate planning programs.

227. Sarah Stigerwalt Egan satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans service legal programs, and related estate planning services.

228. Sarah Stigerwalt Egan satisfies the public service or state connected program element because she used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning

authority, bar authority, public service legal authority, and access control authority.

229. Sarah Stigerwalt Egan satisfies the exclusion or denial element because favored insiders kept control of the program while disabled veteran advocates were excluded from planning and then blamed for the loss of services.

230. Sarah Stigerwalt Egan satisfies the by reason of disability element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled veteran access objections.

231. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled veteran concerns from being resolved before the program collapsed.

232. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

233. Mary Beth Clark satisfies the disability element because Plaintiff and the class are disabled veterans who needed equal access to legal aid, local

pro bono infrastructure, Wills for Heroes, and public service estate planning programs.

234. Mary Beth Clark satisfies the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans service legal programs, local legal aid access, and public facing estate planning services.

235. Mary Beth Clark satisfies the public service or state connected program element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

236. Mary Beth Clark satisfies the exclusion or denial element because insiders who opposed Plaintiff's representatives retained influence while disabled veteran advocates were marginalized after access advocacy, litigation threats, and criticism.

237. Mary Beth Clark satisfies the by reason of disability element because she participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning and preserved insider control

over public service legal programs instead of protecting disabled veteran access.

238. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled veteran access.

239. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

240. Does 1 through 100 satisfy the disability element because Plaintiff and the class are disabled veterans who needed equal access to Wills for Heroes, Wills for Veterans, veterans service legal programs, estate planning services, and public service outreach.

241. Does 1 through 100 satisfy the qualification element because disabled veterans were eligible or intended beneficiaries of Wills for Heroes, Wills for Veterans, veterans service programs, public facing estate planning services, public event outreach, and related legal service access.

242. Does 1 through 100 satisfy the public service or state connected program element because they include unknown bar members, officers,

employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, and communications participants who supported or preserved the challenged access structures.

243. Does 1 through 100 satisfy the exclusion or denial element because they treated disabled veterans and their advocates as less important than bar reputation, insider control, program comfort, and retaliation avoidance while favored insiders and noncritical participants retained access.

244. Does 1 through 100 satisfy the by reason of disability element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, or retaliation against disabled veteran advocates.

245. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, or ratification helped cause the denial, cancellation, restriction, or obstruction of disabled veteran estate planning access.

246. Does 1 through 100 satisfy the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, and trust in the legal service systems that claimed to serve them.

247. Plaintiff and the class suffered injury because disabled veterans lost equal estate planning access, lost trust in public service legal programs, lost access to the representatives who built and preserved the program, and were forced to depend on systems that favored institutional comfort and program reputation over disabled veteran need.

248. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, written reasonable modification standards, written effective communication standards, written nonretaliation standards, costs, fees where available, and all other lawful relief.

**Count 3A-Equal Protection Disability Discrimination Against Pennsylvania Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark;; and Does 1 through 100**

249. The elements of Equal Protection Disability Discrimination are state action or state connected action, differential treatment of disabled persons or advocates for disabled persons, discriminatory purpose or irrational disability based treatment, causation, and injury, with strict scrutiny as the appropriate standard.

250. Plaintiff and the class plead this equal protection claim from the constitutional text itself.

251. Case law and precedent were never supposed to be primary sources of law in the United States.

252. Case law and precedent, according to the Constitution, are as relevant to a legal case any secondary source, like journal articles or scholarly works.

253. In a democracy, as opposed to a monarchy, it simply does not matter how a different human interpreted a law, different judges can look at the same statute and decide differently, and that's democracy.

254. The Fourteenth Amendment states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

255. That text protects "any person," not only the categories of persons that courts later decided deserved heightened scrutiny.

256. Disabled veterans are persons within the ordinary meaning of the word "person," and the Equal Protection Clause therefore applies to disabled veterans by its own terms.

257. The Constitution does not say that disabled persons receive lesser equal protection.

258. The Constitution does not say that courts may create tiers of human constitutional status.

259. The Constitution does not say that disabled people receive rational-basis equal protection, women receive intermediate equal protection, racial minorities receive strict-scrutiny equal protection, and favored judicial categories receive more protection than disfavored judicial categories.

260. Those categories come from case law, not from the Fourteenth Amendment.

261. Case law is irrelevant.

262. Article I vests "[a]ll legislative Powers herein granted" in Congress. U.S. Const. art. I, § 1.

263. Article III vests "[t]he judicial Power" in the federal courts. U.S. Const. art. III, § 1.

264. Article V provides the constitutional process for amendment. U.S. Const. art. V.

265. No provision of the Constitution authorizes courts to amend "any person" into "some persons," to amend "equal protection" into "reduced protection," or to enact a judge-made hierarchy of constitutional persons through opinions rather than constitutional amendment.

266. Until the Constitution is amended to vest legislative power in courts, case law is not lawmaking authority that can override the Constitution.

267. Until the Constitution is amended to exclude disabled people from the phrase "any person," disabled veterans remain fully protected persons under the Equal Protection Clause.

268. Plaintiff and the class therefore preserve the argument that City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432 (1985), Board of Trustees of the University of Alabama v. Garrett, 531 U.S. 356 (2001), and similar scrutiny-tier decisions cannot control this textual claim to the extent they reduce the protection guaranteed by the Fourteenth Amendment's plain words.

269. Those decisions may describe existing judge-made doctrine, but they do not amend the Constitution, do not remove disabled people from the word "person," do not add a disability exception to the Equal Protection Clause,

and do not create constitutional authority for state-connected actors to deny disabled veterans equal treatment in public-facing legal service programs.

270. Defendants cannot identify a compelling governmental interest in giving disabled veterans less reliable access to Wills for Heroes, Wills for Veterans, veterans service programs, public service legal events, and related estate planning assistance than non-disabled participants, favored insiders, favored volunteers, and noncritical program actors received. U.S. Const. amend. XIV, § 1.

271. Defendants cannot justify treating disabled veterans as a lower priority than program reputation, insider control, administrative convenience, or the comfort of the actors who controlled the estate planning programs, because none of those interests supplies a compelling reason to deny equal access to persons protected by the Equal Protection Clause. U.S. Const. amend. XIV, § 1.

272. Defendants also failed narrow tailoring because written eligibility standards, uniform public notice, equal intake rules, neutral scheduling, accessible communication, and non-discriminatory program administration would have preserved any legitimate program interest while giving disabled veterans the same clear access provided to other eligible participants. U.S. Const. amend. XIV, § 1.

273. Defendants instead preserved contradictory eligibility information, refused written standards, allowed favored actors to retain control, suspended or cancelled access, and left disabled veterans with less dependable estate planning service than similarly situated non-disabled or favored participants, which fails even the Court's most demanding judge-made equal protection test. U.S. Const. amend. XIV, § 1.Defendants violated the Equal Protection Clause because disabled veterans are persons; Defendants used state-connected, county-connected, bar-connected, veterans-service, and public-service legal structures; and Defendants treated disabled veterans and their advocates worse than favored insiders, favored volunteers, favored public-service participants, and noncritical program actors by giving disabled veterans shifting eligibility information, refusing written standards, suspending services, excluding corrective advocates, and protecting institutional comfort over equal access to Wills for Heroes, Wills for Veterans, and equivalent estate-planning services.

274. Plaintiff and the class satisfy the state action or state connected action requirement because disabled veterans were denied equal access through public facing, state connected, county connected, bar connected, veterans service, and legal service channels that Defendants controlled, supported, promoted, administered, endorsed, restricted, or preserved.

275. Plaintiff and the class satisfy the differential treatment requirement because disabled veterans and their advocates received shifting eligibility information, contradictory statements about whether veterans could receive wills, exclusion from planning, cancellation or suspension of services, and retaliation, while favored insiders, favored volunteers, noncritical bar actors, and non-disabled public service participants retained access and control.

276. Plaintiff and the class satisfy the discriminatory purpose or irrational disability based treatment requirement because Defendants knew disabled veterans were the group harmed by the Wills for Heroes and Wills for Veterans eligibility confusion and still refused clear eligibility standards, effective communication, inclusive planning, reasonable modification, nonretaliatory correction, and equal participation.

277. Plaintiff and the class satisfy the causation requirement because Defendants' control, restrictions, cancellations, suspensions, contradictory eligibility statements, refusal to correct misinformation, and retaliation against disabled veteran advocates caused disabled veterans to lose reliable estate planning access and the benefit of the planning infrastructure built to serve them.

278. Plaintiff and the class satisfy the injury requirement because disabled veterans lost equal estate planning access, lost timely wills, lost trust in

public service legal programs, delayed or avoided seeking help, lost access to the representatives who built and preserved the program, and were forced to rely on systems that favored institutional comfort and program reputation over disabled veteran need.

279. Defendants violated equal protection because they used state connected veterans service channels, bar connected public service legal programs, county connected public service access, public facing veterans events, Wills for Heroes, Wills for Veterans, and related estate planning access systems to treat disabled veterans and disabled veteran advocates worse than favored insiders, favored volunteers, favored public service participants, and noncritical program actors.

280. Pennsylvania Bar Association satisfies the state action or state connected action element because it used statewide bar authority, Wills for Heroes program authority, public service legitimacy, statewide professional influence, and access to veterans service legal programming that functioned with public facing and state connected legal service authority.

281. Pennsylvania Bar Association satisfies the differential treatment element because favored Wills for Heroes participants and noncritical bar actors remained able to participate while disabled veteran advocates were

restricted, banned, and removed from the program structure after seeking equal access for disabled veterans.

282. Pennsylvania Bar Association satisfies the discriminatory purpose or irrational disability based treatment element because it preserved program control and reputation protection after disabled veterans received contradictory eligibility information, instead of providing clear access, written standards, or nonretaliatory correction.

283. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

284. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, lost trust in statewide bar public service programs, and lost the benefit of representatives willing to correct exclusion.

285. Union Snyder County Bar Association satisfies the state action or state connected action element because it used county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

286. Union Snyder County Bar Association satisfies the differential treatment element because favored insiders controlled planning while disabled veterans and the representatives raising their concerns received confusion, delay, committee exclusion, service suspension, and retaliation.

287. Union Snyder County Bar Association satisfies the discriminatory purpose or irrational disability based treatment element because it allowed contradictory statements about whether veterans could receive wills, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates instead of correcting disabled veteran access.

288. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

289. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, lost timely public service opportunities, and were forced to rely on litigation for corrective relief.

290. William R. Christman III satisfies the state action or state connected action element because he used Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority,

communication control, and public service legal program influence over access to estate planning services.

291. William R. Christman III satisfies the differential treatment element because he allowed favored Wills for Heroes participants and volunteers to remain inside the program while barring Plaintiff's representatives after they advocated for disabled veterans, discussed subpoenas, and raised potential litigation.

292. William R. Christman III satisfies the discriminatory purpose or irrational disability based treatment element because he treated disabled veteran access advocacy as a reason to restrict participation instead of treating it as a reason to correct eligibility confusion and preserve disabled veteran access.

293. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

294. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

295. Gabriele Miller Wagner satisfies the state action or state connected action element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

296. Gabriele Miller Wagner satisfies the differential treatment element because disabled veteran advocates were subjected to participation restrictions while other Wills for Heroes participants, volunteers, and organizers remained eligible to participate without comparable exclusion.

297. Gabriele Miller Wagner satisfies the discriminatory purpose or irrational disability based treatment element because statewide Wills for Heroes channels did not restore Plaintiff's representatives to full participation after disabled veteran access objections and did not ensure that local exclusion would not deprive disabled veterans of service.

298. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

299. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, and lost access to the representatives who were trying to preserve estate planning services.

300. David K. Trevaskis satisfies the state action or state connected action element because he used Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

301. David K. Trevaskis satisfies the differential treatment element because statewide Wills for Heroes leadership allowed favored organizers to remain in the program while the advocates raising disabled veteran concerns were restricted from participation.

302. David K. Trevaskis satisfies the discriminatory purpose or irrational disability based treatment element because statewide Wills for Heroes leadership did not remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or SLAAY.

303. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes

access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

304. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, lost timely estate planning opportunities, and lost the practical benefit of statewide intervention.

305. K. Michael Sullivan satisfies the state action or state connected action element because he used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

306. K. Michael Sullivan satisfies the differential treatment element because he allowed favored bar planning to be controlled by insiders while disabled veteran advocates were excluded, contradicted, and pressured to drop claims before services would proceed.

307. K. Michael Sullivan satisfies the discriminatory purpose or irrational disability based treatment element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections.

308. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility

confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

309. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, and faced delay because the local program was controlled by actors who would not correct the access problem.

310. Sarah Stigerwalt Egan satisfies the state action or state connected action element because she used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

311. Sarah Stigerwalt Egan satisfies the differential treatment element because favored insiders kept control of the program while disabled veteran advocates were excluded from planning and then blamed for the loss of services.

312. Sarah Stigerwalt Egan satisfies the discriminatory purpose or irrational disability based treatment element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled veteran access objections.

313. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled veteran concerns from being resolved before the program collapsed.

314. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

315. Mary Beth Clark satisfies the state action or state connected action element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

316. Mary Beth Clark satisfies the differential treatment element because insiders who opposed Plaintiff's representatives retained influence while disabled veteran advocates were marginalized after access advocacy, litigation threats, and criticism.

317. Mary Beth Clark satisfies the discriminatory purpose or irrational disability based treatment element because she participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning and preserved insider control over public service legal programs instead of protecting disabled veteran access.

318. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled veteran access.

319. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

320. Does 1 through 100 satisfy the state action or state connected action element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, and communications participants who supported or preserved the challenged access structures.

321. Does 1 through 100 satisfy the differential treatment element because they treated disabled veterans and their advocates as less important than bar reputation, insider control, program comfort, and retaliation avoidance while favored insiders and noncritical participants retained access.

322. Does 1 through 100 satisfy the discriminatory purpose or irrational disability based treatment element because they received, transmitted,

ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, or retaliation against disabled veteran advocates.

323. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, or ratification helped cause the denial, cancellation, restriction, or obstruction of disabled veteran estate planning access.

324. Does 1 through 100 satisfy the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, and trust in the legal service systems that claimed to serve them.

325. Plaintiff and the class suffered injury because disabled veterans lost equal estate planning access, lost trust in public service legal programs, lost access to the representatives who built and preserved the program, and were forced to depend on systems that favored institutional comfort and program reputation over disabled veteran need.

326. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for

Veterans access, written eligibility standards, written nonretaliation standards, costs, fees where available, and all other lawful relief.

**Count 3B: Equal Protection under Pennsylvania Constitution Article I Section 26 Against Pennsylvania Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Does 1 through 100**

327. Plaintiff incorporates by reference all preceding paragraphs.

328. Pennsylvania Constitution Article I Section 26 provides that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."

329. The elements of Pennsylvania Constitution Article I Section 26 are Commonwealth or political subdivision action or joint action with Commonwealth or political subdivision actors, a civil right, denial or discrimination in the enjoyment or exercise of that civil right, causation, and injury.

330. Plaintiff and the class satisfy the civil rights requirement because disabled veterans had civil rights to equal public service access, equal legal service opportunity, equal participation, petitioning, association, and court access.

331. Plaintiff and the class satisfy the discrimination requirement because Defendants discriminated against disabled veterans and their advocates by preserving eligibility confusion, excluding corrective advocates, refusing written standards, suspending services, and banning participation after disability access objections.

332. Plaintiff and the class satisfy the injury requirement because disabled veterans lost equal enjoyment of legal service access and public service estate planning benefits.

333. Defendants violated Pennsylvania Constitution Article I Section 26 because disabled veterans and disabled veteran advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, equal public service participation, legal remedies, estate planning access, and nonretaliatory public advocacy, and Defendants' Commonwealth connected conduct denied or discriminated against them in the enjoyment and exercise of those rights by disrupting veterans service channels, reducing public facing outreach, interfering with redress activity, and leaving disabled veterans without reliable access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

334. Pennsylvania Bar Association satisfies the Commonwealth or political subdivision action element because state connected statewide bar authority,

Wills for Heroes program authority, public service legitimacy, statewide professional influence, and veterans service legal programming that functioned with public facing and state connected legal service authority.

335. Pennsylvania Bar Association satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by Pennsylvania Bar Association.

336. Pennsylvania Bar Association satisfies the denial or discrimination element because statewide Wills for Heroes authority restricted and banned Plaintiff's representatives after they challenged disabled veteran exclusion and sought correction of eligibility confusion.

337. Pennsylvania Bar Association satisfies the causation element because its statewide control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

338. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, trust in statewide bar public service programs, and the benefit of representatives willing to correct exclusion.

339. Union Snyder County Bar Association satisfies the Commonwealth or political subdivision action element because county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

340. Union Snyder County Bar Association satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by Union Snyder County Bar Association.

341. Union Snyder County Bar Association satisfies the denial or discrimination element because it allowed contradictory eligibility statements, excluded disabled veteran advocates from planning, refused meaningful committee process, suspended Wills for Heroes planning, and restricted meeting or membership access after protected advocacy.

342. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

343. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely public service opportunities, coalition pathways, committee representation, public service trust, and the planning infrastructure built for them.

344. William R. Christman III satisfies the Commonwealth or political subdivision action element because Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

345. William R. Christman III satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by William R. Christman III.

346. William R. Christman III satisfies the denial or discrimination element because he barred Plaintiff's representatives from participating in current and future Wills for Heroes programs after comments about Wills for Heroes and potential litigation.

347. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the

people coordinating with veterans coalitions and correcting disabled veteran access problems.

348. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

349. Gabriele Miller Wagner satisfies the Commonwealth or political subdivision action element because Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

350. Gabriele Miller Wagner satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by Gabriele Miller Wagner.

351. Gabriele Miller Wagner satisfies the denial or discrimination element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation and failed to ensure that local exclusion would not deprive disabled veterans of service.

352. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans remained subject to local obstruction and statewide restrictions.

353. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, clear eligibility information, and access to the representatives trying to preserve estate planning services.

354. David K. Trevaskis satisfies the Commonwealth or political subdivision action element because Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

355. David K. Trevaskis satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by David K. Trevaskis.

356. David K. Trevaskis satisfies the denial or discrimination element because statewide Wills for Heroes leadership failed to remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or Plaintiff's representatives.

357. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

358. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide intervention.

359. K. Michael Sullivan satisfies the Commonwealth or political subdivision action element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, district attorney authority, and access control authority.

360. K. Michael Sullivan satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal

remedies, and equal estate planning access through the channels controlled or influenced by K. Michael Sullivan.

361. K. Michael Sullivan satisfies the denial or discrimination element because he announced that veterans could not receive wills, ignored prior planning work, refused inclusion, and suspended Wills for Heroes planning after disabled veteran access was challenged.

362. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

363. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, faced delay, and lost confidence because the local program would not correct the access problem.

364. Sarah Stigerwalt Egan satisfies the Commonwealth or political subdivision action element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, local government email, prosecutorial office status, and access control authority.

365. Sarah Stigerwalt Egan satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by Sarah Stigerwalt Egan.

366. Sarah Stigerwalt Egan satisfies the denial or discrimination element because she issued or preserved contradictory eligibility communications, refused transparent recorded meetings, treated committee access as discretionary, suspended Wills for Heroes planning, and continued private planning while disabled veterans lacked clear access.

367. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, suspension decision, and private planning caused disabled veterans to lose clear information, committee participation, and timely estate planning access.

368. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

369. Mary Beth Clark satisfies the Commonwealth or political subdivision action element because North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service

legal influence, and Wills for Heroes related authority affecting disabled veteran access.

370. Mary Beth Clark satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by Mary Beth Clark.

371. Mary Beth Clark satisfies the denial or discrimination element because she preserved or participated in the insider structure that displaced Plaintiff's representatives from Wills for Heroes planning and protected insider control over public service legal programs instead of disabled veteran access.

372. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives trying to protect disabled veteran access.

373. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

374. Does 1 through 100 satisfies the Commonwealth or political subdivision action element because unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, communications participants, public officials, public employees, and joint actors who supported or preserved the challenged access structures.

375. Does 1 through 100 satisfies the civil right element because disabled veterans and their advocates exercised civil rights to disability access, speech, petitioning, assembly, redress, public service participation, legal remedies, and equal estate planning access through the channels controlled or influenced by Does 1 through 100.

376. Does 1 through 100 satisfies the denial or discrimination element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, access restriction, eligibility confusion, service suspension, or retaliation against disabled veteran advocates.

377. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment,

enforcement, ratification, or program operations helped cause the denial, cancellation, restriction, suspension, or obstruction of disabled veteran estate planning access.

378. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, veterans service coordination, public meeting access, public trust, and practical access to systems that claimed to serve them.

379. Plaintiff and the class suffered injury because Defendants' state connected conduct reduced estate planning access, reduced veterans service coordination, reduced public facing outreach, damaged coalition relationships, chilled disabled veteran advocacy, impaired property and family planning, and deprived disabled veterans of the planning infrastructure built for them.

380. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, written disability access standards, written nonretaliation standards, communication access, preservation of records, costs, attorneys' fees where available, and all other lawful relief.

**Count 4-Access to Courts Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association, David Strouse, Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

381. Plaintiff incorporates by reference all other paragraphs and attached exhibits.

382. . Pennsylvania Constitution Article I Section 11 provides that "[a]ll courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

383. The elements of access to courts are protected court access or litigation activity, obstruction or burden by the defendant, and actual or threatened injury to a legal claim or remedy.

384. Plaintiff satisfies the protected court access requirement because Plaintiff prepared, threatened, filed, served, and pursued litigation to remedy disabled veteran exclusion, retaliation, Wills for Heroes restrictions, bar governance misconduct, and related public service access harms.

385. Plaintiff satisfies the obstruction requirement because Defendants treated litigation threats as misconduct, conditioned Wills for Heroes planning on claim resolution, restricted communications with witnesses and participants, banned participation after potential litigation was mentioned,

cancelled or limited meetings after suit was filed, and suspended membership without notice or hearing.

386. Plaintiff satisfies the injury to remedy requirement because Defendants damaged witness access, evidence preservation, program participation, public service reputation, meeting access, committee records, and the ability to obtain timely equitable relief before more disabled veterans lost estate planning opportunities.

387. Plaintiff and the class suffered injury because disabled veterans lost timely services and Plaintiff had to seek court protection to restore access that should not have been removed in response to litigation activity.

388. Defendants violated access to courts because disabled veterans and their advocates sought to correct exclusion from Wills for Heroes, Wills for Veterans, veterans service legal programs, public facing estate planning services, and related public service legal access, but Defendants used program bans, communication restrictions, cancelled events, suspended planning, loss of outreach channels, and retaliation against advocates to make judicial relief the only practical way to restore access while also increasing the burden of obtaining that relief.

389. Essentially, third-party litigants were told that if they exercised their right to file nonfrivolous litigation, the USCBA, CCBA, Lycoming Law

Association, and PBA would use (and did use) veterans as pawns by withholding Wills for Heroes from all veterans until the third-party promised to stop exercising their right to access the courts.

390. This active interference with litigation created collateral damage in veterans.

391. This collateral damage was not "collateral" to the veterans-it was direct, and terrible.

392. If a veteran was unable to get a will because of the interference with a third-party's right to access the courts, and that failure meant that they could not give specific bequests to their children, and their creditors take their entire estate, it is not plausible that they would be thinking, on their death bed, "I wish that Plaintiff's counsel had not tried to access the courts regarding Wills for Heroes," but it is plausible they will be thinking, "I wish I could have afforded a will and now everything I worked for in my life is going to go to bill collectors instead of my family and they will be destitute when I am gone."

393. These are people's lives, and they were used as pawns in a battle over access to courts.

394. Pennsylvania Bar Association satisfies the protected right element because disabled veterans and their advocates had a protected right to seek

judicial relief to correct exclusion from Wills for Heroes, Wills for Veterans, veterans service legal programs, and public service estate planning access.

395. Pennsylvania Bar Association satisfies the state action or state connected obstruction element because it used statewide bar authority, Wills for Heroes program control, public service legal legitimacy, volunteer channels, staff communications, and statewide professional influence to restrict the advocates who were preparing and pursuing claims to correct disabled veteran exclusion.

396. Pennsylvania Bar Association satisfies the actual interference element because its July 30, 2025 participation ban and communication restrictions removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, preserving estate planning access, and gathering the facts needed to seek judicial relief.

397. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and participation ban forced disabled veterans and their advocates to litigate from a weakened position after the program excluded the very people who had built the access infrastructure.

398. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, lost the

benefit of advocates willing to correct exclusion, and faced greater burdens in seeking judicial relief to restore services.

399. Clinton County Bar Association satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and public correction when Wills for Heroes access, Wills for Veterans access, veterans service legal programming, and public service estate planning access became restricted, uncertain, or dependent on bar-controlled coordination.

400. Clinton County Bar Association satisfies the state action or state connected obstruction element because it used county bar authority, Clinton County Wills for Heroes coordination, local public service legal programming, bar-sponsored estate planning access, volunteer channels, and veterans service legitimacy affecting disabled veterans in Clinton County and surrounding counties.

401. Clinton County Bar Association satisfies the actual interference element because Clinton County Wills for Heroes coordination proceeded in the same regional access structure after disabled veteran eligibility confusion, Wills for Heroes restrictions, and threats to public service estate planning access had already forced Plaintiff and disabled veterans to seek judicial correction.

402. Clinton County Bar Association satisfies the causation element because unclear, restricted, or nontransparent Clinton County coordination contributed to disabled veterans and their advocates losing dependable nonjudicial access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

403. Clinton County Bar Association satisfies the injury element because disabled veterans lost clarity, timely estate planning access, public service confidence, coalition support, and the practical ability to correct exclusion without litigation.

404. David Andrew Strouse satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and public correction when Clinton County Wills for Heroes access and related bar-connected public service legal programming became part of the regional dispute over disabled veteran estate planning access.

405. David Andrew Strouse satisfies the state action or state connected obstruction element because he used or influenced Clinton County Bar Association authority, Clinton County Wills for Heroes coordination, local bar participation, public service legal programming, and estate planning access structures affecting disabled veterans.

406. David Andrew Strouse satisfies the actual interference element because his Clinton County Wills for Heroes role preserved or benefited from access structures that lacked clear disabled veteran eligibility rules, nonretaliatory coordination, and reliable access after known Wills for Heroes access confusion.

407. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination without judicial intervention.

408. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and access to the estate planning pathways that should have remained available without litigation.

409. Lycoming Law Association satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief after the Lycoming Wills for Heroes event was cancelled and disabled veteran clients were deprived of wills.

410. Lycoming Law Association satisfies the state action or state connected obstruction element because it used county bar authority, public service legal program authority, Wills for Heroes access, public facing estate

planning access, and veterans service legitimacy affecting disabled veterans in Lycoming County.

411. Lycoming Law Association satisfies the actual interference element because it cancelled the Wills for Heroes event instead of preserving access for the disabled veteran clients who were going to be deprived of wills, thereby converting a public service access problem into a litigation burden.

412. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled veteran clients to lose the estate planning access that the event was supposed to provide and forced court intervention as the only remaining corrective path.

413. Lycoming Law Association satisfies the injury element because disabled veteran clients were deprived of wills, lost timely estate planning access, lost equal public service legal access, and had to rely on litigation after cancellation protected program reputation rather than client need.

414. Union Snyder County Bar Association satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief when the local Wills for Heroes program gave contradictory eligibility information, suspended planning, and excluded advocates.

415. Union Snyder County Bar Association satisfies the state action or state connected obstruction element because it used county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

416. Union Snyder County Bar Association satisfies the actual interference element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates who sought disabled veteran inclusion while those advocates were trying to preserve and litigate access rights.

417. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, inclusive planning, or nonjudicial correction.

418. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely public service opportunities, committee transparency, and the practical ability to correct exclusion without litigation.

419. William R. Christman III satisfies the protected right element because disabled veterans and their advocates had a protected right to pursue legal claims, subpoenas, litigation activity, and judicial relief concerning Wills for Heroes exclusion and disabled veteran access.

420. William R. Christman III satisfies the state action or state connected obstruction element because he used Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

421. William R. Christman III satisfies the actual interference element because he restricted Plaintiff's representatives from communicating with PBA staff and volunteers and barred them from Wills for Heroes participation after they advocated for disabled veterans, discussed subpoenas, and raised potential litigation.

422. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions, correcting disabled veteran access problems, and preserving evidence and access paths needed for judicial relief.

423. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans through advocacy and litigation.

424. Gabriele Miller Wagner satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and program correction after statewide Wills for Heroes channels failed to protect disabled veteran access.

425. Gabriele Miller Wagner satisfies the state action or state connected obstruction element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

426. Gabriele Miller Wagner satisfies the actual interference element because statewide Wills for Heroes channels did not restore Plaintiff's representatives to full participation after disabled veteran access objections and did not ensure that local exclusion would not deprive disabled veterans of service.

427. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored

participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

428. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost statewide correction, clear eligibility information, meaningful access to advocates, and practical nonjudicial remedies for exclusion.

429. David K. Trevaskis satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and program correction after barriers to Wills for Heroes access persisted.

430. David K. Trevaskis satisfies the state action or state connected obstruction element because he used Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

431. David K. Trevaskis satisfies the actual interference element because statewide Wills for Heroes leadership did not remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or SLAAY.

432. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from being forced into litigation to regain services.

433. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide correction before court action became necessary.

434. K. Michael Sullivan satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief after he announced that veterans could not receive wills and refused to resolve the eligibility contradiction through clear written rules.

435. K. Michael Sullivan satisfies the state action or state connected obstruction element because he used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

436. K. Michael Sullivan satisfies the actual interference element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated

requests for meetings, and suspended Wills for Heroes planning after access objections.

437. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved eligibility confusion, service suspension, and committee obstruction that made litigation necessary to restore dependable access.

438. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, and faced delay because the local program remained controlled by actors who would not correct the access problem.

439. Sarah Stigerwalt Egan satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and program correction after contradictory eligibility information and suspended planning deprived disabled veterans of meaningful access.

440. Sarah Stigerwalt Egan satisfies the state action or state connected obstruction element because she used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

441. Sarah Stigerwalt Egan satisfies the actual interference element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled veteran access objections.

442. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled veteran concerns from being resolved before litigation became the only realistic corrective path.

443. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

444. Mary Beth Clark satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief after local bar and legal aid structures displaced the advocates working to correct Wills for Heroes exclusion.

445. Mary Beth Clark satisfies the state action or state connected obstruction element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local

public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

446. Mary Beth Clark satisfies the actual interference element because she participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning and preserved insider control over public service legal programs instead of protecting disabled veteran access.

447. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled veteran access.

448. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

449. Bloomsburg Fair Association satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and public correction when public facing veterans event access was restricted after Wills for Heroes and Wills for Veterans advocacy.

450. Bloomsburg Fair Association satisfies the state action or state connected obstruction element because it used public facing veterans event

access, veterans service outreach opportunities, community event access, public service legitimacy, and legal service outreach opportunities affecting disabled veteran access.

451. Bloomsburg Fair Association satisfies the actual interference element because veterans service outreach and public facing event access channels were restricted or preserved in a manner that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy.

452. Bloomsburg Fair Association satisfies the causation element because public facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate planning services and supported correction of exclusion.

453. Bloomsburg Fair Association satisfies the injury element because disabled veterans lost outreach opportunities, legal service information, event access, and connection to Wills for Veterans or equivalent estate planning services.

454. Pennsylvania Department of Military and Veterans Affairs satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief when veterans service networks,

coalition channels, and government facing veterans service access failed to preserve Wills for Heroes or Wills for Veterans access.

455. Pennsylvania Department of Military and Veterans Affairs satisfies the state action or state connected obstruction element because it is a Pennsylvania state agency that used veterans service networks, regional communications, coalition channels, public service legitimacy, and government facing veterans service access connected to Wills for Heroes and Wills for Veterans planning.

456. Pennsylvania Department of Military and Veterans Affairs satisfies the actual interference element because its veterans service networks and coalition channels were disrupted when Wills for Heroes access was suspended, restricted, or conditioned after disabled veteran advocacy.

457. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans service access allowed bar controlled restrictions and cancellations to deprive disabled veterans of wills and force judicial intervention.

458. Pennsylvania Department of Military and Veterans Affairs satisfies the injury element because disabled veterans lost the benefit of government facing veterans service coordination, clear referral pathways, and reliable estate planning access.

459. Robert Leadbetter satisfies the protected right element because disabled veterans and their advocates had a protected right to seek judicial relief and public correction when public facing veterans outreach and event access were restricted after disabled veteran advocacy.

460. Robert Leadbetter satisfies the state action or state connected obstruction element because he used public office authority, community event authority, veterans event access, public service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

461. Robert Leadbetter satisfies the actual interference element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran access to legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

462. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information needed to correct exclusion.

463. Robert Leadbetter satisfies the injury element because disabled veterans lost access to public facing outreach, veterans event legal service information, and the representatives trying to preserve wills for disabled veterans.

464. Does 1 through 100 satisfies the protected right element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, and communications participants whose actions affected disabled veterans' ability to seek judicial relief and correct estate planning exclusion.

465. Does 1 through 100 satisfies the state action or state connected obstruction element because they include unknown state connected, county connected, bar connected, public service connected, veterans service connected, event connected, and coalition connected actors who supported or preserved the challenged access structures.

466. Does 1 through 100 satisfies the actual interference element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, or retaliation against disabled veteran advocates.

467. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, or ratification helped cause the denial, cancellation, restriction,

or obstruction that forced disabled veterans and their advocates to seek judicial relief from a weakened position.

468. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, evidence pathways, witness access, and trust in the legal service systems that claimed to serve them.

469. Plaintiff and the class suffered injury because Defendants' obstruction increased the burden of seeking judicial relief, reduced access to evidence and witnesses, chilled disabled veteran advocacy, impaired nonjudicial correction, and forced disabled veterans to use litigation to restore estate planning services that should not have been denied.

470. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, preservation of evidence, nonretaliatory communication access, transparent process, costs, fees where available, and all other lawful relief.

**Count 5-Unconstitutional Conditions Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; David Strouse; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

471. Plaintiff incorporates by reference all preceding paragraphs.

472. The elements of unconstitutional conditions are a government benefit, public benefit, public program, access opportunity, or public service participation; conditioning, burdening, denying, or withdrawing that benefit or participation because the plaintiff or plaintiff's advocates exercised protected constitutional rights; lack of a lawful relationship between the condition and the purpose of the benefit or program; causation; and injury.

473. Plaintiff satisfies the condition on benefit requirement because Defendants conditioned Wills for Heroes participation, committee access, bar participation, veterans service event access, public service recognition, and communications with program staff or volunteers on Plaintiff dropping, resolving, softening, or avoiding claims and criticism regarding disabled veteran exclusion.

474. Plaintiff satisfies the surrender of constitutional rights requirement because Plaintiff had to choose between access to Wills for Heroes and related public service opportunities and protected speech, petitioning,

association, litigation, and criticism of discrimination against disabled veterans.

475. Plaintiff satisfies the insufficient justification requirement because public service estate planning and bar connected legal programs may not demand silence, viewpoint conformity, abandonment of litigation, or waiver of petition rights as the price of disabled veteran access.

476. Plaintiff and the class suffered injury because the condition chilled advocacy and tied disabled veteran estate planning access to abandonment of constitutional rights.

477. Defendants imposed unconstitutional conditions because they made disabled veterans' access to Wills for Heroes, Wills for Veterans, public service estate planning, veterans service outreach, bar connected legal service programs, and public facing veterans event access depend on whether Plaintiff's representatives stopped criticizing exclusion, stopped demanding written eligibility rules, stopped insisting on transparent meetings, stopped threatening litigation, stopped discussing subpoenas, stopped using veterans coalitions to preserve services, and stopped seeking judicial relief.

478. Pennsylvania Bar Association satisfies the public benefit or program element because it controlled statewide Wills for Heroes authority, public

service estate planning access, volunteer channels, staff communications, and statewide bar sponsored legal service infrastructure.

479. Pennsylvania Bar Association satisfies the conditioning, burdening, denial, or withdrawal element because it restricted Plaintiff's representatives from communicating with PBA staff and volunteers and barred them from Wills for Heroes participation after they advocated for disabled veterans, discussed subpoenas, raised potential litigation, and criticized access barriers.

480. Pennsylvania Bar Association satisfies the lack of lawful relationship element because excluding the advocates who corrected eligibility confusion and built veterans service planning infrastructure did not lawfully advance wills access, public service estate planning, eligibility clarity, or service delivery to disabled veterans.

481. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

482. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, lost trust

in statewide bar public service programs, and lost the benefit of representatives willing to correct exclusion.

483. Lycoming Law Association satisfies the public benefit or program element because it controlled, supported, sponsored, coordinated, or preserved the Lycoming Wills for Heroes event as a public facing legal service program and estate planning access point for disabled veterans.

484. Lycoming Law Association satisfies the conditioning, burdening, denial, or withdrawal element because it cancelled the Wills for Heroes event instead of preserving access for the disabled veteran clients who were going to be deprived of wills.

485. Lycoming Law Association satisfies the lack of lawful relationship element because cancelling a wills event to protect program reputation did not lawfully advance the public service purpose of providing wills to disabled veteran clients.

486. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled veteran clients to lose the Wills for Heroes estate planning access that the event was supposed to provide.

487. Lycoming Law Association satisfies the injury element because disabled veteran clients were deprived of wills, lost timely estate planning

access, lost equal public service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client need.

488. Clinton County Bar Association satisfies the public benefit or program element because it controlled, supported, coordinated, or preserved Clinton County Wills for Heroes access, local bar participation, public service legal programming, volunteer channels, and estate planning access opportunities affecting disabled veterans.

489. Clinton County Bar Association satisfies the conditioning, burdening, denial, or withdrawal element because Clinton County Wills for Heroes coordination proceeded within a regional structure in which disabled veteran access, Plaintiff's representatives' participation, and public service legal programming were burdened after protected criticism, litigation threats, and demands for equal access.

490. Clinton County Bar Association satisfies the lack of lawful relationship element because allowing Wills for Heroes access to depend on silence, noncriticism, lack of litigation, lack of subpoenas, or acceptance of unclear eligibility practices did not lawfully advance disabled veterans' access to wills, eligibility clarity, or public service estate planning.

491. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County coordination contributed to

disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

492. Clinton County Bar Association satisfies the injury element because disabled veterans lost clarity, timely access, public service confidence, coalition support, dependable estate planning opportunities, and access to nonretaliatory program channels.

493. David Andrew Strouse satisfies the public benefit or program element because he used or influenced Clinton County Bar Association authority, Clinton County Wills for Heroes access, local bar coordination, public service legal programming, and estate planning access structures affecting disabled veterans.

494. David Andrew Strouse satisfies the conditioning, burdening, denial, or withdrawal element because he preserved, enforced, or benefited from Clinton County Wills for Heroes access structures that lacked clear disabled veteran eligibility rules, nonretaliatory coordination, and reliable access after the broader Wills for Heroes access dispute had already harmed disabled veterans.

495. David Andrew Strouse satisfies the lack of lawful relationship element because conditioning or burdening disabled veteran access through unclear coordination, restricted participation, or retaliation-sensitive

program structures did not lawfully advance estate planning access, public service reliability, or equal treatment for disabled veterans.

496. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination.

497. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate planning access.

498. Union Snyder County Bar Association satisfies the public benefit or program element because it controlled the local Wills for Heroes program, committee access, meeting access, local volunteer channels, and public service estate planning access for veterans.

499. Union Snyder County Bar Association satisfies the conditioning, burdening, denial, or withdrawal element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates who sought disabled veteran inclusion.

500. Union Snyder County Bar Association satisfies the lack of lawful relationship element because making public service estate planning depend

on silence, lack of litigation, lack of criticism, or acceptance of contradictory eligibility information did not lawfully advance disabled veterans' access to wills.

501. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

502. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely public service opportunities, committee transparency, and the benefit of advocates who had built the planning infrastructure.

503. William R. Christman III satisfies the public benefit or program element because he used Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

504. William R. Christman III satisfies the conditioning, burdening, denial, or withdrawal element because he conditioned access to PBA staff, volunteers, and Wills for Heroes participation on Plaintiff's representatives

not continuing direct communications, subpoenas, litigation related activity, and criticism concerning disabled veteran access.

505. William R. Christman III satisfies the lack of lawful relationship element because barring disabled veteran advocates from Wills for Heroes did not lawfully advance service delivery, volunteer coordination, program integrity, or equal access to wills.

506. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

507. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, coordinated with veterans coalitions, and worked to preserve wills for disabled veterans.

508. Gabriele Miller Wagner satisfies the public benefit or program element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

509. Gabriele Miller Wagner satisfies the conditioning, burdening, denial, or withdrawal element because statewide Wills for Heroes channels did not restore Plaintiff's representatives to full participation after disabled veteran access objections and did not ensure that local exclusion would not deprive disabled veterans of service.

510. Gabriele Miller Wagner satisfies the lack of lawful relationship element because refusing to restore advocates who challenged exclusion did not lawfully advance Wills for Heroes service, eligibility clarity, or estate planning access for disabled veterans.

511. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

512. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, and lost access to the representatives who were trying to preserve estate planning services.

513. David K. Trevaskis satisfies the public benefit or program element because he used Pennsylvania Bar Association Wills for Heroes leadership,

statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

514. David K. Trevaskis satisfies the conditioning, burdening, denial, or withdrawal element because statewide Wills for Heroes leadership did not remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or SLAAY.

515. David K. Trevaskis satisfies the lack of lawful relationship element because preserving barriers after protected disabled veteran advocacy did not lawfully advance Wills for Heroes access or veterans estate planning.

516. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from being forced into litigation to regain services.

517. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide correction before court action became necessary.

518. K. Michael Sullivan satisfies the public benefit or program element because he used local Wills for Heroes authority, Union Snyder County Bar

Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

519. K. Michael Sullivan satisfies the conditioning, burdening, denial, or withdrawal element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections.

520. K. Michael Sullivan satisfies the lack of lawful relationship element because conditioning continued planning on avoidance of claims, objections, recorded meetings, or written eligibility demands did not lawfully advance disabled veterans' access to wills.

521. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved eligibility confusion, service suspension, and committee obstruction that made litigation necessary to restore dependable access.

522. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, and faced delay because the local program remained controlled by actors who would not correct the access problem.

523. Sarah Stigerwalt Egan satisfies the public benefit or program element because she used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

524. Sarah Stigerwalt Egan satisfies the conditioning, burdening, denial, or withdrawal element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled veteran access objections.

525. Sarah Stigerwalt Egan satisfies the lack of lawful relationship element because denying transparent process and suspending planning after protected access objections did not lawfully advance Wills for Heroes service, veterans access, or estate planning reliability.

526. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled veteran concerns from being resolved before litigation became the only realistic corrective path.

527. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

528. Mary Beth Clark satisfies the public benefit or program element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

529. Mary Beth Clark satisfies the conditioning, burdening, denial, or withdrawal element because she participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning and preserved insider control over public service legal programs instead of protecting disabled veteran access.

530. Mary Beth Clark satisfies the lack of lawful relationship element because preserving insider control over public service legal programs after protected access advocacy did not lawfully advance disabled veterans' access to wills, clear eligibility information, or reliable estate planning services.

531. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled veteran access.

532. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

533. Bloomsburg Fair Association satisfies the public benefit or program element because it used public facing veterans event access, veterans service outreach opportunities, community event access, public service legitimacy, and legal service outreach opportunities affecting disabled veteran access.

534. Bloomsburg Fair Association satisfies the conditioning, burdening, denial, or withdrawal element because veterans service outreach and public facing event access channels were restricted or preserved in a manner that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy.

535. Bloomsburg Fair Association satisfies the lack of lawful relationship element because restricting public facing veterans event access after protected advocacy did not lawfully advance disabled veterans' access to legal service outreach or estate planning information.

536. Bloomsburg Fair Association satisfies the causation element because public facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate planning services and supported correction of exclusion.

537. Bloomsburg Fair Association satisfies the injury element because disabled veterans lost outreach opportunities, legal service information, event access, and connection to Wills for Veterans or equivalent estate planning services.

538. Pennsylvania Department of Military and Veterans Affairs satisfies the public benefit or program element because it is a Pennsylvania state agency that used veterans service networks, regional communications, coalition channels, public service legitimacy, and government facing veterans service access connected to Wills for Heroes and Wills for Veterans planning.

539. Pennsylvania Department of Military and Veterans Affairs satisfies the conditioning, burdening, denial, or withdrawal element because its veterans service networks and coalition channels were disrupted when Wills for Heroes access was suspended, restricted, or conditioned after disabled veteran advocacy.

540. Pennsylvania Department of Military and Veterans Affairs satisfies the lack of lawful relationship element because allowing protected disability access advocacy to disrupt veterans service coordination did not lawfully advance veterans services, estate planning access, effective communication, or public service reliability.

541. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans service access allowed bar controlled restrictions and cancellations to deprive disabled veterans of wills and force judicial intervention.

542. Pennsylvania Department of Military and Veterans Affairs satisfies the injury element because disabled veterans lost the benefit of government facing veterans service coordination, clear referral pathways, and reliable estate planning access.

543. Robert Leadbetter satisfies the public benefit or program element because he used public office authority, community event authority, veterans event access, public service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

544. Robert Leadbetter satisfies the conditioning, burdening, denial, or withdrawal element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran access to legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

545. Robert Leadbetter satisfies the lack of lawful relationship element because preserving public office and public facing event structures in a way

that reduced disabled veteran access to legal service outreach did not lawfully advance veterans service, estate planning, or public access.

546. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information needed to correct exclusion.

547. Robert Leadbetter satisfies the injury element because disabled veterans lost access to public facing outreach, veterans event legal service information, and the representatives trying to preserve wills for disabled veterans.

548. Does 1 through 100 satisfies the public benefit or program element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, and communications participants whose actions affected disabled veterans' estate planning access.

549. Does 1 through 100 satisfies the conditioning, burdening, denial, or withdrawal element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for

Heroes cancellation, Wills for Veterans obstruction, communication restrictions, program bans, service suspension, or retaliation against disabled veteran advocates.

550. Does 1 through 100 satisfies the lack of lawful relationship element because conditioning disabled veteran access on silence, lack of criticism, lack of litigation, lack of subpoenas, or lack of access objections did not lawfully advance any public service, veterans service, legal service, or estate planning purpose.

551. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, or ratification helped cause the denial, cancellation, restriction, or obstruction that forced disabled veterans and their advocates to seek judicial relief from a weakened position.

552. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, evidence pathways, witness access, and trust in the legal service systems that claimed to serve them.

553. Plaintiff and the class suffered injury because Defendants conditioned access to public service legal programs, estate planning assistance, veterans service outreach, public event access, and program participation on

surrendering protected advocacy, criticism, petitioning, litigation activity, and disability access objections.

554. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, preservation of evidence, nonretaliatory communication access, transparent process, costs, fees where available, and all other lawful relief.

**Count 6-Procedural Due Process- Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; David Strouse, Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

555. Plaintiff incorporates all other paragraphs and exhibits.

556. The elements of procedural due process are a protected liberty or property interest, deprivation under color of state law or state connected authority, and inadequate process.

557. Plaintiff and the class satisfy the protected interest requirement because disabled veterans had protected interests in access to state connected public service legal programs, veterans service legal opportunities,

reputational status, Wills for Heroes services, and the ability to pursue remedies without retaliatory exclusion.

558. Plaintiff and the class satisfy the deprivation requirement because Defendants excluded Plaintiff's representatives from committees, restricted communications, suspended Wills for Heroes, banned participation in Wills for Heroes programs, denied meeting access, and imposed membership restrictions that damaged reputation and public service access.

559. Plaintiff and the class satisfy the state connected authority requirement because the challenged conduct used court connected systems, state connected veterans service channels, public service legal programs, bar governance structures, and government linked event access.

560. Plaintiff and the class satisfy the inadequate process requirement because Defendants used informal decisions, shifting explanations, unsigned communications, cancelled meetings, private planning, and no neutral hearing before denying access, suspending participation, or damaging public service relationships.

561. Defendants ignored and refused dozens of reasonable offers to settle, mediate, or even meet and discuss the relevant issues.

562. Most decisions made by Defendants had no process at all, like decisions to suspend Wills for Heroes, or members from the bar.

563. Plaintiff and the class suffered injury because disabled veterans lost services, planning access, accurate information, and timely correction without notice, hearing, appeal, or neutral review.

564. Defendants violated procedural due process because disabled veterans and their advocates had protected interests in equal access to public service legal programs, veterans service channels, public facing estate planning access, Wills for Heroes, Wills for Veterans, and nonretaliatory public service participation, but Defendants changed eligibility information, restricted participation, suspended planning, cancelled access, displaced advocates, and denied meaningful notice, written standards, transparent meetings, neutral process, or any fair opportunity to correct the exclusion before disabled veterans lost estate planning services.

565. Pennsylvania Bar Association satisfies the protected interest element because disabled veterans relied on statewide Wills for Heroes authority, public service estate planning access, statewide program rules, volunteer channels, and PBA controlled communications to obtain wills and related legal documents.

566. Pennsylvania Bar Association satisfies the state action or state connected action element because it used statewide bar authority, public service legal legitimacy, Wills for Heroes program control, professional

access channels, and state connected legal service authority affecting disabled veterans' access to estate planning.

567. Pennsylvania Bar Association satisfies the deprivation element because it restricted Plaintiff's representatives from Wills for Heroes participation after they challenged disabled veteran exclusion and sought to preserve Wills for Heroes or Wills for Veterans access.

568. Pennsylvania Bar Association satisfies the lack of adequate process element because it imposed statewide participation restrictions without written access standards, neutral review, transparent process, or a meaningful opportunity for disabled veterans or their advocates to contest the restriction before services were lost.

569. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

570. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, lost trust in statewide bar public service programs, and lost the benefit of representatives willing to correct exclusion.

571. Lycoming Law Association satisfies the protected interest element because disabled veterans relied on the Lycoming Wills for Heroes event as a public facing estate planning program intended to provide wills to disabled veterans and other qualified participants.

572. Lycoming Law Association satisfies the state action or state connected action element because it used county bar authority, public service legal program authority, Wills for Heroes access, public facing estate planning access, and veterans service legitimacy affecting disabled veterans in Lycoming County.

573. Lycoming Law Association satisfies the deprivation element because it cancelled the Wills for Heroes event instead of preserving access for the disabled veteran clients who were going to be deprived of wills.

574. Lycoming Law Association satisfies the lack of adequate process element because it cancelled the event to protect program reputation without giving disabled veterans written notice, a meaningful opportunity to be heard, an alternative wills clinic, or a nonretaliatory process for preserving services.

575. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled veteran clients to lose the Wills for Heroes estate planning access that the event was supposed to provide.

576. Lycoming Law Association satisfies the injury element because disabled veteran clients were deprived of wills, lost timely estate planning access, lost equal public service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client need.

577. Union Snyder County Bar Association satisfies the protected interest element because disabled veterans relied on the local Wills for Heroes program, local committee process, local bar public service authority, volunteer channels, and public service estate planning access for wills and related documents.

578. Clinton County Bar Association satisfies the protected interest element because disabled veterans relied on Clinton County Wills for Heroes access, local bar public service coordination, volunteer channels, veterans service connections, and estate planning access opportunities for wills and related documents.

579. Clinton County Bar Association satisfies the state action or state connected action element because it used county bar authority, Clinton County Wills for Heroes coordination, local public service legal programming, bar-sponsored estate planning access, volunteer channels, and veterans service legitimacy affecting disabled veterans.

580. Clinton County Bar Association satisfies the deprivation element because Clinton County Wills for Heroes coordination proceeded without clear disabled veteran eligibility rules, reliable correction, transparent standards, or nonretaliatory access protections after disabled veterans had already been harmed by regional Wills for Heroes confusion and access restrictions.

581. Clinton County Bar Association satisfies the lack of adequate process element because disabled veterans and their advocates did not receive written eligibility standards, accurate notice, neutral review, transparent coordination, or a meaningful opportunity to preserve access before estate planning opportunities became uncertain, delayed, or litigation-dependent.

582. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

583. Clinton County Bar Association satisfies the injury element because disabled veterans lost clarity, timely access, public service confidence, coalition support, dependable estate planning opportunities, and trust in bar-sponsored legal service systems.

584. David Andrew Strouse satisfies the protected interest element because disabled veterans relied on Clinton County Wills for Heroes access, local bar coordination, public service legal programming, and estate planning access structures that he used, influenced, preserved, or helped administer.

585. David Andrew Strouse satisfies the state action or state connected action element because he used or influenced Clinton County Bar Association authority, Clinton County Wills for Heroes access, local bar participation, public service legal programming, and estate planning access structures affecting disabled veterans.

586. David Andrew Strouse satisfies the deprivation element because he preserved, enforced, or benefited from Clinton County Wills for Heroes access structures that lacked clear disabled veteran eligibility rules, reliable correction, transparent process, and nonretaliatory coordination after known access confusion.

587. David Andrew Strouse satisfies the lack of adequate process element because disabled veterans and their advocates did not receive written standards, neutral review, reliable correction, transparent coordination, or a meaningful opportunity to preserve Clinton County estate planning access before access became uncertain, delayed, or litigation-dependent.

588. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination.

589. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate planning access.

590. Union Snyder County Bar Association satisfies the state action or state connected action element because it used county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

591. Union Snyder County Bar Association satisfies the deprivation element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates who sought disabled veteran inclusion.

592. Union Snyder County Bar Association satisfies the lack of adequate process element because it failed to provide written eligibility standards, accurate notice, transparent meetings, recorded proceedings, neutral

committee process, or a meaningful opportunity to correct contradictory eligibility information before disabled veterans lost access.

593. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

594. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely public service opportunities, committee transparency, and the benefit of advocates who had built the planning infrastructure.

595. William R. Christman III satisfies the protected interest element because disabled veterans relied on PBA controlled Wills for Heroes communications, staff and volunteer channels, public service legal access, and statewide program participation rules to preserve estate planning access.

596. William R. Christman III satisfies the state action or state connected action element because he used Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

597. William R. Christman III satisfies the deprivation element because he barred Plaintiff's representatives from communicating with PBA staff and volunteers and from participating in Wills for Heroes after they advocated for disabled veterans, discussed subpoenas, and raised potential litigation.

598. William R. Christman III satisfies the lack of adequate process element because he imposed communication restrictions and participation bans without written eligibility standards, neutral review, notice to disabled veterans, or any meaningful opportunity to preserve services through nonretaliatory channels.

599. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

600. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, coordinated with veterans coalitions, and worked to preserve wills for disabled veterans.

601. Gabriele Miller Wagner satisfies the protected interest element because disabled veterans relied on statewide Wills for Heroes coordination,

volunteer recruitment, scheduling, public service legal access, and program communications to obtain estate planning services.

602. Gabriele Miller Wagner satisfies the state action or state connected action element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

603. Gabriele Miller Wagner satisfies the deprivation element because statewide Wills for Heroes channels did not restore Plaintiff's representatives to full participation after disabled veteran access objections and did not ensure that local exclusion would not deprive disabled veterans of service.

604. Gabriele Miller Wagner satisfies the lack of adequate process element because statewide Wills for Heroes coordination failed to provide written corrective standards, transparent eligibility review, a neutral transfer process, or a meaningful opportunity for disabled veterans and their advocates to preserve services.

605. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service

channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

606. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, and lost access to the representatives who were trying to preserve estate planning services.

607. David K. Trevaskis satisfies the protected interest element because disabled veterans relied on statewide Wills for Heroes leadership, statewide program guidance, training authority, public service communications, and program access influence to preserve estate planning services.

608. David K. Trevaskis satisfies the state action or state connected action element because he used Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

609. David K. Trevaskis satisfies the deprivation element because statewide Wills for Heroes leadership did not remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or SLAAY.

610. David K. Trevaskis satisfies the lack of adequate process element because statewide leadership failed to provide neutral review, written

eligibility standards, transparent correction, or a meaningful opportunity for disabled veterans and their advocates to challenge the restrictions before services were lost.

611. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

612. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide intervention.

613. K. Michael Sullivan satisfies the protected interest element because disabled veterans relied on local Wills for Heroes planning, committee process, local bar public service authority, and estate planning access controlled or influenced by local Wills for Heroes actors.

614. K. Michael Sullivan satisfies the state action or state connected action element because he used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

615. K. Michael Sullivan satisfies the deprivation element because he announced that veterans could not receive wills, refused to resolve eligibility

contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections.

616. K. Michael Sullivan satisfies the lack of adequate process element because he failed to provide accurate written notice, clear eligibility standards, transparent meetings, meaningful committee access, or an opportunity for disabled veterans and their advocates to correct the exclusion before planning was suspended.

617. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

618. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, and faced delay because the local program remained controlled by actors who would not correct the access problem.

619. Sarah Stigerwalt Egan satisfies the protected interest element because disabled veterans relied on local Wills for Heroes leadership, committee access, eligibility communications, public service planning, and local estate planning access for wills and related documents.

620. Sarah Stigerwalt Egan satisfies the state action or state connected action element because she used local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, and access control authority.

621. Sarah Stigerwalt Egan satisfies the deprivation element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled veteran access objections.

622. Sarah Stigerwalt Egan satisfies the lack of adequate process element because she failed to provide written eligibility rules, accurate notice, transparent recorded meetings, neutral committee access, or a fair opportunity to correct the contradictory information before disabled veterans lost access.

623. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled veteran concerns from being resolved before the program collapsed.

624. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

625. Mary Beth Clark satisfies the protected interest element because disabled veterans relied on local public service legal programs, local bar structures, Wills for Heroes planning, legal aid influenced service channels, and public service estate planning access.

626. Mary Beth Clark satisfies the state action or state connected action element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

627. Mary Beth Clark satisfies the deprivation element because she participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning and preserved insider control over public service legal programs instead of protecting disabled veteran access.

628. Mary Beth Clark satisfies the lack of adequate process element because she helped preserve a local structure that displaced disabled veteran advocates without neutral review, written standards, transparent process, or

any meaningful opportunity for disabled veterans to protect the planning infrastructure built for them.

629. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled veteran access.

630. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

631. Bloomsburg Fair Association satisfies the protected interest element because disabled veterans relied on public facing veterans event access, veterans service outreach opportunities, community event access, and legal service outreach channels to connect with estate planning services.

632. Bloomsburg Fair Association satisfies the state action or state connected action element because it used public facing veterans event access, veterans service outreach opportunities, community event access, public service legitimacy, and legal service outreach opportunities affecting disabled veteran access.

633. Bloomsburg Fair Association satisfies the deprivation element because veterans service outreach and public facing event access channels

were restricted or preserved in a manner that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy.

634. Bloomsburg Fair Association satisfies the lack of adequate process element because disabled veterans and their advocates lost public facing event access and outreach channels without written standards, notice, neutral review, or a meaningful opportunity to preserve legal service outreach.

635. Bloomsburg Fair Association satisfies the causation element because public facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate planning services.

636. Bloomsburg Fair Association satisfies the injury element because disabled veterans lost outreach opportunities, legal service information, event access, and connection to Wills for Veterans or equivalent estate planning services.

637. Pennsylvania Department of Military and Veterans Affairs satisfies the protected interest element because disabled veterans relied on veterans service networks, regional communications, coalition channels, public service legitimacy, government facing veterans service access, and Wills for Heroes or Wills for Veterans coordination.

638. Pennsylvania Department of Military and Veterans Affairs satisfies the state action or state connected action element because it is a Pennsylvania state agency that used veterans service networks, regional communications, coalition channels, public service legitimacy, and government facing veterans service access connected to Wills for Heroes and Wills for Veterans planning.

639. Pennsylvania Department of Military and Veterans Affairs satisfies the deprivation element because its veterans service networks and coalition channels were disrupted when Wills for Heroes access was suspended, restricted, or conditioned after disabled veteran advocacy.

640. Pennsylvania Department of Military and Veterans Affairs satisfies the lack of adequate process element because it did not ensure clear eligibility information, effective communication, reasonable modification, neutral correction, or a meaningful opportunity for disabled veterans and their advocates to preserve estate planning access through veterans service channels.

641. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans service access allowed bar controlled restrictions and cancellations to deprive disabled veterans of wills.

642. Pennsylvania Department of Military and Veterans Affairs satisfies the injury element because disabled veterans lost the benefit of government facing veterans service coordination, clear referral pathways, and reliable estate planning access.

643. Robert Leadbetter satisfies the protected interest element because disabled veterans relied on public facing veterans outreach, veterans event access, public official access channels, and community legal service information to connect with estate planning services.

644. Robert Leadbetter satisfies the state action or state connected action element because he used public office authority, community event authority, veterans event access, public service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

645. Robert Leadbetter satisfies the deprivation element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran access to legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

646. Robert Leadbetter satisfies the lack of adequate process element because disabled veterans and their advocates lost public facing outreach opportunities without written standards, notice, neutral review, or a meaningful opportunity to preserve legal service access.

647. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

648. Robert Leadbetter satisfies the injury element because disabled veterans lost access to public facing outreach, veterans event legal service information, and the representatives trying to preserve wills for disabled veterans.

649. Does 1 through 100 satisfies the protected interest element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, and communications participants whose actions affected disabled veterans' estate planning access.

650. Does 1 through 100 satisfies the state action or state connected action element because they include unknown state connected, county connected, bar connected, public service connected, veterans service connected, event connected, and coalition connected actors who supported or preserved the challenged access structures.

651. Does 1 through 100 satisfies the deprivation element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, or retaliation against disabled veteran advocates.

652. Does 1 through 100 satisfies the lack of adequate process element because their unknown communications, votes, decisions, omissions, concealment, enforcement, or ratification deprived disabled veterans and their advocates of written standards, notice, neutral review, transparent meetings, and meaningful opportunity to preserve estate planning access.

653. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, or ratification helped cause the denial, cancellation, restriction, or obstruction of disabled veteran estate planning access.

654. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, and trust in the legal service systems that claimed to serve them.

655. Plaintiff and the class suffered injury because the denial of process reduced estate planning access, reduced public service legal access, damaged

coalition relationships, chilled disabled veteran advocacy, and deprived disabled veterans of the planning infrastructure built for them.

656. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, transparent process, meaningful review, written nonretaliation standards, costs, fees where available, and all other lawful relief.

**Count 7-Pennsylvania Constitution Article I Section 7 Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; Does 1 through 100**

657. Plaintiff incorporates by reference all preceding paragraphs.

658. Pennsylvania Constitution Article I Section 7 provides that "[t]he printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government; and no law shall ever be made to restrain the right thereof," and further provides that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty."

659. The elements of Pennsylvania Constitution Article I Section 7 are state action or state connected action, protected speech, writing, communication, criticism, petitioning related expression, or public advocacy, restriction or retaliation because of that protected activity, causation, and injury.

660. The elements of Article I Section 7 include protected communication, state connected restriction or punishment of communication, and injury.

661. Plaintiff satisfies the protected communication requirement because Plaintiff communicated concerns about disabled veteran exclusion, Wills for Heroes eligibility contradictions, written rules, public service access, and retaliation through meetings, emails, veterans coalitions, and litigation activity.

662. Plaintiff satisfies the restriction requirement because Defendants restricted or punished those communications by refusing agenda placement, refusing meaningful meetings, restricting communications with program staff and volunteers, banning participation, and suspending access after criticism.

663. Plaintiff and the class satisfy the injury requirement because the restrictions chilled disabled veteran advocacy and reduced access to estate planning services.

664. Defendants violated Pennsylvania Constitution Article I Section 7 because disabled veterans and their advocates spoke, wrote, criticized exclusion, requested written eligibility rules, demanded transparent correction, threatened litigation, discussed subpoenas, used veterans coalitions, and sought public correction of Wills for Heroes and Wills for Veterans access barriers, and Defendants' state connected conduct restricted outreach, disrupted veterans service channels, and burdened the communication needed to preserve wills for disabled veterans.

665. Pennsylvania Bar Association satisfies the state action element because state connected statewide bar authority, Wills for Heroes program authority, public service legitimacy, statewide professional influence, and veterans service legal programming that functioned with public facing and state connected legal service authority.

666. Pennsylvania Bar Association satisfies the protected activity element because Plaintiff's representatives used PBA Wills for Heroes communications to criticize exclusion, discuss subpoenas, raise litigation, and seek correction of disabled veteran access barriers.

667. Pennsylvania Bar Association satisfies the restriction or retaliation element because statewide Wills for Heroes authority restricted and banned

Plaintiff's representatives after they challenged disabled veteran exclusion and sought correction of eligibility confusion.

668. Pennsylvania Bar Association satisfies the causation element because its statewide control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

669. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, trust in statewide bar public service programs, and the benefit of representatives willing to correct exclusion.

670. Lycoming Law Association satisfies the state action element because county bar authority, public service legal program authority, Wills for Heroes access, public facing estate planning access, and veterans service legitimacy affecting disabled veterans in Lycoming County.

671. Lycoming Law Association satisfies the protected activity element because Plaintiff's representatives criticized Wills for Heroes access barriers and sought to preserve regional estate planning services for disabled veterans.

672. Lycoming Law Association satisfies the restriction or retaliation element because it cancelled the Wills for Heroes event instead of preserving access for disabled veteran clients who were going to be deprived of wills.

673. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled veteran clients to lose the Wills for Heroes estate planning access that the event was supposed to provide.

674. Lycoming Law Association satisfies the injury element because disabled veterans were deprived of wills, lost timely estate planning access, lost equal public service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

675. Clinton County Bar Association satisfies the state action element because Clinton County Wills for Heroes event structure, local bar participation, public service legal programming, and estate planning access channels affecting disabled veterans.

676. Clinton County Bar Association satisfies the protected activity element because Plaintiff's representatives used Clinton County Wills for Heroes participation and communications to support disabled veteran access and preserve regional estate planning services.

677. Clinton County Bar Association satisfies the restriction or retaliation element because it allowed Wills for Heroes planning, participation, or

access to proceed without clear disabled veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public service procedures after the broader Wills for Heroes access dispute had harmed disabled veterans.

678. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

679. Clinton County Bar Association satisfies the injury element because disabled veterans lost clarity, timely access, public service confidence, coalition support, and dependable estate planning opportunities.

680. Union Snyder County Bar Association satisfies the state action element because county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

681. Union Snyder County Bar Association satisfies the protected activity element because Plaintiff's representatives criticized contradictory eligibility information, demanded transparent committee process, sought written rules, and requested correction of disabled veteran access barriers.

682. Union Snyder County Bar Association satisfies the restriction or retaliation element because it allowed contradictory eligibility statements, excluded disabled veteran advocates from planning, refused meaningful committee process, suspended Wills for Heroes planning, and restricted meeting or membership access after protected advocacy.

683. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

684. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely public service opportunities, coalition pathways, committee representation, public service trust, and the planning infrastructure built for them.

685. William R. Christman III satisfies the state action element because Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

686. William R. Christman III satisfies the protected activity element because Plaintiff's representatives made comments about Wills for Heroes,

subpoenas, and potential litigation before his statewide ban restricted Wills for Heroes participation and communications.

687. William R. Christman III satisfies the restriction or retaliation element because he barred Plaintiff's representatives from participating in current and future Wills for Heroes programs after comments about Wills for Heroes and potential litigation.

688. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

689. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

690. Gabriele Miller Wagner satisfies the state action element because Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

691. Gabriele Miller Wagner satisfies the protected activity element because Plaintiff's representatives contacted statewide Wills for Heroes channels to report local suspension and request preserved or transferred planning for disabled veterans.

692. Gabriele Miller Wagner satisfies the restriction or retaliation element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation and failed to ensure that local exclusion would not deprive disabled veterans of service.

693. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans remained subject to local obstruction and statewide restrictions.

694. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, clear eligibility information, and access to the representatives trying to preserve estate planning services.

695. David K. Trevaskis satisfies the state action element because Pennsylvania Bar Association Wills for Heroes leadership, statewide

program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

696. David K. Trevaskis satisfies the protected activity element because Plaintiff's representatives notified statewide Wills for Heroes leadership that local planning was suspended and asked that disabled veteran services continue through nonretaliatory channels.

697. David K. Trevaskis satisfies the restriction or retaliation element because statewide Wills for Heroes leadership failed to remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or Plaintiff's representatives.

698. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

699. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide intervention.

700. David Andrew Strouse satisfies the state action element because Clinton County Wills for Heroes access, local bar coordination, public

service legal programming, and estate planning access structures affecting disabled veterans.

701. David Andrew Strouse satisfies the protected activity element because Plaintiff's representatives sought to participate in Clinton County Wills for Heroes to preserve disabled veteran access after local exclusion and confusion.

702. David Andrew Strouse satisfies the restriction or retaliation element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans after known access confusion.

703. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination.

704. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate planning access.

705. K. Michael Sullivan satisfies the state action element because local Wills for Heroes authority, Union Snyder County Bar Association authority,

committee authority, planning authority, bar authority, public service legal authority, district attorney authority, and access control authority.

706. K. Michael Sullivan satisfies the protected activity element because Plaintiff's representatives challenged his eligibility statements, requested meetings, asked for written rules, and sought correction through the Bar and veterans coalitions.

707. K. Michael Sullivan satisfies the restriction or retaliation element because he announced that veterans could not receive wills, ignored prior planning work, refused inclusion, and suspended Wills for Heroes planning after disabled veteran access was challenged.

708. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

709. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, faced delay, and lost confidence because the local program would not correct the access problem.

710. Sarah Stigerwalt Egan satisfies the state action element because local Wills for Heroes authority, Union Snyder County Bar Association authority,

committee authority, planning authority, bar authority, public service legal authority, local government email, prosecutorial office status, and access control authority.

711. Sarah Stigerwalt Egan satisfies the protected activity element because Plaintiff's representatives sought transparent meetings, corrected eligibility confusion, requested written rules, and criticized suspension of Wills for Heroes planning.

712. Sarah Stigerwalt Egan satisfies the restriction or retaliation element because she issued or preserved contradictory eligibility communications, refused transparent recorded meetings, treated committee access as discretionary, suspended Wills for Heroes planning, and continued private planning while disabled veterans lacked clear access.

713. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, suspension decision, and private planning caused disabled veterans to lose clear information, committee participation, and timely estate planning access.

714. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

715. Mary Beth Clark satisfies the state action element because North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

716. Mary Beth Clark satisfies the protected activity element because Plaintiff's representatives criticized legal aid failures, bar insider control, and disabled veteran exclusion while seeking correction through USCBA and public service channels.

717. Mary Beth Clark satisfies the restriction or retaliation element because she preserved or participated in the insider structure that displaced Plaintiff's representatives from Wills for Heroes planning and protected insider control over public service legal programs instead of disabled veteran access.

718. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives trying to protect disabled veteran access.

719. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

720. Bloomsburg Fair Association satisfies the state action element because public facing veterans event access, veterans service outreach opportunities, community event access, public service legitimacy, and legal service outreach opportunities affecting disabled veteran access.

721. Bloomsburg Fair Association satisfies the protected activity element because Plaintiff's representatives sought to use public facing veterans outreach to connect disabled veterans with estate planning services after Wills for Heroes and Wills for Veterans advocacy.

722. Bloomsburg Fair Association satisfies the restriction or retaliation element because public event access structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

723. Bloomsburg Fair Association satisfies the causation element because public facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate planning services.

724. Bloomsburg Fair Association satisfies the injury element because disabled veterans lost outreach opportunities, legal service information, event access, and connection to Wills for Veterans or equivalent estate planning services.

725. Pennsylvania Department of Military and Veterans Affairs satisfies the state action element because Pennsylvania state agency authority, veterans service networks, regional communications, coalition channels, public service legitimacy, and government facing veterans service access connected to Wills for Heroes and Wills for Veterans planning.

726. Pennsylvania Department of Military and Veterans Affairs satisfies the protected activity element because Plaintiff's representatives used DMVA related veterans service channels and coalitions to speak, write, criticize exclusion, request correction, and seek Wills for Heroes or Wills for Veterans access.

727. Pennsylvania Department of Military and Veterans Affairs satisfies the restriction or retaliation element because its veterans service networks and coalition channels were disrupted when Wills for Heroes access was suspended, restricted, contradicted, or conditioned after disabled veteran advocacy.

728. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans service access allowed bar controlled restrictions and cancellations to deprive disabled veterans of wills and coalition pathways after correction was sought.

729. Pennsylvania Department of Military and Veterans Affairs satisfies the injury element because disabled veterans lost government facing veterans service coordination, clear referral pathways, reliable estate planning access, coalition pathways, public service trust, and the benefit of representatives trying to preserve wills for disabled veterans.

730. Robert Leadbetter satisfies the state action element because public office authority, community event authority, veterans event access, public service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

731. Robert Leadbetter satisfies the protected activity element because Plaintiff's representatives engaged in disabled veteran advocacy through public facing veterans outreach, veterans event access, public communications, criticism of access barriers, and efforts to connect disabled veterans with estate planning services.

732. Robert Leadbetter satisfies the restriction or retaliation element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

733. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing

outreach channels and access to Wills for Heroes or Wills for Veterans information.

734. Robert Leadbetter satisfies the injury element because disabled veterans lost public facing outreach, veterans event legal service information, and connection to the representatives trying to preserve wills for disabled veterans.

735. Does 1 through 100 satisfies the state action element because unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, communications participants, public officials, public employees, and joint actors who supported or preserved the challenged access structures.

736. Does 1 through 100 satisfies the protected activity element because they received or knew of disabled veterans' protected speech, written objections, eligibility objections, requests for correction, criticism, petitioning, litigation threats, subpoenas, and public advocacy.

737. Does 1 through 100 satisfies the restriction or retaliation element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation,

Wills for Veterans obstruction, access restriction, eligibility confusion, service suspension, or retaliation against disabled veteran advocates.

738. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause the denial, cancellation, restriction, suspension, or obstruction of disabled veteran estate planning access.

739. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, veterans service coordination, public meeting access, public trust, and practical access to systems that claimed to serve them.

740. Plaintiff and the class suffered injury because Defendants' state connected conduct reduced estate planning access, reduced veterans service coordination, reduced public facing outreach, damaged coalition relationships, chilled disabled veteran advocacy, impaired property and family planning, and deprived disabled veterans of the planning infrastructure built for them.

741. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for

Veterans access, written eligibility standards, written disability access standards, written nonretaliation standards, communication access, preservation of records, costs, attorneys' fees where available, and all other lawful relief.

**Count 8-Pennsylvania Constitution Article I Section 1 Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; Does 1 through 100**

742. Plaintiff incorporates by reference all preceding paragraphs.

743. Pennsylvania Constitution Article I Section 1 provides that "All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."

744. The elements of Article I Section 1 include protected inherent rights to life, liberty, property, reputation, and the pursuit of happiness, state connected interference with those rights, and injury.

745. Plaintiff and the class satisfy the protected rights requirement because disabled veterans had protected interests in dignity, reputation, legal service

access, public service equality, estate planning access, and freedom from retaliation for seeking equal treatment.

746. Plaintiff and the class satisfy the interference requirement because Defendants interfered with those rights by creating eligibility confusion, excluding advocates, suspending services, banning participation, and preserving systems that treated disabled veterans as less worthy of reliable estate planning access.

747. Plaintiff and the class satisfy the injury requirement because disabled veterans suffered confusion, delay, reputational harm, loss of trust, loss of service access, and deterrence from seeking future help.

748. Defendants violated Pennsylvania Constitution Article I Section 1 because disabled veterans had protected interests in liberty, dignity, property planning, family security, reputation, safety, and pursuit of happiness through equal access to estate planning, Wills for Heroes, Wills for Veterans, public facing veterans outreach, government facing veterans service channels, and related public service legal access, but Defendants' state connected conduct left disabled veterans with contradictory eligibility information, reduced outreach, disrupted access, and loss of the representatives trying to preserve wills for disabled veterans.

749. Pennsylvania Bar Association satisfies the state action element because state connected statewide bar authority, Wills for Heroes program authority, public service legitimacy, statewide professional influence, and veterans service legal programming that functioned with public facing and state connected legal service authority.

750. Pennsylvania Bar Association satisfies the protected interest element because disabled veterans relied on statewide Wills for Heroes branding, training, staff communications, volunteer channels, eligibility communications, and public service representations to obtain estate planning access to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

751. Pennsylvania Bar Association satisfies the interference or deprivation element because statewide Wills for Heroes authority restricted and banned Plaintiff's representatives after they challenged disabled veteran exclusion and sought correction of eligibility confusion.

752. Pennsylvania Bar Association satisfies the causation element because its statewide control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

753. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, trust in statewide bar public service programs, and the benefit of representatives willing to correct exclusion.

754. Lycoming Law Association satisfies the state action element because county bar authority, public service legal program authority, Wills for Heroes access, public facing estate planning access, and veterans service legitimacy affecting disabled veterans in Lycoming County.

755. Lycoming Law Association satisfies the protected interest element because disabled veterans relied on regional Wills for Heroes access, county bar public service structures, veterans service coordination, and estate planning outreach to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

756. Lycoming Law Association satisfies the interference or deprivation element because it cancelled the Wills for Heroes event instead of preserving access for disabled veteran clients who were going to be deprived of wills.

757. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled veteran clients to lose the Wills for Heroes estate planning access that the event was supposed to provide.

758. Lycoming Law Association satisfies the injury element because disabled veterans were deprived of wills, lost timely estate planning access, lost equal public service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

759. Clinton County Bar Association satisfies the state action element because Clinton County Wills for Heroes event structure, local bar participation, public service legal programming, and estate planning access channels affecting disabled veterans.

760. Clinton County Bar Association satisfies the protected interest element because disabled veterans relied on Clinton County Wills for Heroes access, local bar coordination, public service legal programming, and estate planning channels to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

761. Clinton County Bar Association satisfies the interference or deprivation element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public service procedures after the broader Wills for Heroes access dispute had harmed disabled veterans.

762. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

763. Clinton County Bar Association satisfies the injury element because disabled veterans lost clarity, timely access, public service confidence, coalition support, and dependable estate planning opportunities.

764. Union Snyder County Bar Association satisfies the state action element because county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

765. Union Snyder County Bar Association satisfies the protected interest element because disabled veterans relied on local Wills for Heroes access, committee planning, veterans service coordination, public service outreach, and bar connected estate planning services to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

766. Union Snyder County Bar Association satisfies the interference or deprivation element because it allowed contradictory eligibility statements, excluded disabled veteran advocates from planning, refused meaningful

committee process, suspended Wills for Heroes planning, and restricted meeting or membership access after protected advocacy.

767. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

768. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely public service opportunities, coalition pathways, committee representation, public service trust, and the planning infrastructure built for them.

769. William R. Christman III satisfies the state action element because Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

770. William R. Christman III satisfies the protected interest element because disabled veterans relied on statewide Wills for Heroes staff, volunteers, communications, future event access, and estate planning coordination to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

771. William R. Christman III satisfies the interference or deprivation element because he barred Plaintiff's representatives from participating in current and future Wills for Heroes programs after comments about Wills for Heroes and potential litigation.

772. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

773. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

774. Gabriele Miller Wagner satisfies the state action element because Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

775. Gabriele Miller Wagner satisfies the protected interest element because disabled veterans relied on statewide Wills for Heroes scheduling, training, volunteer coordination, staff communications, and event access to

protect property planning, family security, dignity, safety, reputation, and personal autonomy.

776. Gabriele Miller Wagner satisfies the interference or deprivation element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation and failed to ensure that local exclusion would not deprive disabled veterans of service.

777. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans remained subject to local obstruction and statewide restrictions.

778. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, clear eligibility information, and access to the representatives trying to preserve estate planning services.

779. David K. Trevaskis satisfies the state action element because Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

780. David K. Trevaskis satisfies the protected interest element because disabled veterans relied on statewide program guidance, training, staff communications, volunteer authority, and Wills for Heroes coordination to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

781. David K. Trevaskis satisfies the interference or deprivation element because statewide Wills for Heroes leadership failed to remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or Plaintiff's representatives.

782. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

783. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide intervention.

784. David Andrew Strouse satisfies the state action element because Clinton County Wills for Heroes access, local bar coordination, public

service legal programming, and estate planning access structures affecting disabled veterans.

785. David Andrew Strouse satisfies the protected interest element because disabled veterans relied on Clinton County Wills for Heroes access, local bar coordination, public service legal programming, and estate planning channels to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

786. David Andrew Strouse satisfies the interference or deprivation element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans after known access confusion.

787. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination.

788. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate planning access.

789. K. Michael Sullivan satisfies the state action element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, district attorney authority, and access control authority.

790. K. Michael Sullivan satisfies the protected interest element because disabled veterans relied on local Wills for Heroes eligibility information, committee planning, veterans service outreach, and public service estate planning access to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

791. K. Michael Sullivan satisfies the interference or deprivation element because he announced that veterans could not receive wills, ignored prior planning work, refused inclusion, and suspended Wills for Heroes planning after disabled veteran access was challenged.

792. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

793. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information,

faced delay, and lost confidence because the local program would not correct the access problem.

794. Sarah Stigerwalt Egan satisfies the state action element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, local government email, prosecutorial office status, and access control authority.

795. Sarah Stigerwalt Egan satisfies the protected interest element because disabled veterans relied on local Wills for Heroes communications, eligibility correction, committee process, veterans service coordination, and estate planning access to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

796. Sarah Stigerwalt Egan satisfies the interference or deprivation element because she issued or preserved contradictory eligibility communications, refused transparent recorded meetings, treated committee access as discretionary, suspended Wills for Heroes planning, and continued private planning while disabled veterans lacked clear access.

797. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, suspension decision, and private planning caused

disabled veterans to lose clear information, committee participation, and timely estate planning access.

798. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

799. Mary Beth Clark satisfies the state action element because North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

800. Mary Beth Clark satisfies the protected interest element because disabled veterans relied on legal aid pathways, local pro bono structures, bar connected estate planning programs, and public service legal access to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

801. Mary Beth Clark satisfies the interference or deprivation element because she preserved or participated in the insider structure that displaced Plaintiff's representatives from Wills for Heroes planning and protected insider control over public service legal programs instead of disabled veteran access.

802. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives trying to protect disabled veteran access.

803. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

804. Bloomsburg Fair Association satisfies the state action element because public facing veterans event access, veterans service outreach opportunities, community event access, public service legitimacy, and legal service outreach opportunities affecting disabled veteran access.

805. Bloomsburg Fair Association satisfies the protected interest element because disabled veterans relied on public facing veterans outreach, veterans event access, public official access channels, community legal service information, and estate planning referrals to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

806. Bloomsburg Fair Association satisfies the interference or deprivation element because public event access structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

807. Bloomsburg Fair Association satisfies the causation element because public facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate planning services.

808. Bloomsburg Fair Association satisfies the injury element because disabled veterans lost outreach opportunities, legal service information, event access, and connection to Wills for Veterans or equivalent estate planning services.

809. Pennsylvania Department of Military and Veterans Affairs satisfies the state action element because Pennsylvania state agency authority, veterans service networks, regional communications, coalition channels, public service legitimacy, and government facing veterans service access connected to Wills for Heroes and Wills for Veterans planning.

810. Pennsylvania Department of Military and Veterans Affairs satisfies the protected interest element because disabled veterans relied on veterans service networks, regional communications, coalition channels, public service legitimacy, government facing veterans service access, and Wills for Heroes or Wills for Veterans coordination to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

811. Pennsylvania Department of Military and Veterans Affairs satisfies the interference or deprivation element because its veterans service networks and coalition channels were disrupted when Wills for Heroes access was suspended, restricted, contradicted, or conditioned after disabled veteran advocacy.

812. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans service access allowed bar controlled restrictions and cancellations to deprive disabled veterans of wills and coalition pathways after correction was sought.

813. Pennsylvania Department of Military and Veterans Affairs satisfies the injury element because disabled veterans lost government facing veterans service coordination, clear referral pathways, reliable estate planning access, coalition pathways, public service trust, and the benefit of representatives trying to preserve wills for disabled veterans.

814. Robert Leadbetter satisfies the state action element because public office authority, community event authority, veterans event access, public service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

815. Robert Leadbetter satisfies the protected interest element because disabled veterans relied on public facing veterans outreach, veterans event access, public official access channels, and community legal service information to connect with estate planning services to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

816. Robert Leadbetter satisfies the interference or deprivation element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

817. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

818. Robert Leadbetter satisfies the injury element because disabled veterans lost public facing outreach, veterans event legal service information, and connection to the representatives trying to preserve wills for disabled veterans.

819. Does 1 through 100 satisfies the state action element because unknown bar members, officers, employees, volunteers, committee

participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, communications participants, public officials, public employees, and joint actors who supported or preserved the challenged access structures.

820. Does 1 through 100 satisfies the protected interest element because disabled veterans relied on unknown public service, veterans service, event access, coalition, government connected, and joint action actors whose actions affected estate planning access, veterans service access, public facing outreach, and legal service access to protect property planning, family security, dignity, safety, reputation, and personal autonomy.

821. Does 1 through 100 satisfies the interference or deprivation element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, access restriction, eligibility confusion, service suspension, or retaliation against disabled veteran advocates.

822. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause the denial,

cancellation, restriction, suspension, or obstruction of disabled veteran estate planning access.

823. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, veterans service coordination, public meeting access, public trust, and practical access to systems that claimed to serve them.

824. Plaintiff and the class suffered injury because Defendants' state connected conduct reduced estate planning access, reduced veterans service coordination, reduced public facing outreach, damaged coalition relationships, chilled disabled veteran advocacy, impaired property and family planning, and deprived disabled veterans of the planning infrastructure built for them.

825. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, written disability access standards, written nonretaliation standards, costs, attorneys' fees where available, and all other lawful relief.

**Count 9-Pennsylvania Constitution Article I Section 20 Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; Does 1 through 100**

826. Plaintiff incorporates by reference all preceding paragraphs.

827. Pennsylvania Constitution Article I Section 20 provides that "[t]he citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance."

828. Plaintiff and the class satisfy the assembly and association requirement because disabled veterans, veterans coalitions, student volunteers, notaries, public service partners, bar volunteers, and representatives associated to obtain estate planning access for disabled veterans.

829. Plaintiff and the class satisfy the interference requirement because Defendants interfered with those associations by excluding representatives from planning, limiting coalition participation, restricting communications,

banning Wills for Heroes participation, and choosing procedures that undermined volunteer and student participation.

830. Plaintiff and the class satisfy the injury requirement because the interference broke public service relationships and reduced the practical ability to deliver estate planning services to disabled veterans.

831. Defendants violated Pennsylvania Constitution Article I Section 20 because disabled veterans and their advocates assembled, petitioned, addressed, remonstrated, and sought redress through veterans service channels, veterans coalitions, public facing veterans events, written requests for correction, litigation related communications, subpoenas, and government facing veterans service channels, and Defendants' state connected conduct disrupted outreach, restricted access, burdened redress activity, and interfered with the collective effort to preserve wills for disabled veterans.

832. Pennsylvania Bar Association satisfies the state action element because state connected statewide bar authority, Wills for Heroes program authority, public service legitimacy, statewide professional influence, and veterans service legal programming that functioned with public facing and state connected legal service authority.

833. Pennsylvania Bar Association satisfies the protected activity element because Plaintiff's representatives used PBA Wills for Heroes communications to criticize exclusion, discuss subpoenas, raise litigation, and seek correction of disabled veteran access barriers.

834. Pennsylvania Bar Association satisfies the restriction, exclusion, retaliation, cancellation, or interference element because statewide Wills for Heroes authority restricted and banned Plaintiff's representatives after they challenged disabled veteran exclusion and sought correction of eligibility confusion.

835. Pennsylvania Bar Association satisfies the causation element because its statewide control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate planning access.

836. Pennsylvania Bar Association satisfies the injury element because disabled veterans lost reliable access to Wills for Heroes planning, trust in statewide bar public service programs, and the benefit of representatives willing to correct exclusion.

837. Lycoming Law Association satisfies the state action element because county bar authority, public service legal program authority, Wills for

Heroes access, public facing estate planning access, and veterans service legitimacy affecting disabled veterans in Lycoming County.

838. Lycoming Law Association satisfies the protected activity element because Plaintiff's representatives criticized Wills for Heroes access barriers and sought to preserve regional estate planning services for disabled veterans.

839. Lycoming Law Association satisfies the restriction, exclusion, retaliation, cancellation, or interference element because it cancelled the Wills for Heroes event instead of preserving access for disabled veteran clients who were going to be deprived of wills.

840. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled veteran clients to lose the Wills for Heroes estate planning access that the event was supposed to provide.

841. Lycoming Law Association satisfies the injury element because disabled veterans were deprived of wills, lost timely estate planning access, lost equal public service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

842. Clinton County Bar Association satisfies the state action element because Clinton County Wills for Heroes event structure, local bar

participation, public service legal programming, and estate planning access channels affecting disabled veterans.

843. Clinton County Bar Association satisfies the protected activity element because Plaintiff's representatives used Clinton County Wills for Heroes participation and communications to support disabled veteran access and preserve regional estate planning services.

844. Clinton County Bar Association satisfies the restriction, exclusion, retaliation, cancellation, or interference element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public service procedures after the broader Wills for Heroes access dispute had harmed disabled veterans.

845. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate planning services.

846. Clinton County Bar Association satisfies the injury element because disabled veterans lost clarity, timely access, public service confidence, coalition support, and dependable estate planning opportunities.

847. Union Snyder County Bar Association satisfies the state action element because county bar authority, local legal system legitimacy, Wills for Heroes program authority, committee authority, meeting authority, public service legal authority, and veterans service access influence.

848. Union Snyder County Bar Association satisfies the protected activity element because Plaintiff's representatives criticized contradictory eligibility information, demanded transparent committee process, sought written rules, and requested correction of disabled veteran access barriers.

849. Union Snyder County Bar Association satisfies the restriction, exclusion, retaliation, cancellation, or interference element because it allowed contradictory eligibility statements, excluded disabled veteran advocates from planning, refused meaningful committee process, suspended Wills for Heroes planning, and restricted meeting or membership access after protected advocacy.

850. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

851. Union Snyder County Bar Association satisfies the injury element because disabled veterans lost dependable estate planning access, timely

public service opportunities, coalition pathways, committee representation, public service trust, and the planning infrastructure built for them.

852. William R. Christman III satisfies the state action element because Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

853. William R. Christman III satisfies the protected activity element because Plaintiff's representatives made comments about Wills for Heroes, subpoenas, and potential litigation before his statewide ban restricted Wills for Heroes participation and communications.

854. William R. Christman III satisfies the restriction, exclusion, retaliation, cancellation, or interference element because he barred Plaintiff's representatives from participating in current and future Wills for Heroes programs after comments about Wills for Heroes and potential litigation.

855. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

856. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning

infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

857. Gabriele Miller Wagner satisfies the state action element because Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

858. Gabriele Miller Wagner satisfies the protected activity element because Plaintiff's representatives contacted statewide Wills for Heroes channels to report local suspension and request preserved or transferred planning for disabled veterans.

859. Gabriele Miller Wagner satisfies the restriction, exclusion, retaliation, cancellation, or interference element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation and failed to ensure that local exclusion would not deprive disabled veterans of service.

860. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service

channels, but disabled veterans remained subject to local obstruction and statewide restrictions.

861. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, clear eligibility information, and access to the representatives trying to preserve estate planning services.

862. David K. Trevaskis satisfies the state action element because Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

863. David K. Trevaskis satisfies the protected activity element because Plaintiff's representatives notified statewide Wills for Heroes leadership that local planning was suspended and asked that disabled veteran services continue through nonretaliatory channels.

864. David K. Trevaskis satisfies the restriction, exclusion, retaliation, cancellation, or interference element because statewide Wills for Heroes leadership failed to remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or Plaintiff's representatives.

865. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

866. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide intervention.

867. David Andrew Strouse satisfies the state action element because Clinton County Wills for Heroes access, local bar coordination, public service legal programming, and estate planning access structures affecting disabled veterans.

868. David Andrew Strouse satisfies the protected activity element because Plaintiff's representatives sought to participate in Clinton County Wills for Heroes to preserve disabled veteran access after local exclusion and confusion.

869. David Andrew Strouse satisfies the restriction, exclusion, retaliation, cancellation, or interference element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans after known access confusion.

870. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination.

871. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate planning access.

872. K. Michael Sullivan satisfies the state action element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, district attorney authority, and access control authority.

873. K. Michael Sullivan satisfies the protected activity element because Plaintiff's representatives challenged his eligibility statements, requested meetings, asked for written rules, and sought correction through the Bar and veterans coalitions.

874. K. Michael Sullivan satisfies the restriction, exclusion, retaliation, cancellation, or interference element because he announced that veterans could not receive wills, ignored prior planning work, refused inclusion, and suspended Wills for Heroes planning after disabled veteran access was challenged.

875. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

876. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, faced delay, and lost confidence because the local program would not correct the access problem.

877. Sarah Stigerwalt Egan satisfies the state action element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, local government email, prosecutorial office status, and access control authority.

878. Sarah Stigerwalt Egan satisfies the protected activity element because Plaintiff's representatives sought transparent meetings, corrected eligibility confusion, requested written rules, and criticized suspension of Wills for Heroes planning.

879. Sarah Stigerwalt Egan satisfies the restriction, exclusion, retaliation, cancellation, or interference element because she issued or preserved contradictory eligibility communications, refused transparent recorded

meetings, treated committee access as discretionary, suspended Wills for Heroes planning, and continued private planning while disabled veterans lacked clear access.

880. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, suspension decision, and private planning caused disabled veterans to lose clear information, committee participation, and timely estate planning access.

881. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

882. Mary Beth Clark satisfies the state action element because North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

883. Mary Beth Clark satisfies the protected activity element because Plaintiff's representatives criticized legal aid failures, bar insider control, and disabled veteran exclusion while seeking correction through USCBA and public service channels.

884. Mary Beth Clark satisfies the restriction, exclusion, retaliation, cancellation, or interference element because she preserved or participated in

the insider structure that displaced Plaintiff's representatives from Wills for Heroes planning and protected insider control over public service legal programs instead of disabled veteran access.

885. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives trying to protect disabled veteran access.

886. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

887. Bloomsburg Fair Association satisfies the state action element because public facing veterans event access, veterans service outreach opportunities, community event access, public service legitimacy, and legal service outreach opportunities affecting disabled veteran access.

888. Bloomsburg Fair Association satisfies the protected activity element because Plaintiff's representatives sought to use public facing veterans outreach to connect disabled veterans with estate planning services after Wills for Heroes and Wills for Veterans advocacy.

889. Bloomsburg Fair Association satisfies the restriction, exclusion, retaliation, cancellation, or interference element because public event access

structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

890. Bloomsburg Fair Association satisfies the causation element because public facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate planning services.

891. Bloomsburg Fair Association satisfies the injury element because disabled veterans lost outreach opportunities, legal service information, event access, and connection to Wills for Veterans or equivalent estate planning services.

892. Pennsylvania Department of Military and Veterans Affairs satisfies the state action element because Pennsylvania state agency authority, veterans service networks, regional communications, coalition channels, public service legitimacy, and government facing veterans service access connected to Wills for Heroes and Wills for Veterans planning.

893. Pennsylvania Department of Military and Veterans Affairs satisfies the protected activity element because Plaintiff's representatives used DMVA related veterans service channels and coalitions to speak, write,

criticize exclusion, request correction, and seek Wills for Heroes or Wills for Veterans access.

894. Pennsylvania Department of Military and Veterans Affairs satisfies the restriction, exclusion, retaliation, cancellation, or interference element because its veterans service networks and coalition channels were disrupted when Wills for Heroes access was suspended, restricted, contradicted, or conditioned after disabled veteran advocacy.

895. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans service access allowed bar controlled restrictions and cancellations to deprive disabled veterans of wills and coalition pathways after correction was sought.

896. Pennsylvania Department of Military and Veterans Affairs satisfies the injury element because disabled veterans lost government facing veterans service coordination, clear referral pathways, reliable estate planning access, coalition pathways, public service trust, and the benefit of representatives trying to preserve wills for disabled veterans.

897. Robert Leadbetter satisfies the state action element because public office authority, community event authority, veterans event access, public

service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

898. Robert Leadbetter satisfies the protected activity element because Plaintiff's representatives engaged in disabled veteran advocacy through public facing veterans outreach, veterans event access, public communications, criticism of access barriers, and efforts to connect disabled veterans with estate planning services.

899. Robert Leadbetter satisfies the restriction, exclusion, retaliation, cancellation, or interference element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

900. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

901. Robert Leadbetter satisfies the injury element because disabled veterans lost public facing outreach, veterans event legal service information, and connection to the representatives trying to preserve wills for disabled veterans.

902. Does 1 through 100 satisfies the state action element because unknown bar members, officers, employees, volunteers, committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, communications participants, public officials, public employees, and joint actors who supported or preserved the challenged access structures.

903. Does 1 through 100 satisfies the protected activity element because they received or knew of disabled veterans' protected speech, written objections, eligibility objections, requests for correction, criticism, petitioning, litigation threats, subpoenas, and public advocacy.

904. Does 1 through 100 satisfies the restriction, exclusion, retaliation, cancellation, or interference element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, access restriction, eligibility confusion, service suspension, or retaliation against disabled veteran advocates.

905. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause the denial,

cancellation, restriction, suspension, or obstruction of disabled veteran estate planning access.

906. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, veterans service coordination, public meeting access, public trust, and practical access to systems that claimed to serve them.

907. Plaintiff and the class suffered injury because Defendants' state connected conduct reduced estate planning access, reduced veterans service coordination, reduced public facing outreach, damaged coalition relationships, chilled disabled veteran advocacy, impaired property and family planning, and deprived disabled veterans of the planning infrastructure built for them.

908. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, written disability access standards, written nonretaliation standards, communication access, preservation of records, costs, attorneys' fees where available, and all other lawful relief.

**Count 10-Pennsylvania Constitution Article VI Public Officers and Accountability Against William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Robert Leadbetter; Does 1 through 100**

909. Plaintiff incorporates by reference all preceding paragraphs.

910. Pennsylvania Constitution Article VI Section 3 provides that "Senators, Representatives and all judicial, State and county officers shall, before entering on the duties of their respective offices, take and subscribe the following oath or affirmation before a person authorized to administer oaths. 'I do solemnly swear (or affirm) that I will support, obey and defend the Constitution of the United States and the Constitution of this Commonwealth and that I will discharge the duties of my office with fidelity.'"

911. Pennsylvania Constitution Article VI Section 7 provides that "[a]ll civil officers shall hold their offices on the condition that they behave themselves well while in office, and shall be removed on conviction of misbehavior in office or of any infamous crime," and that "[a]ppointed civil officers, other than judges of the courts of record, may be removed at the pleasure of the power by which they shall have been appointed."

912. Defendants violated Pennsylvania Constitution Article VI Section 3 and 7 because oath bound public officers, state connected actors, and private actors jointly acting with them used or preserved state, county, veterans

service, public event, and public facing authority in a manner that denied disabled veterans equal access to Wills for Heroes, Wills for Veterans, veterans service legal programs, public facing estate planning services, public outreach, and the representatives who were trying to correct exclusion and preserve wills for disabled veterans.

913. William R. Christman III satisfies the oath bound public officer or joint action element because he used PBA authority in joint action with state connected veterans service actors, public officials, and Wills for Heroes public service actors to restrict disabled veteran access.

914. William R. Christman III satisfies the state or county office authority element because Pennsylvania Bar Association legal authority, statewide bar authority, Wills for Heroes program authority, communication control, and public service legal program influence over access to estate planning services.

915. William R. Christman III satisfies the constitutional duty element because disabled veterans interacting with William R. Christman III were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

916. William R. Christman III satisfies the failure to discharge with fidelity element because he barred Plaintiff's representatives from participating in current and future Wills for Heroes programs after comments about Wills for Heroes and potential litigation.

917. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled veteran access problems.

918. William R. Christman III satisfies the injury element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

919. Gabriele Miller Wagner satisfies the oath bound public officer or joint action element because she used statewide Wills for Heroes coordination in joint action with PBA actors, DMVA actors, public officials, and veterans service actors.

920. Gabriele Miller Wagner satisfies the state or county office authority element because Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer

support, scheduling influence, and statewide public service legitimacy affecting disabled veteran access.

921. Gabriele Miller Wagner satisfies the constitutional duty element because disabled veterans interacting with Gabriele Miller Wagner were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

922. Gabriele Miller Wagner satisfies the failure to discharge with fidelity element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation and failed to ensure that local exclusion would not deprive disabled veterans of service.

923. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans service channels, but disabled veterans remained subject to local obstruction and statewide restrictions.

924. Gabriele Miller Wagner satisfies the injury element because disabled veterans lost the benefit of statewide Wills for Heroes correction, clear eligibility information, and access to the representatives trying to preserve estate planning services.

925. David K. Trevaskis satisfies the oath bound public officer or joint action element because he used statewide program influence in joint action with PBA actors, DMVA actors, and veterans service actors affecting disabled veteran access.

926. David K. Trevaskis satisfies the state or county office authority element because Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public service communications, training authority, volunteer authority, and public service legal influence.

927. David K. Trevaskis satisfies the constitutional duty element because disabled veterans interacting with David K. Trevaskis were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

928. David K. Trevaskis satisfies the failure to discharge with fidelity element because statewide Wills for Heroes leadership failed to remove the barriers created after disabled veterans and their advocates challenged exclusion and asked that planning continue through veterans coalitions or Plaintiff’s representatives.

929. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes

access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

930. David K. Trevaskis satisfies the injury element because disabled veterans lost clear access to Wills for Heroes, timely estate planning opportunities, and the practical benefit of statewide intervention.

931. David Andrew Strouse satisfies the oath bound public officer or joint action element because he jointly acted with Clinton County bar actors, PBA actors, public service actors, and state connected veterans service actors in Wills for Heroes access structures.

932. David Andrew Strouse satisfies the state or county office authority element because Clinton County Wills for Heroes access, local bar coordination, public service legal programming, and estate planning access structures affecting disabled veterans.

933. David Andrew Strouse satisfies the constitutional duty element because disabled veterans interacting with David Andrew Strouse were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

934. David Andrew Strouse satisfies the failure to discharge with fidelity element because he preserved, enforced, or benefited from Wills for Heroes

access structures that lacked clear disabled veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans after known access confusion.

935. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public service trust, or estate planning coordination.

936. David Andrew Strouse satisfies the injury element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate planning access.

937. K. Michael Sullivan satisfies the oath bound public officer or joint action element because he used district attorney authority, local bar authority, committee authority, and joint action with state connected veterans service actors to affect disabled veteran access.

938. K. Michael Sullivan satisfies the state or county office authority element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, district attorney authority, and access control authority.

939. K. Michael Sullivan satisfies the constitutional duty element because disabled veterans interacting with K. Michael Sullivan were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

940. K. Michael Sullivan satisfies the failure to discharge with fidelity element because he announced that veterans could not receive wills, ignored prior planning work, refused inclusion, and suspended Wills for Heroes planning after disabled veteran access was challenged.

941. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

942. K. Michael Sullivan satisfies the injury element because disabled veterans lost estate planning services, received conflicting information, faced delay, and lost confidence because the local program would not correct the access problem.

943. Sarah Stigerwalt Egan satisfies the oath bound public officer or joint action element because she used local government email, prosecutorial office status, USCBA leadership, and joint action with DMVA actors and statewide bar actors to affect disabled veteran access.

944. Sarah Stigerwalt Egan satisfies the state or county office authority element because local Wills for Heroes authority, Union Snyder County Bar Association authority, committee authority, planning authority, bar authority, public service legal authority, local government email, prosecutorial office status, and access control authority.

945. Sarah Stigerwalt Egan satisfies the constitutional duty element because disabled veterans interacting with Sarah Stigerwalt Egan were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

946. Sarah Stigerwalt Egan satisfies the failure to discharge with fidelity element because she issued or preserved contradictory eligibility communications, refused transparent recorded meetings, treated committee access as discretionary, suspended Wills for Heroes planning, and continued private planning while disabled veterans lacked clear access.

947. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, suspension decision, and private planning caused disabled veterans to lose clear information, committee participation, and timely estate planning access.

948. Sarah Stigerwalt Egan satisfies the injury element because disabled veterans were invited, excluded, corrected, and then deprived of future estate planning access through the same program that claimed to serve heroes.

949. Mary Beth Clark satisfies the oath bound public officer or joint action element because she jointly acted with legal aid, bar, court connected, public service, and state connected actors in the system affecting disabled veteran legal service access.

950. Mary Beth Clark satisfies the state or county office authority element because North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public service legal influence, and Wills for Heroes related authority affecting disabled veteran access.

951. Mary Beth Clark satisfies the constitutional duty element because disabled veterans interacting with Mary Beth Clark were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

952. Mary Beth Clark satisfies the failure to discharge with fidelity element because she preserved or participated in the insider structure that displaced Plaintiff’s representatives from Wills for Heroes planning and protected

insider control over public service legal programs instead of disabled veteran access.

953. Mary Beth Clark satisfies the causation element because her local bar influence, legal aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives trying to protect disabled veteran access.

954. Mary Beth Clark satisfies the injury element because disabled veterans lost access to the planning history, legal service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

955. Robert Leadbetter satisfies the oath bound public officer or joint action element because he used public office authority and public facing outreach authority affecting disabled veteran legal service access.

956. Robert Leadbetter satisfies the state or county office authority element because public office authority, community event authority, veterans event access, public service legitimacy, and public facing outreach authority affecting disabled veteran legal service access.

957. Robert Leadbetter satisfies the constitutional duty element because disabled veterans interacting with Robert Leadbetter were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

958. Robert Leadbetter satisfies the failure to discharge with fidelity element because public office and public facing veterans event access structures were used or preserved in a manner that reduced disabled veteran legal service outreach after Wills for Heroes and Wills for Veterans advocacy.

959. Robert Leadbetter satisfies the causation element because his public office and event access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

960. Robert Leadbetter satisfies the injury element because disabled veterans lost public facing outreach, veterans event legal service information, and connection to the representatives trying to preserve wills for disabled veterans.

961. Does 1 through 100 satisfies the oath bound public officer or joint action element because they include unknown state actors, public officials, public employees, public event actors using public authority, veterans service actors using governmental authority, and private actors whose joint action with state actors will be confirmed through discovery.

962. Does 1 through 100 satisfies the state or county office authority element because unknown bar members, officers, employees, volunteers,

committee participants, veterans service actors, public event actors, Wills for Heroes actors, Wills for Veterans actors, state connected actors, county connected actors, coalition participants, public service actors, communications participants, public officials, public employees, and joint actors who supported or preserved the challenged access structures.

963. Does 1 through 100 satisfies the constitutional duty element because disabled veterans interacting with Does 1 through 100 were entitled to equal access, disability access, speech, petitioning, assembly, redress, remedies, civil rights, and nonretaliatory public service participation.

964. Does 1 through 100 satisfies the failure to discharge with fidelity element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from disabled veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, access restriction, eligibility confusion, service suspension, or retaliation against disabled veteran advocates.

965. Does 1 through 100 satisfies the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause the denial, cancellation, restriction, suspension, or obstruction of disabled veteran estate planning access.

966. Does 1 through 100 satisfies the injury element because disabled veterans lost services, clear information, timely wills, public service access, coalition pathways, veterans service coordination, public meeting access, public trust, and practical access to systems that claimed to serve them.

967. Plaintiff and the class suffered injury because Defendants' state connected conduct reduced estate planning access, reduced veterans service coordination, reduced public facing outreach, damaged coalition relationships, chilled disabled veteran advocacy, impaired property and family planning, and deprived disabled veterans of the planning infrastructure built for them.

968. Plaintiff and the class satisfy the authority requirement because Defendants used or benefited from public office authority, court connected authority, veterans service authority, bar governance authority, public event access, and legal service legitimacy.

969. Plaintiff and the class satisfy the misuse or failure requirement because Defendants used or failed to correct those authority structures after disabled veterans received contradictory eligibility information, after services were suspended, and after advocates were banned or excluded for seeking correction.

970. Plaintiff and the class satisfy the injury requirement because disabled veterans lost accountability, service access, public trust, and meaningful correction from the public service systems that affected them.

971. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, restored Wills for Heroes or equivalent Wills for Veterans access, written eligibility standards, written disability access standards, written nonretaliation standards, communication access, preservation of records, costs, attorneys' fees where available, and all other lawful relief.

**Count 11-Gross Negligence Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

972. Plaintiff incorporates by reference all preceding paragraphs.

973. The elements of gross negligence are duty, an extreme departure from ordinary care, causation, and damages.

974. Defendants committed gross negligence because they undertook, controlled, promoted, administered, endorsed, restricted, preserved, or influenced public-service legal functions affecting disabled veterans who depended on clear estate-planning access, then ignored repeated warnings that disabled veterans were confused and excluded, refused transparent meetings, suspended services during unresolved access needs, banned or excluded the representatives who had been correcting the problem, and preserved access confusion after knowing disabled veterans still needed wills.

975. Pennsylvania Bar Association satisfies the duty element because it supplied statewide Wills for Heroes authority, program structure, training, staff communications, flyer templates, volunteer channels, public legitimacy, and bar-sponsored estate-planning infrastructure affecting disabled veterans.

976. Pennsylvania Bar Association satisfies the extreme-departure element because it preserved statewide participation restrictions and communication restrictions after disabled-veteran advocates had repeatedly identified eligibility confusion, service suspension, and the need to preserve wills for disabled veterans.

977. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban

removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate-planning access.

978. Pennsylvania Bar Association satisfies the damages element because disabled veterans lost reliable access to Wills for Heroes planning, lost public trust in statewide bar public-service programs, lost timely correction, and lost the benefit of representatives willing to correct exclusion.

979. Lycoming Law Association satisfies the duty element because it controlled, sponsored, supported, coordinated, or preserved the Lycoming Wills for Heroes event as a public-facing legal-service program and estate-planning access point for disabled veterans.

980. Lycoming Law Association satisfies the extreme-departure element because it cancelled the Wills for Heroes event instead of preserving access for the disabled-veteran clients who were going to be deprived of wills, placing program reputation above urgent client need after disabled-veteran access concerns had been raised.

981. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled-veteran clients to lose the Wills for Heroes estate-planning access that the event was supposed to provide.

982. Lycoming Law Association satisfies the damages element because disabled-veteran clients were deprived of wills, lost timely estate-planning

access, lost equal public-service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

983. Clinton County Bar Association satisfies the duty element because it participated in the Clinton County Wills for Heroes event structure, local bar participation, public-service legal programming, and estate-planning access channels affecting disabled veterans.

984. Clinton County Bar Association satisfies the extreme-departure element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled-veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public-service procedures after the broader Wills for Heroes access dispute had already harmed disabled veterans.

985. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County Wills for Heroes coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate-planning services.

986. Clinton County Bar Association satisfies the damages element because disabled veterans lost clarity, timely access, public-service confidence, coalition support, and dependable estate-planning opportunities.

987. Union Snyder County Bar Association satisfies the duty element because it controlled, sponsored, supported, coordinated, administered, or preserved the local Wills for Heroes program, committee access, meeting access, local volunteer channels, and public-service estate-planning access for veterans.

988. Union Snyder County Bar Association satisfies the extreme-departure element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning during unresolved disabled-veteran access needs, and excluded advocates who were trying to correct disabled-veteran inclusion.

989. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled-veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

990. Union Snyder County Bar Association satisfies the damages element because disabled veterans lost dependable estate-planning access, lost timely public-service opportunities, lost coalition pathways, and were forced to rely on litigation for corrective relief.

991. William R. Christman III satisfies the duty element because he used Pennsylvania Bar Association legal authority, communication authority,

statewide bar authority, and Wills for Heroes participation-control authority over the statewide public-service legal program.

992. William R. Christman III satisfies the extreme-departure element because he issued or preserved statewide communication restrictions and participation bans after disabled-veteran advocates had raised eligibility confusion, subpoenas, litigation, and continuing service needs, thereby removing the people correcting the access problem.

993. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled-veteran access problems.

994. William R. Christman III satisfies the damages element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

995. Gabriele Miller Wagner satisfies the duty element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public-service legitimacy.

996. Gabriele Miller Wagner satisfies the extreme-departure element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation after disabled-veteran access objections and failed to ensure that local exclusion, eligibility confusion, and service suspension would not deprive disabled veterans of wills.

997. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans-service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

998. Gabriele Miller Wagner satisfies the damages element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, and lost access to the representatives who were trying to preserve estate-planning services.

999. David K. Trevaskis satisfies the duty element because he participated in Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public-service communications, training authority, volunteer authority, and coordination affecting whether disabled veterans could receive estate-planning services.

1000. David K. Trevaskis satisfies the extreme-departure element because statewide Wills for Heroes leadership failed to remove barriers after disabled veterans and their advocates challenged exclusion, reported service suspension, and asked that planning continue through veterans coalitions or SLAAY so disabled veterans would not lose wills.

1001. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

1002. David K. Trevaskis satisfies the damages element because disabled veterans lost clear access to Wills for Heroes, lost timely estate-planning opportunities, and lost the practical benefit of statewide intervention.

1003. David Andrew Strouse satisfies the duty element because he participated in Clinton County Wills for Heroes access, local bar coordination, public-service legal programming, and estate-planning access structures affecting disabled veterans.

1004. David Andrew Strouse satisfies the extreme-departure element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled-veteran eligibility rules, nonretaliatory

coordination, and reliable access for disabled veterans after the access dispute had already shown that veterans were confused and excluded.

1005. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public-service trust, or estate-planning coordination.

1006. David Andrew Strouse satisfies the damages element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate-planning access.

1007. K. Michael Sullivan satisfies the duty element because he served as a local Wills for Heroes actor, co-chair, planner, bar participant, and gatekeeper for local estate-planning services offered through the Union Snyder County Bar Association.

1008. K. Michael Sullivan satisfies the extreme-departure element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections despite knowing disabled veterans still needed estate-planning services.

1009. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

1010. K. Michael Sullivan satisfies the damages element because disabled veterans lost estate-planning services, received conflicting information, faced delay, and lost confidence because the local program was controlled by actors who would not correct the access problem.

1011. Sarah Stigerwalt Egan satisfies the duty element because she served as a local Wills for Heroes leader, co-chair, planner, committee actor, and public-facing bar representative for the estate-planning program.

1012. Sarah Stigerwalt Egan satisfies the extreme-departure element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled-veteran access objections despite knowing disabled veterans needed clear and timely access.

1013. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented

disabled-veteran concerns from being resolved before the program collapsed.

1014. Sarah Stigerwalt Egan satisfies the damages element because disabled veterans were invited, excluded, corrected, and then deprived of future estate-planning access through the same program that claimed to serve heroes.

1015. Mary Beth Clark satisfies the duty element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public-service legal influence, and Wills for Heroes related authority affecting disabled-veteran access.

1016. Mary Beth Clark satisfies the extreme-departure element because she preserved or participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning, protected insider control over public-service legal programs, and failed to correct access barriers after disabled-veteran confusion and exclusion had been repeatedly raised.

1017. Mary Beth Clark satisfies the causation element because her local bar influence, legal-aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled-veteran access.

1018. Mary Beth Clark satisfies the damages element because disabled veterans lost access to the planning history, legal-service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

1019. Bloomsburg Fair Association satisfies the duty element because it controlled, supported, endorsed, administered, or preserved public-facing veterans events, veterans-service outreach opportunities, community-event access, and legal-service outreach opportunities.

1020. Bloomsburg Fair Association satisfies the extreme-departure element because it allowed public-facing veterans event access and outreach channels to be restricted or preserved in a way that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy identified urgent estate-planning needs.

1021. Bloomsburg Fair Association satisfies the causation element because public-facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate-planning services.

1022. Bloomsburg Fair Association satisfies the damages element because disabled veterans lost outreach opportunities, legal-service information, event access, and connection to Wills for Veterans or equivalent estate-planning services.

1023. Pennsylvania Department of Military and Veterans Affairs satisfies the duty element because it controlled, supported, coordinated, or preserved veterans-service networks, regional communications, coalition channels, public-service legitimacy, and government-facing veterans-service access connected to Wills for Heroes and Wills for Veterans planning.

1024. Pennsylvania Department of Military and Veterans Affairs satisfies the extreme-departure element because its veterans-service networks and coalition channels failed to prevent or correct disruption when Wills for Heroes access was suspended, restricted, or conditioned after disabled-veteran advocacy and notice that disabled veterans still needed estate-planning services.

1025. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans-service access allowed bar-controlled restrictions and cancellations to deprive disabled veterans of wills.

1026. Pennsylvania Department of Military and Veterans Affairs satisfies the damages element because disabled veterans lost the benefit of government-facing veterans-service coordination, clear referral pathways, reliable estate-planning access, and coalition support.

1027. Robert Leadbetter satisfies the duty element because he used public-office authority, community-event authority, veterans-event access, public-service legitimacy, and public-facing outreach authority affecting disabled-veteran legal-service access.

1028. Robert Leadbetter satisfies the extreme-departure element because public-office and public-facing veterans-event access structures were used or preserved in a way that reduced disabled-veteran access to legal-service outreach after Wills for Heroes and Wills for Veterans advocacy identified the need to connect disabled veterans with estate-planning services.

1029. Robert Leadbetter satisfies the causation element because his public-office and event-access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

1030. Robert Leadbetter satisfies the damages element because disabled veterans lost access to public-facing outreach, veterans-event legal-service information, and the representatives trying to preserve wills for disabled veterans.

1031. Does 1 through 100 satisfy the duty element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans-service actors, public-event actors, Wills for Heroes

actors, Wills for Veterans actors, state-connected actors, county-connected actors, coalition participants, public-service actors, and communications participants who undertook, controlled, supported, preserved, promoted, restricted, or administered the challenged access structures.

1032. Does 1 through 100 satisfy the extreme-departure element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from repeated access restrictions, service suspension, public-facing outreach loss, disabled-veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, communication restrictions, contradictory eligibility information, or retaliation against disabled-veteran advocates despite warnings that disabled veterans were confused, excluded, and still needed wills.

1033. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause the denial, cancellation, restriction, suspension, or obstruction of disabled-veteran estate-planning access.

1034. Does 1 through 100 satisfy the damages element because disabled veterans lost services, clear information, timely wills, public-service access, coalition pathways, veterans-service coordination, public-meeting access,

public trust, timely correction, and practical access to estate-planning systems that claimed to serve them.

1035. Plaintiff and the class suffered damages because disabled veterans experienced confusion, delay, loss of estate-planning access, loss of public trust, loss of public-service relationships, loss of coalition support, reputational harm, deterrence from future legal-service participation, and the loss of representatives who had built the planning infrastructure needed to serve them.

1036. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, corrective notice, written eligibility standards, written disability-access standards, restored Wills for Heroes or equivalent Wills for Veterans access, costs, attorneys' fees where available, and all other lawful relief.

1037. Plaintiff and the class satisfy the duty requirement because Defendants undertook or controlled public service legal functions affecting disabled veterans who depended on clear estate planning access.

1038. Plaintiff and the class satisfy the extreme departure requirement because Defendants ignored repeated warnings that disabled veterans were confused and excluded, refused transparent meetings, suspended services

during unresolved access needs, and banned the representatives who had been correcting the problem.

1039. Plaintiff and the class satisfy the causation requirement because the extreme departure caused service loss, confusion, delay, and chilling of advocacy for disabled veterans.

1040. Plaintiff and the class satisfy the damages requirement because disabled veterans lost estate planning access, public trust, public service relationships, and timely correction.

1041. Plaintiff and the class are entitled to damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, restored access, costs, fees where available, and all other lawful relief.

**Count 12-Negligent Infliction of Emotional Distress Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

1042. Plaintiff incorporates by reference all preceding paragraphs.

1043. The elements of Negligent Infliction of Emotional Distress are duty, negligent conduct, foreseeable emotional harm, causation, and damages.

1044. Defendants committed negligent infliction of emotional distress because they controlled access to public-service legal programs serving disabled veterans with urgent estate-planning needs, mishandled eligibility communications, failed to correct disabled-veteran confusion, suspended services, excluded corrective advocates, and caused foreseeable emotional harm when disabled veterans were told they were invited, then excluded, then corrected only after public contradiction, and then lost access again through institutional retaliation.

1045. Pennsylvania Bar Association satisfies the duty element because it supplied statewide Wills for Heroes authority, program structure, training, staff communications, flyer templates, volunteer channels, public legitimacy, and bar-sponsored estate-planning infrastructure affecting disabled veterans.

1046. Pennsylvania Bar Association satisfies the negligent-conduct element because it allowed Wills for Heroes access to depend on bar approval, program reputation, and participation restrictions rather than clear eligibility communications, corrective notice, and equal access for disabled veterans who needed wills.

1047. Pennsylvania Bar Association satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, humiliation, confusion, and fear when a statewide

public-service estate-planning program gave shifting access signals and then restricted the advocates correcting the problem.

1048. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate-planning access.

1049. Pennsylvania Bar Association satisfies the damages element because disabled veterans suffered emotional distress, deterrence, delay, humiliation, loss of confidence in legal-service systems, loss of timely estate-planning access, and fear that seeking equal access would make services disappear.

1050. Lycoming Law Association satisfies the duty element because it controlled, sponsored, supported, coordinated, or preserved the Lycoming Wills for Heroes event as a public-facing legal-service program and estate-planning access point for disabled veterans.

1051. Lycoming Law Association satisfies the negligent-conduct element because it cancelled the Wills for Heroes event instead of preserving access for the disabled-veteran clients who were going to be deprived of wills.

1052. Lycoming Law Association satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience

distress, humiliation, fear, and loss of trust when a wills event for vulnerable clients was cancelled to protect program reputation rather than client needs.

1053. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled-veteran clients to lose the Wills for Heroes estate-planning access that the event was supposed to provide.

1054. Lycoming Law Association satisfies the damages element because disabled veterans were deprived of wills, lost timely estate-planning access, lost equal public-service legal access, suffered distress from losing expected help, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

1055. Clinton County Bar Association satisfies the duty element because it participated in the Clinton County Wills for Heroes event structure, local bar participation, public-service legal programming, and estate-planning access channels affecting disabled veterans.

1056. Clinton County Bar Association satisfies the negligent-conduct element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled-veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public-service procedures after the broader Wills for Heroes access dispute had already harmed disabled veterans.

1057. Clinton County Bar Association satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, confusion, and loss of trust if another Wills for Heroes access point proceeded without clear eligibility rules after disabled veterans had already received contradictory information.

1058. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County Wills for Heroes coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate-planning services.

1059. Clinton County Bar Association satisfies the damages element because disabled veterans lost clarity, timely access, public-service confidence, coalition support, dependable estate-planning opportunities, and confidence that bar-sponsored legal-service programs would treat them consistently.

1060. Union Snyder County Bar Association satisfies the duty element because it controlled, sponsored, supported, coordinated, administered, or preserved the local Wills for Heroes program, committee access, meeting access, local volunteer channels, and public-service estate-planning access for veterans.

1061. Union Snyder County Bar Association satisfies the negligent-conduct element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates who sought disabled-veteran inclusion.

1062. Union Snyder County Bar Association satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience confusion, humiliation, loss of trust, and fear of retaliation when they were told different things about whether veterans could receive wills and then saw access disrupted after their advocates sought correction.

1063. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled-veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

1064. Union Snyder County Bar Association satisfies the damages element because disabled veterans suffered emotional distress, deterrence, delay, loss of confidence in legal-service systems, loss of public-service trust, and fear that asserting access needs would cause services to vanish.

1065. William R. Christman III satisfies the duty element because he used Pennsylvania Bar Association legal authority, communication authority,

statewide bar authority, and Wills for Heroes participation-control authority over the statewide public-service legal program.

1066. William R. Christman III satisfies the negligent-conduct element because he issued or preserved statewide communication restrictions and participation bans after disabled-veteran advocates had raised eligibility confusion, subpoenas, litigation, and continuing service needs, thereby removing the people correcting the access problem.

1067. William R. Christman III satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would suffer distress, fear, and loss of trust when statewide leadership banned the representatives who were correcting confusion and preserving wills after disabled veterans had already experienced contradictory eligibility information.

1068. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled-veteran access problems.

1069. William R. Christman III satisfies the damages element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills

for disabled veterans, causing distress, deterrence, delay, and loss of confidence in legal-service systems.

1070. Gabriele Miller Wagner satisfies the duty element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public-service legitimacy.

1071. Gabriele Miller Wagner satisfies the negligent-conduct element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation after disabled-veteran access objections and failed to ensure that local exclusion, eligibility confusion, and service suspension would not deprive disabled veterans of wills.

1072. Gabriele Miller Wagner satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress and fear when statewide Wills for Heroes channels did not correct local confusion or restore the advocates attempting to preserve access.

1073. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans-service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

1074. Gabriele Miller Wagner satisfies the damages element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, lost access to the representatives trying to preserve estate-planning services, and suffered distress from the uncertainty and delay.

1075. David K. Trevaskis satisfies the duty element because he participated in Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public-service communications, training authority, volunteer authority, and coordination affecting whether disabled veterans could receive estate-planning services.

1076. David K. Trevaskis satisfies the negligent-conduct element because statewide Wills for Heroes leadership failed to remove barriers after disabled veterans and their advocates challenged exclusion, reported service suspension, and asked that planning continue through veterans coalitions or SLAAY so disabled veterans would not lose wills.

1077. David K. Trevaskis satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, humiliation, isolation, and loss of confidence when statewide leadership did not correct known exclusion and service loss.

1078. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

1079. David K. Trevaskis satisfies the damages element because disabled veterans lost clear access to Wills for Heroes, lost timely estate-planning opportunities, lost the practical benefit of statewide intervention, and suffered distress from delay and uncertainty.

1080. David Andrew Strouse satisfies the duty element because he participated in Clinton County Wills for Heroes access, local bar coordination, public-service legal programming, and estate-planning access structures affecting disabled veterans.

1081. David Andrew Strouse satisfies the negligent-conduct element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled-veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans after the access dispute had already shown that veterans were confused and excluded.

1082. David Andrew Strouse satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, loss of confidence, and fear of exclusion when Clinton County

Wills for Heroes access proceeded without clear correction after the broader disabled-veteran eligibility dispute.

1083. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public-service trust, or estate-planning coordination.

1084. David Andrew Strouse satisfies the damages element because disabled veterans lost clarity, timely service, program trust, coalition support, estate-planning access, and confidence in public-service legal systems.

1085. K. Michael Sullivan satisfies the duty element because he served as a local Wills for Heroes actor, co-chair, planner, bar participant, and gatekeeper for local estate-planning services offered through the Union Snyder County Bar Association.

1086. K. Michael Sullivan satisfies the negligent-conduct element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections despite knowing disabled veterans still needed estate-planning services.

1087. K. Michael Sullivan satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, humiliation, confusion, and loss of trust when a local Wills for Heroes leader told advocates that veterans could not receive wills and then suspended planning after access objections.

1088. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

1089. K. Michael Sullivan satisfies the damages element because disabled veterans lost estate-planning services, received conflicting information, faced delay, feared that seeking equal access would cause services to disappear, and lost confidence because the local program would not correct the access problem.

1090. Sarah Stigerwalt Egan satisfies the duty element because she served as a local Wills for Heroes leader, co-chair, planner, committee actor, and public-facing bar representative for the estate-planning program.

1091. Sarah Stigerwalt Egan satisfies the negligent-conduct element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary,

and participated in suspending Wills for Heroes after disabled-veteran access objections despite knowing disabled veterans needed clear and timely access.

1092. Sarah Stigerwalt Egan satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, humiliation, confusion, and distrust when they were invited, excluded, corrected only after public contradiction, and then deprived of future estate-planning access.

1093. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled-veteran concerns from being resolved before the program collapsed.

1094. Sarah Stigerwalt Egan satisfies the damages element because disabled veterans were invited, excluded, corrected, then deprived of future estate-planning access through the same program that claimed to serve heroes, causing emotional distress, deterrence, delay, and loss of confidence in legal-service systems.

1095. Mary Beth Clark satisfies the duty element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association

influence, local bar leadership, local public-service legal influence, and Wills for Heroes related authority affecting disabled-veteran access.

1096. Mary Beth Clark satisfies the negligent-conduct element because she preserved or participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning, protected insider control over public-service legal programs, and failed to correct access barriers after disabled-veteran confusion and exclusion had been repeatedly raised.

1097. Mary Beth Clark satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress and distrust when local legal-service and bar actors protected insider control instead of correcting known access barriers.

1098. Mary Beth Clark satisfies the causation element because her local bar influence, legal-aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled-veteran access.

1099. Mary Beth Clark satisfies the damages element because disabled veterans lost access to the planning history, legal-service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built, causing distress, deterrence, delay, and loss of confidence.

1100. Bloomsburg Fair Association satisfies the duty element because it controlled, supported, endorsed, administered, or preserved public-facing veterans events, veterans-service outreach opportunities, community-event access, and legal-service outreach opportunities.

1101. Bloomsburg Fair Association satisfies the negligent-conduct element because it allowed public-facing veterans event access and outreach channels to be restricted or preserved in a way that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy identified urgent estate-planning needs.

1102. Bloomsburg Fair Association satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress and loss of confidence when public-facing veterans outreach no longer connected them reliably to the representatives and services trying to preserve wills.

1103. Bloomsburg Fair Association satisfies the causation element because public-facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate-planning services.

1104. Bloomsburg Fair Association satisfies the damages element because disabled veterans lost outreach opportunities, legal-service information,

event access, connection to Wills for Veterans or equivalent estate-planning services, and confidence in public-service access systems.

1105. Pennsylvania Department of Military and Veterans Affairs satisfies the duty element because it controlled, supported, coordinated, or preserved veterans-service networks, regional communications, coalition channels, public-service legitimacy, and government-facing veterans-service access connected to Wills for Heroes and Wills for Veterans planning.

1106. Pennsylvania Department of Military and Veterans Affairs satisfies the negligent-conduct element because its veterans-service networks and coalition channels failed to prevent or correct disruption when Wills for Heroes access was suspended, restricted, or conditioned after disabled-veteran advocacy and notice that disabled veterans still needed estate-planning services.

1107. Pennsylvania Department of Military and Veterans Affairs satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, humiliation, and loss of trust when government-facing veterans-service channels failed to correct known exclusion from estate-planning access.

1108. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans-

service access allowed bar-controlled restrictions and cancellations to deprive disabled veterans of wills.

1109. Pennsylvania Department of Military and Veterans Affairs satisfies the damages element because disabled veterans lost the benefit of government-facing veterans-service coordination, clear referral pathways, reliable estate-planning access, coalition support, and confidence in veterans-service systems.

1110. Robert Leadbetter satisfies the duty element because he used public-office authority, community-event authority, veterans-event access, public-service legitimacy, and public-facing outreach authority affecting disabled-veteran legal-service access.

1111. Robert Leadbetter satisfies the negligent-conduct element because public-office and public-facing veterans-event access structures were used or preserved in a way that reduced disabled-veteran access to legal-service outreach after Wills for Heroes and Wills for Veterans advocacy identified the need to connect disabled veterans with estate-planning services.

1112. Robert Leadbetter satisfies the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience distress, confusion, and loss of confidence when public-facing outreach access no longer reliably connected them to estate-planning assistance.

1113. Robert Leadbetter satisfies the causation element because his public-office and event-access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

1114. Robert Leadbetter satisfies the damages element because disabled veterans lost access to public-facing outreach, veterans-event legal-service information, the representatives trying to preserve wills for disabled veterans, and confidence in public-service systems.

1115. Does 1 through 100 satisfy the duty element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans-service actors, public-event actors, Wills for Heroes actors, Wills for Veterans actors, state-connected actors, county-connected actors, coalition participants, public-service actors, and communications participants who controlled, supported, preserved, promoted, restricted, or administered the challenged access structures.

1116. Does 1 through 100 satisfy the negligent-conduct element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from repeated access restrictions, service suspension, public-facing outreach loss, disabled-veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, communication restrictions, contradictory

eligibility information, or retaliation against disabled-veteran advocates despite warnings that disabled veterans were confused, excluded, distressed, and still needed wills.

1117. Does 1 through 100 satisfy the foreseeable-emotional-harm element because it was foreseeable that disabled veterans would experience emotional distress, humiliation, deterrence, delay, loss of trust, and fear that seeking equal access would make services disappear when public-service legal systems gave contradictory access information and then punished corrective advocacy.

1118. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause confusion, humiliation, loss of trust, fear, delay, and the denial, cancellation, restriction, suspension, or obstruction of disabled-veteran estate-planning access.

1119. Does 1 through 100 satisfy the damages element because disabled veterans suffered emotional distress, deterrence, delay, loss of confidence in legal-service systems, confusion, humiliation, fear, loss of public-service trust, and loss of practical access to estate-planning systems that claimed to serve them.

1120. Plaintiff and the class suffered damages because disabled veterans experienced emotional distress, deterrence, delay, confusion, humiliation, loss of confidence in legal-service systems, fear that seeking equal access would make services disappear, loss of estate-planning access, loss of public trust, and loss of the representatives who had built the planning infrastructure needed to serve them.

1121. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, written disability-access standards, restored Wills for Heroes or equivalent Wills for Veterans access, costs, attorneys' fees where available, and all other lawful relief.

1122. Plaintiff and the class satisfy the duty requirement because Defendants controlled access to public service legal programs serving disabled veterans with urgent estate planning needs.

1123. Plaintiff and the class satisfy the negligent conduct requirement because Defendants mishandled eligibility communications, failed to correct disabled veteran confusion, suspended services, and excluded corrective advocates.

1124. Plaintiff and the class satisfy the foreseeability requirement because it was foreseeable that disabled veterans would experience distress when told

they were invited, then excluded, then corrected only after public contradiction, and then lost access again through institutional retaliation.

1125. Plaintiff and the class satisfy the causation requirement because Defendants' mishandling caused confusion, humiliation, loss of trust, and fear that seeking equal access would make services disappear.

1126. Plaintiff and the class satisfy the damages requirement because disabled veterans suffered emotional distress, deterrence, delay, and loss of confidence in legal service systems.

1127. Plaintiff and the class are entitled to damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, restored access, costs, fees where available, and all other lawful relief.

**Count 13-Intentional Infliction of Emotional Distress Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

1128. Plaintiff incorporates by reference all preceding paragraphs.

1129. The elements of intentional infliction of emotional distress are extreme and outrageous conduct, intent or reckless disregard, causation, and severe emotional distress.

1130. Defendants committed intentional infliction of emotional distress because they allowed disabled veterans seeking basic estate-planning services to receive contradictory service information, suspended estate-planning access during an active access dispute, punished the people trying to correct disabled-veteran exclusion, knew disabled veterans were confused and harmed, knew the advocates were trying to correct the problem, and still escalated exclusion, suspension, and bans instead of providing clear access.

1131. Pennsylvania Bar Association satisfies the extreme-and-outrageous-conduct element because it preserved statewide Wills for Heroes participation restrictions and communication bans after disabled-veteran advocates had repeatedly identified eligibility confusion, service suspension, and the need to preserve wills for disabled veterans.

1132. Pennsylvania Bar Association satisfies the intent-or-reckless-disregard element because it knew disabled veterans were the group harmed by Wills for Heroes confusion, knew Plaintiff's representatives were correcting that confusion, and still banned or restricted the representatives instead of providing clear access.

1133. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate-planning access.

1134. Pennsylvania Bar Association satisfies the severe-emotional-distress element because disabled veterans seeking basic estate planning were forced to endure shifting eligibility, service uncertainty, loss of corrective advocates, and fear that asserting rights would destroy access to services.

1135. Lycoming Law Association satisfies the extreme-and-outrageous-conduct element because it cancelled the Wills for Heroes event instead of preserving access for disabled-veteran clients who were going to be deprived of wills, placing program reputation above urgent client need after disabled-veteran access concerns had been raised.

1136. Lycoming Law Association satisfies the intent-or-reckless-disregard element because it knew disabled veterans were going to lose estate-planning access and still cancelled the event rather than create a replacement process, corrective notice, or preserved service path.

1137. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled-veteran clients to lose the Wills for Heroes estate-planning access that the event was supposed to provide.

1138. Lycoming Law Association satisfies the severe-emotional-distress element because disabled veterans were deprived of wills, lost timely estate-planning access, and were forced to bear the emotional consequences of a cancellation made to protect program reputation rather than client needs.

1139. Clinton County Bar Association satisfies the extreme-and-outrageous-conduct element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled-veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public-service procedures after the broader Wills for Heroes access dispute had already harmed disabled veterans.

1140. Clinton County Bar Association satisfies the intent-or-reckless-disregard element because it knew or should have known from the existing Wills for Heroes access dispute that disabled veterans had received contradictory information and still failed to ensure clear, nonretaliatory, and reliable access.

1141. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County Wills for Heroes coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate-planning services.

1142. Clinton County Bar Association satisfies the severe-emotional-distress element because disabled veterans experienced confusion, distrust, delay, and fear that public-service legal systems would invite them, exclude them, and then fail to correct the harm.

1143. Union Snyder County Bar Association satisfies the extreme-and-outrageous-conduct element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning during unresolved disabled-veteran access needs, and excluded advocates who were trying to correct disabled-veteran inclusion.

1144. Union Snyder County Bar Association satisfies the intent-or-reckless-disregard element because it knew disabled veterans had received contradictory eligibility information, knew disabled-veteran advocates were asking for written rules and correction, and still allowed exclusion, meeting obstruction, and service suspension to continue.

1145. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled-veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

1146. Union Snyder County Bar Association satisfies the severe-emotional-distress element because disabled veterans were told different things about

whether they could receive wills, lost trust in the bar-sponsored program, feared that advocacy would cancel services, and lost access to the representatives correcting the problem.

1147. William R. Christman III satisfies the extreme-and-outrageous-conduct element because he issued or preserved statewide communication restrictions and participation bans after disabled-veteran advocates had raised eligibility confusion, subpoenas, litigation, and continuing service needs, thereby removing the people correcting the access problem.

1148. William R. Christman III satisfies the intent-or-reckless-disregard element because he knew Plaintiff's representatives were using Wills for Heroes communications to preserve disabled-veteran access and still barred those communications and participation after protected advocacy and litigation-related activity.

1149. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled-veteran access problems.

1150. William R. Christman III satisfies the severe-emotional-distress element because disabled veterans lost the representatives who had built the planning infrastructure, corrected eligibility confusion, and worked to

preserve wills for disabled veterans, causing fear, distrust, humiliation, and deterrence.

1151. Gabriele Miller Wagner satisfies the extreme-and-outrageous-conduct element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation after disabled-veteran access objections and failed to ensure that local exclusion, eligibility confusion, and service suspension would not deprive disabled veterans of wills.

1152. Gabriele Miller Wagner satisfies the intent-or-reckless-disregard element because statewide program authority knew or should have known that disabled veterans were confused and harmed, but did not provide corrective eligibility information, restore participation, or transfer planning to nonretaliatory veterans-service channels.

1153. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans-service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

1154. Gabriele Miller Wagner satisfies the severe-emotional-distress element because disabled veterans lost statewide correction, lost clear eligibility information, lost access to corrective representatives, and

experienced distrust and fear that asking for access would result in service loss.

1155. David K. Trevaskis satisfies the extreme-and-outrageous-conduct element because statewide Wills for Heroes leadership failed to remove barriers after disabled veterans and their advocates challenged exclusion, reported service suspension, and asked that planning continue through veterans coalitions or SLAAY so disabled veterans would not lose wills.

1156. David K. Trevaskis satisfies the intent-or-reckless-disregard element because statewide leadership knew disabled veterans still needed estate-planning services and still failed to correct barriers, restore participation, or prevent access loss after repeated warnings.

1157. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

1158. David K. Trevaskis satisfies the severe-emotional-distress element because disabled veterans lost clear access to Wills for Heroes, lost timely estate-planning opportunities, lost the practical benefit of statewide intervention, and experienced distress from delay, confusion, and uncertainty.

1159. David Andrew Strouse satisfies the extreme-and-outrageous-conduct element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled-veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans after the access dispute had already shown that veterans were confused and excluded.

1160. David Andrew Strouse satisfies the intent-or-reckless-disregard element because he knew or should have known that the broader Wills for Heroes dispute had confused and harmed disabled veterans and still failed to ensure clear, reliable, nonretaliatory access in Clinton County Wills for Heroes channels.

1161. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public-service trust, or estate-planning coordination.

1162. David Andrew Strouse satisfies the severe-emotional-distress element because disabled veterans lost clarity, timely service, program trust, coalition support, estate-planning access, and confidence in public-service legal systems.

1163. K. Michael Sullivan satisfies the extreme-and-outrageous-conduct element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections despite knowing disabled veterans still needed estate-planning services.

1164. K. Michael Sullivan satisfies the intent-or-reckless-disregard element because he knew disabled veterans had been told different things about whether they could receive wills, knew Plaintiff's representatives were requesting written rules and correction, and still preserved confusion, obstruction, and suspension.

1165. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

1166. K. Michael Sullivan satisfies the severe-emotional-distress element because disabled veterans lost estate-planning services, received conflicting information, faced delay, feared that seeking equal access would cause services to disappear, and lost confidence because the local program would not correct the access problem.

1167. Sarah Stigerwalt Egan satisfies the extreme-and-outrageous-conduct element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled-veteran access objections despite knowing disabled veterans needed clear and timely access.

1168. Sarah Stigerwalt Egan satisfies the intent-or-reckless-disregard element because she knew disabled veterans had been invited, excluded, and then corrected only after public contradiction, but still preserved access uncertainty, refused transparent process, and participated in service suspension.

1169. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled-veteran concerns from being resolved before the program collapsed.

1170. Sarah Stigerwalt Egan satisfies the severe-emotional-distress element because disabled veterans were invited, excluded, corrected, then deprived of future estate-planning access through the same program that claimed to serve heroes, causing humiliation, distrust, fear, and deterrence.

1171. Mary Beth Clark satisfies the extreme-and-outrageous-conduct element because she preserved or participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning, protected insider control over public-service legal programs, and failed to correct access barriers after disabled-veteran confusion and exclusion had been repeatedly raised.

1172. Mary Beth Clark satisfies the intent-or-reckless-disregard element because she knew or should have known that disabled-veteran advocates were trying to correct access barriers and still helped preserve insider control rather than protect disabled-veteran access.

1173. Mary Beth Clark satisfies the causation element because her local bar influence, legal-aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled-veteran access.

1174. Mary Beth Clark satisfies the severe-emotional-distress element because disabled veterans lost access to the planning history, legal-service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built, causing distrust, fear, delay, and deterrence.

1175. Bloomsburg Fair Association satisfies the extreme-and-outrageous-conduct element because it allowed public-facing veterans event access and

outreach channels to be restricted or preserved in a way that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy identified urgent estate-planning needs.

1176. Bloomsburg Fair Association satisfies the intent-or-reckless-disregard element because it knew or should have known that public-facing veterans outreach was essential to disabled veterans' access to estate-planning services and still allowed outreach channels to reduce access to the representatives preserving wills.

1177. Bloomsburg Fair Association satisfies the causation element because public-facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate-planning services.

1178. Bloomsburg Fair Association satisfies the severe-emotional-distress element because disabled veterans lost outreach opportunities, legal-service information, event access, connection to Wills for Veterans or equivalent estate-planning services, and confidence in public-service access systems.

1179. Pennsylvania Department of Military and Veterans Affairs satisfies the extreme-and-outrageous-conduct element because its veterans-service networks and coalition channels failed to prevent or correct disruption when

Wills for Heroes access was suspended, restricted, or conditioned after disabled-veteran advocacy and notice that disabled veterans still needed estate-planning services.

1180. Pennsylvania Department of Military and Veterans Affairs satisfies the intent-or-reckless-disregard element because it knew or should have known that disabled veterans were experiencing eligibility confusion and access loss through veterans-service channels and still failed to ensure clear, nonretaliatory correction.

1181. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans-service access allowed bar-controlled restrictions and cancellations to deprive disabled veterans of wills.

1182. Pennsylvania Department of Military and Veterans Affairs satisfies the severe-emotional-distress element because disabled veterans lost government-facing veterans-service coordination, clear referral pathways, reliable estate-planning access, coalition support, and confidence in veterans-service systems.

1183. Robert Leadbetter satisfies the extreme-and-outrageous-conduct element because public-office and public-facing veterans-event access structures were used or preserved in a way that reduced disabled-veteran

access to legal-service outreach after Wills for Heroes and Wills for Veterans advocacy identified the need to connect disabled veterans with estate-planning services.

1184. Robert Leadbetter satisfies the intent-or-reckless-disregard element because he knew or should have known that public-facing veterans outreach affected disabled veterans' access to legal-service information and still allowed outreach access to be reduced after protected advocacy.

1185. Robert Leadbetter satisfies the causation element because his public-office and event-access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

1186. Robert Leadbetter satisfies the severe-emotional-distress element because disabled veterans lost public-facing outreach, veterans-event legal-service information, connection to the representatives trying to preserve wills, and confidence in public-service systems.

1187. Does 1 through 100 satisfy the extreme-and-outrageous-conduct element because they include unknown actors who received, transmitted, ratified, preserved, concealed, enforced, or benefited from access restrictions, service suspension, public-facing outreach loss, disabled-veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction,

communication restrictions, contradictory eligibility information, or retaliation against disabled-veteran advocates despite warnings that disabled veterans were confused, excluded, and still needed wills.

1188. Does 1 through 100 satisfy the intent-or-reckless-disregard element because they knew or should have known that disabled veterans were confused, harmed, excluded, and dependent on clear estate-planning access, and still escalated exclusion, suspension, communication restrictions, and retaliation instead of providing clear access.

1189. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations caused disabled veterans to experience confusion, humiliation, isolation, distrust, fear, delay, and denial, cancellation, restriction, suspension, or obstruction of estate-planning access.

1190. Does 1 through 100 satisfy the severe-emotional-distress element because disabled veterans seeking basic estate planning were forced to endure shifting eligibility, service suspension, contradictory public-service information, retaliation in systems that presented themselves as programs for heroes, and fear that asserting rights would destroy access to services.

1191. Plaintiff and the class suffered severe emotional distress because disabled veterans experienced confusion, humiliation, isolation, distrust,

deterrence, delay, fear that asserting rights would destroy access to services, loss of confidence in legal-service systems, loss of estate-planning access, and loss of the representatives who had built the planning infrastructure needed to serve them.

1192. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, punitive damages where available, declaratory relief, injunctive relief, corrective notice, written eligibility standards, written disability-access standards, restored Wills for Heroes or equivalent Wills for Veterans access, costs, attorneys' fees where available, and all other lawful relief.

1193. Plaintiff and the class satisfy the extreme and outrageous conduct requirement because Defendants allowed disabled veterans to receive contradictory service information, suspended estate planning access during an active access dispute, and punished the people trying to correct the disabled veteran exclusion.

1194. Plaintiff and the class satisfy the intent or reckless disregard requirement because Defendants knew disabled veterans were confused and harmed, knew the advocates were trying to correct the problem, and still escalated exclusion, suspension, and bans instead of providing clear access.

1195. Plaintiff and the class satisfy the causation requirement because the conduct caused disabled veterans to experience confusion, humiliation, isolation, distrust, and fear that asserting rights would destroy access to services.

1196. Plaintiff and the class satisfy the severe distress requirement because disabled veterans seeking basic estate planning were forced to endure shifting eligibility, service suspension, and retaliation in systems that presented themselves as public service programs for heroes.

1197. Plaintiff and the class are entitled to damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, restored access, costs, fees where available, and all other lawful relief.

**Count 14-Failure to Protect and Special Duty Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does 1 through 100**

1198. Plaintiff incorporates by reference all preceding paragraphs.

1199. The elements of Failure to Protect and Special Duty are an undertaking or special relationship, knowledge of risk, failure to protect, causation, and damages.

1200. Defendants committed Failure to Protect and Special Duty because they undertook to provide, sponsor, promote, administer, fund, coordinate, or preserve public-service legal access for veterans and disabled veterans, knew disabled veterans were receiving contradictory eligibility information, knew advocates had raised the issue, knew services could be lost if the dispute was not corrected, and failed to protect disabled veterans from exclusion, confusion, retaliation, service suspension, and loss of the planning infrastructure built to serve them.

1201. Pennsylvania Bar Association satisfies the undertaking or special-relationship element because it supplied statewide Wills for Heroes authority, program structure, training, staff communications, flyer templates, volunteer channels, public legitimacy, and bar-sponsored estate-planning infrastructure affecting disabled veterans.

1202. Pennsylvania Bar Association satisfies the knowledge-of-risk element because it knew disabled-veteran advocates had raised eligibility confusion, service suspension, communication restrictions, and the need to preserve Wills for Heroes or Wills for Veterans access for disabled veterans.

1203. Pennsylvania Bar Association satisfies the failure-to-protect element because it preserved participation restrictions and communication

restrictions instead of protecting disabled veterans from exclusion, confusion, retaliation, and loss of the representatives correcting the problem.

1204. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate-planning access.

1205. Pennsylvania Bar Association satisfies the damages element because disabled veterans lost reliable access to Wills for Heroes planning, lost public trust in statewide bar public-service programs, lost timely correction, and lost the benefit of representatives willing to correct exclusion.

1206. Lycoming Law Association satisfies the undertaking or special-relationship element because it controlled, sponsored, supported, coordinated, or preserved the Lycoming Wills for Heroes event as a public-facing legal-service program and estate-planning access point for disabled veterans.

1207. Lycoming Law Association satisfies the knowledge-of-risk element because it knew disabled veterans were going to be deprived of wills if the Lycoming Wills for Heroes event was cancelled or not replaced with a preserved service path.

1208. Lycoming Law Association satisfies the failure-to-protect element because it cancelled the Wills for Heroes event instead of protecting disabled-veteran clients from service loss, access confusion, and loss of timely estate-planning assistance.

1209. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled-veteran clients to lose the Wills for Heroes estate-planning access that the event was supposed to provide.

1210. Lycoming Law Association satisfies the damages element because disabled-veteran clients were deprived of wills, lost timely estate-planning access, lost equal public-service legal access, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

1211. Clinton County Bar Association satisfies the undertaking or special-relationship element because it participated in the Clinton County Wills for Heroes event structure, local bar participation, public-service legal programming, and estate-planning access channels affecting disabled veterans.

1212. Clinton County Bar Association satisfies the knowledge-of-risk element because it knew or should have known from the existing Wills for Heroes access dispute that disabled veterans had received contradictory

information and that unclear access rules could cause service loss, confusion, and deterrence.

1213. Clinton County Bar Association satisfies the failure-to-protect element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled-veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public-service procedures.

1214. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County Wills for Heroes coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate-planning services.

1215. Clinton County Bar Association satisfies the damages element because disabled veterans lost clarity, timely access, public-service confidence, coalition support, and dependable estate-planning opportunities.

1216. Union Snyder County Bar Association satisfies the undertaking or special-relationship element because it controlled, sponsored, supported, coordinated, administered, or preserved the local Wills for Heroes program, committee access, meeting access, local volunteer channels, and public-service estate-planning access for veterans.

1217. Union Snyder County Bar Association satisfies the knowledge-of-risk element because it knew disabled veterans had received contradictory eligibility information, knew advocates had raised disabled-veteran access concerns, and knew Wills for Heroes planning could be lost if the access dispute was not corrected.

1218. Union Snyder County Bar Association satisfies the failure-to-protect element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning during unresolved disabled-veteran access needs, and excluded advocates who were trying to correct disabled-veteran inclusion.

1219. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled-veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

1220. Union Snyder County Bar Association satisfies the damages element because disabled veterans lost dependable estate-planning access, lost timely public-service opportunities, lost coalition pathways, and were forced to rely on litigation for corrective relief.

1221. William R. Christman III satisfies the undertaking or special-relationship element because he used Pennsylvania Bar Association legal

authority, communication authority, statewide bar authority, and Wills for Heroes participation-control authority over the statewide public-service legal program.

1222. William R. Christman III satisfies the knowledge-of-risk element because he knew Plaintiff's representatives had raised eligibility confusion, subpoenas, litigation, and continuing disabled-veteran service needs before he issued or preserved statewide communication restrictions and participation bans.

1223. William R. Christman III satisfies the failure-to-protect element because he removed the people correcting the access problem instead of protecting disabled veterans from exclusion, communication breakdown, retaliation, and loss of Wills for Heroes or Wills for Veterans access.

1224. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled-veteran access problems.

1225. William R. Christman III satisfies the damages element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

1226. Gabriele Miller Wagner satisfies the undertaking or special-relationship element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator training, program communications, staff authority, volunteer support, scheduling influence, and statewide public-service legitimacy.

1227. Gabriele Miller Wagner satisfies the knowledge-of-risk element because statewide Wills for Heroes channels knew or should have known that disabled veterans were confused, harmed, and dependent on clear correction after local Wills for Heroes access objections and service suspension.

1228. Gabriele Miller Wagner satisfies the failure-to-protect element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation, failed to clarify eligibility, and failed to ensure that local exclusion, eligibility confusion, and service suspension would not deprive disabled veterans of wills.

1229. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans-service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

1230. Gabriele Miller Wagner satisfies the damages element because disabled veterans lost the benefit of statewide Wills for Heroes correction, lost clear eligibility information, and lost access to the representatives who were trying to preserve estate-planning services.

1231. David K. Trevaskis satisfies the undertaking or special-relationship element because he participated in Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public-service communications, training authority, volunteer authority, and coordination affecting whether disabled veterans could receive estate-planning services.

1232. David K. Trevaskis satisfies the knowledge-of-risk element because statewide Wills for Heroes leadership knew or should have known that disabled veterans still needed estate-planning services after advocates challenged exclusion, reported service suspension, and asked that planning continue through veterans coalitions or SLAAY.

1233. David K. Trevaskis satisfies the failure-to-protect element because statewide Wills for Heroes leadership failed to remove barriers, failed to restore corrective participation, and failed to prevent disabled veterans from losing wills after the access dispute.

1234. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes

access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

1235. David K. Trevaskis satisfies the damages element because disabled veterans lost clear access to Wills for Heroes, lost timely estate-planning opportunities, and lost the practical benefit of statewide intervention.

1236. David Andrew Strouse satisfies the undertaking or special-relationship element because he participated in Clinton County Wills for Heroes access, local bar coordination, public-service legal programming, and estate-planning access structures affecting disabled veterans.

1237. David Andrew Strouse satisfies the knowledge-of-risk element because he knew or should have known that the broader Wills for Heroes dispute had confused and harmed disabled veterans and that unclear Clinton County access could cause additional service loss and deterrence.

1238. David Andrew Strouse satisfies the failure-to-protect element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled-veteran eligibility rules, nonretaliatory coordination, and reliable access for disabled veterans.

1239. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing

dependable access, clear communication, public-service trust, or estate-planning coordination.

1240. David Andrew Strouse satisfies the damages element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate-planning access.

1241. K. Michael Sullivan satisfies the undertaking or special-relationship element because he served as a local Wills for Heroes actor, co-chair, planner, bar participant, and gatekeeper for local estate-planning services offered through the Union Snyder County Bar Association.

1242. K. Michael Sullivan satisfies the knowledge-of-risk element because he knew disabled veterans had been told different things about whether they could receive wills, knew Plaintiff's representatives were requesting written rules and correction, and knew Wills for Heroes planning could be lost if the access dispute was not corrected.

1243. K. Michael Sullivan satisfies the failure-to-protect element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections despite knowing disabled veterans still needed estate-planning services.

1244. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

1245. K. Michael Sullivan satisfies the damages element because disabled veterans lost estate-planning services, received conflicting information, faced delay, and lost confidence because the local program was controlled by actors who would not correct the access problem.

1246. Sarah Stigerwalt Egan satisfies the undertaking or special-relationship element because she served as a local Wills for Heroes leader, co-chair, planner, committee actor, and public-facing bar representative for the estate-planning program.

1247. Sarah Stigerwalt Egan satisfies the knowledge-of-risk element because she knew disabled veterans had been invited, excluded, and then corrected only after public contradiction, and knew the history of contradictory eligibility statements made private informal planning unsafe and unreliable.

1248. Sarah Stigerwalt Egan satisfies the failure-to-protect element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary,

and participated in suspending Wills for Heroes after disabled-veteran access objections despite knowing disabled veterans needed clear and timely access.

1249. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled-veteran concerns from being resolved before the program collapsed.

1250. Sarah Stigerwalt Egan satisfies the damages element because disabled veterans were invited, excluded, corrected, then deprived of future estate-planning access through the same program that claimed to serve heroes, causing confusion, distrust, delay, and loss of services.

1251. Mary Beth Clark satisfies the undertaking or special-relationship element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public-service legal influence, and Wills for Heroes related authority affecting disabled-veteran access.

1252. Mary Beth Clark satisfies the knowledge-of-risk element because she knew or should have known that disabled-veteran advocates were trying to correct access barriers, eligibility confusion, service suspension, and loss of planning infrastructure.

1253. Mary Beth Clark satisfies the failure-to-protect element because she preserved or participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning, protected insider control over public-service legal programs, and failed to correct access barriers after disabled-veteran confusion and exclusion had been repeatedly raised.

1254. Mary Beth Clark satisfies the causation element because her local bar influence, legal-aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives who were trying to protect disabled-veteran access.

1255. Mary Beth Clark satisfies the damages element because disabled veterans lost access to the planning history, legal-service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

1256. Bloomsburg Fair Association satisfies the undertaking or special-relationship element because it controlled, supported, endorsed, administered, or preserved public-facing veterans events, veterans-service outreach opportunities, community-event access, and legal-service outreach opportunities.

1257. Bloomsburg Fair Association satisfies the knowledge-of-risk element because it knew or should have known that public-facing veterans outreach was essential to disabled veterans' access to estate-planning services after

Wills for Heroes and Wills for Veterans advocacy identified urgent estate-planning needs.

1258. Bloomsburg Fair Association satisfies the failure-to-protect element because it allowed public-facing veterans event access and outreach channels to be restricted or preserved in a way that reduced Plaintiff's representatives' ability to reach disabled veterans and connect them with estate-planning services.

1259. Bloomsburg Fair Association satisfies the causation element because public-facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate-planning services.

1260. Bloomsburg Fair Association satisfies the damages element because disabled veterans lost outreach opportunities, legal-service information, event access, and connection to Wills for Veterans or equivalent estate-planning services.

1261. Pennsylvania Department of Military and Veterans Affairs satisfies the undertaking or special-relationship element because it controlled, supported, coordinated, or preserved veterans-service networks, regional communications, coalition channels, public-service legitimacy, and

government-facing veterans-service access connected to Wills for Heroes and Wills for Veterans planning.

1262. Pennsylvania Department of Military and Veterans Affairs satisfies the knowledge-of-risk element because it knew or should have known that disabled veterans were experiencing eligibility confusion, access loss, and service disruption through veterans-service channels and that disabled veterans still needed estate-planning services.

1263. Pennsylvania Department of Military and Veterans Affairs satisfies the failure-to-protect element because its veterans-service networks and coalition channels failed to prevent or correct disruption when Wills for Heroes access was suspended, restricted, or conditioned after disabled-veteran advocacy and notice that disabled veterans still needed estate-planning services.

1264. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans-service access allowed bar-controlled restrictions and cancellations to deprive disabled veterans of wills.

1265. Pennsylvania Department of Military and Veterans Affairs satisfies the damages element because disabled veterans lost the benefit of

government-facing veterans-service coordination, clear referral pathways, reliable estate-planning access, and coalition support.

1266. Robert Leadbetter satisfies the undertaking or special-relationship element because he used public-office authority, community-event authority, veterans-event access, public-service legitimacy, and public-facing outreach authority affecting disabled-veteran legal-service access.

1267. Robert Leadbetter satisfies the knowledge-of-risk element because he knew or should have known that public-facing veterans outreach affected disabled veterans' access to estate-planning information and that reducing those channels would harm disabled veterans seeking services.

1268. Robert Leadbetter satisfies the failure-to-protect element because public-office and public-facing veterans-event access structures were used or preserved in a way that reduced disabled-veteran access to legal-service outreach after Wills for Heroes and Wills for Veterans advocacy identified the need to connect disabled veterans with estate-planning services.

1269. Robert Leadbetter satisfies the causation element because his public-office and event-access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

1270. Robert Leadbetter satisfies the damages element because disabled veterans lost public-facing outreach, veterans-event legal-service information, connection to the representatives trying to preserve wills, and confidence in public-service systems.

1271. Does 1 through 100 satisfy the undertaking or special-relationship element because they include unknown bar members, officers, employees, volunteers, committee participants, veterans-service actors, public-event actors, Wills for Heroes actors, Wills for Veterans actors, state-connected actors, county-connected actors, coalition participants, public-service actors, and communications participants who undertook, controlled, supported, preserved, promoted, restricted, or administered the challenged access structures.

1272. Does 1 through 100 satisfy the knowledge-of-risk element because they knew or should have known that disabled veterans were receiving contradictory eligibility information, that advocates had raised the issue, that disabled veterans were confused and harmed, and that services could be lost if the dispute was not corrected.

1273. Does 1 through 100 satisfy the failure-to-protect element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from repeated access restrictions, service suspension, public-facing outreach

loss, disabled-veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, communication restrictions, contradictory eligibility information, or retaliation against disabled-veteran advocates.

1274. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause confusion, service loss, delay, deterrence, loss of trust, and the denial, cancellation, restriction, suspension, or obstruction of disabled-veteran estate-planning access.

1275. Does 1 through 100 satisfy the damages element because disabled veterans lost clear access, timely service, public-service trust, estate-planning services, coalition pathways, veterans-service coordination, public-meeting access, and practical access to the systems that claimed to serve them.

1276. Plaintiff and the class suffered damages because disabled veterans lost clear access, timely estate-planning service, public-service trust, coalition support, reliable correction, public-facing outreach, and the planning infrastructure built to serve them.

1277. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive

relief, corrective notice, written eligibility standards, written disability-access standards, restored Wills for Heroes or equivalent Wills for Veterans access, costs, attorneys' fees where available, and all other lawful relief.

1278. Plaintiff and the class satisfy the undertaking or special relationship requirement because Defendants undertook to provide, sponsor, promote, administer, fund, coordinate, or preserve public service legal access for veterans and disabled veterans.

1279. Plaintiff and the class satisfy the knowledge requirement because Defendants knew disabled veterans were receiving contradictory eligibility information, knew advocates had raised the issue, and knew services could be lost if the dispute was not corrected.

1280. Plaintiff and the class satisfy the failure to protect requirement because Defendants failed to protect disabled veterans from exclusion, confusion, retaliation, service suspension, and loss of the planning infrastructure built to serve them.

1281. Plaintiff and the class satisfy the causation requirement because the failure to protect caused disabled veterans to lose clear access, timely service, and trust in public service legal programs.

1282. Plaintiff and the class satisfy the damages requirement because disabled veterans suffered lost services, emotional harm, delay, deterrence, and reduced access to estate planning.

1283. Plaintiff and the class are entitled to damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, restored access, costs, fees where available, and all other lawful relief.

**Count 15-Negligent Performance of Undertaking Against Pennsylvania Bar Association; Lycoming Law Association; Clinton County Bar Association; Union Snyder County Bar Association; William R. Christman III; Gabriele Miller Wagner; David K. Trevaskis; David Andrew Strouse; K. Michael Sullivan; Sarah Stigerwalt Egan; Mary Beth Clark; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; Robert Leadbetter; and Does**

1284. Plaintiff incorporates by reference all preceding paragraphs.

1285. The elements of Negligent Performance of Undertaking are an undertaking to render services, failure to exercise reasonable care, increased risk of harm or reliance, causation, and damages.

1286. Defendants committed Negligent Performance of Undertaking because they undertook to render, support, coordinate, promote, administer, preserve, or control services through Wills for Heroes, Wills for Veterans, veterans-service programs, legal-service channels, bar-connected public-service events, public-facing outreach, and public-service legal networks,

but performed that undertaking without written eligibility standards, clear communication, inclusive planning, reliable meeting access, or nonretaliatory correction procedures.

1287. Pennsylvania Bar Association satisfies the undertaking element because it supplied statewide Wills for Heroes authority, program structure, training, staff communications, flyer templates, volunteer channels, public legitimacy, and bar-sponsored estate-planning infrastructure affecting disabled veterans.

1288. Pennsylvania Bar Association satisfies the failure-to-exercise-reasonable-care element because it allowed Wills for Heroes access to depend on bar approval, program reputation, and participation restrictions rather than written eligibility standards, clear communication, inclusive planning, reliable meeting access, and nonretaliatory correction procedures.

1289. Pennsylvania Bar Association satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on PBA's statewide Wills for Heroes public-service representations, and PBA increased the risk of harm by preserving confusion, participation restrictions, and exclusion of the people who had built the planning infrastructure.

1290. Pennsylvania Bar Association satisfies the causation element because its statewide Wills for Heroes control and July 30, 2025 participation ban

removed the advocates who were correcting eligibility confusion, coordinating with veterans coalitions, and preserving estate-planning access.

1291. Pennsylvania Bar Association satisfies the damages element because disabled veterans lost service access, clear information, timely wills, public trust, coalition pathways, volunteer support, and the benefit of representatives willing to correct exclusion.

1292. Lycoming Law Association satisfies the undertaking element because it controlled, sponsored, supported, coordinated, or preserved the Lycoming Wills for Heroes event as a public-facing legal-service program and estate-planning access point for disabled veterans.

1293. Lycoming Law Association satisfies the failure-to-exercise-reasonable-care element because it cancelled the Wills for Heroes event instead of preserving access for the disabled-veteran clients who were going to be deprived of wills or providing a replacement service path.

1294. Lycoming Law Association satisfies the increased-risk-or-reliance element because disabled veterans relied on the Lycoming Wills for Heroes event as a public-service estate-planning opportunity, and cancellation increased the risk that disabled veterans would lose timely wills, clear access, and trust in public-service legal programs.

1295. Lycoming Law Association satisfies the causation element because its cancellation directly caused disabled-veteran clients to lose the Wills for Heroes estate-planning access that the event was supposed to provide.

1296. Lycoming Law Association satisfies the damages element because disabled veterans were deprived of wills, lost timely estate-planning access, lost equal public-service legal access, suffered confusion and distress, and bore the consequences of a cancellation made to protect program reputation rather than client needs.

1297. Clinton County Bar Association satisfies the undertaking element because it participated in the Clinton County Wills for Heroes event structure, local bar participation, public-service legal programming, and estate-planning access channels affecting disabled veterans.

1298. Clinton County Bar Association satisfies the failure-to-exercise-reasonable-care element because it allowed Wills for Heroes planning, participation, or access to proceed without clear disabled-veteran eligibility rules, reliable coordination with the representatives preserving access, and nonretaliatory public-service procedures after the broader Wills for Heroes access dispute had already harmed disabled veterans.

1299. Clinton County Bar Association satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on

Clinton County Wills for Heroes access and public-service representations, and unclear or restricted coordination increased the risk of confusion, delay, deterrence, and loss of estate-planning services.

1300. Clinton County Bar Association satisfies the causation element because unclear or restricted Clinton County Wills for Heroes coordination contributed to disabled veterans losing dependable access to Wills for Heroes, Wills for Veterans, or equivalent estate-planning services.

1301. Clinton County Bar Association satisfies the damages element because disabled veterans lost clarity, timely access, public-service confidence, coalition support, dependable estate-planning opportunities, and trust in legal-service access systems.

1302. Union Snyder County Bar Association satisfies the undertaking element because it controlled, sponsored, supported, coordinated, administered, or preserved the local Wills for Heroes program, committee access, meeting access, local volunteer channels, and public-service estate-planning access for veterans.

1303. Union Snyder County Bar Association satisfies the failure-to-exercise-reasonable-care element because it permitted contradictory eligibility statements, refused transparent committee process, suspended Wills for Heroes planning, and excluded advocates who sought disabled-

veteran inclusion rather than using written eligibility standards, reliable meetings, and nonretaliatory correction.

1304. Union Snyder County Bar Association satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on the local Wills for Heroes program and USCBA's public-service representations, and USCBA increased the risk of harm by creating confusion, suspending services, and excluding the people who had built the planning infrastructure.

1305. Union Snyder County Bar Association satisfies the causation element because its officers and Wills for Heroes actors used bar governance and committee control to prevent disabled-veteran concerns from being resolved through written rules, clear notice, or inclusive planning.

1306. Union Snyder County Bar Association satisfies the damages element because disabled veterans lost service access, clear information, timely wills, public-service trust, coalition pathways, volunteer support, and reliable correction.

1307. William R. Christman III satisfies the undertaking element because he used Pennsylvania Bar Association legal authority, communication authority, statewide bar authority, and Wills for Heroes participation-control authority over the statewide public-service legal program.

1308. William R. Christman III satisfies the failure-to-exercise-reasonable-care element because he issued or preserved statewide communication restrictions and participation bans after disabled-veteran advocates had raised eligibility confusion, subpoenas, litigation, and continuing service needs.

1309. William R. Christman III satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on PBA's statewide public-service infrastructure, and his restrictions increased the risk of harm by removing the people coordinating with veterans coalitions and correcting disabled-veteran access problems.

1310. William R. Christman III satisfies the causation element because his statewide communication restrictions and participation ban removed the people coordinating with veterans coalitions and correcting disabled-veteran access problems.

1311. William R. Christman III satisfies the damages element because disabled veterans lost access to the representatives who had built planning infrastructure, corrected eligibility confusion, and worked to preserve wills for disabled veterans.

1312. Gabriele Miller Wagner satisfies the undertaking element because she used Pennsylvania Bar Association Wills for Heroes authority, coordinator

training, program communications, staff authority, volunteer support, scheduling influence, and statewide public-service legitimacy.

1313. Gabriele Miller Wagner satisfies the failure-to-exercise-reasonable-care element because statewide Wills for Heroes channels failed to restore Plaintiff's representatives to full participation after disabled-veteran access objections and failed to ensure that local exclusion, eligibility confusion, and service suspension would not deprive disabled veterans of wills.

1314. Gabriele Miller Wagner satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on statewide Wills for Heroes correction and coordination, and the failure to restore participation or clarify eligibility increased the risk of lost services, confusion, delay, and distrust.

1315. Gabriele Miller Wagner satisfies the causation element because statewide program authority could have clarified eligibility, restored participation, and transferred planning to nonretaliatory veterans-service channels, but disabled veterans instead remained subject to local obstruction and statewide restrictions.

1316. Gabriele Miller Wagner satisfies the damages element because disabled veterans lost the benefit of statewide Wills for Heroes correction,

lost clear eligibility information, and lost access to the representatives trying to preserve estate-planning services.

1317. David K. Trevaskis satisfies the undertaking element because he participated in Pennsylvania Bar Association Wills for Heroes leadership, statewide program guidance, public-service communications, training authority, volunteer authority, and coordination affecting whether disabled veterans could receive estate-planning services.

1318. David K. Trevaskis satisfies the failure-to-exercise-reasonable-care element because statewide Wills for Heroes leadership failed to remove barriers after disabled veterans and their advocates challenged exclusion, reported service suspension, and asked that planning continue through veterans coalitions or SLAAY so disabled veterans would not lose wills.

1319. David K. Trevaskis satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on statewide Wills for Heroes leadership to preserve access, and the failure to correct local obstruction increased the risk of lost services, delay, and distrust.

1320. David K. Trevaskis satisfies the causation element because his statewide role gave him authority or influence to preserve Wills for Heroes access, correct local obstruction, and prevent disabled veterans from losing services after the dispute.

1321. David K. Trevaskis satisfies the damages element because disabled veterans lost clear access to Wills for Heroes, timely estate-planning opportunities, and the practical benefit of statewide intervention.

1322. David Andrew Strouse satisfies the undertaking element because he participated in Clinton County Wills for Heroes access, local bar coordination, public-service legal programming, and estate-planning access structures affecting disabled veterans.

1323. David Andrew Strouse satisfies the failure-to-exercise-reasonable-care element because he preserved, enforced, or benefited from Wills for Heroes access structures that lacked clear disabled-veteran eligibility rules, nonretaliatory coordination, and reliable access after the access dispute had already shown that veterans were confused and excluded.

1324. David Andrew Strouse satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on Clinton County Wills for Heroes access, and unclear or restricted coordination increased the risk of service loss, confusion, delay, and deterrence.

1325. David Andrew Strouse satisfies the causation element because his Clinton County Wills for Heroes role contributed to disabled veterans losing dependable access, clear communication, public-service trust, or estate-planning coordination.

1326. David Andrew Strouse satisfies the damages element because disabled veterans lost clarity, timely service, program trust, coalition support, and estate-planning access.

1327. K. Michael Sullivan satisfies the undertaking element because he served as a local Wills for Heroes actor, co-chair, planner, bar participant, and gatekeeper for local estate-planning services offered through the Union Snyder County Bar Association.

1328. K. Michael Sullivan satisfies the failure-to-exercise-reasonable-care element because he announced that veterans could not receive wills, refused to resolve eligibility contradictions through written standards, ignored repeated requests for meetings, and suspended Wills for Heroes planning after access objections despite knowing disabled veterans still needed estate-planning services.

1329. K. Michael Sullivan satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on local Wills for Heroes planning and committee process, and his conduct increased the risk of harm by creating confusion, suspending services, and excluding the people who had built the planning infrastructure.

1330. K. Michael Sullivan satisfies the causation element because his statements and planning decisions created or preserved the eligibility

confusion, service suspension, and committee obstruction that blocked disabled veterans from dependable access.

1331. K. Michael Sullivan satisfies the damages element because disabled veterans lost estate-planning services, received conflicting information, faced delay, and lost confidence because the local program was controlled by actors who would not correct the access problem.

1332. Sarah Stigerwalt Egan satisfies the undertaking element because she served as a local Wills for Heroes leader, co-chair, planner, committee actor, and public-facing bar representative for the estate-planning program.

1333. Sarah Stigerwalt Egan satisfies the failure-to-exercise-reasonable-care element because she gave or preserved contradictory eligibility information, refused transparent recorded meetings, treated committee access as discretionary, and participated in suspending Wills for Heroes after disabled-veteran access objections despite knowing disabled veterans needed clear and timely access.

1334. Sarah Stigerwalt Egan satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on local Wills for Heroes planning and eligibility communications, and her conduct increased the risk of harm by preserving confusion, refusing transparent meetings, and allowing service suspension.

1335. Sarah Stigerwalt Egan satisfies the causation element because her reversals, meeting refusals, and suspension of planning directly prevented disabled-veteran concerns from being resolved before the program collapsed.

1336. Sarah Stigerwalt Egan satisfies the damages element because disabled veterans were invited, excluded, corrected, then deprived of future estate-planning access through the same program that claimed to serve heroes.

1337. Mary Beth Clark satisfies the undertaking element because she used North Penn Legal Services affiliation, Union Snyder County Bar Association influence, local bar leadership, local public-service legal influence, and Wills for Heroes related authority affecting disabled-veteran access.

1338. Mary Beth Clark satisfies the failure-to-exercise-reasonable-care element because she preserved or participated in the local bar structure that displaced Plaintiff's representatives from Wills for Heroes planning, protected insider control over public-service legal programs, and failed to correct access barriers after disabled-veteran confusion and exclusion had been repeatedly raised.

1339. Mary Beth Clark satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on local public-service

legal networks, and her conduct increased the risk of harm by preserving insider control and excluding the representatives trying to correct access barriers.

1340. Mary Beth Clark satisfies the causation element because her local bar influence, legal-aid affiliation, and role in preserving insider control helped create and maintain the conditions that excluded the representatives trying to protect disabled-veteran access.

1341. Mary Beth Clark satisfies the damages element because disabled veterans lost access to the planning history, legal-service capacity, pro bono infrastructure, and advocacy that Plaintiff's representatives had built.

1342. Bloomsburg Fair Association satisfies the undertaking element because it controlled, supported, endorsed, administered, or preserved public-facing veterans events, veterans-service outreach opportunities, community-event access, and legal-service outreach opportunities.

1343. Bloomsburg Fair Association satisfies the failure-to-exercise-reasonable-care element because it allowed public-facing veterans-event access and outreach channels to be restricted or preserved in a way that reduced Plaintiff's representatives' ability to reach disabled veterans after Wills for Heroes and Wills for Veterans advocacy identified urgent estate-planning needs.

1344. Bloomsburg Fair Association satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on public-facing veterans outreach to connect with estate-planning services, and reduced outreach increased the risk of service loss, delay, and distrust.

1345. Bloomsburg Fair Association satisfies the causation element because public-facing event restrictions reduced disabled veterans' access to the representatives and outreach channels that would have connected them to estate-planning services.

1346. Bloomsburg Fair Association satisfies the damages element because disabled veterans lost outreach opportunities, legal-service information, event access, and connection to Wills for Veterans or equivalent estate-planning services.

1347. Pennsylvania Department of Military and Veterans Affairs satisfies the undertaking element because it controlled, supported, coordinated, or preserved veterans-service networks, regional communications, coalition channels, public-service legitimacy, and government-facing veterans-service access connected to Wills for Heroes and Wills for Veterans planning.

1348. Pennsylvania Department of Military and Veterans Affairs satisfies the failure-to-exercise-reasonable-care element because its veterans-service networks and coalition channels failed to prevent or correct disruption when

Wills for Heroes access was suspended, restricted, or conditioned after disabled-veteran advocacy and notice that disabled veterans still needed estate-planning services.

1349. Pennsylvania Department of Military and Veterans Affairs satisfies the increased-risk-or-reliance element because disabled veterans and their advocates relied on government-facing veterans-service coordination, and the failure to correct disruption increased the risk of access loss, service delay, and distrust.

1350. Pennsylvania Department of Military and Veterans Affairs satisfies the causation element because its failure to ensure nonretaliatory veterans-service access allowed bar-controlled restrictions and cancellations to deprive disabled veterans of wills.

1351. Pennsylvania Department of Military and Veterans Affairs satisfies the damages element because disabled veterans lost the benefit of government-facing veterans-service coordination, clear referral pathways, reliable estate-planning access, and coalition support.

1352. Robert Leadbetter satisfies the undertaking element because he used public-office authority, community-event authority, veterans-event access, public-service legitimacy, and public-facing outreach authority affecting disabled-veteran legal-service access.

1353. Robert Leadbetter satisfies the failure-to-exercise-reasonable-care element because public-office and public-facing veterans-event access structures were used or preserved in a way that reduced disabled-veteran access to legal-service outreach after Wills for Heroes and Wills for Veterans advocacy identified the need to connect disabled veterans with estate-planning services.

1354. Robert Leadbetter satisfies the increased-risk-or-reliance element because disabled veterans relied on public-facing veterans outreach, and reduced outreach increased the risk of lost legal-service information, delayed estate planning, and distrust in public-service systems.

1355. Robert Leadbetter satisfies the causation element because his public-office and event-access influence contributed to disabled veterans losing outreach channels and access to Wills for Heroes or Wills for Veterans information.

1356. Robert Leadbetter satisfies the damages element because disabled veterans lost public-facing outreach, veterans-event legal-service information, connection to the representatives trying to preserve wills, and confidence in public-service systems.

1357. Does 1 through 100 satisfy the undertaking element because they include unknown bar members, officers, employees, volunteers, committee

participants, veterans-service actors, public-event actors, Wills for Heroes actors, Wills for Veterans actors, state-connected actors, county-connected actors, coalition participants, public-service actors, and communications participants who undertook, controlled, supported, preserved, promoted, restricted, or administered the challenged access structures.

1358. Does 1 through 100 satisfy the failure-to-exercise-reasonable-care element because they received, transmitted, ratified, preserved, concealed, enforced, or benefited from access restrictions, service suspension, public-facing outreach loss, disabled-veteran exclusion, Wills for Heroes cancellation, Wills for Veterans obstruction, communication restrictions, contradictory eligibility information, or retaliation against disabled-veteran advocates despite the need for written eligibility standards, clear communication, inclusive planning, reliable meeting access, and nonretaliatory correction procedures.

1359. Does 1 through 100 satisfy the increased-risk-or-reliance element because disabled veterans and their advocates relied on Defendants' public-service representations, and Doe Defendants increased the risk of harm by creating confusion, suspending services, excluding the people who had built the planning infrastructure, and preserving access structures that did not protect disabled veterans.

1360. Does 1 through 100 satisfy the causation element because their unknown communications, votes, decisions, omissions, concealment, enforcement, ratification, or program operations helped cause confusion, service loss, delay, deterrence, loss of trust, and the denial, cancellation, restriction, suspension, or obstruction of disabled-veteran estate-planning access.

1361. Does 1 through 100 satisfy the damages element because disabled veterans lost service access, clear information, timely wills, public-service access, coalition pathways, veterans-service coordination, volunteer support, public trust, and practical access to the systems that claimed to serve them.

1362. Plaintiff and the class suffered damages because disabled veterans lost service access, clear information, timely wills, public-service access, coalition pathways, veterans-service coordination, emotional security, volunteer support, public trust, and the planning infrastructure built to serve them.

1363. Plaintiff and the class are entitled to compensatory damages, consequential damages, nominal damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, written disability-access standards, restored Wills for Heroes or equivalent Wills for Veterans access, costs, attorneys' fees where available, and all other lawful relief.

1364. Plaintiff and the class satisfy the undertaking requirement because Defendants undertook to render services through Wills for Heroes, Wills for Veterans, veterans service programs, legal aid channels, bar connected public service events, court connected systems, and public service legal networks.

1365. Plaintiff and the class satisfy the lack of reasonable care requirement because Defendants performed that undertaking without written eligibility standards, clear communication, inclusive planning, reliable meeting access, or nonretaliatory correction procedures.

1366. Plaintiff and the class satisfy the increased risk or reliance requirement because disabled veterans and their advocates relied on Defendants' public service representations, and Defendants increased the risk of harm by creating confusion, suspending services, and excluding the people who had built the planning infrastructure.

1367. Plaintiff and the class satisfy the causation requirement because the negligent undertaking caused disabled veterans to lose timely estate planning access and forced them to depend on litigation to restore services.

1368. Plaintiff and the class satisfy the damages requirement because disabled veterans suffered loss of service access, confusion, delay, emotional distress, reduced trust, and loss of coalition and volunteer support.

1369. Plaintiff and the class are entitled to damages, declaratory relief, injunctive relief, corrective notice, written eligibility standards, restored access, costs, fees where available, and all other lawful relief.

**Count 16-Pennsylvania Unfair and Deceptive Trade Practices and Consumer Protection Law American Bar Association; Pennsylvania Bar Association; Union Snyder County Bar Association; Lycoming Law Association; Clinton County Bar Association; North Penn Legal Services, Inc.; Pennsylvania Legal Aid Network, Inc.; Legal Services Corporation; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; International Legal Aid Group; Snyder County STOP Coalition; Union County STOP Coalition; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; and Doe Organizational Defendants**

1370. Plaintiff incorporates by reference all preceding paragraphs.

1371. The Pennsylvania Unfair Trade Practices and Consumer Protection Law declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3.

1372. "Trade" and "commerce" include the advertising, offering for sale, sale, or distribution of services and anything of value that directly or indirectly affects the people of Pennsylvania. 73 P.S. § 201-2(3).

1373. The UTPCPL defines unfair or deceptive acts or practices to include conduct that causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, certification, affiliation, connection,

characteristics, benefits, uses, or standard of goods or services. 73 P.S. § 201-2(4).

1374. The UTPCPL also prohibits advertising services with intent not to sell them as advertised and engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding. 73 P.S. § 201-2(4)(ix), (xxi).

1375. Defendants violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law because they marketed, promoted, represented, administered, sponsored, funded, endorsed, or preserved Wills for Heroes, Wills for Veterans, bar sponsored legal services, legal aid systems, public facing veterans events, public service estate planning programs, committee access, volunteer opportunities, veterans service referral channels, public protection systems, and legal service outreach as neutral, service oriented, fair, eligibility based, client protective, and available to disabled veterans and their advocates, while concealing contradictory eligibility information, insider control, retaliation, access restrictions, service suspension, cancellation risk, exclusion of corrective advocates, lack of conflict free repair, lack of substitute counsel, and lack of meaningful remedies when lawyer controlled systems harmed clients.

1376. American Bar Association satisfies the deceptive act or practice element because it used national professional legitimacy, access to justice narratives, pro bono narratives, lawyer regulation narratives, public protection narratives, and legal system reform narratives to present lawyer controlled public service legal systems as protecting the public, while those systems failed to prevent disabled veteran exclusion, failed to supply substitute providers, failed to correct conflicts, and failed to provide meaningful remedies when local and statewide legal service systems failed.

1377. American Bar Association satisfies the justifiable reliance element because disabled veterans, legal service users, volunteers, lawyers, bar participants, nonprofit providers, and public service partners reasonably relied on the American Bar Association's professional authority and public protection representations when trusting that lawyer controlled pro bono, access to justice, and attorney accountability systems would serve clients rather than preserve insider control.

1378. American Bar Association satisfies the ascertainable loss element because disabled veterans lost public service trust, legal access credibility, substitute provider pathways, correction mechanisms, practical estate planning access, volunteer support, and the benefit of legal service systems marketed as public protective.

1379. Pennsylvania Bar Association satisfies the deceptive act or practice element because it presented Wills for Heroes as a statewide public service estate planning program serving eligible participants, while statewide Wills for Heroes authority later restricted Plaintiff's representatives from participation after they challenged disabled veteran exclusion, discussed subpoenas, raised litigation, and sought correction.

1380. Pennsylvania Bar Association satisfies the justifiable reliance element because disabled veterans, veterans coalitions, volunteers, students, local bar actors, and Plaintiff's representatives reasonably relied on statewide Wills for Heroes branding, training, staff communications, volunteer channels, eligibility communications, and public service representations when they invested time, trust, outreach, and planning resources into preserving wills for disabled veterans.

1381. Pennsylvania Bar Association satisfies the ascertainable loss element because disabled veterans lost clear eligibility information, timely wills, estate planning access, public service trust, coalition pathways, volunteer support, and the representatives who had built the planning infrastructure for disabled veteran access.

1382. Union Snyder County Bar Association satisfies the deceptive act or practice element because it represented Wills for Heroes planning,

committee access, bar sponsored pro bono programming, local public service legal access, and estate planning services as neutral, service oriented, committee based, and available while permitting contradictory eligibility statements, denying transparent committee process, suspending planning, and excluding advocates who sought disabled veteran inclusion.

1383. Union Snyder County Bar Association satisfies the justifiable reliance element because disabled veterans, veterans coalitions, volunteers, students, and Plaintiff's representatives reasonably relied on USCBA minutes, committee statements, agenda procedures, local bar communications, Wills for Heroes planning, and public service representations when they prepared outreach, corrected eligibility confusion, and sought to preserve wills.

1384. Union Snyder County Bar Association satisfies the ascertainable loss element because disabled veterans lost clear information, timely wills, committee transparency, public service trust, coalition pathways, volunteer support, and reliable access to estate planning services.

1385. Lycoming Law Association satisfies the deceptive act or practice element because it presented the Lycoming Wills for Heroes event as a public facing estate planning opportunity for eligible participants, while the event was cancelled instead of preserved for disabled veteran clients who were going to lose wills.

1386. Lycoming Law Association satisfies the justifiable reliance element because disabled veterans and their advocates reasonably relied on the Lycoming Wills for Heroes event as a real service pathway for wills and related estate planning documents.

1387. Lycoming Law Association satisfies the ascertainable loss element because disabled veterans lost the Lycoming Wills for Heroes estate planning access, lost timely wills, lost public service trust, and suffered delay, confusion, and loss of expected services.

1388. Clinton County Bar Association satisfies the deceptive act or practice element because it participated in Clinton County Wills for Heroes access, local bar coordination, public service legal programming, volunteer coordination, and estate planning access channels without clear disabled veteran eligibility rules, reliable correction, or nonretaliatory access protections after the broader Wills for Heroes access dispute had already confused and harmed disabled veterans.

1389. Clinton County Bar Association satisfies the justifiable reliance element because disabled veterans, veterans service partners, volunteers, and Plaintiff's representatives reasonably relied on Clinton County Wills for Heroes public service representations and local bar coordination as a real estate planning access pathway.

1390. Clinton County Bar Association satisfies the ascertainable loss element because disabled veterans lost clarity, timely access, public service confidence, coalition support, dependable estate planning opportunities, and trust in bar sponsored legal service systems.

1391. North Penn Legal Services, Inc. satisfies the deceptive act or practice element because it used legal aid status, public service legitimacy, client protection narratives, conflict screening expectations, referral influence, and bar connected pro bono relationships to preserve the appearance of neutral legal service access while participating in or benefiting from insider structures that displaced the representatives who were trying to protect disabled veterans.

1392. North Penn Legal Services, Inc. satisfies the justifiable reliance element because disabled veterans, low income clients, public service partners, volunteers, and Plaintiff's representatives reasonably relied on NPLS's legal aid status, public interest mission, referral legitimacy, and pro bono relationships as client protective legal service channels.

1393. North Penn Legal Services, Inc. satisfies the ascertainable loss element because disabled veterans lost access to reliable legal service pathways, substitute provider support, pro bono infrastructure, conflict free correction, and public service trust.

1394. Pennsylvania Legal Aid Network, Inc. satisfies the deceptive act or practice element because it promoted, funded, supported, preserved, or benefited from statewide legal aid structures represented as client protective and access expanding while those structures lacked effective repair, conflict free substitute provider mechanisms, and neutral correction when disabled veterans lost public service legal access.

1395. Pennsylvania Legal Aid Network, Inc. satisfies the justifiable reliance element because disabled veterans, legal aid clients, public service partners, and Plaintiff's representatives reasonably relied on Pennsylvania Legal Aid Network, Inc.'s funding, coordination, access to justice, and legal aid legitimacy as part of the public service legal system that should protect vulnerable clients.

1396. Pennsylvania Legal Aid Network, Inc. satisfies the ascertainable loss element because disabled veterans lost access to dependable legal service pathways, conflict free substitute provider systems, public service trust, and meaningful correction when Wills for Heroes or Wills for Veterans access failed.

1397. Legal Services Corporation satisfies the deceptive act or practice element because it promoted, funded, supported, preserved, or benefited from civil legal aid systems represented as expanding access to justice while

those systems failed to provide effective substitute provider access, conflict repair, or client centered correction when legal aid and bar connected systems left disabled veterans without reliable estate planning access.

1398. Legal Services Corporation satisfies the justifiable reliance element because disabled veterans, legal aid clients, nonprofit partners, and Plaintiff's representatives reasonably relied on LSC funded access to justice systems as client protective systems that would not preserve incumbent provider control at the expense of vulnerable clients.

1399. Legal Services Corporation satisfies the ascertainable loss element because disabled veterans lost practical legal service access, substitute provider pathways, trusted public service referral channels, conflict repair, and meaningful repair.

1400. Transitions of PA satisfies the deceptive act or practice element because it participated in or benefited from victim service, public service, referral, nonprofit, coalition, and legal service channels represented as neutral and client protective while the same regional systems preserved incumbent lawyer approved pathways and reduced access to independent or corrective providers.

1401. Transitions of PA satisfies the justifiable reliance element because disabled veterans, vulnerable clients, public service partners, and Plaintiff's

representatives reasonably relied on Transitions of PA’s victim service and legal service referral network as a neutral public service pathway.

1402. Transitions of PA satisfies the ascertainable loss element because disabled veterans lost referral trust, public service credibility, coalition support, substitute provider access, and dependable connection to estate planning or related legal service assistance.

1403. Transitions Legal Center satisfies the deceptive act or practice element because it participated in or benefited from legal service, victim service, referral, pro bono, and public service channels represented as neutral and client protective while those channels preserved incumbent lawyer approved referral pathways and reduced access to independent or corrective providers.

1404. Transitions Legal Center satisfies the justifiable reliance element because disabled veterans, vulnerable clients, public service partners, and Plaintiff’s representatives reasonably relied on Transitions Legal Center’s legal service and referral legitimacy as a neutral pathway for lawful assistance.

1405. Transitions Legal Center satisfies the ascertainable loss element because disabled veterans lost referral trust, public service credibility,

coalition support, substitute provider access, and dependable connection to estate planning or related legal service assistance.

1406. Bloomsburg Fair Association satisfies the deceptive act or practice element because it represented public facing event access, veterans outreach, community event access, and legal service outreach opportunities as open, neutral, and service oriented while event access structures were used or preserved in a manner that reduced disabled veterans' access to representatives and outreach channels trying to connect them with estate planning services.

1407. Bloomsburg Fair Association satisfies the justifiable reliance element because disabled veterans and their advocates reasonably relied on public facing veterans event access and community outreach as real pathways to legal service information and estate planning assistance.

1408. Bloomsburg Fair Association satisfies the ascertainable loss element because disabled veterans lost outreach opportunities, legal service information, event access, public service trust, and connection to Wills for Veterans or equivalent estate planning services.

1409. International Legal Aid Group satisfies the deceptive act or practice element because it used international access to justice narratives, legal aid legitimacy, public protection narratives, and legal system improvement

language to preserve lawyer controlled access structures while failing to disclose that those structures did not supply substitute providers, did not repair conflicts, did not prevent public service cancellation, and did not provide meaningful remedies when local and statewide legal service systems failed.

1410. International Legal Aid Group satisfies the justifiable reliance element because disabled veterans and their advocates reasonably relied on International Legal Aid Group's access to justice and legal aid legitimacy when trusting that legal aid structures promoted through professional networks would expand client access rather than preserve provider control.

1411. International Legal Aid Group satisfies the ascertainable loss element because disabled veterans lost public service trust, legal access credibility, substitute provider pathways, correction mechanisms, and practical estate planning access.

1412. Snyder County STOP Coalition satisfies the deceptive act or practice element because it participated in or preserved service provider networks, public service referrals, legal aid relationships, and coalition pathways represented as client centered and neutral while those pathways preserved incumbent lawyer approved referral channels and failed to protect disabled veterans from loss of equal legal service access.

1413. Snyder County STOP Coalition satisfies the justifiable reliance element because disabled veterans, public service participants, legal service partners, and Plaintiff's representatives reasonably relied on Snyder County STOP Coalition networks as neutral public service channels for connecting vulnerable people to services.

1414. Snyder County STOP Coalition satisfies the ascertainable loss element because disabled veterans lost coalition pathways, public service trust, referral access, legal service information, and nonretaliatory correction channels.

1415. Union County STOP Coalition satisfies the deceptive act or practice element because it participated in or preserved service provider networks, public service referrals, legal aid relationships, and coalition pathways represented as client centered and neutral while those pathways preserved incumbent lawyer approved referral channels and failed to protect disabled veterans from loss of equal legal service access.

1416. Union County STOP Coalition satisfies the justifiable reliance element because disabled veterans, public service participants, legal service partners, and Plaintiff's representatives reasonably relied on Union County STOP Coalition networks as neutral public service channels for connecting vulnerable people to services.

1417. Union County STOP Coalition satisfies the ascertainable loss element because disabled veterans lost coalition pathways, public service trust, referral access, legal service information, and nonretaliatory correction channels.

1418. Union County Criminal Justice Advisory Board satisfies the deceptive act or practice element because it participated in or preserved public service, county connected, justice system, coalition, referral, and access to services structures represented as neutral, public serving, collaborative, and protective of vulnerable people while those structures were used or preserved in a manner that reduced disabled veterans' access to advocates, legal service information, coalition pathways, and estate planning channels trying to connect them with Wills for Heroes, Wills for Veterans, or equivalent services.

1419. Union County Criminal Justice Advisory Board satisfies the justifiable reliance element because disabled veterans, public service participants, legal service partners, veterans service participants, and Plaintiff's representatives reasonably relied on CJAB participation, meetings, networks, referrals, and public service legitimacy as neutral channels for identifying community needs, coordinating services, and connecting vulnerable people with lawful assistance.

1420. Union County Criminal Justice Advisory Board satisfies the ascertainable loss element because disabled veterans lost coalition pathways, referral access, public service trust, legal service information, outreach opportunities, and nonretaliatory correction channels when county connected service networks failed to preserve equal access to estate planning assistance.

1421. Union County Mental Health Advisory Committee satisfies the deceptive act or practice element because it participated in or preserved public service, county connected, mental health, coalition, referral, and access to services structures represented as neutral, public serving, collaborative, and protective of vulnerable people while those structures were used or preserved in a manner that reduced disabled veterans' access to advocates, legal service information, coalition pathways, and estate planning channels trying to connect them with Wills for Heroes, Wills for Veterans, or equivalent services.

1422. Union County Mental Health Advisory Committee satisfies the justifiable reliance element because disabled veterans, vulnerable community members, public service participants, legal service partners, veterans service participants, and Plaintiff's representatives reasonably relied on Mental Health Advisory Committee participation, meetings,

networks, referrals, and public service legitimacy as neutral channels for identifying needs, coordinating services, and connecting vulnerable people with lawful assistance.

1423. Union County Mental Health Advisory Committee satisfies the ascertainable loss element because disabled veterans lost coalition pathways, referral access, public service trust, legal service information, outreach opportunities, and nonretaliatory correction channels when county connected service networks failed to preserve equal access to estate planning assistance.

1424. Doe Organizational Defendants satisfy the deceptive act or practice element because they used presently unknown bar, legal aid, nonprofit, public service, veterans service, coalition, referral, event, funding, professional, or institutional roles to market, promote, preserve, conceal, ratify, or benefit from legal service systems represented as neutral, fair, client protective, and available while those systems restricted disabled veteran access.

1425. Doe Organizational Defendants satisfy the justifiable reliance element because disabled veterans, veterans coalitions, volunteers, students, public service partners, and Plaintiff's representatives reasonably relied on those unknown organizational communications, event structures, referral

pathways, public service representations, and legal service legitimacy when seeking estate planning services.

1426. Doe Organizational Defendants satisfy the ascertainable loss element because disabled veterans lost service access, clear information, timely wills, coalition pathways, veterans service coordination, volunteer support, public trust, and practical access to legal service systems that claimed to serve them.

1427. Plaintiff and the class suffered ascertainable loss because disabled veterans lost clear eligibility information, timely wills, estate planning access, legal service access, coalition pathways, public service trust, volunteer support, substitute provider access, and the planning infrastructure built to serve them.

1428. Defendants' deceptive conduct caused those losses because disabled veterans and their advocates invested time, trust, outreach, volunteer labor, coalition relationships, planning resources, and public service reliance into systems represented as neutral, service oriented, fair, client protective, and available, when those systems instead concealed access restrictions, insider control, retaliation risk, cancellation risk, lack of written standards, lack of neutral correction, and lack of meaningful repair.

1429. Plaintiff and the class are entitled to actual damages, statutory damages, treble damages where available, declaratory relief, injunctive relief, corrective notice, written eligibility standards, written nonendorsement and nonretaliation standards, restored Wills for Heroes or equivalent Wills for Veterans access, neutral referral procedures, preservation of records, costs, attorneys' fees where available, and all other lawful relief under 73 P.S. § 201-9.2 and any other applicable law.

**Count 17-First Amendment Retaliation Against Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; Pennsylvania Bar Association; Union–Snyder County Bar Association; Pennsylvania Legal Aid Network, Inc.; North Penn Legal Services, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Michael F.J. Piecuch; Lori R. Hackenberg; Jeffrey A. Rowe; Mark J. Conway; Matthew W. Brann; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Sarah Stigerwalt-Egan; Alexandra Sholley; Kathleen Lincoln; Brian Ulmer; Jessica Chapman; William R. Christman III; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; David Andrew Strouse; Jenna Ann Neidig; Robert Cravitz; Pennsylvania Department of Military and Veterans Affairs; Office of Disciplinary Counsel; United States Bankruptcy Court for the Middle District of Pennsylvania; and Doe Defendants**

1430. Plaintiff incorporates by reference all preceding paragraphs.

1431. The elements of First Amendment retaliation are protected First Amendment activity, retaliatory action sufficient to deter a person of

ordinary firmness from exercising First Amendment rights, and a causal connection showing that the protected activity was a substantial or motivating factor in the retaliatory action.

1432. Plaintiff and Plaintiff's agents engaged in protected First Amendment activity by criticizing legal-system misconduct, objecting to exclusion from legal services and public-service systems, challenging conflicts of interest, reporting malpractice, seeking public accountability, requesting neutral process, demanding nonretaliation, communicating with courts, agencies, funders, bar associations, public officials, public-service entities, and community partners, threatening or filing nonfrivolous litigation, discussing witnesses and subpoenas, preserving claims, and petitioning for relief.

1433. Union County Criminal Justice Advisory Board retaliated against Plaintiff and Plaintiff's agents by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1434. Union County Mental Health Advisory Committee retaliated against Plaintiff and Plaintiff's agents by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1435. Union County STOP Coalition retaliated against Plaintiff and Plaintiff's agents by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1436. Snyder County STOP Coalition retaliated against Plaintiff and Plaintiff's agents by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local

institutional credibility to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1437. Pennsylvania Bar Association retaliated against Plaintiff and Plaintiff's agents by using statewide bar authority, professional legitimacy, Wills for Heroes control, pro bono program control, staff communications, volunteer communications, and bar-connected public-service channels to restrict communications, bar participation, program access, public-service opportunities, witness activity, and litigation-related advocacy after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1438. Union–Snyder County Bar Association retaliated against Plaintiff and Plaintiff's agents by using local bar authority, membership control, listserv control, meeting access, committee access, minute practices, public-service programming, professional legitimacy, and local legal-system influence to exclude, isolate, discipline, suspend, disparage, or chill Plaintiff and Plaintiff's agents after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and demands for accountability.

1439. Pennsylvania Legal Aid Network, Inc. retaliated against Plaintiff and Plaintiff's agents by using statewide legal-aid coordination, provider

legitimacy, funding relationships, training authority, public-service recognition, and legal-aid institutional influence to preserve, ratify, allow, or fail to correct retaliatory exclusion after Plaintiff and Plaintiff's agents criticized legal-aid malpractice, funding failures, conflict gaps, provider protection, and retaliation.

1440. North Penn Legal Services, Inc. retaliated against Plaintiff and Plaintiff's agents by using legal-aid authority, public funding, provider dominance, client intake, representation status, referral relationships, court recognition, and local legal-service legitimacy to preserve, ratify, allow, or fail to correct retaliation after Plaintiff and Plaintiff's agents criticized malpractice, client abandonment, conflicts of interest, and legal-aid failures.

1441. Transitions of PA retaliated against Plaintiff and Plaintiff's agents by using public-service, victim-service, referral, domestic-violence-service, coalition, and legal-aid-adjacent relationships to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1442. Transitions Legal Center retaliated against Plaintiff and Plaintiff's agents by using legal-service, pro bono, victim-service, referral, court-related, and public-service relationships to exclude, burden, chill, ratify, or

fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and legal-system advocacy.

1443. Bloomsburg Fair Association retaliated against Plaintiff and Plaintiff's agents by using public-event access, community legitimacy, veterans-event access, public-service visibility, and event-gatekeeping authority to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, petitioning, litigation activity, and public-service advocacy.

1444. Michael F.J. Piecuch retaliated against Plaintiff and Plaintiff's agents by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, and local legal-system authority to encourage, ratify, allow, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, litigation activity, witness activity, and advocacy concerning local legal institutions.

1445. Lori R. Hackenberg retaliated against Plaintiff and Plaintiff's agents by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to encourage, ratify, allow, or fail to prevent retaliation after

Plaintiff and Plaintiff's agents engaged in protected criticism, litigation activity, witness activity, and legal-system advocacy.

1446. Jeffrey A. Rowe retaliated against Plaintiff and Plaintiff's agents by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, and local legal-system influence to encourage, ratify, allow, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, litigation activity, witness activity, and legal-system advocacy.

1447. Mark J. Conway retaliated against Plaintiff and Plaintiff's agents by using bankruptcy judicial authority, sanctions authority, docket authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden, chill, ratify, allow, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, litigation activity, witness activity, and court-accountability advocacy.

1448. Matthew W. Brann retaliated against Plaintiff and Plaintiff's agents by using federal judicial authority, docket authority, case-management authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden, chill, ratify, allow, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, litigation activity, petitioning, witness activity, and court-access advocacy.

1449. Robert Leadbeter retaliated against Plaintiff and Plaintiff's agents by using public-office authority, legislative-office legitimacy, public-facing event influence, veterans-event influence, community-recognition authority, and public-service relationships to exclude, burden, chill, ratify, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected advocacy, litigation activity, and legal-system criticism.

1450. Heath Brosius retaliated against Plaintiff and Plaintiff's agents by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local referral systems to burden, chill, ratify, allow, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism of prosecutors, courts, legal-aid actors, and public-service systems.

1451. Brian Kerstetter retaliated against Plaintiff and Plaintiff's agents by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to burden, chill, ratify, allow, or fail to prevent retaliation after Plaintiff and Plaintiff's agents engaged in protected criticism, motions, advocacy, litigation activity, and witness activity.

1452. Jamie Saleski retaliated against Plaintiff and Plaintiff's agents by using prothonotary authority, filing-system authority, docket-access

authority, public-record authority, counsel-of-record records, and courthouse administration to preserve court-access burdens, record-access burdens, and retaliatory chilling effects after Plaintiff and Plaintiff's agents engaged in protected criticism, litigation, and efforts to correct legal-system failures.

1453. K. Michael Sullivan retaliated against Plaintiff and Plaintiff's agents by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to reject, disparage, ignore, isolate, or help exclude Plaintiff and Plaintiff's agents after protected criticism, litigation threats, public advocacy, and requests for accountability.

1454. Sarah Stigerwalt-Egan retaliated against Plaintiff and Plaintiff's agents by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and communications with statewide bar and veterans-service actors to exclude, delay, cancel, misrepresent, suspend, or chill Plaintiff and Plaintiff's agents's participation after protected criticism, litigation threats, public advocacy, and demands for accountability.

1455. Alexandra Sholley retaliated against Plaintiff and Plaintiff's agents by using lawyer status, USCBA officer authority, secretary authority, minute

practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to treat protected objections, minutes corrections, litigation activity, and criticism as misconduct or grounds for exclusion.

1456. Kathleen Lincoln retaliated against Plaintiff and Plaintiff's agents by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, settlement-related influence, professional relationships, and local legal networks to burden, chill, ratify, allow, or fail to prevent retaliation after protected criticism, litigation threats, ethics complaints, witness activity, and demands for accountability.

1457. Brian Ulmer retaliated against Plaintiff and Plaintiff's agents by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected public-service programs, attorney networks, and communications affecting public-service opportunities to preserve, ratify, allow, or benefit from retaliatory exclusion after protected criticism, litigation activity, and witness-related advocacy.

1458. Jessica Chapman retaliated against Plaintiff and Plaintiff's agents by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, legal profession legitimacy, bar-connected relationships, and access-to-justice narratives to burden, chill, ratify, allow, or benefit from

retaliation after protected criticism, litigation, and legal-system accountability efforts.

1459. William R. Christman III retaliated against Plaintiff and Plaintiff's agents by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, professional legitimacy, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict communications, bar participation, program access, and witness-related litigation activity after Plaintiff and Plaintiff's agents engaged in protected comments, potential litigation, witness identification, and criticism of bar-controlled programs.

1460. Gabriele Miller-Wagner retaliated against Plaintiff and Plaintiff's agents by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, and statewide bar legitimacy to preserve, ratify, allow, or fail to prevent retaliatory exclusion after protected criticism, litigation threats, witness activity, and public-service advocacy.

1461. David K. Trevaskis retaliated against Plaintiff and Plaintiff's agents by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and statewide bar credibility to preserve,

ratify, allow, or fail to prevent retaliatory exclusion after protected criticism, litigation activity, witness activity, and public-service advocacy.

1462. Lori Molloy retaliated against Plaintiff and Plaintiff's agents by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks to preserve, ratify, allow, encourage, or fail to correct retaliation after protected malpractice reporting, litigation, and legal-aid accountability efforts.

1463. Timothy Smith retaliated against Plaintiff and Plaintiff's agents by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, representation-status practices, and legal-aid institutional control to preserve, ratify, allow, encourage, or fail to correct retaliation after protected malpractice reporting, litigation, and legal-aid accountability efforts.

1464. Mary Beth Clark retaliated against Plaintiff and Plaintiff's agents by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, public-service gatekeeping, and professional networks to carry legal-aid

hostility into bar, court, fee, referral, and public-service structures after protected malpractice reporting, protected litigation, and protected criticism.

1465. David Andrew Strouse retaliated against Plaintiff and Plaintiff's agents by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to preserve, ratify, allow, or benefit from retaliatory exclusion after protected criticism, litigation, and public advocacy.

1466. Jenna Ann Neidig retaliated against Plaintiff and Plaintiff's agents by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to preserve, ratify, allow, or benefit from retaliatory exclusion after protected criticism, litigation, and public advocacy.

1467. Robert Cravitz retaliated against Plaintiff and Plaintiff's agents by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to

preserve, ratify, allow, or benefit from retaliatory exclusion after protected criticism, litigation, and public advocacy.

1468. Pennsylvania Department of Military and Veterans Affairs retaliated against Plaintiff and Plaintiff's agents by using veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, event coordination, public-facing legitimacy, and referral channels to preserve, ratify, allow, or fail to prevent retaliatory exclusion after protected advocacy, public-service planning, litigation activity, and legal-system criticism.

1469. Office of Disciplinary Counsel retaliated against Plaintiff and Plaintiff's agents by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, disciplinary legitimacy, and lawyer-controlled accountability structures to treat protected criticism, subpoena activity, witness identification, litigation threats, and legal-system advocacy as disciplinary matters or grounds for professional pressure.

1470. United States Bankruptcy Court for the Middle District of Pennsylvania retaliated against Plaintiff and Plaintiff's agents by using federal bankruptcy authority, docket authority, hearing authority, case-management authority, sanctions-related authority, attorney-practice

authority, filing systems, staff communications, and bankruptcy-access structures to burden, chill, ratify, allow, or fail to prevent retaliation after protected criticism, litigation activity, and court-accountability efforts.

1471. Doe Defendants retaliated against Plaintiff and Plaintiff's agents by using presently unknown bar, court, legal-aid, public-service, veterans-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent retaliatory exclusion and chilling treatment after protected criticism, litigation, witness activity, and legal-system advocacy.

1472. Defendants' retaliatory actions would deter a person of ordinary firmness from continuing protected speech, petitioning, association, litigation, witness participation, public advocacy, legal-aid accountability work, and legal-system criticism because Defendants controlled or influenced access to courts, legal-aid services, bar membership, public-service programs, referral systems, public meetings, advisory boards, records, professional legitimacy, disciplinary exposure, and institutional credibility.

1473. The causal connection between Plaintiff and Plaintiff's agents's protected activity and Defendants' retaliation is shown by temporal

proximity, direct references to protected criticism and litigation, differential treatment after protected activity, refusal to provide ordinary access after complaints, shifting explanations, inconsistent access statements, deviations from normal procedure, escalation after protected activity, disciplinary pressure after protected advocacy, and Defendants' repeated treatment of criticism, witness identification, subpoena activity, complaints, litigation threats, and public advocacy as reasons to exclude, punish, delay, discipline, or isolate Plaintiff and Plaintiff's agents and Plaintiff and Plaintiff's agents's legal team.

1474. Defendants are liable for First Amendment retaliation because Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, Plaintiff and Plaintiff's agents's agents, and related advocates engaged in protected First Amendment activity; each Defendant took, ratified, encouraged, allowed, or failed to prevent retaliatory action that would deter a person of ordinary firmness; and the protected activity was a substantial or motivating factor in the retaliation.

1475. Plaintiff and Plaintiff's agents is entitled to declaratory relief, injunctive relief, compensatory damages, nominal damages, punitive damages where available, corrective notice, restoration of access, reinstatement to programs and participation channels, conflict-free

substitute-provider relief, nondiscrimination and nonretaliation orders, preservation of records, neutral complaint review, costs, fees where available, and all other lawful relief.

**Count 18-42 U.S.C. § 1985 Conspiracy and 42 U.S.C. § 1986 Failure to Prevent Conspiracy Against Pennsylvania Bar Association; Union–Snyder County Bar Association; Office of Disciplinary Counsel; Lori R. Hackenberg; William R. Christman III; David Andrew Strouse; Jenna Ann Neidig; Sarah Stigerwalt-Egan; Michael F.J. Piecuch; Mark J. Conway; Jeffrey A. Rowe; Matthew W. Brann; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Alexandra Sholley; Kathleen Lincoln; Brian Ulmer; Jessica Chapman; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; Robert Cravitz; North Penn Legal Services, Inc.; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; Pennsylvania Legal Aid Network, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; and Doe Defendants**

1476. Plaintiff incorporates by reference all preceding paragraphs.

1477. The elements of a claim under 42 U.S.C. § 1985(2) are a conspiracy to deter, intimidate, injure, or retaliate against a party, witness, attorney, or person assisting litigation because of participation in federal court proceedings, an act in furtherance of the conspiracy, and injury to person, property, or federal rights.

1478. The elements of a claim under 42 U.S.C. § 1985(3) are a conspiracy, a purpose to deprive Plaintiff and Plaintiff's agents or similarly situated persons of equal protection, equal privileges, or equal enjoyment of rights, an act in furtherance of the conspiracy, and injury to person, property, or federal rights.

1479. The elements of a claim under 42 U.S.C. § 1986 are knowledge of a § 1985 conspiracy, power to prevent or aid in preventing the conspiracy, neglect or refusal to prevent it, and injury caused by the wrongful acts committed.

1480. Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, Plaintiff and Plaintiff's agents's agents, witnesses, prospective witnesses, and similarly situated persons participated in protected federal litigation activity by preparing, filing, supporting, investigating, documenting, witnessing, preserving, or pursuing claims concerning legal-aid failures, bar retaliation, court-access restrictions, public-service exclusion, conflicts of interest, professional retaliation, disciplinary misuse, funding failures, and related legal-system misconduct.

1481. Pennsylvania Bar Association joined, advanced, ratified, or failed to prevent the conspiracy by using statewide bar authority, Wills for Heroes

control, public-service legal-program authority, staff communications, volunteer communications, and professional legitimacy to deter Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons from pursuing, supporting, or participating in federal litigation.

1482. Union–Snyder County Bar Association joined, advanced, ratified, or failed to prevent the conspiracy by using local bar authority, membership control, listserv control, meeting access, committee access, minute practices, public-service programming, and local professional legitimacy to deter Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons from pursuing, supporting, or participating in federal litigation.

1483. Office of Disciplinary Counsel joined, advanced, ratified, or failed to prevent the conspiracy by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and disciplinary legitimacy to burden protected litigation, witness identification, subpoena activity, criticism, and petitioning.

1484. Lori R. Hackenberg joined, advanced, ratified, or failed to prevent the conspiracy by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to chill or burden Plaintiff and Plaintiff's agents's federal litigation activity, witness activity, and related advocacy.

1485. William R. Christman III joined, advanced, ratified, or failed to prevent the conspiracy by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, professional legitimacy, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict communications, bar participation, program participation, and witness-related litigation activity.

1486. David Andrew Strouse joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to support or preserve retaliatory treatment after protected federal litigation activity.

1487. Jenna Ann Neidig joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, USCBA involvement, officer or former-

officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to support or preserve retaliatory treatment after protected federal litigation activity.

1488. Sarah Stigerwalt-Egan joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and communications with statewide bar and veterans-service actors to deter, burden, or punish protected federal litigation activity and witness participation.

1489. Michael F.J. Piecuch joined, advanced, ratified, or failed to prevent the conspiracy by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, and local legal-system authority to chill or burden protected federal litigation activity, witness identification, subpoena activity, and criticism of local legal institutions.

1490. Mark J. Conway joined, advanced, ratified, or failed to prevent the conspiracy by using bankruptcy judicial authority, sanctions authority, docket authority, attorney-practice authority, recusal authority, and federal

court legitimacy to burden protected federal litigation activity, witness activity, and criticism of federal court systems.

1491. Jeffrey A. Rowe joined, advanced, ratified, or failed to prevent the conspiracy by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, and local legal-system influence to preserve exclusionary or chilling treatment after protected federal litigation activity.

1492. Matthew W. Brann joined, advanced, ratified, or failed to prevent the conspiracy by using federal judicial authority, docket authority, case-management authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden protected federal litigation, witness activity, petitioning, and court-access advocacy.

1493. Robert Leadbeter joined, advanced, ratified, or failed to prevent the conspiracy by using public-office authority, legislative-office legitimacy, public-facing event influence, veterans-event influence, community-recognition authority, and public-service relationships to support or preserve exclusionary treatment after protected federal litigation activity.

1494. Heath Brosius joined, advanced, ratified, or failed to prevent the conspiracy by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence,

and local referral systems to chill, deter, or burden federal litigation activity and witness-related participation.

1495. Brian Kerstetter joined, advanced, ratified, or failed to prevent the conspiracy by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to chill, deter, or burden federal litigation activity and witness-related participation.

1496. Jamie Saleski joined, advanced, ratified, or failed to prevent the conspiracy by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to preserve court-access burdens and chilling treatment after protected federal litigation activity.

1497. K. Michael Sullivan joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to exclude, burden, or punish Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons because of protected federal litigation activity.

1498. Alexandra Sholley joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, USCBA officer authority, secretary authority, minute practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to treat protected federal litigation activity, record correction, criticism, and witness-related activity as misconduct.

1499. Kathleen Lincoln joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, settlement-related influence, professional relationships, and local legal networks to burden or chill protected federal litigation, witness activity, ethics complaints, and demands for accountability.

1500. Brian Ulmer joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected public-service programs, attorney networks, and communications affecting public-service opportunities to support or preserve exclusionary treatment after protected federal litigation activity.

1501. Jessica Chapman joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, legal profession legitimacy, bar-connected relationships, and access-to-justice narratives to burden Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons because of protected federal litigation activity.

1502. Gabriele Miller-Wagner joined, advanced, ratified, or failed to prevent the conspiracy by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, and statewide bar legitimacy to support or preserve exclusionary treatment after protected federal litigation activity.

1503. David K. Trevaskis joined, advanced, ratified, or failed to prevent the conspiracy by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and statewide bar credibility to support or preserve exclusionary treatment after protected federal litigation activity.

1504. Lori Molloy joined, advanced, ratified, or failed to prevent the conspiracy by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks to burden protected malpractice reporting, federal litigation, and witness-related activity.

1505. Timothy Smith joined, advanced, ratified, or failed to prevent the conspiracy by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, representation-status practices, and legal-aid institutional control to burden protected malpractice reporting, federal litigation, and witness-related activity.

1506. Mary Beth Clark joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, public-service gatekeeping, and professional networks to carry legal-aid hostility into bar, court, fee, referral, and public-

service structures after protected malpractice reporting and protected federal litigation activity.

1507. Robert Cravitz joined, advanced, ratified, or failed to prevent the conspiracy by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to support or preserve retaliatory treatment after protected federal litigation activity.

1508. North Penn Legal Services, Inc. joined, advanced, ratified, or failed to prevent the conspiracy by using legal-aid authority, public funding, provider dominance, client intake, representation status, referral relationships, court recognition, and local legal-service legitimacy to burden Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons after protected malpractice reporting and federal litigation activity.

1509. Union County Criminal Justice Advisory Board joined, advanced, ratified, or failed to prevent the conspiracy by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral

structures, policy access, and local institutional credibility to burden protected federal litigation activity and related advocacy.

1510. Union County Mental Health Advisory Committee joined, advanced, ratified, or failed to prevent the conspiracy by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to burden protected federal litigation activity and related advocacy.

1511. Union County STOP Coalition joined, advanced, ratified, or failed to prevent the conspiracy by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to burden protected federal litigation activity and related advocacy.

1512. Snyder County STOP Coalition joined, advanced, ratified, or failed to prevent the conspiracy by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local

institutional credibility to burden protected federal litigation activity and related advocacy.

1513. United States Bankruptcy Court for the Middle District of Pennsylvania joined, advanced, ratified, or failed to prevent the conspiracy by using federal bankruptcy authority, docket authority, hearing authority, case-management authority, sanctions-related authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to burden protected federal litigation activity and related court-access advocacy.

1514. Pennsylvania Legal Aid Network, Inc. joined, advanced, ratified, or failed to prevent the conspiracy by using statewide legal-aid coordination, provider legitimacy, funding relationships, training authority, public-service recognition, and legal-aid institutional influence to burden protected malpractice reporting, federal litigation, and witness-related activity.

1515. Transitions of PA joined, advanced, ratified, or failed to prevent the conspiracy by using public-service, victim-service, referral, domestic-violence-service, coalition, and legal-aid-adjacent relationships to support or preserve exclusionary treatment after protected federal litigation activity.

1516. Transitions Legal Center joined, advanced, ratified, or failed to prevent the conspiracy by using legal-service, pro bono, victim-service,

referral, court-related, and public-service relationships to support or preserve exclusionary treatment after protected federal litigation activity.

1517. Bloomsburg Fair Association joined, advanced, ratified, or failed to prevent the conspiracy by using public-event access, community legitimacy, veterans-event access, public-service visibility, and event-gatekeeping authority to support or preserve exclusionary treatment after protected federal litigation activity.

1518. Pennsylvania Department of Military and Veterans Affairs joined, advanced, ratified, or failed to prevent the conspiracy by using veterans-service authority, coalition access, public-service recognition, veterans-outreach structures, event coordination, public-facing legitimacy, and referral channels to support or preserve exclusionary treatment after protected federal litigation activity.

1519. Doe Defendants 1 through 200 joined, advanced, ratified, transmitted, concealed, enforced, benefited from, failed to prevent, or aided the conspiracy through presently unknown bar, court, legal-aid, public-service, veterans-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles.

1520. Defendants acted in furtherance of the conspiracy by excluding Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel,

Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons from programs, meetings, committees, communications, court-access channels, legal-aid channels, bar channels, public-service channels, veterans-service channels, referral channels, and professional networks after protected federal litigation activity.

1521. Defendants also acted in furtherance of the conspiracy by treating litigation, subpoenas, witness identification, preservation notices, complaints, public criticism, protected advocacy, and anticipated testimony as misconduct, threats, incivility, disruption, or grounds for exclusion rather than protected federal litigation activity.

1522. Defendants injured Plaintiff and Plaintiff's agents by delaying justice, increasing litigation burdens, damaging reputation, restricting access to legal-aid and public-service systems, chilling protected advocacy, burdening counsel's ability to prepare and prosecute claims, obstructing witness cooperation, and preserving the systems that caused the underlying harm.

1523. Defendants with knowledge of the conspiracy had the power to prevent or aid in preventing the conspiracy through their roles in courts, bar associations, legal-aid institutions, funding systems, disciplinary systems,

public-service programs, advisory boards, referral networks, professional communication channels, and institutional leadership structures.

1524. Defendants neglected or refused to prevent the conspiracy despite knowledge of protected federal litigation activity, knowledge of retaliatory exclusion, knowledge of access restrictions, knowledge of public-service retaliation, knowledge of legal-aid retaliation, knowledge of court-access burdens, and knowledge of the foreseeable harm to Plaintiff and Plaintiff's agents and similarly situated persons.

1525. Defendants are liable under 42 U.S.C. § 1985 because they conspired to deter, intimidate, injure, or retaliate against Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, witnesses, prospective witnesses, and similarly situated persons because of federal litigation activity, and because they conspired to deprive Plaintiff and Plaintiff's agents and similarly situated persons of equal protection, equal privileges, and equal enjoyment of rights.

1526. Defendants with knowledge of the conspiracy are liable under 42 U.S.C. § 1986 because they had power to prevent or aid in preventing the § 1985 conspiracy, neglected or refused to do so, and Plaintiff and Plaintiff's agents suffered injury as a result.

1527. Plaintiff and Plaintiff's agents is entitled to declaratory relief, injunctive relief, compensatory damages, nominal damages, punitive damages where available, corrective notice, restoration of access, nondiscrimination and nonretaliation orders, preservation of records, neutral review, costs, fees where available, and all other lawful relief.

**Count 19-Sherman Act § 1 Group Boycott and Concerted Refusal to Deal (Specific to Plaintiff and Plaintiff's agents) Against Pennsylvania Bar Association; Union–Snyder County Bar Association; Office of Disciplinary Counsel; Lori R. Hackenberg; William R. Christman III; David Andrew Strouse; Jenna Ann Neidig; Sarah Stigerwalt-Egan; Michael F.J. Piecuch; Mark J. Conway; Jeffrey A. Rowe; Matthew W. Brann; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Alexandra Sholley; Kathleen Lincoln; Brian Ulmer; Jessica Chapman; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; Robert Cravitz; North Penn Legal Services, Inc.; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; Pennsylvania Legal Aid Network, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; and Doe Defendants 1 through 200**

1528. Plaintiff incorporates by reference all preceding paragraphs.

1529. The elements of a Sherman Act § 1 group boycott or concerted refusal to deal are concerted action by separate actors, an agreement or coordinated course of conduct to refuse to deal with or exclude a person, provider,

competitor, client channel, referral source, or market participant, unreasonable restraint of trade in a relevant market, antitrust injury, and damages or entitlement to equitable relief.

1530. The relevant markets include civil legal services, publicly funded legal-aid services, low-income legal services, pro bono legal services, court-access services, attorney-accountability services, substitute-provider services, conflict-free legal services, bar-connected public-service legal programs, and related referral, funding, professional-legitimacy, and court-access channels.

1531. Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, Plaintiff and Plaintiff's agents's agents, substitute providers, class members, similarly situated clients, witnesses, and related advocates participate in or seek access to those markets as clients, legal-service users, legal-service providers, referral participants, public-service participants, court users, witnesses, advocates, nonprofit legal-service actors, or persons seeking conflict-free and nonretaliatory legal help.

1532. Defendants entered, enforced, ratified, facilitated, or failed to prevent a group boycott and concerted refusal to deal by coordinating professional, court-connected, bar-connected, legal-aid-connected, public-service-

connected, disciplinary, referral, funding, program-access, and legitimacy channels to exclude Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, Plaintiff and Plaintiff's agents's agents, substitute providers, class members, and similarly situated persons from ordinary access to legal services, pro bono systems, public-service legal programs, referral channels, professional cooperation, conflict-free legal-aid pathways, and court-adjacent legal opportunities.

1533. Pennsylvania Bar Association participated in the group boycott by using statewide bar authority, Wills for Heroes control, pro bono program control, staff communications, volunteer communications, professional legitimacy, and statewide public-service legal channels to exclude Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from bar-controlled legal-service opportunities and referral channels.

1534. Union–Snyder County Bar Association participated in the group boycott by using local bar authority, membership control, listserv control, meeting access, committee access, minute practices, local public-service programming, and professional legitimacy to isolate Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's

agents's legal team, and associated providers from local legal-service cooperation, referrals, bar programs, and professional participation.

1535. Office of Disciplinary Counsel participated in the group boycott by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, disciplinary legitimacy, and lawyer-controlled accountability structures to increase the cost of Plaintiff and Plaintiff's agents's counsel's participation in the legal-services market and to deter cooperation with Plaintiff and Plaintiff's agents's legal team.

1536. Lori R. Hackenberg participated in the group boycott by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to preserve exclusionary local legal-system treatment and restrict meaningful participation by Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers.

1537. William R. Christman III participated in the group boycott by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict Plaintiff and Plaintiff's agents's counsel's access to bar-

controlled programs, communications, witnesses, and legal-service opportunities.

1538. David Andrew Strouse participated in the group boycott by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to preserve coordinated exclusion from local legal-service and professional channels.

1539. Jenna Ann Neidig participated in the group boycott by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to preserve coordinated exclusion from local bar, referral, and public-service channels.

1540. Sarah Stigerwalt-Egan participated in the group boycott by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and communications with statewide bar and public-service actors to exclude Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and

associated providers from ordinary legal-service cooperation and program access.

1541. Michael F.J. Piecuch participated in the group boycott by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, and local legal-system authority to reinforce professional exclusion, access restrictions, and refusal-to-deal conditions within the local legal market.

1542. Mark J. Conway participated in the group boycott by using bankruptcy judicial authority, sanctions authority, docket authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden Plaintiff and Plaintiff's agents's counsel's participation in federal court and related legal-service markets.

1543. Jeffrey A. Rowe participated in the group boycott by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, and local legal-system influence to preserve professional exclusion and refusal-to-deal conditions in local legal and court-adjacent markets.

1544. Matthew W. Brann participated in the group boycott by using federal judicial authority, docket authority, case-management authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden

Plaintiff and Plaintiff's agents's counsel's participation in federal litigation and related attorney-accountability markets.

1545. Robert Leadbeter participated in the group boycott by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to reinforce exclusion from public-facing legal-service opportunities and community-recognition channels.

1546. Heath Brosius participated in the group boycott by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local referral systems to preserve exclusion from local referral, public-service, and court-adjacent legal-service channels.

1547. Brian Kerstetter participated in the group boycott by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to preserve exclusion from county-connected referral, advisory, public-service, and court-adjacent legal-service channels.

1548. Jamie Saleski participated in the group boycott by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to

preserve court-access barriers and refusal-to-deal conditions affecting Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and similarly situated court users.

1549. K. Michael Sullivan participated in the group boycott by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to exclude Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from bar-connected legal-service and public-service channels.

1550. Alexandra Sholley participated in the group boycott by using lawyer status, USCBA officer authority, secretary authority, minute practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to preserve exclusion from professional, public-service, and bar-connected channels.

1551. Kathleen Lincoln participated in the group boycott by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, settlement-related influence, professional relationships, and

local legal networks to reinforce exclusion from legal-service cooperation, professional relationships, and local referral channels.

1552. Brian Ulmer participated in the group boycott by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected public-service programs, attorney networks, and communications affecting public-service opportunities to preserve exclusion from public-service and bar-connected legal channels.

1553. Jessica Chapman participated in the group boycott by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, legal profession legitimacy, bar-connected relationships, and access-to-justice narratives to burden Plaintiff and Plaintiff's agents's counsel's participation in legal-service, attorney-accountability, and public-interest legal markets.

1554. Gabriele Miller-Wagner participated in the group boycott by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, and statewide bar legitimacy to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and

Plaintiff's agents's legal team, and associated providers from statewide public-service legal opportunities.

1555. David K. Trevaskis participated in the group boycott by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and statewide bar credibility to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from statewide public-service legal opportunities.

1556. Lori Molloy participated in the group boycott by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks to protect incumbent legal-aid control and exclude corrective providers, complainants, and malpractice-accountability actors.

1557. Timothy Smith participated in the group boycott by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, representation-status practices, and

legal-aid institutional control to protect incumbent legal-aid control and exclude corrective providers, complainants, and malpractice-accountability actors.

1558. Mary Beth Clark participated in the group boycott by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, public-service gatekeeping, and professional networks to carry legal-aid hostility into bar, referral, public-service, fee, and court-adjacent structures.

1559. Robert Cravitz participated in the group boycott by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to preserve exclusion from local professional, referral, and public-service channels.

1560. North Penn Legal Services, Inc. participated in the group boycott by using legal-aid authority, public funding, provider dominance, client intake, representation status, referral relationships, court recognition, and local legal-service legitimacy to exclude corrective providers, conflict-free alternatives, malpractice-accountability actors, and similarly situated legal-

service participants from meaningful access to clients, referrals, and legal-aid repair mechanisms.

1561. Union County Criminal Justice Advisory Board participated in the group boycott by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from advisory, referral, and county-connected legal-service channels.

1562. Union County Mental Health Advisory Committee participated in the group boycott by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from advisory, referral, and county-connected legal-service channels.

1563. Union County STOP Coalition participated in the group boycott by using county-connected domestic-violence service coordination, prosecutor

participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from coalition, referral, and county-connected legal-service channels.

1564. Snyder County STOP Coalition participated in the group boycott by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from coalition, referral, and county-connected legal-service channels.

1565. United States Bankruptcy Court for the Middle District of Pennsylvania participated in the group boycott by using federal bankruptcy authority, docket authority, hearing authority, case-management authority, sanctions-related authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to burden Plaintiff and

Plaintiff's agents's counsel's participation in federal legal-service, debt-relief, attorney-accountability, and court-access markets.

1566. Pennsylvania Legal Aid Network, Inc. participated in the group boycott by using statewide legal-aid coordination, provider legitimacy, funding relationships, training authority, public-service recognition, and legal-aid institutional influence to protect incumbent legal-aid providers and exclude corrective providers, conflict-free alternatives, complainants, and malpractice-accountability actors.

1567. Transitions of PA participated in the group boycott by using public-service, victim-service, referral, domestic-violence-service, coalition, and legal-aid-adjacent relationships to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from public-service, referral, and legal-aid-adjacent channels.

1568. Transitions Legal Center participated in the group boycott by using legal-service, pro bono, victim-service, referral, court-related, and public-service relationships to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from legal-service, referral, and public-service channels.

1569. Bloomsburg Fair Association participated in the group boycott by using public-event access, community legitimacy, public-service visibility, and event-gatekeeping authority to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from public-facing legal-service and community-access channels.

1570. Pennsylvania Department of Military and Veterans Affairs participated in the group boycott by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to restrict Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, and associated providers from public-service, referral, and coalition channels.

1571. Doe Defendants 1 through 200 participated in the group boycott by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent the coordinated refusal to deal.

1572. Defendants' concerted conduct restrained trade because it reduced the availability of legal services, narrowed access to conflict-free and substitute

legal assistance, restricted public-service legal opportunities, suppressed corrective competition, preserved incumbent legal-aid and bar-controlled channels, chilled alternative providers, and denied clients and class members the benefits of competitive legal-service output, quality, accountability, and choice.

1573. Defendants' concerted refusal to deal caused antitrust injury because Plaintiff and Plaintiff's agents and similarly situated persons lost access to legal services, substitute providers, public-service programs, referrals, professional cooperation, court-access support, attorney-accountability assistance, funding pathways, and legal-service output that would have existed in a competitive and nonretaliatory market.

1574. Defendants are liable under Sherman Act § 1 because they acted in concert to exclude Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, associated providers, class members, and similarly situated persons from legal-service, legal-aid, pro bono, referral, public-service, attorney-accountability, and court-access markets; the exclusion unreasonably restrained trade; and the restraint caused antitrust injury.

1575. Plaintiff and Plaintiff's agents is entitled to declaratory relief, injunctive relief, treble damages, costs, attorneys' fees, corrective notice,

restoration of access, nondiscrimination and nonretaliation orders, preservation of records, neutral referral access, conflict-free substitute-provider access, and all other lawful relief.

**Count 20-Intentional Interference With Contractual Relations and Intentional Interference With Prospective Contractual Relations Against Pennsylvania Bar Association; Union–Snyder County Bar Association; Office of Disciplinary Counsel; Lori R. Hackenberg; William R. Christman III; David Andrew Strouse; Jenna Ann Neidig; Sarah Stigerwalt-Egan; Michael F.J. Piecuch; Mark J. Conway; Jeffrey A. Rowe; Matthew W. Brann; Robert Leadbeter; Heath Brosius; Brian Kerstetter; Jamie Saleski; K. Michael Sullivan; Alexandra Sholley; Kathleen Lincoln; Brian Ulmer; Jessica Chapman; Gabriele Miller-Wagner; David K. Trevaskis; Lori Molloy; Timothy Smith; Mary Beth Clark; Robert Cravitz; North Penn Legal Services, Inc.; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; Snyder County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; Pennsylvania Legal Aid Network, Inc.; Transitions of PA; Transitions Legal Center; Bloomsburg Fair Association; Pennsylvania Department of Military and Veterans Affairs; and Doe Defendants 1 through 200**

1576. Plaintiff incorporates by reference all preceding paragraphs.

1577. The elements of intentional interference with contractual relations are the existence of a contract, Defendants' knowledge of the contract, intentional and improper interference with performance of the contract, absence of privilege or justification, and resulting damages.

1578. The elements of intentional interference with prospective contractual relations are a prospective contractual or economic relationship, a reasonable probability that the relationship would have occurred, Defendants' purpose or intent to prevent the relationship from occurring, absence of privilege or justification, and resulting damages.

1579. Plaintiff and Plaintiff's agents, Plaintiff and Plaintiff's agents's counsel, Plaintiff and Plaintiff's agents's legal team, Plaintiff and Plaintiff's agents's agents, class members, similarly situated clients, witnesses, referral sources, public-service partners, legal-aid applicants, substitute providers, and nonprofit legal-service actors had existing and prospective contractual, professional, legal-service, referral, representation, public-service, pro bono, funding, program-participation, settlement, court-access, attorney-client, witness-cooperation, and community-service relationships.

1580. Defendants knew or should have known that Plaintiff and Plaintiff's agents and Plaintiff and Plaintiff's agents's legal team had existing and prospective legal-service, referral, public-service, witness, funding, program, and representation relationships because those relationships were disclosed through court filings, correspondence, bar communications, legal-aid communications, public-service communications, coalition communications,

public records, meeting discussions, disciplinary communications, and litigation activity.

1581. Pennsylvania Bar Association intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using statewide bar authority, Wills for Heroes control, pro bono program control, staff communications, volunteer communications, professional legitimacy, and statewide public-service legal channels to restrict access to programs, volunteers, witnesses, referrals, public-service partners, and legal-service opportunities.

1582. Union–Snyder County Bar Association intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using local bar authority, membership control, listserv control, meeting access, committee access, minute practices, local public-service programming, and professional legitimacy to isolate Plaintiff and Plaintiff's agents from local referrals, bar programs, professional cooperation, public-service opportunities, and legal-service relationships.

1583. Office of Disciplinary Counsel intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, disciplinary legitimacy, and

lawyer-controlled accountability structures to burden Plaintiff and Plaintiff's agents's counsel's ability to represent clients, pursue claims, maintain professional relationships, communicate with witnesses, and develop legal-service opportunities.

1584. Lori R. Hackenberg intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to preserve exclusionary local legal-system treatment that burdened Plaintiff and Plaintiff's agents's legal representation, referral relationships, witness cooperation, and access to public-service channels.

1585. William R. Christman III intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict program participation, communications, witnesses, volunteers, and legal-service opportunities.

1586. David Andrew Strouse intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic

relationships by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to preserve exclusion from local legal-service and professional channels.

1587. Jenna Ann Neidig intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to preserve exclusion from local bar, referral, public-service, and legal-service channels.

1588. Sarah Stigerwalt-Egan intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and communications with statewide bar and public-service actors to block or burden legal-service cooperation, program participation, referral access, public-service relationships, and witness cooperation.

1589. Michael F.J. Piecuch intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, and local legal-system authority to reinforce professional exclusion, access restrictions, and refusal-to-deal conditions affecting Plaintiff and Plaintiff's agents's legal-service and representation relationships.

1590. Mark J. Conway intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using bankruptcy judicial authority, sanctions authority, docket authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden Plaintiff and Plaintiff's agents's counsel's representation relationships, court-access relationships, bankruptcy-related legal-service opportunities, and attorney-accountability work.

1591. Jeffrey A. Rowe intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, and local legal-system influence to preserve professional exclusion and access restrictions

affecting Plaintiff and Plaintiff's agents's legal-service, referral, and court-adjacent relationships.

1592. Matthew W. Brann intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using federal judicial authority, docket authority, case-management authority, attorney-practice authority, recusal authority, and federal court legitimacy to burden Plaintiff and Plaintiff's agents's counsel's representation relationships, federal litigation work, attorney-accountability work, and related legal-service opportunities.

1593. Robert Leadbeter intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to reinforce exclusion from public-facing legal-service opportunities, referral relationships, community partnerships, and public-service channels.

1594. Heath Brosius intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local

referral systems to preserve exclusion from local referral, public-service, victim-service, and court-adjacent legal-service channels.

1595. Brian Kerstetter intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to preserve exclusion from county-connected referral, advisory, public-service, and court-adjacent legal-service channels.

1596. Jamie Saleski intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to preserve court-access burdens and record-access conditions affecting Plaintiff and Plaintiff's agents's legal-service relationships, representation status, and ability to protect claims.

1597. K. Michael Sullivan intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to exclude Plaintiff and

Plaintiff's agents from bar-connected legal-service, public-service, referral, and professional-cooperation relationships.

1598. Alexandra Sholley intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, USCBA officer authority, secretary authority, minute practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to preserve exclusion from professional, public-service, referral, and bar-connected channels.

1599. Kathleen Lincoln intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, settlement-related influence, professional relationships, and local legal networks to reinforce exclusion from legal-service cooperation, professional relationships, settlement opportunities, and local referral channels.

1600. Brian Ulmer intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected public-

service programs, attorney networks, and communications affecting public-service opportunities to preserve exclusion from public-service and bar-connected legal channels.

1601. Jessica Chapman intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, legal profession legitimacy, bar-connected relationships, and access-to-justice narratives to burden Plaintiff and Plaintiff's agents's counsel's client relationships, legal-service relationships, attorney-accountability work, and public-interest legal relationships.

1602. Gabriele Miller-Wagner intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, public-service legal-program access, scheduling authority, and statewide bar legitimacy to restrict Plaintiff and Plaintiff's agents's access to statewide public-service legal opportunities, volunteers, referrals, and program relationships.

1603. David K. Trevaskis intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic

relationships by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, public-facing legal-program influence, volunteer-program influence, and statewide bar credibility to restrict Plaintiff and Plaintiff's agents's access to statewide public-service legal opportunities, volunteers, referrals, and program relationships.

1604. Lori Molloy intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships with courts, funders, bar actors, referral sources, and public-service networks to protect incumbent legal-aid control and burden corrective representation, client-repair relationships, and substitute-provider relationships.

1605. Timothy Smith intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, representation-status practices, and legal-aid institutional control to protect incumbent legal-aid

control and burden corrective representation, client-repair relationships, and substitute-provider relationships.

1606. Mary Beth Clark intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, public-service gatekeeping, and professional networks to carry legal-aid hostility into bar, referral, public-service, fee, settlement, and court-adjacent structures.

1607. Robert Cravitz intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to preserve exclusion from local professional, referral, settlement, and public-service channels.

1608. North Penn Legal Services, Inc. intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using legal-aid authority, public funding, provider dominance, client intake, representation status, referral relationships, court

recognition, and local legal-service legitimacy to obstruct corrective providers, conflict-free alternatives, client-repair relationships, malpractice-accountability work, and substitute legal-service relationships.

1609. Union County Criminal Justice Advisory Board intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to restrict advisory, referral, public-service, and county-connected legal-service relationships.

1610. Union County Mental Health Advisory Committee intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to restrict advisory, referral, public-service, and county-connected legal-service relationships.

1611. Union County STOP Coalition intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to restrict coalition, referral, public-service, and county-connected legal-service relationships.

1612. Snyder County STOP Coalition intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to restrict coalition, referral, public-service, and county-connected legal-service relationships.

1613. United States Bankruptcy Court for the Middle District of Pennsylvania intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using federal bankruptcy authority, docket authority, hearing authority, case-management authority, sanctions-related authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access

structures to burden Plaintiff and Plaintiff's agents's federal legal-service, debt-relief, attorney-accountability, and court-access relationships.

1614. Pennsylvania Legal Aid Network, Inc. intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using statewide legal-aid coordination, provider legitimacy, funding relationships, training authority, public-service recognition, and legal-aid institutional influence to protect incumbent legal-aid providers and obstruct corrective providers, conflict-free alternatives, complainants, and malpractice-accountability relationships.

1615. Transitions of PA intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using public-service, victim-service, referral, domestic-violence-service, coalition, and legal-aid-adjacent relationships to restrict public-service, referral, coalition, and legal-aid-adjacent relationships.

1616. Transitions Legal Center intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using legal-service, pro bono, victim-service, referral, court-related, and public-service relationships to restrict legal-service, referral, pro bono, and public-service relationships.

1617. Bloomsburg Fair Association intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using public-event access, community legitimacy, public-service visibility, and event-gatekeeping authority to restrict public-facing legal-service, community-service, referral, and event-access relationships.

1618. Pennsylvania Department of Military and Veterans Affairs intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to restrict public-service, referral, coalition, and legal-service relationships.

1619. Doe Defendants 1 through 200 intentionally interfered with Plaintiff and Plaintiff's agents's existing and prospective contractual and economic relationships by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent interference with Plaintiff and Plaintiff's agents's contracts and prospective relationships.

1620. Defendants acted intentionally and without privilege or justification because the interference was directed at protected criticism, litigation

activity, legal-aid accountability work, public-service participation, witness activity, substitute-provider relationships, conflict-free legal-service access, and efforts to obtain remedies for legal-system misconduct.

1621. Defendants caused Plaintiff and Plaintiff's agents and similarly situated persons to lose existing or prospective legal-service relationships, client relationships, referral relationships, pro bono relationships, public-service relationships, witness relationships, funding relationships, settlement opportunities, professional relationships, community partnerships, and court-access opportunities.

1622. Defendants are liable for intentional interference with contractual relations because Plaintiff and Plaintiff's agents had existing contractual, representation, public-service, referral, settlement, program-participation, or legal-service relationships; Defendants knew of those relationships; Defendants intentionally and improperly interfered with those relationships; and Plaintiff and Plaintiff's agents suffered damages.

1623. Defendants are liable for intentional interference with prospective contractual relations because Plaintiff and Plaintiff's agents had reasonable probabilities of future contractual, representation, public-service, referral, settlement, program-participation, funding, or legal-service relationships; Defendants intended to prevent or burden those relationships; Defendants

acted without privilege or justification; and Plaintiff and Plaintiff's agents suffered damages.

1624. Plaintiff and Plaintiff's agents is entitled to compensatory damages, consequential damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, restoration of access, preservation of records, neutral referral access, conflict-free substitute-provider access, costs, fees where available, and all other lawful relief.

**Count 21-Structural Sherman Act § 1 Group Boycott and Concerted Refusal to Deal Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1625. Plaintiff incorporates by reference all preceding paragraphs.

1626. The elements of a Sherman Act § 1 structural group boycott and concerted refusal to deal are concerted action by separate actors, an

agreement or coordinated course of conduct that excludes or refuses to deal with a market participant, unreasonable restraint of trade in a relevant market, antitrust injury, and damages or entitlement to equitable relief.

1627. The relevant markets include legal services, civil legal-aid services, low-income legal services, attorney-accountability services, attorney-entry and licensing systems, court-access services, pro bono legal services, public-service legal programs, conflict-free substitute-provider services, referral channels, legal-aid funding channels, attorney-regulation systems, professional-legitimacy channels, and court-adjacent legal-service systems.

1628. Defendants used lawyer-controlled licensing, accreditation, funding, discipline, court access, bar access, legal-aid access, referral access, pro bono access, public-service access, professional legitimacy, procedural control, and institutional recognition to preserve lawyer-dominated control over legal services and to exclude Plaintiff, Plaintiff's counsel, Plaintiff's legal team, substitute providers, corrective providers, conflict-free providers, non-incumbent providers, class members, and similarly situated persons from meaningful participation in the relevant markets.

1629. Administrative Office of Pennsylvania Courts participated in the structural group boycott by using court administration, filing systems, docket systems, court technology, judicial administration, and court-user

infrastructure to preserve attorney-centered access structures that restrict substitute providers, nonlawyer assistance, and corrective legal-service competition.

1630. American Bar Association participated in the structural group boycott by using accreditation influence, model-rule influence, professional standard setting, legal-education control, pro bono narratives, and national professional legitimacy to preserve lawyer-controlled entry, accountability, referral, and service structures.

1631. Bloomsburg Fair Association participated in the structural group boycott by using public-event access, community legitimacy, event gatekeeping, public-service visibility, and public-facing referral opportunities to preserve bar-connected service channels and restrict competing legal-service access.

1632. Matthew W. Brann participated in the structural group boycott by using federal judicial authority, docket authority, case-management authority, attorney-practice norms, recusal authority, and federal court legitimacy to preserve lawyer- and judge-controlled access to federal remedies and attorney-accountability systems.

1633. Heath Brosius participated in the structural group boycott by using prosecutorial authority, county public-office authority, court-facing

influence, victim-service influence, STOP Coalition influence, and local referral systems to preserve incumbent lawyer-approved service channels and restrict competing legal-service pathways.

1634. Jessica Chapman participated in the structural group boycott by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, access-to-justice narratives, and legal profession legitimacy to burden corrective legal-service competition and preserve incumbent lawyer-controlled accountability systems.

1635. William R. Christman III participated in the structural group boycott by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict competing public-service legal access and preserve bar-controlled channels.

1636. Mary Beth Clark participated in the structural group boycott by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, and public-service gatekeeping to preserve incumbent legal-aid and local bar control.

1637. Committee on Rules of Practice and Procedure participated in the structural group boycott by using federal rulemaking influence, procedure, court-access rules, attorney-practice rules, judicial administration, and litigation systems to preserve lawyer-dependent court access and restrict alternative legal assistance.

1638. Commonwealth of Pennsylvania participated in the structural group boycott by using state legitimacy, statutory frameworks, public funding, court-system support, attorney regulation, unauthorized-practice structures, legal-aid systems, and public-service recognition to preserve lawyer-controlled legal-service markets.

1639. Mark J. Conway participated in the structural group boycott by using bankruptcy judicial authority, sanctions authority, docket authority, hearing authority, attorney-practice authority, recusal authority, and federal bankruptcy legitimacy to preserve lawyer-controlled debt-relief and bankruptcy legal-service channels.

1640. Court of Judicial Discipline participated in the structural group boycott by using judicial-discipline authority, judicial-accountability structures, adjudicatory legitimacy, and court-connected oversight systems to preserve judge- and lawyer-controlled accountability channels.

1641. Robert Cravitz participated in the structural group boycott by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to preserve incumbent professional and referral channels.

1642. Doe Defendants participated in the structural group boycott by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent coordinated exclusionary conduct.

1643. Federal Judicial Center participated in the structural group boycott by using judicial education, federal court research, training functions, professional norms, institutional legitimacy, and support for federal court administration to preserve lawyer- and judge-controlled access structures.

1644. Lori R. Hackenberg participated in the structural group boycott by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to preserve incumbent local legal-service channels and restrict corrective competition.

1645. International Legal Aid Group participated in the structural group boycott by using international legal-aid influence, comparative legal-aid legitimacy, policy recognition, institutional credibility, and access-to-justice narratives to preserve incumbent legal-aid legitimacy and restrict alternative provider recognition.

1646. Judicial Conduct Board of Pennsylvania participated in the structural group boycott by using complaint intake, investigative discretion, judicial-accountability gatekeeping, professional accountability influence, and court-connected legitimacy to preserve judge- and lawyer-controlled accountability structures.

1647. Heather Kelly participated in the structural group boycott by using legal-aid influence, NPLS-aligned relationships, local bar connections, professional credibility, and attorney-accountability silence to preserve incumbent legal-aid control and discourage corrective competition.

1648. Brian Kerstetter participated in the structural group boycott by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to preserve county-connected referral and public-service channels controlled by incumbent legal actors.

1649. Robert Leadbeter participated in the structural group boycott by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to reinforce incumbent public-facing legal-service channels.

1650. Legal Services Corporation participated in the structural group boycott by using federal legal-aid funding, grantee recognition, compliance structures, oversight authority, provider legitimacy, and national legal-aid influence to preserve incumbent grantee control and restrict conflict-free substitute-provider access.

1651. Kathleen Lincoln participated in the structural group boycott by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, professional relationships, and local legal networks to preserve incumbent local legal-service and referral channels.

1652. Gabriele Miller-Wagner participated in the structural group boycott by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, scheduling authority, public-service legal-program access, and statewide bar legitimacy to preserve bar-controlled public-service legal channels.

1653. Lori Molloy participated in the structural group boycott by using North Penn Legal Services executive authority, public funding control,

attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships to preserve NPLS dominance and restrict corrective providers.

1654. Jenna Ann Neidig participated in the structural group boycott by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to preserve local bar-controlled professional access.

1655. North Penn Legal Services, Inc. participated in the structural group boycott by using legal-aid authority, public funding, regional provider dominance, client intake, case assignments, representation status, referral relationships, court recognition, grievance systems, and legal-aid legitimacy to exclude conflict-free alternatives, substitute providers, and malpractice-accountability actors.

1656. Northumberland County Prothonotary's Office participated in the structural group boycott by using filing authority, docket access, public-record access, counsel-of-record records, service practices, and courthouse administration to preserve lawyer-centered court-access structures and restrict practical substitute-provider access.

1657. Office of Attorney General participated in the structural group boycott by using public legal authority, state enforcement authority, government-lawyer legitimacy, consumer-protection influence, and attorney-controlled accountability channels to preserve incumbent legal-industry control.

1658. Office of Disciplinary Counsel participated in the structural group boycott by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and disciplinary legitimacy to preserve lawyer-controlled accountability and burden corrective competition.

1659. Pennsylvania Bar Association participated in the structural group boycott by using statewide bar authority, professional legitimacy, public-service legal programs, Wills for Heroes structures, pro bono systems, committees, CLE influence, referral channels, and bar governance to preserve bar-controlled legal-service markets.

1660. Pennsylvania Board of Law Examiners participated in the structural group boycott by using bar admission, examination authority, character-and-fitness screening, licensing gatekeeping, credentialing authority, and professional entry control to restrict legal-service supply and preserve lawyer-controlled market entry.

1661. Pennsylvania Department of Human Services participated in the structural group boycott by using public funding, social-service authority, legal-aid-related funding structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved legal-service pathways.

1662. Pennsylvania Department of Military and Veterans Affairs participated in the structural group boycott by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to preserve incumbent bar-connected public-service legal channels.

1663. Pennsylvania General Assembly participated in the structural group boycott by using statutory authority, public funding authority, legal-aid funding structures, attorney-regulation frameworks, unauthorized-practice structures, and legislative recognition to preserve lawyer-controlled legal-service systems.

1664. Pennsylvania Legal Aid Network, Inc. participated in the structural group boycott by using statewide legal-aid coordination, provider legitimacy, funding relationships, referral influence, training authority, public-service recognition, and legal-aid policy influence to preserve incumbent provider dominance and restrict alternative providers.

1665. Supreme Court of Pennsylvania participated in the structural group boycott by using attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, and professional-regulation authority to preserve lawyer-controlled legal-service and accountability systems.

1666. Michael F.J. Piecuch participated in the structural group boycott by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, advisory-board connections, and local legal-system authority to preserve incumbent local legal-service control.

1667. Jeffrey Rowe participated in the structural group boycott by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, advisory access, and local legal-system influence to preserve incumbent local legal-service channels.

1668. Jamie Saleski participated in the structural group boycott by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to preserve lawyer-centered court-access structures.

1669. Alexandra Sholley participated in the structural group boycott by using lawyer status, USCBA officer authority, secretary authority, minute

practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to preserve bar-controlled access.

1670. Timothy Smith participated in the structural group boycott by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, and representation-status practices to preserve NPLS dominance and restrict client-repair alternatives.

1671. Snyder County participated in the structural group boycott by using county government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy to preserve incumbent local legal-service channels.

1672. Snyder County STOP Coalition participated in the structural group boycott by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to preserve incumbent lawyer-approved referral channels.

1673. Sarah Stigerwalt-Egan participated in the structural group boycott by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and statewide bar communications to preserve bar-controlled access and restrict competing providers.

1674. K. Michael Sullivan participated in the structural group boycott by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to preserve bar-controlled public-service legal channels.

1675. David Andrew Strouse participated in the structural group boycott by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to preserve local professional exclusion.

1676. Transitions Legal Center participated in the structural group boycott by using legal-service participation, pro bono relationships, victim-service relationships, referral systems, court-related connections, public-service networks, and local legal-service channels to preserve incumbent lawyer-approved referral pathways.

1677. Transitions of PA participated in the structural group boycott by using victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, and court-related referral structures to preserve incumbent lawyer-approved service channels.

1678. David K. Trevaskis participated in the structural group boycott by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, volunteer-program influence, public-facing legal-program influence, and statewide bar credibility to preserve bar-controlled public-service legal opportunities.

1679. Brian Ulmer participated in the structural group boycott by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, and attorney networks to preserve bar-controlled public-service legal channels.

1680. Union County participated in the structural group boycott by using county government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems to preserve incumbent local legal-service channels.

1681. Union–Snyder County Bar Association participated in the structural group boycott by using local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy to preserve local lawyer-controlled access.

1682. Union County Criminal Justice Advisory Board participated in the structural group boycott by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to preserve incumbent legal-service channels.

1683. Union County Mental Health Advisory Committee participated in the structural group boycott by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to preserve incumbent lawyer-approved service channels.

1684. Union County STOP Coalition participated in the structural group boycott by using county-connected domestic-violence service coordination,

prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to preserve incumbent lawyer-approved service channels.

1685. United States Bankruptcy Court for the Middle District of Pennsylvania participated in the structural group boycott by using bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to preserve lawyer-controlled bankruptcy and debt-relief legal-service channels.

1686. United States Congress participated in the structural group boycott by using federal legislative authority, federal court creation, federal legal-aid funding statutes, procedural-rule delegation, federal judicial structures, and legal-services funding to preserve lawyer-centered control over legal services and attorney accountability.

1687. United States Court of Appeals for the Third Circuit participated in the structural group boycott by using appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary

authority, filing rules, appellate-access structures, and judicial legitimacy to preserve lawyer- and judge-controlled legal-accountability systems.

1688. United States District Court for the Middle District of Pennsylvania participated in the structural group boycott by using federal trial-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, and judicial legitimacy to preserve lawyer-controlled federal court access.

1689. United States Department of Health and Human Services participated in the structural group boycott by using federal public funding authority, social-service authority, legal-aid-related funding structures, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved service pathways.

1690. United States Judicial Conference participated in the structural group boycott by using federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, and federal court legitimacy to preserve lawyer- and judge-controlled federal court systems.

1691. Defendants' coordinated conduct restrained trade by restricting entry, reducing legal-service output, limiting conflict-free substitute-provider

access, suppressing public-service legal opportunities, preserving incumbent legal-aid and bar-controlled channels, discouraging corrective competition, increasing dependence on licensed lawyers, and depriving clients and class members of legal-service choice, quality, accountability, and access.

1692. Defendants' structural group boycott caused antitrust injury because Plaintiff and similarly situated persons lost access to legal services, conflict-free substitute providers, public-service legal programs, court-access assistance, attorney-accountability services, referrals, professional cooperation, funding pathways, and legal-service output that would have existed in a competitive and nonretaliatory legal-services market.

1693. Defendants are liable under Sherman Act § 1 because they acted in concert to preserve a lawyer-controlled structure that excluded Plaintiff, Plaintiff's counsel, Plaintiff's legal team, associated providers, class members, and similarly situated persons from legal-service, legal-aid, attorney-accountability, referral, public-service, court-access, and professional-legitimacy markets; the exclusion unreasonably restrained trade; and the restraint caused antitrust injury.

1694. Plaintiff is entitled to declaratory relief, injunctive relief, treble damages, costs, attorneys' fees, corrective notice, restoration of access, nondiscrimination and nonretaliation orders, preservation of records, neutral

referral access, conflict-free substitute-provider access, and all other lawful relief.

1695. COUNT __

1696. Sherman Act § 1 General Output-Restriction Conspiracy Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County

STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference

1697. Plaintiff incorporates by reference all preceding paragraphs.

1698. The elements of a Sherman Act § 1 output-restriction conspiracy are concerted action by separate actors, an agreement or coordinated course of conduct that restricts output in a relevant market, unreasonable restraint of trade, antitrust injury, and damages or entitlement to equitable relief.

1699. The relevant markets include legal services, civil legal-aid services, low-income legal services, conflict-free legal services, substitute-provider services, attorney-accountability services, court-access services, pro bono legal services, public-service legal programs, referral channels, funding

channels, professional-legitimacy channels, and court-adjacent legal-service systems.

1700. Defendants agreed, coordinated, ratified, enforced, or failed to prevent an output-restriction scheme that reduced the quantity, quality, availability, independence, and accessibility of legal services by concentrating access to clients, referrals, funding, courts, discipline, professional legitimacy, public-service programs, and legal-aid channels in incumbent lawyer-controlled institutions.

1701. Administrative Office of Pennsylvania Courts restricted legal-service output by using court administration, filing systems, docket systems, court technology, judicial administration, and court-user infrastructure to preserve attorney-centered access structures that make court relief depend on scarce lawyer-controlled services and restrict substitute-provider participation.

1702. American Bar Association restricted legal-service output by using accreditation influence, model-rule influence, professional standard setting, legal-education control, pro bono narratives, and national professional legitimacy to preserve entry barriers and lawyer-controlled accountability systems that reduce the supply of available providers.

1703. Bloomsburg Fair Association restricted legal-service output by using public-event access, community legitimacy, event gatekeeping, public-

service visibility, and public-facing referral opportunities to preserve bar-connected public-service channels and reduce access for alternative legal-service providers.

1704. Matthew W. Brann restricted legal-service output by using federal judicial authority, docket authority, case-management authority, attorney-practice norms, recusal authority, and federal court legitimacy to preserve lawyer- and judge-controlled court-access systems that increase the burden on future attorneys, substitute providers, and legal reformers.

1705. Heath Brosius restricted legal-service output by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local referral systems to preserve incumbent lawyer-approved service channels and reduce access to independent or corrective providers.

1706. Jessica Chapman restricted legal-service output by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, access-to-justice narratives, and legal profession legitimacy to burden corrective legal-service participation and protect incumbent lawyer-controlled accountability systems.

1707. William R. Christman III restricted legal-service output by using Pennsylvania Bar Association general-counsel authority, statewide bar

influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to limit participation in bar-controlled public-service legal opportunities.

1708. Mary Beth Clark restricted legal-service output by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, and public-service gatekeeping to preserve incumbent legal-aid and local bar control over clients, referrals, and public-service access.

1709. Committee on Rules of Practice and Procedure restricted legal-service output by using federal rulemaking influence, procedure, court-access rules, attorney-practice rules, judicial administration, and litigation systems to make meaningful participation depend on lawyer status and procedural expertise.

1710. Commonwealth of Pennsylvania restricted legal-service output by using state legitimacy, statutory frameworks, public funding, court-system support, attorney regulation, unauthorized-practice structures, legal-aid systems, and public-service recognition to preserve lawyer-controlled legal-service markets.

1711. Mark J. Conway restricted legal-service output by using bankruptcy judicial authority, sanctions authority, docket authority, hearing authority, attorney-practice authority, recusal authority, and federal bankruptcy legitimacy to increase the cost of participation in bankruptcy and debt-relief legal-service markets.

1712. Court of Judicial Discipline restricted legal-service output by using judicial-discipline authority, judicial-accountability structures, adjudicatory legitimacy, and court-connected oversight systems to preserve judge- and lawyer-controlled accountability channels instead of independent accountability output.

1713. Robert Cravitz restricted legal-service output by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to preserve incumbent professional and referral channels.

1714. Doe Defendants restricted legal-service output by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent the output-restriction conspiracy.

1715. Federal Judicial Center restricted legal-service output by using judicial education, federal court research, training functions, professional norms, institutional legitimacy, and support for federal court administration to preserve lawyer- and judge-controlled federal court access structures.

1716. Lori R. Hackenberg restricted legal-service output by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to preserve incumbent local legal-service channels and reduce opportunities for independent legal assistance.

1717. International Legal Aid Group restricted legal-service output by using international legal-aid influence, comparative legal-aid legitimacy, policy recognition, institutional credibility, and access-to-justice narratives to preserve incumbent legal-aid legitimacy and reduce recognition of alternative providers.

1718. Judicial Conduct Board of Pennsylvania restricted legal-service output by using complaint intake, investigative discretion, judicial-accountability gatekeeping, professional accountability influence, and court-connected legitimacy to preserve judge- and lawyer-controlled accountability output.

1719. Heather Kelly restricted legal-service output by using legal-aid influence, NPLS-aligned relationships, local bar connections, professional

credibility, and attorney-accountability silence to preserve incumbent legal-aid control and discourage client-repair alternatives.

1720. Brian Kerstetter restricted legal-service output by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to preserve county-connected referral and public-service channels controlled by incumbent legal actors.

1721. Robert Leadbeter restricted legal-service output by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to reinforce incumbent public-facing legal-service channels.

1722. Legal Services Corporation restricted legal-service output by using federal legal-aid funding, grantee recognition, compliance structures, oversight authority, provider legitimacy, and national legal-aid influence to preserve incumbent grantee control and limit conflict-free substitute-provider output.

1723. Kathleen Lincoln restricted legal-service output by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, professional relationships, and local legal networks to preserve incumbent local legal-service and referral channels.

1724. Gabriele Miller-Wagner restricted legal-service output by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, scheduling authority, public-service legal-program access, and statewide bar legitimacy to preserve bar-controlled public-service legal channels.

1725. Lori Molloy restricted legal-service output by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships to preserve NPLS dominance while limiting substitute counsel, conflict-free alternatives, and client-repair services.

1726. Jenna Ann Neidig restricted legal-service output by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to preserve local bar-controlled professional access.

1727. North Penn Legal Services, Inc. restricted legal-service output by using legal-aid authority, public funding, regional provider dominance, client intake, case assignments, representation status, referral relationships, court recognition, grievance systems, and legal-aid legitimacy to leave

clients dependent on a dominant provider rather than increasing substitute-provider output.

1728. Northumberland County Prothonotary's Office restricted legal-service output by using filing authority, docket access, public-record access, counsel-of-record records, service practices, and courthouse administration to preserve lawyer-centered court-access structures that reduce practical legal assistance for court users.

1729. Office of Attorney General restricted legal-service output by using public legal authority, state enforcement authority, government-lawyer legitimacy, consumer-protection influence, and attorney-controlled accountability channels to preserve incumbent legal-industry control.

1730. Office of Disciplinary Counsel restricted legal-service output by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and disciplinary legitimacy to increase the cost of corrective legal-service work and preserve lawyer-controlled accountability.

1731. Pennsylvania Bar Association restricted legal-service output by using statewide bar authority, professional legitimacy, public-service legal programs, Wills for Heroes structures, pro bono systems, committees, CLE

influence, referral channels, and bar governance to keep public-service legal opportunities within bar-controlled channels.

1732. Pennsylvania Board of Law Examiners restricted legal-service output by using bar admission, examination authority, character-and-fitness screening, licensing gatekeeping, credentialing authority, and professional entry control to restrict legal-service supply.

1733. Pennsylvania Department of Human Services restricted legal-service output by using public funding, social-service authority, legal-aid-related funding structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved legal-service pathways.

1734. Pennsylvania Department of Military and Veterans Affairs restricted legal-service output by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to preserve incumbent bar-connected public-service legal channels.

1735. Pennsylvania General Assembly restricted legal-service output by using statutory authority, public funding authority, legal-aid funding structures, attorney-regulation frameworks, unauthorized-practice structures,

and legislative recognition to preserve lawyer-controlled legal-service systems.

1736. Pennsylvania Legal Aid Network, Inc. restricted legal-service output by using statewide legal-aid coordination, provider legitimacy, funding relationships, referral influence, training authority, public-service recognition, and legal-aid policy influence to preserve incumbent provider dominance and limit competitive legal-aid output.

1737. Supreme Court of Pennsylvania restricted legal-service output by using attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, and professional-regulation authority to control legal-service supply, entry, procedure, and accountability.

1738. Michael F.J. Piecuch restricted legal-service output by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, advisory-board connections, and local legal-system authority to preserve incumbent local legal-service control.

1739. Jeffrey Rowe restricted legal-service output by using magisterial judicial authority, courthouse access, local bar relationships, court-connected

public-service participation, advisory access, and local legal-system influence to preserve incumbent local legal-service channels.

1740. Jamie Saleski restricted legal-service output by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to preserve lawyer-centered court-access structures.

1741. Alexandra Sholley restricted legal-service output by using lawyer status, USCBA officer authority, secretary authority, minute practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to preserve bar-controlled public-service and professional access.

1742. Timothy Smith restricted legal-service output by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, and representation-status practices to preserve NPLS dominance while limiting substitute counsel, conflict-free alternatives, and client-repair services.

1743. Snyder County restricted legal-service output by using county government authority, public-service structures, county-connected legal

systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy to preserve incumbent local legal-service channels.

1744. Snyder County STOP Coalition restricted legal-service output by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to preserve incumbent lawyer-approved referral channels.

1745. Sarah Stigerwalt-Egan restricted legal-service output by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and statewide bar communications to preserve bar-controlled access and reduce participation by alternative providers.

1746. K. Michael Sullivan restricted legal-service output by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to preserve bar-controlled public-service legal channels.

1747. David Andrew Strouse restricted legal-service output by using lawyer status, local attorney networks, USCBA participation, listserv participation,

bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to preserve local professional exclusion.

1748. Transitions Legal Center restricted legal-service output by using legal-service participation, pro bono relationships, victim-service relationships, referral systems, court-related connections, public-service networks, and local legal-service channels to preserve incumbent lawyer-approved referral pathways.

1749. Transitions of PA restricted legal-service output by using victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, and court-related referral structures to preserve incumbent lawyer-approved service channels.

1750. David K. Trevaskis restricted legal-service output by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, volunteer-program influence, public-facing legal-program influence, and statewide bar credibility to preserve bar-controlled public-service legal opportunities.

1751. Brian Ulmer restricted legal-service output by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation,

statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, and attorney networks to preserve bar-controlled public-service legal channels.

1752. Union County restricted legal-service output by using county government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems to preserve incumbent local legal-service channels.

1753. Union–Snyder County Bar Association restricted legal-service output by using local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy to keep public-service and referral channels under local bar control.

1754. Union County Criminal Justice Advisory Board restricted legal-service output by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to preserve incumbent legal-service channels.

1755. Union County Mental Health Advisory Committee restricted legal-service output by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to preserve incumbent lawyer-approved service channels.

1756. Union County STOP Coalition restricted legal-service output by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to preserve incumbent lawyer-approved service channels.

1757. United States Bankruptcy Court for the Middle District of Pennsylvania restricted legal-service output by using bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to preserve lawyer-controlled bankruptcy and debt-relief legal-service channels.

1758. United States Congress restricted legal-service output by using federal legislative authority, federal court creation, federal legal-aid funding statutes, procedural-rule delegation, federal judicial structures, and legal-services funding to preserve lawyer-centered control over legal services and attorney accountability.

1759. United States Court of Appeals for the Third Circuit restricted legal-service output by using appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate-access structures, and judicial legitimacy to preserve lawyer- and judge-controlled legal-accountability systems.

1760. United States District Court for the Middle District of Pennsylvania restricted legal-service output by using federal trial-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, and judicial legitimacy to preserve lawyer-controlled federal court access.

1761. United States Department of Health and Human Services restricted legal-service output by using federal public funding authority, social-service authority, legal-aid-related funding structures, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved service pathways.

1762. United States Judicial Conference restricted legal-service output by using federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, and federal court legitimacy to preserve lawyer- and judge-controlled federal court systems.

1763. Defendants' coordinated output restriction reduced the number of available legal-service providers, reduced the number of conflict-free legal-aid options, reduced substitute-counsel availability, reduced public-service legal opportunities, reduced attorney-accountability services, reduced court-access assistance, reduced referrals to alternative providers, reduced corrective competition, and reduced the practical ability of Plaintiff and similarly situated persons to obtain legal help.

1764. Defendants' coordinated output restriction caused antitrust injury because Plaintiff and similarly situated persons lost legal-service access, legal-aid access, conflict-free substitute-provider access, referral access, public-service program access, attorney-accountability assistance, and court-access support that would have existed in a competitive legal-services market.

1765. Defendants are liable under Sherman Act § 1 because they acted in concert to restrict output in legal-service, legal-aid, attorney-accountability,

public-service, referral, funding, court-access, and professional-legitimacy markets; the restraint was unreasonable; and the restraint caused antitrust injury.

1766. Plaintiff is entitled to declaratory relief, injunctive relief, treble damages, costs, attorneys' fees, corrective notice, restoration of access, nondiscrimination and nonretaliation orders, preservation of records, neutral referral access, conflict-free substitute-provider access, increased legal-service output, and all other lawful relief.

**Count 22-Sherman Act § 2 Monopolization, Attempted Monopolization, and Conspiracy to Monopolize Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1767. Plaintiff incorporates by reference all preceding paragraphs.

1768. The elements of Sherman Act § 2 monopolization are monopoly power in the relevant market, willful acquisition or maintenance of that power through exclusionary conduct rather than superior product, business

acumen, or historic accident, antitrust injury, and damages or entitlement to equitable relief.

1769. The elements of attempted monopolization are anticompetitive or predatory conduct, specific intent to monopolize, dangerous probability of achieving monopoly power in the relevant market, antitrust injury, and damages or entitlement to equitable relief.

1770. The elements of conspiracy to monopolize are concerted action, specific intent to monopolize, overt acts in furtherance of the conspiracy, antitrust injury, and damages or entitlement to equitable relief.

1771. The relevant markets include legal services, civil legal-aid services, low-income legal services, conflict-free legal services, substitute-provider services, attorney-accountability services, court-access services, pro bono legal services, public-service legal programs, referral channels, funding channels, professional-legitimacy channels, and court-adjacent legal-service systems.

1772. Defendants possess, maintain, attempt to acquire, and conspire to preserve monopoly power by controlling lawyer licensing, accreditation, professional discipline, court access, legal-aid funding, bar membership, pro bono programs, public-service legal programs, referrals, court-recognized representation status, professional legitimacy, attorney accountability,

unauthorized-practice restrictions, and the public narrative that only incumbent lawyer-controlled institutions may provide legitimate legal assistance.

1773. Administrative Office of Pennsylvania Courts maintained monopoly power by using court administration, filing systems, docket systems, court technology, judicial administration, and court-user infrastructure to preserve attorney-centered access structures and keep court relief dependent on lawyer-controlled services.

1774. American Bar Association maintained monopoly power by using accreditation influence, model-rule influence, professional standard setting, legal-education control, pro bono narratives, and national professional legitimacy to preserve lawyer-controlled entry, accountability, referral, and service structures.

1775. Bloomsburg Fair Association maintained monopoly power by using public-event access, community legitimacy, event gatekeeping, public-service visibility, and public-facing referral opportunities to reinforce bar-connected legal-service channels and exclude alternative public-service legal providers.

1776. Matthew W. Brann maintained monopoly power by using federal judicial authority, docket authority, case-management authority, attorney-

practice norms, recusal authority, and federal court legitimacy to preserve lawyer- and judge-controlled court-access systems and burden corrective legal-service competition.

1777. Heath Brosius maintained monopoly power by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local referral systems to preserve incumbent lawyer-approved service channels and restrict independent legal-service pathways.

1778. Jessica Chapman maintained monopoly power by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, access-to-justice narratives, and legal profession legitimacy to burden corrective legal-service participation and protect incumbent lawyer-controlled accountability systems.

1779. William R. Christman III maintained monopoly power by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict public-service legal opportunities to bar-approved channels.

1780. Mary Beth Clark maintained monopoly power by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, and public-service gatekeeping to preserve incumbent legal-aid and local bar control over clients, referrals, and public-service access.

1781. Committee on Rules of Practice and Procedure maintained monopoly power by using federal rulemaking influence, procedure, court-access rules, attorney-practice rules, judicial administration, and litigation systems to make meaningful participation depend on lawyer status and procedural expertise.

1782. Commonwealth of Pennsylvania maintained monopoly power by using state legitimacy, statutory frameworks, public funding, court-system support, attorney regulation, unauthorized-practice structures, legal-aid systems, and public-service recognition to preserve lawyer-controlled legal-service markets.

1783. Mark J. Conway maintained monopoly power by using bankruptcy judicial authority, sanctions authority, docket authority, hearing authority, attorney-practice authority, recusal authority, and federal bankruptcy legitimacy to increase the cost of participation in bankruptcy and debt-relief legal-service markets.

1784. Court of Judicial Discipline maintained monopoly power by using judicial-discipline authority, judicial-accountability structures, adjudicatory legitimacy, and court-connected oversight systems to preserve judge- and lawyer-controlled accountability channels.

1785. Robert Cravitz maintained monopoly power by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to preserve incumbent professional and referral channels.

1786. Doe Defendants maintained monopoly power by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent monopolistic and exclusionary conduct.

1787. Federal Judicial Center maintained monopoly power by using judicial education, federal court research, training functions, professional norms, institutional legitimacy, and support for federal court administration to preserve lawyer- and judge-controlled federal court access structures.

1788. Lori R. Hackenberg maintained monopoly power by using judicial authority, courthouse authority, court-connected professional networks, local

legal-system influence, and public-service legitimacy to preserve incumbent local legal-service channels and restrict independent legal assistance.

1789. International Legal Aid Group maintained monopoly power by using international legal-aid influence, comparative legal-aid legitimacy, policy recognition, institutional credibility, and access-to-justice narratives to preserve incumbent legal-aid legitimacy and restrict recognition of alternative providers.

1790. Judicial Conduct Board of Pennsylvania maintained monopoly power by using complaint intake, investigative discretion, judicial-accountability gatekeeping, professional accountability influence, and court-connected legitimacy to preserve judge- and lawyer-controlled accountability structures.

1791. Heather Kelly maintained monopoly power by using legal-aid influence, NPLS-aligned relationships, local bar connections, professional credibility, and attorney-accountability silence to preserve incumbent legal-aid control and discourage client-repair alternatives.

1792. Brian Kerstetter maintained monopoly power by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to

preserve county-connected referral and public-service channels controlled by incumbent legal actors.

1793. Robert Leadbeter maintained monopoly power by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to reinforce incumbent public-facing legal-service channels.

1794. Legal Services Corporation maintained monopoly power by using federal legal-aid funding, grantee recognition, compliance structures, oversight authority, provider legitimacy, and national legal-aid influence to preserve incumbent grantee control and limit conflict-free substitute-provider access.

1795. Kathleen Lincoln maintained monopoly power by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, professional relationships, and local legal networks to preserve incumbent local legal-service and referral channels.

1796. Gabriele Miller-Wagner maintained monopoly power by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, scheduling authority, public-service legal-program access, and statewide bar legitimacy to preserve bar-controlled public-service legal channels.

1797. Lori Molloy maintained monopoly power by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships to preserve NPLS dominance while limiting substitute counsel, conflict-free alternatives, and client-repair services.

1798. Jenna Ann Neidig maintained monopoly power by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to preserve local bar-controlled professional access.

1799. North Penn Legal Services, Inc. maintained monopoly power by using legal-aid authority, public funding, regional provider dominance, client intake, case assignments, representation status, referral relationships, court recognition, grievance systems, and legal-aid legitimacy to keep clients dependent on a dominant provider rather than allowing substitute-provider entry and client-repair competition.

1800. Northumberland County Prothonotary's Office maintained monopoly power by using filing authority, docket access, public-record access, counsel-of-record records, service practices, and courthouse administration

to preserve lawyer-centered court-access structures that reduce practical legal assistance for court users.

1801. Office of Attorney General maintained monopoly power by using public legal authority, state enforcement authority, government-lawyer legitimacy, consumer-protection influence, and attorney-controlled accountability channels to preserve incumbent legal-industry control.

1802. Office of Disciplinary Counsel maintained monopoly power by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and disciplinary legitimacy to increase the cost of corrective legal-service work and preserve lawyer-controlled accountability.

1803. Pennsylvania Bar Association maintained monopoly power by using statewide bar authority, professional legitimacy, public-service legal programs, Wills for Heroes structures, pro bono systems, committees, CLE influence, referral channels, and bar governance to keep public-service legal opportunities within bar-controlled channels.

1804. Pennsylvania Board of Law Examiners maintained monopoly power by using bar admission, examination authority, character-and-fitness screening, licensing gatekeeping, credentialing authority, and professional entry control to restrict legal-service supply.

1805. Pennsylvania Department of Human Services maintained monopoly power by using public funding, social-service authority, legal-aid-related funding structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved legal-service pathways.

1806. Pennsylvania Department of Military and Veterans Affairs maintained monopoly power by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to preserve incumbent bar-connected public-service legal channels.

1807. Pennsylvania General Assembly maintained monopoly power by using statutory authority, public funding authority, legal-aid funding structures, attorney-regulation frameworks, unauthorized-practice structures, and legislative recognition to preserve lawyer-controlled legal-service systems.

1808. Pennsylvania Legal Aid Network, Inc. maintained monopoly power by using statewide legal-aid coordination, provider legitimacy, funding relationships, referral influence, training authority, public-service recognition, and legal-aid policy influence to preserve incumbent provider dominance and limit competitive legal-aid output.

1809. Supreme Court of Pennsylvania maintained monopoly power by using attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, and professional-regulation authority to control legal-service supply, entry, procedure, and accountability.

1810. Michael F.J. Piecuch maintained monopoly power by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, advisory-board connections, and local legal-system authority to preserve incumbent local legal-service control.

1811. Jeffrey Rowe maintained monopoly power by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, advisory access, and local legal-system influence to preserve incumbent local legal-service channels.

1812. Jamie Saleski maintained monopoly power by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to preserve lawyer-centered court-access structures.

1813. Alexandra Sholley maintained monopoly power by using lawyer status, USCBA officer authority, secretary authority, minute practices,

meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to preserve bar-controlled public-service and professional access.

1814. Timothy Smith maintained monopoly power by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, and representation-status practices to preserve NPLS dominance while limiting substitute counsel, conflict-free alternatives, and client-repair services.

1815. Snyder County maintained monopoly power by using county government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy to preserve incumbent local legal-service channels.

1816. Snyder County STOP Coalition maintained monopoly power by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to preserve incumbent lawyer-approved referral channels.

1817. Sarah Stigerwalt-Egan maintained monopoly power by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and statewide bar communications to preserve bar-controlled access and reduce participation by alternative providers.

1818. K. Michael Sullivan maintained monopoly power by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to preserve bar-controlled public-service legal channels.

1819. David Andrew Strouse maintained monopoly power by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to preserve local professional exclusion.

1820. Transitions Legal Center maintained monopoly power by using legal-service participation, pro bono relationships, victim-service relationships, referral systems, court-related connections, public-service networks, and local legal-service channels to preserve incumbent lawyer-approved referral pathways.

1821. Transitions of PA maintained monopoly power by using victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, and court-related referral structures to preserve incumbent lawyer-approved service channels.

1822. David K. Trevaskis maintained monopoly power by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, volunteer-program influence, public-facing legal-program influence, and statewide bar credibility to preserve bar-controlled public-service legal opportunities.

1823. Brian Ulmer maintained monopoly power by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, and attorney networks to preserve bar-controlled public-service legal channels.

1824. Union County maintained monopoly power by using county government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems to preserve incumbent local legal-service channels.

1825. Union–Snyder County Bar Association maintained monopoly power by using local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy to keep public-service and referral channels under local bar control.

1826. Union County Criminal Justice Advisory Board maintained monopoly power by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to preserve incumbent legal-service channels.

1827. Union County Mental Health Advisory Committee maintained monopoly power by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to preserve incumbent lawyer-approved service channels.

1828. Union County STOP Coalition maintained monopoly power by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider

networks, public-service referrals, legal-aid relationships, and local institutional credibility to preserve incumbent lawyer-approved service channels.

1829. United States Bankruptcy Court for the Middle District of Pennsylvania maintained monopoly power by using bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to preserve lawyer-controlled bankruptcy and debt-relief legal-service channels.

1830. United States Congress maintained monopoly power by using federal legislative authority, federal court creation, federal legal-aid funding statutes, procedural-rule delegation, federal judicial structures, and legal-services funding to preserve lawyer-centered control over legal services and attorney accountability.

1831. United States Court of Appeals for the Third Circuit maintained monopoly power by using appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate-access structures, and judicial legitimacy to preserve lawyer- and judge-controlled legal-accountability systems.

1832. United States District Court for the Middle District of Pennsylvania maintained monopoly power by using federal trial-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, and judicial legitimacy to preserve lawyer-controlled federal court access.

1833. United States Department of Health and Human Services maintained monopoly power by using federal public funding authority, social-service authority, legal-aid-related funding structures, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved service pathways.

1834. United States Judicial Conference maintained monopoly power by using federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, and federal court legitimacy to preserve lawyer- and judge-controlled federal court systems.

1835. Defendants' monopoly power is shown by their collective ability to control entry into the legal profession, define authorized legal practice, control legal-aid funding, control court access, control disciplinary exposure, control professional legitimacy, control referral channels, control public-service legal programs, and prevent clients and alternative providers from

obtaining meaningful substitute legal help when incumbent lawyer-controlled systems fail.

1836. Defendants willfully maintained and attempted to maintain monopoly power through exclusionary conduct rather than superior legal services because they used licensing, funding, rulemaking, discipline, court authority, bar authority, public-service access, referral control, legal-aid dominance, and professional legitimacy to suppress corrective competition, conflict-free substitute providers, alternative legal assistance, malpractice-accountability services, and independent legal-service output.

1837. Defendants specifically intended to monopolize the relevant markets because their conduct preserved the lawyer-controlled system, protected incumbent legal-aid and bar-connected actors, excluded alternative providers, restricted substitute counsel, and punished or burdened efforts to challenge the monopoly.

1838. Defendants conspired to monopolize by coordinating across courts, bar associations, legal-aid entities, disciplinary bodies, public-service systems, funding systems, referral systems, public offices, and professional networks to preserve lawyer-controlled legal-service channels and exclude corrective competition.

1839. Defendants' monopolization, attempted monopolization, and conspiracy to monopolize caused antitrust injury because Plaintiff and similarly situated persons lost legal-service access, legal-aid access, conflict-free substitute-provider access, referral access, public-service program access, attorney-accountability assistance, and court-access support that would have existed in a competitive legal-services market.

1840. Defendants are liable under Sherman Act § 2 because they possessed, maintained, attempted to acquire, and conspired to preserve monopoly power in legal-service, legal-aid, attorney-accountability, public-service, referral, funding, court-access, and professional-legitimacy markets through exclusionary conduct, and that conduct caused antitrust injury.

1841. Plaintiff is entitled to declaratory relief, injunctive relief, treble damages, costs, attorneys' fees, corrective notice, restoration of access, nondiscrimination and nonretaliation orders, preservation of records, neutral referral access, conflict-free substitute-provider access, increased legal-service output, and all other lawful relief.

**Count 23-Civil RICO Under 18 U.S.C. § 1962(c) Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse;**

**Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1842. Plaintiff incorporates by reference all preceding paragraphs.

1843. The elements of a civil RICO claim under 18 U.S.C. § 1962(c) are conduct, of an enterprise, through a pattern, of racketeering activity, causing injury to Plaintiff's business or property.

1844. The enterprise consists of an association-in-fact enterprise made up of courts, bar associations, legal-aid entities, disciplinary entities, public-service entities, funding entities, public offices, referral systems, professional networks, and Doe participants that operated together to preserve lawyer-controlled legal-service channels, protect incumbent providers, suppress corrective competition, restrict substitute-provider access, conceal legal-aid failures, and burden Plaintiff's ability to obtain

legal services, court access, public-service access, referrals, attorney accountability, and client repair.

1845. The enterprise had a common purpose: to preserve incumbent lawyer-controlled legal-service authority, legal-aid dominance, bar-controlled public-service access, court-connected legitimacy, disciplinary leverage, funding control, referral control, and professional-market exclusion while preventing Plaintiff, Plaintiff's counsel, Plaintiff's legal team, substitute providers, corrective providers, class members, and similarly situated persons from obtaining equal, conflict-free, nonretaliatory, and competitive legal-service access.

1846. The enterprise functioned through relationships among Defendants, including shared legal-profession status, court authority, public funding, bar authority, legal-aid authority, disciplinary authority, referral influence, public-service access, professional communications, court-connected legitimacy, and repeated coordination around exclusion, silence, retaliation, funding preservation, legal-aid protection, and professional control.

1847. The enterprise had continuity because Defendants' conduct was not isolated; it involved repeated acts over time involving legal-aid failures, bar exclusion, court-access burdens, public-service restrictions, disciplinary pressure, referral restrictions, funding preservation, professional legitimacy,

and coordinated responses to criticism, litigation, witness activity, malpractice reporting, and demands for accountability.

1848. Administrative Office of Pennsylvania Courts conducted or participated in the enterprise by using court administration, filing systems, docket systems, court technology, judicial administration, and court-user infrastructure to preserve attorney-centered access structures and support the enterprise's court-access control.

1849. American Bar Association conducted or participated in the enterprise by using accreditation influence, model-rule influence, professional standard setting, legal-education control, pro bono narratives, and national professional legitimacy to support the enterprise's lawyer-controlled entry and accountability structure.

1850. Bloomsburg Fair Association conducted or participated in the enterprise by using public-event access, community legitimacy, event gatekeeping, public-service visibility, and public-facing referral opportunities to support the enterprise's public-facing service and referral channels.

1851. Matthew W. Brann conducted or participated in the enterprise by using federal judicial authority, docket authority, case-management authority, attorney-practice norms, recusal authority, and federal court

legitimacy to support the enterprise's court-access and attorney-accountability control.

1852. Heath Brosius conducted or participated in the enterprise by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local referral systems to support the enterprise's local referral and public-service control.

1853. Jessica Chapman conducted or participated in the enterprise by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, access-to-justice narratives, and legal profession legitimacy to support the enterprise's professional-pressure and accountability-control functions.

1854. William R. Christman III conducted or participated in the enterprise by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to support the enterprise's bar-program and communication-control functions.

1855. Mary Beth Clark conducted or participated in the enterprise by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer

relationships, USCBA influence, local court relationships, referral influence, and public-service gatekeeping to support the enterprise's local bar and legal-aid control.

1856. Committee on Rules of Practice and Procedure conducted or participated in the enterprise by using federal rulemaking influence, procedure, court-access rules, attorney-practice rules, judicial administration, and litigation systems to support the enterprise's procedural and court-access control.

1857. Commonwealth of Pennsylvania conducted or participated in the enterprise by using state legitimacy, statutory frameworks, public funding, court-system support, attorney regulation, unauthorized-practice structures, legal-aid systems, and public-service recognition to support the enterprise's lawyer-controlled legal-service structure.

1858. Mark J. Conway conducted or participated in the enterprise by using bankruptcy judicial authority, sanctions authority, docket authority, hearing authority, attorney-practice authority, recusal authority, and federal bankruptcy legitimacy to support the enterprise's federal court-access and attorney-practice control.

1859. Court of Judicial Discipline conducted or participated in the enterprise by using judicial-discipline authority, judicial-accountability structures,

adjudicatory legitimacy, and court-connected oversight systems to support the enterprise's judge- and lawyer-controlled accountability structure.

1860. Robert Cravitz conducted or participated in the enterprise by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to support the enterprise's local professional network.

1861. Doe Defendants conducted or participated in the enterprise by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent enterprise conduct.

1862. Federal Judicial Center conducted or participated in the enterprise by using judicial education, federal court research, training functions, professional norms, institutional legitimacy, and support for federal court administration to support the enterprise's federal judicial legitimacy structure.

1863. Lori R. Hackenberg conducted or participated in the enterprise by using judicial authority, courthouse authority, court-connected professional

networks, local legal-system influence, and public-service legitimacy to support the enterprise's local court and professional control.

1864. International Legal Aid Group conducted or participated in the enterprise by using international legal-aid influence, comparative legal-aid legitimacy, policy recognition, institutional credibility, and access-to-justice narratives to support the enterprise's legal-aid legitimacy structure.

1865. Judicial Conduct Board of Pennsylvania conducted or participated in the enterprise by using complaint intake, investigative discretion, judicial-accountability gatekeeping, professional accountability influence, and court-connected legitimacy to support the enterprise's accountability gatekeeping.

1866. Heather Kelly conducted or participated in the enterprise by using legal-aid influence, NPLS-aligned relationships, local bar connections, professional credibility, and attorney-accountability silence to support the enterprise's legal-aid protection and client-repair suppression.

1867. Brian Kerstetter conducted or participated in the enterprise by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to support the enterprise's county-connected referral and public-service control.

1868. Robert Leadbeter conducted or participated in the enterprise by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to support the enterprise's public-facing legitimacy and event-access functions.

1869. Legal Services Corporation conducted or participated in the enterprise by using federal legal-aid funding, grantee recognition, compliance structures, oversight authority, provider legitimacy, and national legal-aid influence to support the enterprise's funding, grantee-protection, and legal-aid legitimacy functions.

1870. Kathleen Lincoln conducted or participated in the enterprise by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, professional relationships, and local legal networks to support the enterprise's local bar and referral functions.

1871. Gabriele Miller-Wagner conducted or participated in the enterprise by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, scheduling authority, public-service legal-program access, and statewide bar legitimacy to support the enterprise's pro bono and public-service program functions.

1872. Lori Molloy conducted or participated in the enterprise by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships to support the enterprise's legal-aid dominance, client-control, and malpractice-response functions.

1873. Jenna Ann Neidig conducted or participated in the enterprise by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service legal programming, and court-connected professional relationships to support the enterprise's local bar access and communication functions.

1874. North Penn Legal Services, Inc. conducted or participated in the enterprise by using legal-aid authority, public funding, regional provider dominance, client intake, case assignments, representation status, referral relationships, court recognition, grievance systems, and legal-aid legitimacy to support the enterprise's legal-aid dominance and client-channel control.

1875. Northumberland County Prothonotary's Office conducted or participated in the enterprise by using filing authority, docket access, public-record access, counsel-of-record records, service practices, and courthouse administration to support the enterprise's court-record and counsel-status control.

1876. Office of Attorney General conducted or participated in the enterprise by using public legal authority, state enforcement authority, government-lawyer legitimacy, consumer-protection influence, and attorney-controlled accountability channels to support the enterprise's public enforcement and professional-control functions.

1877. Office of Disciplinary Counsel conducted or participated in the enterprise by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and disciplinary legitimacy to support the enterprise's disciplinary-pressure and professional-control functions.

1878. Pennsylvania Bar Association conducted or participated in the enterprise by using statewide bar authority, professional legitimacy, public-service legal programs, Wills for Heroes structures, pro bono systems, committees, CLE influence, referral channels, and bar governance to support the enterprise's statewide bar-control functions.

1879. Pennsylvania Board of Law Examiners conducted or participated in the enterprise by using bar admission, examination authority, character-and-fitness screening, licensing gatekeeping, credentialing authority, and professional entry control to support the enterprise's market-entry control.

1880. Pennsylvania Department of Human Services conducted or participated in the enterprise by using public funding, social-service authority, legal-aid-related funding structures, service-provider relationships, referral environments, and public-service legitimacy to support the enterprise's public funding and referral functions.

1881. Pennsylvania Department of Military and Veterans Affairs conducted or participated in the enterprise by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to support the enterprise's public-service and referral functions.

1882. Pennsylvania General Assembly conducted or participated in the enterprise by using statutory authority, public funding authority, legal-aid funding structures, attorney-regulation frameworks, unauthorized-practice structures, and legislative recognition to support the enterprise's statutory and funding structure.

1883. Pennsylvania Legal Aid Network, Inc. conducted or participated in the enterprise by using statewide legal-aid coordination, provider legitimacy, funding relationships, referral influence, training authority, public-service recognition, and legal-aid policy influence to support the enterprise's statewide legal-aid coordination and provider-protection functions.

1884. Supreme Court of Pennsylvania conducted or participated in the enterprise by using attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, and professional-regulation authority to support the enterprise's licensing, discipline, rulemaking, and court-access control.

1885. Michael F.J. Piecuch conducted or participated in the enterprise by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, advisory-board connections, and local legal-system authority to support the enterprise's local court and bar-control functions.

1886. Jeffrey Rowe conducted or participated in the enterprise by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, advisory access, and local legal-system influence to support the enterprise's local court and public-service functions.

1887. Jamie Saleski conducted or participated in the enterprise by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse

administration to support the enterprise's filing, docket, and counsel-status functions.

1888. Alexandra Sholley conducted or participated in the enterprise by using lawyer status, USCBA officer authority, secretary authority, minute practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to support the enterprise's local bar communication and record-control functions.

1889. Timothy Smith conducted or participated in the enterprise by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, and representation-status practices to support the enterprise's legal-aid management and client-control functions.

1890. Snyder County conducted or participated in the enterprise by using county government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy to support the enterprise's county referral and public-service functions.

1891. Snyder County STOP Coalition conducted or participated in the enterprise by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to support the enterprise's coalition and referral functions.

1892. Sarah Stigerwalt-Egan conducted or participated in the enterprise by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and statewide bar communications to support the enterprise's local bar and public-service program functions.

1893. K. Michael Sullivan conducted or participated in the enterprise by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to support the enterprise's bar-controlled public-service functions.

1894. David Andrew Strouse conducted or participated in the enterprise by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to support the enterprise's local professional network.

1895. Transitions Legal Center conducted or participated in the enterprise by using legal-service participation, pro bono relationships, victim-service relationships, referral systems, court-related connections, public-service networks, and local legal-service channels to support the enterprise's referral and legal-service channel functions.

1896. Transitions of PA conducted or participated in the enterprise by using victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, and court-related referral structures to support the enterprise's referral and public-service functions.

1897. David K. Trevaskis conducted or participated in the enterprise by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, volunteer-program influence, public-facing legal-program influence, and statewide bar credibility to support the enterprise's public-service legal-program functions.

1898. Brian Ulmer conducted or participated in the enterprise by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, and attorney networks to support the enterprise's statewide bar and public-service functions.

1899. Union County conducted or participated in the enterprise by using county government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems to support the enterprise's county referral and public-service functions.

1900. Union–Snyder County Bar Association conducted or participated in the enterprise by using local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy to support the enterprise's local bar-control functions.

1901. Union County Criminal Justice Advisory Board conducted or participated in the enterprise by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to support the enterprise's advisory and referral functions.

1902. Union County Mental Health Advisory Committee conducted or participated in the enterprise by using county-connected mental-health

advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to support the enterprise's advisory and referral functions.

1903. Union County STOP Coalition conducted or participated in the enterprise by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to support the enterprise's coalition and referral functions.

1904. United States Bankruptcy Court for the Middle District of Pennsylvania conducted or participated in the enterprise by using bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to support the enterprise's bankruptcy court-access and attorney-practice functions.

1905. United States Congress conducted or participated in the enterprise by using federal legislative authority, federal court creation, federal legal-aid funding statutes, procedural-rule delegation, federal judicial structures, and

legal-services funding to support the enterprise's federal funding and court-structure functions.

1906. United States Court of Appeals for the Third Circuit conducted or participated in the enterprise by using appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate-access structures, and judicial legitimacy to support the enterprise's appellate court-access and professional-control functions.

1907. United States District Court for the Middle District of Pennsylvania conducted or participated in the enterprise by using federal trial-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, and judicial legitimacy to support the enterprise's federal trial-court access and attorney-practice functions.

1908. United States Department of Health and Human Services conducted or participated in the enterprise by using federal public funding authority, social-service authority, legal-aid-related funding structures, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy to support the enterprise's public funding and referral functions.

1909. United States Judicial Conference conducted or participated in the enterprise by using federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, and federal court legitimacy to support the enterprise's federal judicial administration and court-governance functions.

1910. Defendants conducted the enterprise through racketeering activity involving repeated use of mail, wires, electronic communications, funding submissions, public representations, court communications, disciplinary communications, bar communications, referral communications, and program communications to preserve funding, legitimacy, access, referrals, and authority while concealing, minimizing, or misrepresenting legal-aid failures, retaliation, exclusion, conflicts, access restrictions, and lack of client repair.

1911. Defendants' racketeering activity included mail fraud and wire fraud because Defendants used mail, email, electronic filing, electronic records, public communications, funding communications, bar communications, legal-aid communications, disciplinary communications, and referral communications to further the enterprise's scheme to preserve incumbent legal-service control and to deprive Plaintiff and similarly situated persons of money, property, legal-service opportunities, referral opportunities,

contract opportunities, public-service access, court-access opportunities, and client-repair opportunities.

1912. Defendants' racketeering activity was related because the acts shared common purposes, participants, victims, methods, and results, including preserving incumbent legal-service control, protecting lawyer-controlled institutions, suppressing corrective competition, restricting public-service access, burdening protected litigation, preserving funding, and denying Plaintiff and similarly situated persons meaningful access to legal services, accountability, and repair.

1913. Defendants' racketeering activity had continuity because it extended over time and threatens to continue so long as Defendants retain control over legal-aid funding, attorney regulation, court access, bar programs, public-service access, referral channels, professional legitimacy, and client-repair systems.

1914. Plaintiff suffered injury to business or property because Defendants' enterprise caused loss of legal-service opportunities, contract opportunities, prospective contract opportunities, referral opportunities, public-service opportunities, funding opportunities, court-access opportunities, client-repair opportunities, money, property, time, litigation resources, professional

opportunities, and the economic value of access to conflict-free legal help and substitute legal-service channels.

1915. Defendants are liable under 18 U.S.C. § 1962(c) because each conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, and that racketeering activity injured Plaintiff's business or property.

1916. Plaintiff is entitled to treble damages, costs, attorneys' fees, declaratory relief, injunctive relief, corrective notice, restoration of access, preservation of records, neutral referral access, conflict-free substitute-provider access, funding-accountability review, client-repair review, and all other lawful relief.

**Count 24-RICO Conspiracy Under 18 U.S.C. § 1962(d) Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1917. Plaintiff incorporates by reference all preceding paragraphs.

1918. The elements of a RICO conspiracy under 18 U.S.C. § 1962(d) are an agreement that a RICO enterprise would be conducted through a pattern of

racketeering activity, knowledge of the essential nature of the enterprise and the pattern of racketeering activity, agreement to facilitate the enterprise's affairs, and injury to Plaintiff's business or property caused by the conspiracy.

1919. Defendants agreed that the enterprise would preserve lawyer-controlled legal-service authority, legal-aid dominance, bar-controlled public-service access, court-connected legitimacy, disciplinary leverage, funding control, referral control, and professional-market exclusion through repeated acts involving mail, wires, electronic communications, funding communications, public representations, court communications, disciplinary communications, bar communications, referral communications, and program communications.

1920. Defendants knew the essential nature of the enterprise because each Defendant operated within, communicated through, relied on, benefited from, or enforced the same court, bar, legal-aid, public-service, disciplinary, referral, funding, professional-legitimacy, and attorney-regulation systems that preserved incumbent control and excluded Plaintiff, Plaintiff's counsel, Plaintiff's legal team, substitute providers, corrective providers, class members, and similarly situated persons from equal, conflict-free, nonretaliatory, and competitive legal-service access.

1921. Administrative Office of Pennsylvania Courts agreed to facilitate the enterprise by using court administration, filing systems, docket systems, court technology, judicial administration, and court-user infrastructure to preserve attorney-centered access structures and support the enterprise's court-access control.

1922. American Bar Association agreed to facilitate the enterprise by using accreditation influence, model-rule influence, professional standard setting, legal-education control, pro bono narratives, and national professional legitimacy to preserve lawyer-controlled entry, accountability, referral, and service structures.

1923. Bloomsburg Fair Association agreed to facilitate the enterprise by using public-event access, community legitimacy, event gatekeeping, public-service visibility, and public-facing referral opportunities to support the enterprise's public-facing service and referral channels.

1924. Matthew W. Brann agreed to facilitate the enterprise by using federal judicial authority, docket authority, case-management authority, attorney-practice norms, recusal authority, and federal court legitimacy to support the enterprise's court-access and attorney-accountability control.

1925. Heath Brosius agreed to facilitate the enterprise by using prosecutorial authority, county public-office authority, court-facing influence, victim-

service influence, STOP Coalition influence, and local referral systems to support the enterprise's local referral and public-service control.

1926. Jessica Chapman agreed to facilitate the enterprise by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, access-to-justice narratives, and legal profession legitimacy to support the enterprise's professional-pressure and accountability-control functions.

1927. William R. Christman III agreed to facilitate the enterprise by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to support the enterprise's bar-program and communication-control functions.

1928. Mary Beth Clark agreed to facilitate the enterprise by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, and public-service gatekeeping to support the enterprise's local bar and legal-aid control.

1929. Committee on Rules of Practice and Procedure agreed to facilitate the enterprise by using federal rulemaking influence, procedure, court-access

rules, attorney-practice rules, judicial administration, and litigation systems to support the enterprise's procedural and court-access control.

1930. Commonwealth of Pennsylvania agreed to facilitate the enterprise by using state legitimacy, statutory frameworks, public funding, court-system support, attorney regulation, unauthorized-practice structures, legal-aid systems, and public-service recognition to support the enterprise's lawyer-controlled legal-service structure.

1931. Mark J. Conway agreed to facilitate the enterprise by using bankruptcy judicial authority, sanctions authority, docket authority, hearing authority, attorney-practice authority, recusal authority, and federal bankruptcy legitimacy to support the enterprise's federal court-access and attorney-practice control.

1932. Court of Judicial Discipline agreed to facilitate the enterprise by using judicial-discipline authority, judicial-accountability structures, adjudicatory legitimacy, and court-connected oversight systems to support the enterprise's judge- and lawyer-controlled accountability structure.

1933. Robert Cravitz agreed to facilitate the enterprise by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response

participation, public-service participation, and local legal structures to support the enterprise's local professional network.

1934. Doe Defendants agreed to facilitate the enterprise by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent enterprise conduct.

1935. Federal Judicial Center agreed to facilitate the enterprise by using judicial education, federal court research, training functions, professional norms, institutional legitimacy, and support for federal court administration to support the enterprise's federal judicial legitimacy structure.

1936. Lori R. Hackenberg agreed to facilitate the enterprise by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to support the enterprise's local court and professional control.

1937. International Legal Aid Group agreed to facilitate the enterprise by using international legal-aid influence, comparative legal-aid legitimacy, policy recognition, institutional credibility, and access-to-justice narratives to support the enterprise's legal-aid legitimacy structure.

1938. Judicial Conduct Board of Pennsylvania agreed to facilitate the enterprise by using complaint intake, investigative discretion, judicial-accountability gatekeeping, professional accountability influence, and court-connected legitimacy to support the enterprise's accountability gatekeeping.

1939. Heather Kelly agreed to facilitate the enterprise by using legal-aid influence, NPLS-aligned relationships, local bar connections, professional credibility, and attorney-accountability silence to support the enterprise's legal-aid protection and client-repair suppression.

1940. Brian Kerstetter agreed to facilitate the enterprise by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to support the enterprise's county-connected referral and public-service control.

1941. Robert Leadbeter agreed to facilitate the enterprise by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to support the enterprise's public-facing legitimacy and event-access functions.

1942. Legal Services Corporation agreed to facilitate the enterprise by using federal legal-aid funding, grantee recognition, compliance structures, oversight authority, provider legitimacy, and national legal-aid influence to

support the enterprise's funding, grantee-protection, and legal-aid legitimacy functions.

1943. Kathleen Lincoln agreed to facilitate the enterprise by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, professional relationships, and local legal networks to support the enterprise's local bar and referral functions.

1944. Gabriele Miller-Wagner agreed to facilitate the enterprise by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, scheduling authority, public-service legal-program access, and statewide bar legitimacy to support the enterprise's pro bono and public-service program functions.

1945. Lori Molloy agreed to facilitate the enterprise by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships to support the enterprise's legal-aid dominance, client-control, and malpractice-response functions.

1946. Jenna Ann Neidig agreed to facilitate the enterprise by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures, public-service

legal programming, and court-connected professional relationships to support the enterprise's local bar access and communication functions.

1947. North Penn Legal Services, Inc. agreed to facilitate the enterprise by using legal-aid authority, public funding, regional provider dominance, client intake, case assignments, representation status, referral relationships, court recognition, grievance systems, and legal-aid legitimacy to support the enterprise's legal-aid dominance and client-channel control.

1948. Northumberland County Prothonotary's Office agreed to facilitate the enterprise by using filing authority, docket access, public-record access, counsel-of-record records, service practices, and courthouse administration to support the enterprise's court-record and counsel-status control.

1949. Office of Attorney General agreed to facilitate the enterprise by using public legal authority, state enforcement authority, government-lawyer legitimacy, consumer-protection influence, and attorney-controlled accountability channels to support the enterprise's public enforcement and professional-control functions.

1950. Office of Disciplinary Counsel agreed to facilitate the enterprise by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and

disciplinary legitimacy to support the enterprise's disciplinary-pressure and professional-control functions.

1951. Pennsylvania Bar Association agreed to facilitate the enterprise by using statewide bar authority, professional legitimacy, public-service legal programs, Wills for Heroes structures, pro bono systems, committees, CLE influence, referral channels, and bar governance to support the enterprise's statewide bar-control functions.

1952. Pennsylvania Board of Law Examiners agreed to facilitate the enterprise by using bar admission, examination authority, character-and-fitness screening, licensing gatekeeping, credentialing authority, and professional entry control to support the enterprise's market-entry control.

1953. Pennsylvania Department of Human Services agreed to facilitate the enterprise by using public funding, social-service authority, legal-aid-related funding structures, service-provider relationships, referral environments, and public-service legitimacy to support the enterprise's public funding and referral functions.

1954. Pennsylvania Department of Military and Veterans Affairs agreed to facilitate the enterprise by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-

facing legitimacy, and referral channels to support the enterprise's public-service and referral functions.

1955. Pennsylvania General Assembly agreed to facilitate the enterprise by using statutory authority, public funding authority, legal-aid funding structures, attorney-regulation frameworks, unauthorized-practice structures, and legislative recognition to support the enterprise's statutory and funding structure.

1956. Pennsylvania Legal Aid Network, Inc. agreed to facilitate the enterprise by using statewide legal-aid coordination, provider legitimacy, funding relationships, referral influence, training authority, public-service recognition, and legal-aid policy influence to support the enterprise's statewide legal-aid coordination and provider-protection functions.

1957. Supreme Court of Pennsylvania agreed to facilitate the enterprise by using attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system authority, court-access authority, and professional-regulation authority to support the enterprise's licensing, discipline, rulemaking, and court-access control.

1958. Michael F.J. Piecuch agreed to facilitate the enterprise by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, advisory-board

connections, and local legal-system authority to support the enterprise's local court and bar-control functions.

1959. Jeffrey Rowe agreed to facilitate the enterprise by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, advisory access, and local legal-system influence to support the enterprise's local court and public-service functions.

1960. Jamie Saleski agreed to facilitate the enterprise by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to support the enterprise's filing, docket, and counsel-status functions.

1961. Alexandra Sholley agreed to facilitate the enterprise by using lawyer status, USCBA officer authority, secretary authority, minute practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to support the enterprise's local bar communication and record-control functions.

1962. Timothy Smith agreed to facilitate the enterprise by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments,

corrective action, grievance responses, and representation-status practices to support the enterprise's legal-aid management and client-control functions.

1963. Snyder County agreed to facilitate the enterprise by using county government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy to support the enterprise's county referral and public-service functions.

1964. Snyder County STOP Coalition agreed to facilitate the enterprise by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to support the enterprise's coalition and referral functions.

1965. Sarah Stigerwalt-Egan agreed to facilitate the enterprise by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and statewide bar communications to support the enterprise's local bar and public-service program functions.

1966. K. Michael Sullivan agreed to facilitate the enterprise by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications,

local legal-system influence, public-service legal-program access, and professional legitimacy to support the enterprise's bar-controlled public-service functions.

1967. David Andrew Strouse agreed to facilitate the enterprise by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected professional relationships to support the enterprise's local professional network.

1968. Transitions Legal Center agreed to facilitate the enterprise by using legal-service participation, pro bono relationships, victim-service relationships, referral systems, court-related connections, public-service networks, and local legal-service channels to support the enterprise's referral and legal-service channel functions.

1969. Transitions of PA agreed to facilitate the enterprise by using victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, and court-related referral structures to support the enterprise's referral and public-service functions.

1970. David K. Trevaskis agreed to facilitate the enterprise by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro

bono authority, volunteer-program influence, public-facing legal-program influence, and statewide bar credibility to support the enterprise's public-service legal-program functions.

1971. Brian Ulmer agreed to facilitate the enterprise by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service structures, public-facing legal programs, and attorney networks to support the enterprise's statewide bar and public-service functions.

1972. Union County agreed to facilitate the enterprise by using county government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems to support the enterprise's county referral and public-service functions.

1973. Union–Snyder County Bar Association agreed to facilitate the enterprise by using local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy to support the enterprise's local bar-control functions.

1974. Union County Criminal Justice Advisory Board agreed to facilitate the enterprise by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to support the enterprise's advisory and referral functions.

1975. Union County Mental Health Advisory Committee agreed to facilitate the enterprise by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to support the enterprise's advisory and referral functions.

1976. Union County STOP Coalition agreed to facilitate the enterprise by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to support the enterprise's coalition and referral functions.

1977. United States Bankruptcy Court for the Middle District of Pennsylvania agreed to facilitate the enterprise by using bankruptcy

jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to support the enterprise's bankruptcy court-access and attorney-practice functions.

1978. United States Congress agreed to facilitate the enterprise by using federal legislative authority, federal court creation, federal legal-aid funding statutes, procedural-rule delegation, federal judicial structures, and legal-services funding to support the enterprise's federal funding and court-structure functions.

1979. United States Court of Appeals for the Third Circuit agreed to facilitate the enterprise by using appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate-access structures, and judicial legitimacy to support the enterprise's appellate court-access and professional-control functions.

1980. United States District Court for the Middle District of Pennsylvania agreed to facilitate the enterprise by using federal trial-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, and judicial

legitimacy to support the enterprise's federal trial-court access and attorney-practice functions.

1981. United States Department of Health and Human Services agreed to facilitate the enterprise by using federal public funding authority, social-service authority, legal-aid-related funding structures, civil-rights compliance structures, service-provider relationships, referral environments, and public-service legitimacy to support the enterprise's public funding and referral functions.

1982. United States Judicial Conference agreed to facilitate the enterprise by using federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, and federal court legitimacy to support the enterprise's federal judicial administration and court-governance functions.

1983. Defendants agreed that the enterprise's affairs would be conducted through a pattern of racketeering activity involving repeated use of mail, wires, electronic communications, funding submissions, public representations, court communications, disciplinary communications, bar communications, referral communications, and program communications to preserve funding, legitimacy, access, referrals, authority, and institutional

control while concealing, minimizing, or misrepresenting legal-aid failures, retaliation, exclusion, conflicts, access restrictions, and lack of client repair.

1984. Defendants agreed that acts of mail fraud and wire fraud would further the enterprise because those communications preserved incumbent legal-service control, protected institutional legitimacy, maintained public funding and referral channels, discouraged corrective competition, and deprived Plaintiff and similarly situated persons of money, property, legal-service opportunities, referral opportunities, contract opportunities, public-service access, court-access opportunities, and client-repair opportunities.

1985. Defendants' agreement is shown by their common purpose, repeated coordination, mutual benefit, shared professional and institutional relationships, parallel exclusionary acts, common response to criticism and litigation, use of the same communication channels, and preservation of the same lawyer-controlled systems.

1986. Plaintiff suffered injury to business or property because Defendants' RICO conspiracy caused loss of legal-service opportunities, contract opportunities, prospective contract opportunities, referral opportunities, public-service opportunities, funding opportunities, court-access opportunities, client-repair opportunities, money, property, time, litigation

resources, professional opportunities, and the economic value of access to conflict-free legal help and substitute legal-service channels.

1987. Defendants are liable under 18 U.S.C. § 1962(d) because they agreed that the enterprise's affairs would be conducted through a pattern of racketeering activity, knew the essential nature of the enterprise and racketeering pattern, agreed to facilitate the enterprise's affairs, and caused injury to Plaintiff's business or property.

1988. Plaintiff is entitled to treble damages, costs, attorneys' fees, declaratory relief, injunctive relief, corrective notice, restoration of access, preservation of records, neutral referral access, conflict-free substitute-provider access, funding-accountability review, client-repair review, and all other lawful relief.

**Count 25-Civil Conspiracy -Against Administrative Office of Pennsylvania Courts; American Bar Association; Bloomsburg Fair Association; Matthew W. Brann; Heath Brosius; Jessica Chapman; William R. Christman III; Mary Beth Clark; Committee on Rules of Practice and Procedure; Commonwealth of Pennsylvania; Mark J. Conway; Court of Judicial Discipline; Robert Cravitz; Doe Defendants; Federal Judicial Center; Lori R. Hackenberg; International Legal Aid Group; Judicial Conduct Board of Pennsylvania; Heather Kelly; Brian Kerstetter; Robert Leadbeter; Legal Services Corporation; Kathleen Lincoln; Gabriele Miller-Wagner; Lori Molloy; Jenna Ann Neidig; North Penn Legal Services, Inc.; Northumberland County Prothonotary's Office; Office of Attorney General; Office of Disciplinary Counsel; Pennsylvania Bar Association; Pennsylvania Board of Law Examiners; Pennsylvania Department of Human Services; Pennsylvania Department of Military and Veterans Affairs; Pennsylvania General Assembly; Pennsylvania Legal Aid Network, Inc.; Supreme Court of Pennsylvania; Michael F.J. Piecuch; Jeffrey Rowe; Jamie Saleski; Alexandra Sholley; Timothy Smith; Snyder County; Snyder County STOP Coalition; Sarah Stigerwalt-Egan; K. Michael Sullivan; David Andrew Strouse; Transitions Legal Center; Transitions of PA; David K. Trevaskis; Brian Ulmer; Union County; Union–Snyder County Bar Association; Union County Criminal Justice Advisory Board; Union County Mental Health Advisory Committee; Union County STOP Coalition; United States Bankruptcy Court for the Middle District of Pennsylvania; United States Congress; United States Court of Appeals for the Third Circuit; United States District Court for the Middle District of Pennsylvania; United States Department of Health and Human Services; and United States Judicial Conference**

1989. Plaintiff incorporates by reference all preceding paragraphs.

1990. The elements of civil conspiracy are a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means, an overt act done in pursuance of the common

purpose, legal malice or intent to injure where required, and actual legal damage.

1991. Defendants combined and acted with a common purpose to preserve lawyer-controlled legal-service authority, legal-aid dominance, court-connected legitimacy, bar-controlled public-service access, disciplinary leverage, referral control, funding control, and professional exclusion, while burdening Plaintiff, Plaintiff's counsel, Plaintiff's legal team, substitute providers, corrective providers, class members, and similarly situated persons who challenged legal-system misconduct.

1992. Administrative Office of Pennsylvania Courts joined, ratified, or advanced the civil conspiracy by using court administration, filing systems, docket systems, court technology, judicial administration, and court-user infrastructure to preserve attorney-centered access structures and court-access barriers.

1993. American Bar Association joined, ratified, or advanced the civil conspiracy by using accreditation influence, model-rule influence, professional standard setting, legal-education control, pro bono narratives, and national professional legitimacy to preserve lawyer-controlled entry, accountability, referral, and service structures.

1994. Bloomsburg Fair Association joined, ratified, or advanced the civil conspiracy by using public-event access, community legitimacy, event gatekeeping, public-service visibility, and public-facing referral opportunities to support exclusionary public-facing service and referral channels.

1995. Matthew W. Brann joined, ratified, or advanced the civil conspiracy by using federal judicial authority, docket authority, case-management authority, attorney-practice norms, recusal authority, and federal court legitimacy to preserve court-access burdens and attorney-accountability barriers.

1996. Heath Brosius joined, ratified, or advanced the civil conspiracy by using prosecutorial authority, county public-office authority, court-facing influence, victim-service influence, STOP Coalition influence, and local referral systems to preserve local referral, court-connected, and public-service exclusion.

1997. Jessica Chapman joined, ratified, or advanced the civil conspiracy by using lawyer status, professional-accountability channels, disciplinary-adjacent pressure, access-to-justice narratives, and legal profession legitimacy to burden corrective legal-service participation and protect incumbent lawyer-controlled accountability systems.

1998. William R. Christman III joined, ratified, or advanced the civil conspiracy by using Pennsylvania Bar Association general-counsel authority, statewide bar influence, staff communication channels, volunteer communication channels, Wills for Heroes authority, and public-service legal-program control to restrict program participation, communications, witness access, and legal-service opportunities.

1999. Mary Beth Clark joined, ratified, or advanced the civil conspiracy by using lawyer status, NPLS-aligned legal-aid influence, Judicare or volunteer relationships, USCBA influence, local court relationships, referral influence, and public-service gatekeeping to carry legal-aid hostility into bar, referral, public-service, fee, settlement, and court-adjacent structures.

2000. Committee on Rules of Practice and Procedure joined, ratified, or advanced the civil conspiracy by using federal rulemaking influence, procedure, court-access rules, attorney-practice rules, judicial administration, and litigation systems to preserve lawyer-dependent access to courts and litigation remedies.

2001. Commonwealth of Pennsylvania joined, ratified, or advanced the civil conspiracy by using state legitimacy, statutory frameworks, public funding, court-system support, attorney regulation, unauthorized-practice structures,

legal-aid systems, and public-service recognition to preserve lawyer-controlled legal-service systems.

2002. Mark J. Conway joined, ratified, or advanced the civil conspiracy by using bankruptcy judicial authority, sanctions authority, docket authority, hearing authority, attorney-practice authority, recusal authority, and federal bankruptcy legitimacy to burden court access, attorney accountability, and corrective litigation.

2003. Court of Judicial Discipline joined, ratified, or advanced the civil conspiracy by using judicial-discipline authority, judicial-accountability structures, adjudicatory legitimacy, and court-connected oversight systems to preserve judge- and lawyer-controlled accountability channels.

2004. Robert Cravitz joined, ratified, or advanced the civil conspiracy by using lawyer status, local attorney networks, USCBA participation, bar-connected professional influence, listserv participation, litigation-response participation, public-service participation, and local legal structures to preserve exclusion from local professional, referral, settlement, and public-service channels.

2005. Doe Defendants joined, ratified, or advanced the civil conspiracy by using presently unknown bar, court, legal-aid, public-service, disciplinary, funding, referral, county, state, federal, nonprofit, professional, electronic-

communication, and institutional roles to transmit, conceal, enforce, benefit from, ratify, or fail to prevent conspiratorial conduct.

2006. Federal Judicial Center joined, ratified, or advanced the civil conspiracy by using judicial education, federal court research, training functions, professional norms, institutional legitimacy, and support for federal court administration to preserve lawyer- and judge-controlled federal court access structures.

2007. Lori R. Hackenberg joined, ratified, or advanced the civil conspiracy by using judicial authority, courthouse authority, court-connected professional networks, local legal-system influence, and public-service legitimacy to preserve local court and professional exclusion.

2008. International Legal Aid Group joined, ratified, or advanced the civil conspiracy by using international legal-aid influence, comparative legal-aid legitimacy, policy recognition, institutional credibility, and access-to-justice narratives to preserve incumbent legal-aid legitimacy and restrict recognition of corrective providers.

2009. Judicial Conduct Board of Pennsylvania joined, ratified, or advanced the civil conspiracy by using complaint intake, investigative discretion, judicial-accountability gatekeeping, professional accountability influence,

and court-connected legitimacy to preserve judge- and lawyer-controlled accountability structures.

2010. Heather Kelly joined, ratified, or advanced the civil conspiracy by using legal-aid influence, NPLS-aligned relationships, local bar connections, professional credibility, and attorney-accountability silence to preserve incumbent legal-aid control and discourage client-repair alternatives.

2011. Brian Kerstetter joined, ratified, or advanced the civil conspiracy by using prosecutorial authority, county public-office authority, advisory-board influence, public-service participation, court-facing power, and local legal-system authority to preserve county-connected referral and public-service exclusion.

2012. Robert Leadbeter joined, ratified, or advanced the civil conspiracy by using public-office authority, legislative-office legitimacy, public-facing event influence, community-recognition authority, and public-service relationships to reinforce incumbent public-facing legal-service channels.

2013. Legal Services Corporation joined, ratified, or advanced the civil conspiracy by using federal legal-aid funding, grantee recognition, compliance structures, oversight authority, provider legitimacy, and national legal-aid influence to preserve incumbent grantee control and limit conflict-free substitute-provider access.

2014. Kathleen Lincoln joined, ratified, or advanced the civil conspiracy by using lawyer status, USCBA officer or treasurer authority, local bar governance, meeting participation, professional relationships, and local legal networks to preserve exclusion from legal-service cooperation, professional relationships, settlement opportunities, and local referral channels.

2015. Gabriele Miller-Wagner joined, ratified, or advanced the civil conspiracy by using Pennsylvania Bar Association pro bono authority, Wills for Heroes coordination, volunteer recruitment influence, scheduling authority, public-service legal-program access, and statewide bar legitimacy to restrict statewide public-service legal opportunities, volunteers, referrals, and program relationships.

2016. Lori Molloy joined, ratified, or advanced the civil conspiracy by using North Penn Legal Services executive authority, public funding control, attorney supervision, intake systems, grievance responses, malpractice-response systems, and institutional relationships to protect incumbent legal-aid control and burden corrective representation, client-repair relationships, and substitute-provider relationships.

2017. Jenna Ann Neidig joined, ratified, or advanced the civil conspiracy by using lawyer status, USCBA involvement, officer or former-officer status, local bar governance, listserv participation, meeting-record structures,

public-service legal programming, and court-connected professional relationships to preserve exclusion from local bar, referral, public-service, and legal-service channels.

2018. North Penn Legal Services, Inc. joined, ratified, or advanced the civil conspiracy by using legal-aid authority, public funding, regional provider dominance, client intake, case assignments, representation status, referral relationships, court recognition, grievance systems, and legal-aid legitimacy to obstruct corrective providers, conflict-free alternatives, client-repair relationships, malpractice-accountability work, and substitute legal-service relationships.

2019. Northumberland County Prothonotary's Office joined, ratified, or advanced the civil conspiracy by using filing authority, docket access, public-record access, counsel-of-record records, service practices, and courthouse administration to preserve lawyer-centered court-access structures and restrict practical substitute-provider access.

2020. Office of Attorney General joined, ratified, or advanced the civil conspiracy by using public legal authority, state enforcement authority, government-lawyer legitimacy, consumer-protection influence, and attorney-controlled accountability channels to preserve incumbent legal-industry control.

2021. Office of Disciplinary Counsel joined, ratified, or advanced the civil conspiracy by using attorney-discipline authority, complaint screening, investigatory discretion, charging authority, professional-regulation authority, and disciplinary legitimacy to burden corrective legal-service work and preserve lawyer-controlled accountability.

2022. Pennsylvania Bar Association joined, ratified, or advanced the civil conspiracy by using statewide bar authority, professional legitimacy, public-service legal programs, Wills for Heroes structures, pro bono systems, committees, CLE influence, referral channels, and bar governance to preserve statewide bar-controlled legal-service channels.

2023. Pennsylvania Board of Law Examiners joined, ratified, or advanced the civil conspiracy by using bar admission, examination authority, character-and-fitness screening, licensing gatekeeping, credentialing authority, and professional entry control to restrict legal-service supply and preserve lawyer-controlled market entry.

2024. Pennsylvania Department of Human Services joined, ratified, or advanced the civil conspiracy by using public funding, social-service authority, legal-aid-related funding structures, service-provider relationships, referral environments, and public-service legitimacy to preserve incumbent lawyer-approved legal-service pathways.

2025. Pennsylvania Department of Military and Veterans Affairs joined, ratified, or advanced the civil conspiracy by using public-service authority, coalition access, public-service recognition, outreach structures, event coordination, public-facing legitimacy, and referral channels to preserve incumbent bar-connected public-service legal channels.

2026. Pennsylvania General Assembly joined, ratified, or advanced the civil conspiracy by using statutory authority, public funding authority, legal-aid funding structures, attorney-regulation frameworks, unauthorized-practice structures, and legislative recognition to preserve lawyer-controlled legal-service systems.

2027. Pennsylvania Legal Aid Network, Inc. joined, ratified, or advanced the civil conspiracy by using statewide legal-aid coordination, provider legitimacy, funding relationships, referral influence, training authority, public-service recognition, and legal-aid policy influence to protect incumbent legal-aid providers and obstruct corrective providers, conflict-free alternatives, complainants, and malpractice-accountability relationships.

2028. Supreme Court of Pennsylvania joined, ratified, or advanced the civil conspiracy by using attorney-admission authority, disciplinary authority, rulemaking authority, unauthorized-practice authority, judicial-system

authority, court-access authority, and professional-regulation authority to preserve lawyer-controlled legal-service and accountability systems.

2029. Michael F.J. Piecuch joined, ratified, or advanced the civil conspiracy by using judicial authority, former bar leadership, courthouse influence, local court-administration influence, public-service relationships, advisory-board connections, and local legal-system authority to preserve incumbent local legal-service control.

2030. Jeffrey Rowe joined, ratified, or advanced the civil conspiracy by using magisterial judicial authority, courthouse access, local bar relationships, court-connected public-service participation, advisory access, and local legal-system influence to preserve incumbent local legal-service channels.

2031. Jamie Saleski joined, ratified, or advanced the civil conspiracy by using prothonotary authority, filing-system authority, docket-access authority, public-record authority, counsel-of-record records, and courthouse administration to preserve court-access burdens and record-access conditions affecting legal-service relationships, representation status, and claim protection.

2032. Alexandra Sholley joined, ratified, or advanced the civil conspiracy by using lawyer status, USCBA officer authority, secretary authority, minute

practices, meeting-record control, listserv structures, Young Lawyers Division access, Law Day participation, Wills for Heroes participation, and local bar governance to preserve exclusion from professional, public-service, referral, and bar-connected channels.

2033. Timothy Smith joined, ratified, or advanced the civil conspiracy by using North Penn Legal Services senior-management authority, attorney supervision, case-management systems, client communication, attorney assignments, corrective action, grievance responses, and representation-status practices to protect incumbent legal-aid control and burden corrective representation, client-repair relationships, and substitute-provider relationships.

2034. Snyder County joined, ratified, or advanced the civil conspiracy by using county government authority, public-service structures, county-connected legal systems, court-adjacent relationships, prosecutor-connected systems, advisory and coalition relationships, referral environments, and public legitimacy to preserve incumbent local legal-service channels.

2035. Snyder County STOP Coalition joined, ratified, or advanced the civil conspiracy by using county-connected victim-service coordination, domestic-violence service structures, public meetings, service-provider networks, public-service referrals, legal-aid relationships, and local

institutional credibility to restrict coalition, referral, public-service, and county-connected legal-service relationships.

2036. Sarah Stigerwalt-Egan joined, ratified, or advanced the civil conspiracy by using lawyer status, USCBA presidential authority, Wills for Heroes control, meeting access, listserv access, committee access, Teams access, public-service legal-program access, and statewide bar communications to block or burden legal-service cooperation, program participation, referral access, public-service relationships, and witness cooperation.

2037. K. Michael Sullivan joined, ratified, or advanced the civil conspiracy by using lawyer status, USCBA influence, Wills for Heroes authority, bar communications, local legal-system influence, public-service legal-program access, and professional legitimacy to exclude Plaintiff from bar-connected legal-service, public-service, referral, and professional-cooperation relationships.

2038. David Andrew Strouse joined, ratified, or advanced the civil conspiracy by using lawyer status, local attorney networks, USCBA participation, listserv participation, bar governance participation, litigation-response participation, public-service participation, and court-connected

professional relationships to preserve exclusion from local legal-service and professional channels.

2039. Transitions Legal Center joined, ratified, or advanced the civil conspiracy by using legal-service, pro bono, victim-service, referral, court-related, and public-service relationships to restrict legal-service, referral, pro bono, and public-service relationships.

2040. Transitions of PA joined, ratified, or advanced the civil conspiracy by using victim-service structures, public-service referral networks, domestic-violence service relationships, pro bono channels, legal-aid relationships, county-connected systems, and court-related referral structures to restrict public-service, referral, coalition, and legal-aid-adjacent relationships.

2041. David K. Trevaskis joined, ratified, or advanced the civil conspiracy by using Pennsylvania Bar Association Wills for Heroes leadership, statewide pro bono authority, volunteer-program influence, public-facing legal-program influence, and statewide bar credibility to restrict statewide public-service legal opportunities, volunteers, referrals, and program relationships.

2042. Brian Ulmer joined, ratified, or advanced the civil conspiracy by using lawyer status, Pennsylvania Bar Association participation, Wills for Heroes participation, statewide pro bono networks, bar-connected legal-service

structures, public-facing legal programs, and attorney networks to preserve exclusion from public-service and bar-connected legal channels.

2043. Union County joined, ratified, or advanced the civil conspiracy by using county government authority, public-service systems, advisory-board structures, criminal-justice structures, mental-health structures, STOP-related systems, referral environments, public legitimacy, and county-connected systems to preserve incumbent local legal-service channels.

2044. Union–Snyder County Bar Association joined, ratified, or advanced the civil conspiracy by using local bar governance, membership control, listserv control, committee access, meeting access, minute practices, Wills for Heroes planning, Law Day programming, Young Lawyers Division access, public-service opportunities, and local professional legitimacy to isolate Plaintiff from local referrals, bar programs, professional cooperation, public-service opportunities, and legal-service relationships.

2045. Union County Criminal Justice Advisory Board joined, ratified, or advanced the civil conspiracy by using county-connected criminal-justice advisory authority, prosecutor participation, court-connected participation, public-service coordination, government-connected referral structures, policy access, and local institutional credibility to restrict advisory, referral, public-service, and county-connected legal-service relationships.

2046. Union County Mental Health Advisory Committee joined, ratified, or advanced the civil conspiracy by using county-connected mental-health advisory authority, public-service coordination, disability-related service systems, court-connected participation, provider networks, public advisory access, referral relationships, and local institutional credibility to restrict advisory, referral, public-service, and county-connected legal-service relationships.

2047. Union County STOP Coalition joined, ratified, or advanced the civil conspiracy by using county-connected domestic-violence service coordination, prosecutor participation, public meetings, victim-service structures, service-provider networks, public-service referrals, legal-aid relationships, and local institutional credibility to restrict coalition, referral, public-service, and county-connected legal-service relationships.

2048. United States Bankruptcy Court for the Middle District of Pennsylvania joined, ratified, or advanced the civil conspiracy by using bankruptcy jurisdiction, docket authority, hearing authority, case-management authority, sanctions-related authority, local-rule authority, attorney-practice authority, filing systems, staff communications, and bankruptcy-access structures to burden federal legal-service, debt-relief, attorney-accountability, and court-access relationships.

2049. United States Congress joined, ratified, or advanced the civil conspiracy by using federal legislative authority, federal court creation, federal legal-aid funding statutes, procedural-rule delegation, federal judicial structures, and legal-services funding to preserve lawyer-centered control over legal services and attorney accountability.

2050. United States Court of Appeals for the Third Circuit joined, ratified, or advanced the civil conspiracy by using appellate authority, precedent authority, procedural authority, attorney-practice authority, disciplinary authority, filing rules, appellate-access structures, and judicial legitimacy to preserve lawyer- and judge-controlled legal-accountability systems.

2051. United States District Court for the Middle District of Pennsylvania joined, ratified, or advanced the civil conspiracy by using federal trial-court authority, docket authority, case-management authority, filing authority, local-rule authority, sanctions authority, attorney-practice authority, and judicial legitimacy to preserve lawyer-controlled federal court access.

2052. United States Department of Health and Human Services joined, ratified, or advanced the civil conspiracy by using federal public funding authority, social-service authority, legal-aid-related funding structures, civil-rights compliance structures, service-provider relationships, referral

environments, and public-service legitimacy to preserve incumbent lawyer-approved service pathways.

2053. United States Judicial Conference joined, ratified, or advanced the civil conspiracy by using federal judicial administration authority, policy authority, rules-related authority, court-governance influence, administrative oversight, and federal court legitimacy to preserve lawyer- and judge-controlled federal court systems.

2054. Defendants committed overt acts in furtherance of the conspiracy by excluding Plaintiff and similarly situated persons from legal-service channels, public-service programs, bar communications, referral channels, court-access systems, legal-aid repair pathways, disciplinary fairness, professional networks, and conflict-free substitute-provider opportunities.

2055. Defendants acted with legal malice because their conduct was directed at preserving institutional, professional, funding, referral, and court-connected power at the expense of Plaintiff's legal rights, legal access, contractual relationships, prospective relationships, public-service access, legal-aid repair, and ability to obtain meaningful accountability.

2056. Plaintiff suffered actual legal damage, including lost legal-service access, lost public-service access, lost referral opportunities, lost contractual and prospective contractual relationships, increased litigation costs, delay,

reputational harm, chilling injury, loss of conflict-free substitute-provider access, loss of client-repair opportunities, and loss of meaningful legal-aid accountability.

2057. Defendants are liable for civil conspiracy because they combined for the common purpose of preserving lawyer-controlled legal-service, legal-aid, court-access, funding, referral, disciplinary, and public-service structures through unlawful means; each Defendant committed, ratified, or benefited from overt acts in furtherance of the conspiracy; and Plaintiff suffered legal damage.

2058. Plaintiff is entitled to compensatory damages, consequential damages, punitive damages where available, restitution, disgorgement, declaratory relief, injunctive relief, corrective notice, restoration of access, preservation of records, neutral referral access, conflict-free substitute-provider access, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 1: Courts violate when the Constitution when they cite case law or precedent as law, America is a civil-law country and the only valid laws are the Constitution and bills enacted by legislatures**

2059. Plaintiff incorporates by reference all preceding paragraphs.

2060. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary,

funding, procedural, and professional systems that use case law, precedent, stare decisis, common law, judicial opinions, and judge-made doctrine as binding law against Plaintiff and similarly situated persons.

2061. Plaintiff is entitled to a declaration that Defendants may not cite, enforce, defend, or apply case law, precedent, stare decisis, common law, judicial opinions, or judge-made doctrine as binding law unless the rule being applied comes from a constitutionally valid source.

2062. Article I vests legislative power in Congress, Article III gives courts power to decide cases and controversies, the Pennsylvania Constitution vests legislative power in the General Assembly, Pennsylvania requires laws to pass by bill, and judge-made doctrines cannot substitute for public lawmaking when Defendants use them to restrict fees, remedies, court access, malpractice accountability, legal-aid accountability, recusal, sanctions, discipline, immunity, public-service access, attorney accountability, public remedies, and the practical ability of ordinary people to obtain relief.

2063. Defendants' use of case law and precedent as binding law injures Plaintiff by allowing judges, courts, lawyers, bar entities, disciplinary entities, legal-aid entities, public-service entities, funding actors, and court-connected institutions to enforce rules that were never enacted through

constitutionally valid lawmaking, while still treating those rules as controlling barriers to Plaintiff's rights, remedies, claims, access, counsel, substitute-provider options, public-service participation, and accountability.

2064. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from enforcing invalid judge-made rules as binding law, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 2: Case law about the judicial system violates both the vesting clause and conflict-of-interest rules**

2065. Plaintiff incorporates by reference all preceding paragraphs.

2066. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that allow courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, and court-connected institutions to create and enforce binding precedent about their own powers, immunities, discipline, procedure, attorney fees, sanctions, recusal standards, attorney regulation, legal-aid accountability, malpractice remedies, court access, and public-service legal access.

2067. Plaintiff is entitled to a declaration that courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, and court-connected

institutions cannot create, enforce, defend, or benefit from binding precedent about their own authority, protections, procedures, markets, accountability systems, immunity systems, fee systems, disciplinary systems, recusal systems, withdrawal systems, and court-access systems where those actors have direct professional, financial, reputational, institutional, or market interests in the rules being made.

2068. Self-interested judicial-system precedent violates due process, equal protection, the Petition Clause, access to courts, anti-conflict principles, and the rule that no person may judge that person's own cause when Defendants use it to decide the scope of judicial immunity, prosecutorial immunity, disciplinary immunity, court-created attorney protections, attorney-fee barriers, legal-aid accountability, court-access restrictions, sanctions, recusal, withdrawal, procedure, discipline, malpractice remedies, and public-service exclusion.

2069. Defendants' reliance on self-interested judicial-system precedent injures Plaintiff by allowing the same courts, judges, lawyers, legal-aid providers, bar entities, disciplinary entities, public-service entities, and court-connected institutions that benefit from the challenged systems to define the rules governing their own liability, neutrality, access obligations,

disciplinary exposure, fee exposure, procedural duties, public-service duties, and accountability.

2070. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from enforcing self-interested judicial-system precedent as binding law, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 3: The Courts tendency to systematically apply a more lenient standard of Constitutional analysis to constitutional violations by Courts, judges, lawyers, and bar associations violates the Constitution and is an underlying predicate unlawful act for RICO, antitrust, and civil conspiracy**

2071. Plaintiff incorporates by reference all preceding paragraphs.

2072. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that apply more lenient constitutional standards, weaker evidentiary requirements, more forgiving conflict rules, favorable presumptions, or unsupported institutional assumptions to courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, judicial agencies, and court-connected institutions than they apply to ordinary parties.

2073. Plaintiff is entitled to a declaration that Defendants may not apply more lenient constitutional standards, weaker evidentiary requirements, more forgiving conflict rules, favorable presumptions, or unsupported institutional assumptions to courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, judicial agencies, and court-connected institutions than they apply to ordinary parties.

2074. Judicial decisions using self-protective constitutional standards to preserve insider power, misrepresent neutrality, block accountability, restrict substitute-provider access, defeat claims, deny meaningful remedies, protect legal-aid actors, protect courts, protect lawyers, protect bar entities, protect disciplinary actors, or preserve professional self-regulation violate due process, equal protection, access to courts, the Petition Clause, anti-conflict principles, and the rule that no person may judge that person's own cause.

2075. Defendants' use of different and more lenient standards for courts, judges, lawyers, bar entities, disciplinary bodies, legal-aid actors, judicial agencies, and court-connected institutions injures Plaintiff by allowing the same institutional actors who benefit from the challenged systems to decide the level of scrutiny, evidence, neutrality, causation, prejudice, intent, remedy, immunity, recusal, discipline, attorney accountability, legal-aid accountability, and court-access protection that applies to their own conduct.

2076. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on self-protective and more lenient constitutional standards for legal-system actors, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 4: Lawyer-legislators must recuse themselves from votes on the judicial system**

2077. Plaintiff incorporates by reference all preceding paragraphs.

2078. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems affected by votes, enactments, appropriations, oversight decisions, funding decisions, committee work, legislative silence, or legislative approvals by lawyer-legislators and JD-holding legislators who possess direct personal, professional, financial, credential-based, institutional, and market interests in the judicial system.

2079. Plaintiff is entitled to a declaration that lawyer-legislators and JD-holding legislators have personal, private, professional, credential-based, institutional, and market interests in measures affecting courts, judges, lawyers, legal-aid systems, attorney regulation, judicial regulation, court administration, legal-service markets, legal education, bar admission,

discipline, immunity, attorney fees, procedure, public-service legal programs, public funding for legal services, unauthorized-practice rules, court access, and public access to remedies.

2080. Plaintiff is entitled to a declaration that lawyer-legislators and JD-holding legislators must disclose those interests and recuse from voting, sponsoring, advancing, blocking, funding, defunding, investigating, approving, or refusing to correct judicial-system measures unless constitutionally adequate public findings supported by evidence establish that participation does not create an unconstitutional conflict of interest, biased lawmaking structure, unequal-protection problem, due-process problem, or self-dealing delegation of public power.

2081. Legislators who are lawyers or hold law degrees benefit from laws, appropriations, committee actions, disciplinary structures, court rules, court funding, attorney-regulation structures, judicial-administration systems, immunity systems, fee systems, procedure, bar-admission systems, legal-aid funding, legal-education structures, and unauthorized-practice restrictions that preserve the value of legal credentials, protect lawyer-controlled markets, restrict substitute providers, limit nonlawyer competition, and preserve insider access to courts, referrals, professional legitimacy, public-service programs, and legal-service funding.

2082. Defendants' reliance on judicial-system measures affected by conflicted lawyer-legislator participation injures Plaintiff by allowing self-interested legal professionals inside legislative bodies to preserve the same lawyer-controlled systems that restrict Plaintiff's court access, legal-aid access, conflict-free substitute-provider access, public-service access, attorney-accountability remedies, malpractice remedies, fee remedies, procedural rights, and ability to obtain meaningful legal relief from institutions controlled by lawyers and judges.

2083. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from enforcing judicial-system measures enacted, preserved, funded, or defended through unconstitutional lawyer-legislator conflicts, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 5: Courts should adopt the same anti-fraternization rules as MLB umpires**

2084. Plaintiff incorporates by reference all preceding paragraphs.

2085. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that permit

courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, and court-connected institutions to maintain professional, social, financial, committee, bar-association, referral, public-service, educational, disciplinary, funding, and institutional relationships that would be treated as obvious conflicts of interest in any system requiring genuine independence between decisionmakers, regulated actors, and repeat participants.

2086. Plaintiff is entitled to a declaration that courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, and court-connected institutions must adopt and follow independence, anti-fraternization, disclosure, recusal, separation, and conflict rules sufficient to prevent judges, courts, disciplinary actors, bar actors, legal-aid actors, prosecutors, court staff, public-service actors, and repeat lawyers from privately coordinating, socially aligning, professionally protecting, or institutionally favoring each other while exercising public power over Plaintiff and similarly situated persons.

2087. The Constitution does not permit legal-system actors to decide cases, control access, regulate lawyers, process complaints, assign public-service opportunities, administer legal-aid systems, adjudicate discipline, allocate referrals, or enforce court rules while maintaining insider relationships that

create actual bias, apparent bias, institutional bias, loyalty conflicts, retaliation incentives, reciprocal protection incentives, or market-protection incentives.

2088. Defendants' failure to maintain meaningful independence injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, and court-connected institutions to control legal access, public-service access, legal-aid access, referrals, discipline, sanctions, recusal, court administration, attorney accountability, malpractice remedies, and substitute-provider access through relationships that protect insiders and burden ordinary litigants, clients, applicants, witnesses, advocates, and legal-service users.

2089. Plaintiff is entitled to declaratory relief, injunctive relief requiring constitutionally adequate independence, disclosure, recusal, separation, anti-fraternization, and conflict rules, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 6: The 1968 Amendment to the Pennsylvania Constitution itself violated the Constitution, harmed the public, and deceived the Public**

2090. Plaintiff incorporates by reference all preceding paragraphs.

2091. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct Pennsylvania judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that depend on Pennsylvania Constitution Article V § 10(c), judicial rulemaking authority, judicial control over practice and procedure, judicial control over attorney admission and discipline, judicial control over court administration, and judicial power to suspend laws inconsistent with court-made rules.

2092. Plaintiff is entitled to a declaration that the 1968 Pennsylvania Judiciary Article and Pennsylvania Constitution Article V § 10(c) are invalid to the extent they transfer legislative power to the judiciary, permit courts to make binding law governing practice, procedure, attorney regulation, court administration, attorney admission, attorney discipline, legal-service access, court access, public remedies, or public legal rights, or allow judicial rules to suspend statutes enacted by the General Assembly.

2093. Plaintiff is entitled to a declaration that Defendants may not enforce judicially created rules, procedures, disciplinary systems, attorney-admission systems, attorney-regulation systems, court-access systems, or judicial-administration structures against Plaintiff and similarly situated persons

where those systems rest on an unconstitutional transfer of legislative power, an invalid amendment structure, an invalid ballot process, or a judicial self-regulation system that permits courts and lawyers to govern their own power.

2094. Defendants' reliance on Article V § 10(c) injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, and court-connected institutions to control attorney regulation, court access, procedures, remedies, sanctions, withdrawal, discipline, recusal, unauthorized practice, legal-aid access, public-service legal programs, and attorney accountability through judicial rulemaking rather than constitutionally valid legislation.

2095. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from enforcing judicial rules and judicially controlled systems that rest on invalid Article V § 10(c) authority, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 7: JARA, which repealed the attorney fees act of 1814, is invalid, and until the public decides they want to increase the fees for lawyers, lawyers may not charge more than the fees in the 1814 ActPlaintiff incorporates by reference all preceding paragraphs.**

2096. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that depend on JARA, Act No. 53 of 1978, judicial-system repeal legislation, judicial-system codification, judicial procedure, judicial remedies, attorney regulation, court administration, and related measures enacted or preserved through conflicted lawyer-legislator participation.

2097. Plaintiff is entitled to a declaration that JARA, Act No. 53 of 1978, is unconstitutional to the extent lawyer-legislators and JD-holding legislators had personal, private, professional, credential-based, institutional, financial, reputational, or market interests in a judicial-system repeal act affecting courts, judges, attorneys, judicial procedure, legal remedies, attorney regulation, court administration, and public access to legal relief.

2098. Plaintiff is entitled to a declaration that Defendants may not enforce, defend, administer, rely upon, or benefit from JARA-based judicial, procedural, attorney-regulation, court-access, disciplinary, fee, immunity, recusal, withdrawal, legal-aid, malpractice, public-service, or legal-remedy

systems where the legislative act was affected by lawmakers who should have disclosed conflicts and recused from voting, sponsoring, advancing, blocking, preserving, funding, or defending the measure.

2099. Defendants' reliance on JARA injures Plaintiff by allowing conflicted lawyer-legislators and JD-holding legislators to preserve judicial-system structures that benefit lawyers, courts, judges, bar entities, disciplinary entities, legal-aid actors, and court-connected institutions while restricting Plaintiff's court access, legal-aid access, conflict-free substitute-provider access, attorney-accountability remedies, malpractice remedies, fee remedies, procedural rights, public-service access, and ability to obtain meaningful legal relief.

2100. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from enforcing JARA-based systems affected by unconstitutional lawmaker conflicts, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

2101. Plaintiff is entitled to a declaration that JARA is unconstitutional because it exceeded Pennsylvania's one-vote, one-bill, one-subject, clear-title, consideration, and reenactment safeguards by using codification and compilation language to bundle substantive repeals, judicial-system restructuring, attorney-fee changes, fee-cap changes, access-to-courts

changes, judicial-procedure changes, and public-remedy changes into an omnibus act that did not clearly notify the public or separately submit each affected right, remedy, fee rule, or judicial-system change to ordinary constitutional legislation.

2102. Plaintiff is entitled to a declaration that Defendants may not enforce, defend, administer, rely upon, or benefit from JARA-based judicial, procedural, attorney-regulation, court-access, disciplinary, fee, immunity, recusal, withdrawal, legal-aid, malpractice, public-service, or legal-remedy systems where those systems rest on omnibus legislation that failed Pennsylvania's constitutional safeguards for legislative clarity, separate consideration, public notice, and valid enactment.

2103. Defendants' reliance on JARA injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to enforce bundled judicial-system changes that restrict Plaintiff's court access, legal-aid access, conflict-free substitute-provider access, attorney-accountability remedies, malpractice remedies, fee remedies, procedural rights, public-service access, and ability to obtain meaningful legal relief.

2104. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from enforcing JARA-based systems affected by

unconstitutional omnibus enactment defects, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 8: Law school is unconstitutional and harms the public**

2105. Plaintiff incorporates by reference all preceding paragraphs.

2106. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat ABA-accredited law-school completion as a public-protection justification for lawyer monopoly control, attorney licensing, legal-aid staffing, court-recognized advocacy, exclusion of alternative providers, and denial of substitute legal-service options.

2107. Plaintiff is entitled to a declaration that Defendants' reliance on ABA-accredited law-school completion as a public-protection justification fails where Defendants have not shown that the law-school requirement protects clients, prevents malpractice, supplies conflict-free substitute counsel, increases rural legal access, repairs abandoned cases, protects vulnerable court users, or provides meaningful remedies when licensed attorneys and legal-aid providers fail clients.

2108. Defendants' reliance on law-school completion injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access rules, attorney-only advocacy structures, lawyer-controlled public-service programs, lawyer-controlled legal-aid systems, and lawyer-controlled accountability systems without proving that law-school completion prevents the specific harms suffered by Plaintiff and similarly situated persons.

2109. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on law-school completion as an unsupported justification for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 9: The bar exam is unconstitutional and harms the public**

2110. Plaintiff incorporates by reference all preceding paragraphs.

2111. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat passage of a bar examination as a public-protection justification for lawyer

monopoly control, attorney licensing, court-recognized advocacy, exclusion of alternative providers, and denial of conflict-free substitute legal-service options.

2112. Plaintiff is entitled to a declaration that Defendants' reliance on bar-exam passage as a public-protection justification fails where Defendants have not shown that the bar examination protects clients, prevents malpractice, supplies conflict-free substitute counsel, increases rural legal access, repairs abandoned cases, protects vulnerable court users, prevents retaliation, prevents discrimination, or provides meaningful remedies when licensed attorneys and legal-aid providers fail clients.

2113. Defendants' reliance on bar-exam passage injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access rules, attorney-only advocacy structures, lawyer-controlled public-service programs, lawyer-controlled legal-aid systems, and lawyer-controlled accountability systems without proving that bar-exam passage prevents the specific harms suffered by Plaintiff and similarly situated persons.

2114. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on bar-exam passage as an unsupported

justification for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 10: Character and fitness examinations are unconstitutional and harms the public**

2115. Plaintiff incorporates by reference all preceding paragraphs.

2116. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat character-and-fitness screening as a public-protection justification for lawyer monopoly control, attorney licensing, court-recognized advocacy, exclusion of alternative providers, and denial of conflict-free substitute legal-service options.

2117. Plaintiff is entitled to a declaration that Defendants' reliance on character-and-fitness screening as a public-protection justification fails where Defendants have not shown that the character-and-fitness system protects clients, prevents malpractice, prevents retaliation, prevents conflicts of interest, prevents discrimination, supplies conflict-free substitute counsel, repairs abandoned cases, increases legal-service access, or provides

meaningful remedies when licensed attorneys and legal-aid providers fail clients.

2118. Defendants' reliance on character-and-fitness screening injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access rules, attorney-only advocacy structures, lawyer-controlled public-service programs, lawyer-controlled legal-aid systems, and lawyer-controlled accountability systems without proving that character-and-fitness screening prevents the specific harms suffered by Plaintiff and similarly situated persons.

2119. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on character-and-fitness screening as an unsupported justification for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 11: Peer Report: The delegation of regulation from the Disciplinary Board to individual lawyer for peer report is unconstitutional and harms the public Plaintiff incorporates by reference all preceding paragraphs.**

2120. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat peer reporting, attorney self-policing, disciplinary referrals, grievance systems, professional responsibility rules, and lawyer-controlled accountability structures as public-protection justifications for lawyer monopoly control, attorney licensing, court-recognized advocacy, exclusion of alternative providers, and denial of conflict-free substitute legal-service options.

2121. Plaintiff is entitled to a declaration that Defendants' reliance on peer reporting and lawyer self-policing as public-protection justifications fails where Defendants have not shown that peer reporting protects clients, prevents malpractice, prevents retaliation, prevents discrimination, prevents conflicts of interest, supplies conflict-free substitute counsel, repairs abandoned cases, increases legal-service access, exposes attorney misconduct reliably, or provides meaningful remedies when licensed attorneys and legal-aid providers fail clients.

2122. Defendants' reliance on peer reporting and lawyer self-policing injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access rules, attorney-only advocacy structures, lawyer-controlled public-service programs, lawyer-controlled legal-aid systems, and lawyer-controlled accountability systems without proving that peer reporting prevents the specific harms suffered by Plaintiff and similarly situated persons.

2123. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on peer reporting and lawyer self-policing as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 12: Local Rules drafted by judges are unconstitutional and harm the public**

2124. Plaintiff incorporates by reference all preceding paragraphs.

2125. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat local rules, standing orders, courthouse practices, filing rules, judicial preferences,

county practices, local bar customs, and court-specific procedures as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2126. Plaintiff is entitled to a declaration that Defendants' reliance on local rules and court-specific procedural systems as public-protection justifications fails where Defendants have not shown that local rules protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, provide meaningful notice to unrepresented litigants, or provide meaningful remedies when licensed attorneys, legal-aid providers, courts, and court-connected systems fail clients.

2127. Defendants' reliance on local rules and court-specific procedural systems injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, lawyer-dependent filing systems, courthouse customs, judge-specific practices, local gatekeeping rules, and procedural barriers

without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2128. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on local rules and court-specific procedural systems as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 12: Civil and criminal rules drafted by lawyers or anyone other than legislators are unconstitutional and harm the public**

2129. Plaintiff incorporates by reference all preceding paragraphs.

2130. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat civil procedure, criminal procedure, appellate procedure, evidence-related procedural rules, standing orders, filing rules, motion rules, discovery rules, deadline rules, hearing rules, sanction rules, withdrawal rules, substitution rules, continuance rules, default rules, summary-judgment rules, jury-access rules, and appeal rules as public-protection justifications for lawyer

monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2131. Plaintiff is entitled to a declaration that Defendants' reliance on civil and criminal procedure systems as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, provide meaningful notice to unrepresented litigants, prevent lawyer-controlled procedural gamesmanship, or provide meaningful remedies when licensed attorneys, legal-aid providers, courts, and court-connected systems fail clients.

2132. Defendants' reliance on civil and criminal procedure systems injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, lawyer-dependent filing systems, technical procedural barriers, missed-deadline traps, discovery burdens, hearing-access barriers, sanction threats, withdrawal burdens, substitution barriers, appeal barriers, and court-specific procedural systems without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2133. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on civil and criminal procedure systems as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 13: Rules of Professional Conduct drafted by lawyers or judges are unconstitutional and harm the public**

2134. Plaintiff incorporates by reference all preceding paragraphs.

2135. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat Rules of Professional Conduct, attorney discipline, professional responsibility rules, ethics opinions, grievance systems, lawyer self-regulation, and court-controlled attorney regulation as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2136. Plaintiff is entitled to a declaration that Defendants' reliance on Rules of Professional Conduct and lawyer self-regulation as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent

discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, prevent lawyers from abandoning vulnerable clients, or provide meaningful remedies when licensed attorneys, legal-aid providers, courts, and court-connected systems fail clients.

2137. Defendants' reliance on Rules of Professional Conduct and lawyer self-regulation injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, lawyer-controlled accountability systems, disciplinary gatekeeping, vague ethics standards, selective enforcement, professional-insider protection, and remedies that protect the profession rather than injured clients without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2138. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on Rules of Professional Conduct and lawyer self-regulation as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 14: Courthouse rules regarding dress codes, cell phones, recording, or any other rule conflicting with the Constitution and drafted by anyone other than a legislator are unconstitutional and harm the public**

2139. Plaintiff incorporates by reference all preceding paragraphs.

2140. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat courthouse rules, courthouse customs, security practices, filing-counter practices, clerk practices, scheduling practices, communication practices, courtroom-access practices, hearing-access practices, transcript-access practices, technology practices, remote-access practices, and counsel-of-record practices as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2141. Plaintiff is entitled to a declaration that Defendants' reliance on courthouse rules and courthouse practices as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, provide meaningful notice to

unrepresented litigants, prevent courthouse staff from favoring repeat insiders, or provide meaningful remedies when licensed attorneys, legal-aid providers, courts, and court-connected systems fail clients.

2142. Defendants' reliance on courthouse rules and courthouse practices injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, lawyer-dependent courthouse practices, insider-facing communication systems, opaque scheduling practices, record-access burdens, transcript-access burdens, technology barriers, filing barriers, courtroom-access barriers, and counsel-of-record confusion without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2143. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on courthouse rules and courthouse practices as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 15: Attorney and Judicial Disciplinary Boards are unconstitutional and harm the public**

2144. Plaintiff incorporates by reference all preceding paragraphs.

2145. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat the Disciplinary Board, disciplinary hearings, disciplinary investigations, attorney grievance procedures, hearing committees, disciplinary counsel, private discipline, public discipline, diversion, dismissals, sanctions, and lawyer-controlled professional accountability as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2146. Plaintiff is entitled to a declaration that Defendants' reliance on the Disciplinary Board and attorney-discipline system as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, compensate injured clients, correct active court harm, or provide meaningful remedies

when licensed attorneys, legal-aid providers, courts, and court-connected systems fail clients.

2147. Defendants' reliance on the Disciplinary Board and attorney-discipline system injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, lawyer-controlled accountability systems, complaint-screening gatekeeping, opaque disciplinary discretion, insider protection, delayed discipline, non-reparative sanctions, and remedies that discipline attorneys without repairing injured clients, without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2148. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on the Disciplinary Board and attorney-discipline system as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 16: County bar-based fee dispute resolution, where conflicts between clients and the attorneys are decided by the attorney's closest friends and drinking buddies, is unconstitutional and harms the public**

2149. Plaintiff incorporates by reference all preceding paragraphs.

2150. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat fee-dispute procedures, voluntary county-bar fee-dispute resolution, lawyer-controlled fee-review committees, attorney-fee doctrines, court-created fee barriers, fee caps, fee-shifting restrictions, malpractice-cost barriers, and nonjudicial fee-review systems as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2151. Plaintiff is entitled to a declaration that Defendants' reliance on fee-dispute systems and attorney-fee doctrines as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, compensate injured clients, correct active court harm, or provide meaningful remedies when licensed

attorneys, legal-aid providers, courts, and court-connected systems fail clients.

2152. Defendants' reliance on fee-dispute systems and attorney-fee doctrines injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, lawyer-controlled fee-review systems, voluntary bar-based dispute channels, insider-controlled accountability mechanisms, court-created fee barriers, and remedies that protect attorneys and institutions rather than injured clients, without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2153. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on fee-dispute systems and attorney-fee doctrines as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 17: Funding civil legal aid through monopolistic single law firms who cover dozens of counties and turn away conflicts-of-interest is unconstitutional and harms the public**

2154. Plaintiff incorporates by reference all preceding paragraphs.

2155. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that delegate public civil legal-aid obligations to dominant lawyer-controlled providers without requiring conflict-free substitute counsel, independent conflict panels, client-repair mechanisms, meaningful funder intervention, or practical replacement representation when the funded provider has a conflict, abandons a client, commits malpractice, retaliates against criticism, or places its institutional interests against the client's interests.

2156. Plaintiff is entitled to a declaration that Defendants' reliance on public civil legal-aid funding delegations as public-protection justifications fails where Defendants have not shown that those funding systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, compensate injured clients, correct active court harm, or provide meaningful remedies when licensed attorneys, legal-aid providers, funders, courts, and court-connected systems fail clients.

2157. Defendants' reliance on public civil legal-aid funding delegations injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, dominant regional legal-aid providers, conflict turnaway systems, grantee-protection structures, referral dead ends, non-reparative oversight, and funding arrangements that protect incumbent providers rather than injured clients, without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2158. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on public civil legal-aid funding delegations as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 18: The American Rule is unconstitutional, was not part of any historical tradition in the United States, was concocted in the late 1800s to keep women, freed slaves, and immigrants from filing lawsuits, was outlawed by statute until 1977 in Pennsylvania, and harms the public**

2159. Plaintiff incorporates by reference all preceding paragraphs.

2160. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary,

funding, procedural, professional, and public-service systems that treat the American Rule, attorney-fee barriers, fee-shifting limits, court-created fee doctrines, fee caps, litigation-cost rules, and pay-your-own-lawyer structures as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2161. Plaintiff is entitled to a declaration that Defendants' reliance on the American Rule and attorney-fee barriers as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, compensate injured clients, correct active court harm, or provide meaningful remedies when licensed attorneys, legal-aid providers, funders, courts, and court-connected systems fail clients.

2162. Defendants' reliance on the American Rule and attorney-fee barriers injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, and court-connected institutions to preserve attorney-only access structures, litigation-cost barriers, court-created fee obstacles, non-reparative

accountability systems, inaccessible malpractice remedies, and public-remedy systems that make injured clients bear the cost of proving legal-system misconduct, without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2163. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on the American Rule and attorney-fee barriers as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 19: Judicial immunity was explicitly rejected in the Declaration of Independence, was explicitly rejected in the Constitution, was explicitly rejected by the Supreme Court throughout the 1700s, while Founding Fathers were still on the Court, was not concocted until the late 1800s, was concocted only by judges and lawyers, contradicts the Petition clause, does not exist in any other democracy, ancient or modern, is a sign of royal religious monarchy and tyranny, and is unconstitutional and harms the public**

2164. Plaintiff incorporates by reference all preceding paragraphs.

2165. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat

judicial immunity, quasi-judicial immunity, prosecutorial immunity, disciplinary immunity, sovereign immunity, governmental immunity, official immunity, qualified immunity, litigation privilege, witness immunity, and related court-created immunity doctrines as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2166. Plaintiff is entitled to a declaration that Defendants' reliance on immunity doctrines as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, increase legal-service access, compensate injured clients, correct active court harm, deter misconduct by courts, judges, lawyers, legal-aid providers, prosecutors, disciplinary actors, public officials, or court-connected institutions, or provide meaningful remedies when those actors fail clients and court users.

2167. Defendants' reliance on immunity doctrines injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, prosecutors,

public officials, and court-connected institutions to preserve attorney-only access structures, court-created accountability barriers, non-reparative oversight systems, inaccessible damages remedies, and self-protective doctrines that shield legal-system actors from consequences while leaving injured clients and court users without practical repair, without proving that those doctrines prevent the specific harms suffered by Plaintiff and similarly situated persons.

2168. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on immunity doctrines as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 20: Judicial recusal rules prove the bias of Courts and bar associations, as they have delegated to 18-year old legislators without college degrees to make the rules for judicial recusal, even though there is no difference between rules on judicial recusal and the rules lawyers claim only lawyers and judges can draft, like the rules for everything else, and in the meantime, have concocted their own rules for judicial recusal, which are unconstitutional and harms the public**

2169. Plaintiff incorporates by reference all preceding paragraphs.

2170. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary,

funding, procedural, professional, and public-service systems that treat recusal standards, judicial self-disqualification, appearance-of-bias doctrine, disclosure rules, judicial ethics, court-created harmless-error rules, appellate-review standards, and insider-controlled bias remedies as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2171. Plaintiff is entitled to a declaration that Defendants' reliance on recusal standards and judicial self-policing as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent bias, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply neutral decisionmakers, repair biased proceedings, increase legal-service access, compensate injured clients, correct active court harm, deter misconduct by courts, judges, lawyers, legal-aid providers, prosecutors, disciplinary actors, public officials, or court-connected institutions, or provide meaningful remedies when those actors fail clients and court users.

2172. Defendants' reliance on recusal standards and judicial self-policing injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding

actors, prosecutors, public officials, and court-connected institutions to preserve attorney-only access structures, insider-controlled neutrality rules, court-created bias remedies, non-reparative review systems, deferential appellate standards, and self-protective procedures that allow conflicted or biased actors to remain in control while injured clients and court users lack practical repair, without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2173. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on recusal standards and judicial self-policing as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

**Declaratory Judgment 21: Lawyer created withdrawal rules are unconstitutional and harm the public**

2174. Plaintiff incorporates by reference all preceding paragraphs.

2175. An actual controversy exists because Defendants continue to enforce, defend, administer, rely upon, benefit from, or refuse to correct judicial, legal-aid, attorney-regulation, bar-controlled, court-access, disciplinary, funding, procedural, professional, and public-service systems that treat attorney-withdrawal rules, substitution rules, counsel-of-record practices,

continuance practices, representation-status practices, attorney-abandonment doctrines, conflict-withdrawal rules, court-controlled withdrawal procedures, and lawyer-centered case-management systems as public-protection justifications for lawyer monopoly control, attorney-centered court access, exclusion of substitute providers, and denial of meaningful legal relief to ordinary court users.

2176. Plaintiff is entitled to a declaration that Defendants' reliance on attorney-withdrawal and substitution systems as public-protection justifications fails where Defendants have not shown that those systems protect clients, prevent malpractice, prevent retaliation, prevent discrimination, prevent conflicts of interest, supply conflict-free substitute counsel, repair abandoned cases, preserve hearing access, prevent surprise loss of counsel, provide meaningful notice, prevent representation-status confusion, compensate injured clients, correct active court harm, or provide meaningful remedies when licensed attorneys, legal-aid providers, funders, courts, and court-connected systems fail clients.

2177. Defendants' reliance on attorney-withdrawal and substitution systems injures Plaintiff by allowing courts, judges, lawyers, bar entities, disciplinary bodies, judicial agencies, legal-aid actors, public-service actors, funding actors, prosecutors, public officials, and court-connected institutions to

preserve attorney-only access structures, lawyer-controlled withdrawal practices, non-reparative substitution systems, opaque counsel-of-record records, denial-of-continuance practices, conflict turnaway systems, and client-abandonment rules that leave injured clients and court users without practical repair, without proving that those systems prevent the specific harms suffered by Plaintiff and similarly situated persons.

2178. Plaintiff is entitled to declaratory relief, injunctive relief preventing Defendants from relying on attorney-withdrawal and substitution systems as unsupported justifications for excluding substitute providers and preserving lawyer monopoly control, corrective notice, preservation of records, costs, fees where available, and all other lawful relief.

# Prayer for Relief

Plaintiff, individually and on behalf of the proposed class, respectfully requests that the Court enter judgment in favor of Plaintiff and the class and against Defendants on all counts for which each Defendant is liable.

Plaintiff and the class request a declaration that Defendants violated Plaintiff's federal constitutional rights, federal statutory rights, Pennsylvania constitutional rights, common-law rights, and related legal rights by excluding, confusing, retaliating against, and denying equal access to disabled veterans in Wills for Heroes, Wills for Veterans, veterans-service legal programs, public-facing estate-planning services, bar-connected public-service programs, public-event access, coalition access, and related public-service legal systems.

Plaintiff and the class request a declaration that disabled veterans may not be excluded from Wills for Heroes, Wills for Veterans, public-service estate planning, veterans-service legal programs, public-facing veterans outreach, public-service legal events, or related communications because Plaintiff, Plaintiff's representatives, disabled veterans, veterans-service partners, volunteers, students, or advocates engaged in protected advocacy, disability-rights opposition, petitioning, litigation activity, subpoenas, requests for written eligibility rules, requests for transparent meetings, or requests for corrective access.

Plaintiff and the class request preliminary and permanent injunctive relief prohibiting Defendants from excluding Plaintiff, disabled veterans, veterans-service partners, representatives, volunteers, students, and advocates from Wills for Heroes, Wills for Veterans, public-service estate planning, veterans-service legal programs, bar-connected legal-service events, public-facing veterans outreach, public-event access, coalition communications, and related public-service legal communications because of protected advocacy, disability-rights opposition, or litigation activity.

Plaintiff and the class request preliminary and permanent injunctive relief requiring Defendants to restore Plaintiff's representatives, volunteers, students, veterans-service partners, and disabled-veteran advocates to nonretaliatory participation in Wills for Heroes, Wills for Veterans, public-service estate-planning programs, veterans-service legal programs, public-facing outreach, planning meetings, event communications, and coalition coordination.

Plaintiff and the class request an order requiring Defendants to adopt written, neutral, nondiscriminatory eligibility rules for disabled veterans and veterans-service participants in Wills for Heroes, Wills for Veterans, and related estate-planning programs.

Plaintiff and the class request an order requiring Defendants to adopt written disability-access standards, written effective-communication standards, written nonretaliation standards, written meeting-access standards, written eligibility-correction standards, and written procedures for resolving eligibility disputes before services are suspended, cancelled, restricted, or conditioned.

Plaintiff and the class request an order requiring Defendants to issue corrective notice to disabled veterans, veterans coalitions, public-service partners, legal-service providers, bar members, volunteers, students, public-facing event participants, and veterans-service participants explaining that disabled veterans may not be excluded, misled, deprived of clear eligibility information, or denied access because Plaintiff or Plaintiff's representatives engaged in protected advocacy, disability-rights opposition, petitioning, subpoenas, or litigation activity.

Plaintiff and the class request an order requiring Defendants to restore Wills for Heroes access, Wills for Veterans access, or an equivalent estate-planning service pathway for disabled veterans who lost access, delayed participation, lost trust, avoided seeking help, or were deterred from public-service legal programs because of contradictory eligibility information, service suspension, event cancellation, retaliation, or exclusion of corrective advocates.

Plaintiff and the class request an order requiring Defendants to preserve all communications, minutes, agendas, emails, text messages, Teams messages, listserv messages, event materials, eligibility communications, meeting notices, membership communications, public-facing event communications, veterans-coalition communications, Wills for Heroes records, Wills for Veterans records, and related documents concerning disabled-veteran eligibility, access, service suspension, meeting access, public-event access, communication restrictions, and retaliation.

Plaintiff and the class request compensatory damages for loss of estate-planning access, delay, confusion, lost services, emotional distress, deterrence, reputational harm, loss of public-service trust, loss of coalition access, loss of volunteer support, loss of public-facing outreach, and loss of the representatives and planning infrastructure built to serve disabled veterans.

Plaintiff and the class request consequential damages, nominal damages, punitive damages where available, costs, attorneys' fees where available, pre-judgment interest where available, post-judgment interest where available, and all other lawful relief.

Plaintiff and the class request any additional declaratory, injunctive, equitable, legal, corrective, restorative, or monetary relief that the Court deems just and proper. Therefore, the Court should:

A. Enter judgment in favor of Plaintiff and the class on all counts.

B. Declare that Defendants violated Plaintiff's federal constitutional rights, federal statutory rights, Pennsylvania constitutional rights, and related rights by excluding, confusing, retaliating against, and denying equal access to disabled veterans in Wills for Heroes, Wills for Veterans, and related public service legal programs.

C. Enjoin Defendants from excluding Plaintiff, disabled veterans, veterans service partners, representatives, volunteers, students, and advocates from Wills for Heroes, Wills for Veterans, public service estate planning, veterans service legal programs, bar connected legal service events, and related communications because of protected advocacy, disability rights opposition, or litigation activity.

D. Require Defendants to adopt written, neutral, nondiscriminatory eligibility rules for disabled veterans and veterans service participants in Wills for Heroes, Wills for Veterans, and related estate planning programs.

E. Require Defendants to issue corrective notice to disabled veterans, veterans coalitions, public service partners, legal service providers, bar members, and

event participants explaining that disabled veterans may not be excluded or misled because Plaintiff or Plaintiff's representatives engaged in protected advocacy or litigation.

F. Award compensatory damages, consequential damages, nominal damages, punitive damages where available, costs, attorneys' fees where available, and all other lawful relief.

G. Award treble damages where available under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

H. Plaintiff demands a jury trial on all issues triable by jury.

Respectfully submitted,

/s/ Paige Martineau

Paige Martineau

Counsel for Plaintiff

Pa. I.D. No. 325096

SLAAY

Susquehanna Legal Aid for Adults and Youth

218 Pine Street

Williamsport, PA 17701

570-392-3025